# EXHIBIT "C"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


SITEONE LANDSCAPE SUPPLY,   *   Case No. 23-CV-2084(GRB)
 LLC,                       *
                            *
            Plaintiff,      *   Long Island Federal
                            *    Courthouse
                            *   100 Federal Plaza
      v.                    *   Central Islip, NY  11722
                            *
NICHOLAS GIORDANO, et al.,  *   October 15, 2024
                            *
            Defendants.     *
                            *
    * * * * * * * * * * * * * * *

         TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
            BEFORE THE HONORABLE STEVEN I. LOCKE
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:              JOHN SIKES GIBBS, III, ESQ.
                                Troutman Pepper Hamilton
                                 Sanders LLP
                                600 Peachtree Street, NE
                                Suite 3000
                                Atlanta, GA  30308


For the Defendants:             MICHAEL MULE, ESQ.
                                COLLEEN O'NEIL, ESQ.
                                ROBERT MILMAN, ESQ.
                                JAMES ORIOLI, ESQ.
                                Milman Labuda Law Group PLLC
                                3000 Marcus Avenue
                                Lake Success, NY  11042



Proceedings recorded by electronic sound recording,
transcript produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**Shelton, CT 06484 (203)732-6461**

2

1          (Proceedings commenced at 10:54 a.m.)

2              THE CLERK:  Calling case 23-CV-2084 Siteone

3     Landscape Supply, LLC v. Giordano, et al.

4              Counsel, please state your appearance for the

5     record.

6              MR. GIBBS:  Good afternoon, or good morning.  I'm

7     Kevin Gibbs here on behalf of the plaintiff, Siteone

8     Landscapes Supply.

9              THE COURT:  Gibbs?

10             MR. GIBBS:  That's right, Your Honor.

11             THE COURT:  Okay.

12             MR. GIBBS:  And with me is my partner Matthew

13    Adler, also from my firm, as well as Kevin Mulry is here as

14    well as co-counsel.

15             MR. ADLER:  Good morning, Your Honor.

16             MR. MULRY:  Good morning, Your Honor.

17             MR. MULE:  Good morning, Your Honor.  Michael Mule,

18    from Milman Labuda Law Group, on behalf of the defendants.

19    Along with me is Colleen O'Neil and Rob Milman.  And also I

20    have my lead attorney, James Orioli.

21             THE COURT:  I'm sorry, Bob?

22             MR. MULE:  Sorry.  No, Rob.  Robert Milman.

23             THE COURT:  Milman.  Okay.  But you represent some

24    -- you represent different defendants, or do you all

25    represent all the defendants?

3

1          MR. MULE:  As of mid-September, early, mid-

2     September, we represent all defendants.

3          THE COURT:  Okay.  We've got a number of motions to

4     get through.  I'll try and do this in an orderly fashion as

5     best we're able.  I've read all of the papers multiple times.

6          The first motion to compel is Docket Entry 141 with

7     opposition at Docket Entry 145.  141 is a motion by the

8     plaintiff to produce documents and supplemental -- pardon me

9     -- supplemental discovery responses from the Vic defendants.

10    There is push back in the opposition that says -- suggests

11    maybe some of this has been produced.  I don't know if that's

12    the case.

13         So, Mr. Gibbs, are you doing the talking today?

14         MR. GIBBS:  Yes, Your Honor, I am.

15         THE COURT:  Okay.

16         MR. GIBBS:  Would you like me to take the podium?

17         THE COURT:  You can stay seated if you want, or

18    whatever you want.  Just remember, if you're not at a

19    microphone, it won't get picked up.

20         MR. GIBBS:  Got it.

21         THE COURT:  For a transcript.

22         And so if you want to stand, maybe use the lectern.

23    All right.

24         MR. GIBBS:  Perfect.  Thank you, Your Honor.

25         THE COURT:  So tell me what you need to tell me.

4

1    Do not feel like you need to repeat every point in your

2    papers, though.

3              MR. GIBBS:  Sure, Your Honor.  If I may, I'd like

4    to start off on just sort of a brief summary of sort of an

5    overarching theme that we're presented here with today, just

6    give a little bit of background and context.

7              THE COURT:  All right.  I may cut you off, but go

8    ahead.

9              MR. GIBBS:  It will be relatively short, Your

10   Honor.  I'd like to just go back just a little bit in time

11   because I think this is very relevant to a number of the

12   arguments that we'll hear from defendants today.

13             So going back to February 27th of this year, Judge

14   Brown held a hearing on the motion to dismiss from the

15   defendants.  And in his order, he -- or in his oral order

16   that he made, he specifically denied all of the motions to

17   dismiss in their entirety.  There was no reservation.  He

18   said the claims should go -- all the claims would go forward

19   into discovery.

20             And he quoted, just really quickly said, I do think

21   this case has to be put on a rapid path in discovery.  I

22   think we have to get this to completion rapidly because it's

23   an important ongoing business concern.  He closed with -- on

24   that point.  He said, but I will say, I do think the case

25   should move faster than slower given the nature of the

5

1    concerns.

2         Your Honor, since the inception of this case, our

3    client has lost more than $10 million in revenue to the

4    defendants.  So this is certainly an ongoing and very

5    important business concern.

6         With that sort of imprimatur from the court

7    initially, we set a discovery deadline which was actually

8    yesterday, October 14th.  We were then here before Your Honor

9    back on May 30th on some discovery motions related to some

10   bank subpoenas that we had issued for some very important

11   financial records.

12        And when we were here, Your Honor said

13   specifically, while I appreciate the skepticism as to some or

14   all of these claims, talking to the defendants, you're

15   essentially asking to the case.  I think at discovery, which

16   is not the right juncture for it.

17        And the reason that's important, Your Honor,

18   because in opposition to the bank subpoenas that were issued

19   back in May, they made merits objections.  Principally, there

20   is no evidence to support the claims.  We don't think the

21   claims have merit for these various legal reasons; these

22   various factual reasons.  And Your Honor was very clear that

23   the motion to dismiss has been decided, adjudicated, and the

24   case is in discovery, and we need to move forward

25   expeditiously.

6

1           And again, the discovery deadline was yesterday.

2    And all that really leads us to why we're here today and why

3    we have filed nine separate motions to compel.  And the

4    reasons, they're really not complicated and they're really

5    two-fold.

6           The first reason is the defendants, especially the

7    Vic defendants in particular, they've provided effectively

8    nothing to us in discovery, despite the fact that we have

9    issued discovery requests back in April, we had hours and

10   hours of video conference, meet and confers over the -- over

11   the objections and the responses.  We finally got

12   supplemental responses moths after that.  But they've

13   effectively produced nothing.  They have produced -- the Vic

14   defendants have produced 17 documents in total.

15          Only two of the -- two of those documents did

16   Siteone not already have in its possession.  The Don

17   defendants, they've produced a little more, but still

18   effectively nothing.  Most of the documents we already had.

19   Several -- half of tier production are Spam emails from

20   LinkedIn and Breathalyzer.net.  And so that's the first

21   reason.  They've really provided nothing.

22          The second -- the second reason -- again, the

23   reason why I gave that sort of background, Your Honor, is

24   because Judge Brown was clear, you were clear in May, that

25   the merits -- arguing the merits in opposition to discovery

7

1       requests, that's just really not the proper juncture for it.

2                And that's what we see.  A lot of the arguments

3       that we're going to go through are merits arguments.  We

4       don't believe their claims.  Their claims have no merit.  But

5       that's not why we're here, Your Honor.  We're in discovery to

6       build the record for our claims, because this is a case where

7       our allegations are that the defendants have acted in a

8       clandestine secretaire manner, communicating among

9       themselves, using these various corporate entities to move

10      money among and between themselves to fund this competing

11      business improperly.

12               And so the evidence -- the evidence to support our

13      claims is not going to come from Siteone.  We don't have

14      their phone records.  We don't have their text messages, so

15      we have to rely on them to give us these documents in

16      discovery.  And so certainly at this point, you know, Your

17      Honor, we don't have, you know, the sort of smoking gun type,

18      you know, text messages, emails, things like that, because we

19      wouldn't have it, Your Honor, because this stuff was done not

20      with Siteone equipment, resources, it was done with their own

21      -- their own accounts and whatnot.

22               So with that backdrop, Your Honor, one thing I

23      would like to provide if the Court would permit me to

24      approach, I have a short -- sort of an outline to accompany

25      the arguments that I would like to make if I could.

8

1          THE COURT:  Did you give a copy to your adversary?

2          MR. GIBBS:  I did.

3          THE COURT:  Okay.

4          MR. GIBBS:  I did, Your Honor.

5          THE COURT:  Then you can.

6          MR. GIBBS:  Thank you.

7      (Pause)

8          MR. GIBBS:  And again, Your Honor, this is pretty

9      straightforward.  And there's so many motions.  The goal of

10      this was really to hopefully just sort of streamline things,

11      put everything in one place, at least, you know, from our

12      perspective, Siteone's perspective.

13          The first page, which starts on Page 2, that's just

14      an organizational chart just to understand exactly how the

15      parties that are relevant today are grouped to understand the

16      ownership structure and whatnot.

17          The second -- I'm sorry.  The third page, this is a

18      summary of defendant's production to date.  So it's Page 3.

19      It just gives a more granular detail in case the Court is

20      wondering exactly what has been produced to date.  So that's

21      abundantly clear for the record.

22          Page 4, that's a summary of Siteone's production,

23      and you can sort of compare and contrast between the two and

24      I think pretty clearly see the volume of material that

25      Siteone has not only produced, but what we've -- the great

9

1    efforts that we've gone to, the number of employee's data

2    that we served, the number of documents we reviewed, that all

3    of that has been done in a timely manner.  And then Siteone,

4    that we have in fact substantially completed our production

5    at this stage.

6            Page 5 is just a quick description of what we do as

7    a sort of transparency efforts by the parties.  We have

8    endeavored -- I personally have endeavored to ensure that

9    defense counsel has been aware of what we're doing, the

10   timing of our productions, what documents -- what data we've

11   collected, what has been search -- the search terms, we've

12   run.  The number of hit counts on each search term.  We've

13   tried to be very transparent in the process.

14           And initially we thought the defendants would be

15   transparent as well.  We did receive from the Don defendants

16   fairly early on, the hit count report, but we had issues with

17   that and it appears that at this point they've not been

18   willing to negotiate over those terms.

19           The Vic defendants, they provided a hit count

20   report, much later, and then also have, you know, refused to

21   sort of engage over that.  So that's just a summary of those

22   issues.

23           And then Page 6, it's just a summary of just a list

24   of the, you know, docket numbers for all -- everything that's

25   currently pending before the Court.

10

1          And then, Page 7 to me is -- this is really where

2     -- and I'm not sure if the Court has a predisposition of the

3     order in which to go through the motions.  If you want to go

4     through it, you know, numerically on the docket, but you

5     know, to my mind the sort of meat of the coconut are the

6     motions to compel that we filed.  And so Page 7 really is --

7     I tried to in essence sort of bucket the various disputes

8     that we have into these four groups, which I think is

9     hopefully helpful just to show exactly -- this is exactly --

10    these are the areas of dispute from our view of the world.

11    These are the things that we really want from the Court, and

12    these are the, you know, the basic issues that I've

13    identified that are really core to the dispute.

14         And then after that, if we could -- you know, if

15    the Court wants, there is just some further sort of more

16    granular details about the relief that we've requested in

17    terms of meeting and conferring over search terms, searching

18    of text messages, all that stuff.

19         So in terms of actually dealing with the motions

20    themselves, Your Honor, of course it is completely however

21    you would like to go through these.  I --

22         THE COURT:  Well, I'm not adverse to the way you

23    summarized the motions to compel, but I think Mr. Mule is --

24    just that topically is that -- I'm talking about Page 7 of

25    this handout.  Does that seem like an accurate identification

11

1     of the issues in the motions to compel?  Do you see what I'm

2     saying?

3            MR. MULE:  These are the -- these are the general

4     categories.

5            THE COURT:  So -- well, let me follow up by saying,

6     the reason I ask is if we attack it using the summary of the

7     motions, I would address all the motions essentially at once,

8     and then you obviously can file opposition and we'll do it --

9     we'd do it topic by topic.

10            I was originally prepared to do it in docket entry

11     by docket entry, only out of a concern that we don't

12     accidentally miss anything, because I don't want you to come

13     back on this once you have the rulings.

14            MR. MULE:  Yes, Your Honor.

15            THE COURT:  So -- and that being said, I will also

16     add, Mr. Mule, let's say you think everything here is

17     accurate but -- in this summary of motions, but two issues

18     are missing.  We can also add those to the end.  I just -- my

19     concern is just failing to answer any questions.  And so what

20     I will either way is to the degree anything is granted, I'll

21     grant it and then say everything else is denied just so that

22     we -- the loop is closed.

23            So what's your reaction to that, Mr. Mule?

24            MR. MULE:  I mean, I think your initial way to go

25     about it is probably the more complete way, just to make sure

12

1    we're not missing anything.

2              THE COURT:  Well, they're his motions, right?  So

3    by and large.

4              MR. MULE:  Yep.

5              THE COURT:  Assuming the protective orders are just

6    the flip side of a motion to compel.  So I guess I'm -- as

7    I'm sort of musing out loud, it seems to me to the degree

8    anything is missing from the summary, it would be the

9    plaintiff who is missing it.  Unless you disagree, Mr. Mule.

10         (Pause)

11             MR. MULE:  This is generally the categories.

12             THE COURT:  All right.  So you're okay, then, with

13   proceeding using the summary.  And like I said, Mr. Mule, if

14   something come up and you want to add -- if there are 10

15   topics here and you want to add topics 11 and 12 --

16             MR. MULE:  Sure.

17             THE COURT:  -- I'm open to that.  I'm just trying

18   to make this as efficient as possible.

19             MR. MULE:  Yep.

20             THE COURT:  Okay.  I assume that's what you're

21   asking for, Mr. Gibbs, right?

22             MR. GIBBS:  Yes, Your Honor.

23             THE COURT:  Okay.

24             MR. GIBBS:  Yes, sir.  And we can take it, you

25   know, sort of point by point in these lists.

13

1          THE COURT:  Yeah, I'm just -- give me --

2          MR. GIBBS:  And I'll tell you, you know, the one

3    thing that's a little different is in the Docket Number 141,

4    which was the initial motion.  Really, the only difference in

5    that one is that we do have a request for fees in that, so if

6    we want to address that later --

7          THE COURT:  We can deal with fees at the end.

8          MR. GIBBS:  Okay.

9          THE COURT:  I'll tell you now, I'm not inclined to

10   grant them.  But that being said --

11         MR. GIBBS:  Okay.

12         THE COURT:  -- I will also point out that it seemed

13   to me that the motion at Docket 40 -- 141 and 145 is sort of

14   flushed out with Docket Entries 152 and 173, because Docket

15   Entry 141 is really a historical gripe.  It's not, this is

16   the documents I'm missing, please give me them.

17         MR. GIBBS:  Well, it -- well, you're right, Your

18   Honor.  It does provide the context, I think, for, you know,

19   sort of how we got here, because the ultimate gripe was, they

20   haven't done anything.  They've promised, promised, promised.

21         THE COURT:  Right.  But you can't get -- I can't

22   give an order that says, okay, do everything.  That's --

23         MR. GIBBS:  That's right.

24         THE COURT:  -- not helpful.

25         MR. GIBBS:  That -- that -- correct.  Correct.

14

1          THE COURT:  So -- which is why it seemed to me that

2     the subsequent docket entries, which were also directed at

3     Vic, have more specific topics.  But that being said --

4          MR. GIBBS:  That is correct.

5          THE COURT:  -- if you want to proceed with the

6     summary --

7          MR. GIBBS:  I think that's right, Your Honor.

8          THE COURT:  -- that's fine, just, I need a minute

9     because as we're going I'm going to fashion an order that

10    hopefully captures everything.

11         MR. GIBBS:  Certainly.

12         THE COURT:  And so, I just want to write -- I need

13    to do it by docket number, though, so just give me one

14    second.

15         (Pause)

16         THE COURT:  Okay.  So you want to start with

17    communications among defendants with -- and with key

18    witnesses?

19         MR. GIBBS:  Yes, Your Honor.

20         THE COURT:  Okay.

21         MR. MULE:  Your Honor,  may I just ask a question?

22         THE COURT:  Yes, sure.

23         MR. MULE:  Will I have the opportunity to give a

24    summary and response to Mr. Gibbs' summary before my turn, or

25    now?

15

1          THE COURT:  Yeah, sure.  You can do that from your

2  -- where you're -- I mean, you two swap at the podium, and

3  you can also sit where you are and just talk into the mic.

4          MR. MULE:  Yeah.  Sure.

5          THE COURT:  It's up to you.

6          MR. MULE:  Yeah, I'll --

7          MR. GIBBS:  Sit up here?

8          THE COURT:  Yeah.

9          MR. MULE:  Sure.  Thank you.

10          MR. MILMAN:  I guess everybody's very comfortable

11  at the podium.  Me, my preference, I'd rather be seated.

12          MR. MULE:  All right.  Thank you, Your Honor.  Just

13  obviously you would expect that my view of the state of

14  discovery in this case is going to be drastically different

15  than that of Mr. Gibbs.

16          From our perspective, this case is a vendetta case.

17  Don settled his claims -- his claims for payment with Siteone

18  on February 21, 2023.  The day -- the day after, Nick was

19  terminated, the last of the three individuals who are sued in

20  this case.  And Siteone was planning, at that time to -- with

21  this lawsuit.  They were -- without telling us, of course,

22  they were planning this lawsuit.  Their theory of the case

23  essentially has been that Don, Nick, and Vic are all in

24  cahoots, they're all competing.

25          THE COURT:  Were you representing Don and maybe the

16

1    other defendants too, prior to the initiation of the law

2    suit, or did you only step in upon filing of the complaint?

3              MR. MULE:  Yeah.  So I came in -- I was

4    representing Don and Vic prior to the lawsuit.  They both had

5    settlements with Siteone and my partner was involved in those

6    negotiations as well.

7              THE COURT:  Were you involved with the restrictive

8    covenants, like at that point when the purchase was going on?

9              MR. MULE:  We were -- we were involved in the

10   restrictive covenants, we were not involved in those drafting

11   back in 2000.

12             THE COURT:  So the -- when the asset purchase

13   agreement was executed, you were not the lawyers on that.

14             MR. MULE:  We were not the attorneys.

15             THE COURT:  And, Mr. Gibbs, you were not the

16   attorneys on that either?

17             MR. GIBBS:  No, Your Honor, we were not.  Yeah.

18             THE COURT:  Okay.  So whoever drafted all that is

19   not here.

20             MR. MULE:  That's correct.

21             MR. GIBBS:  Correct.

22             MR. MULE:  That's correct.  So you know, so this --

23             MR. MILMAN:  They're in a separate lawsuit.

24             MR. MULE:  So --

25             THE COURT:  Well, that -- I can imagine why.

17

1        MR. MILMAN:  Yeah, exactly.

2        MR. MULE:  So, you know, what we -- what we have

3   here essentially is, you had the asset purchase, purchase of

4   assets and garden department.  Don was the sole owner.  Don's

5   got these restrictive covenants, the last of which expires in

6   January 14 of 2025.  So, a few months away.  And so Don was

7   paying --

8        THE COURT:  And you don't challenge that he was

9   bound by -- whatever they say, he's bound by?

10       MR. MULE:  He's bound by, he's bound by it.

11       THE COURT:  Okay.

12       MR. MULE:  And so the fatal flaw and problem that

13  Siteone has is, they are trying to basically say, we have

14  this noncompete with Don, but the only ones who are competing

15  that they have evidence of are Nick and Vic.

16       THE COURT:  Well, and just -- this will -- may

17  guide some of the answers or some of the rulings, is that

18  Scapes, S-C-A-P-E-S, we agree, that is competing with --

19       MR. MULE:  Absolutely.

20       THE COURT:  -- Siteone.  Is Siteone operating as a

21  garden department, or operating as Siteone?

22       MR. GIBBS:  There is some legacy, I guess signage

23  for garden department --

24       THE COURT:  Okay.

25       MR. GIBBS:  -- still, so it's -- it depends on

18

1    where you look, honestly.

2             THE COURT:  Okay.  Fair enough.  That's fine.

3    Okay, but -- so there's competition.  Okay.  Please,

4    continue, Mr. Mule.

5             MR. MULE:  There's competitions.  Absolutely.  And

6    that's never been -- from right at the beginning said, Nick

7    and Vic, they're competing.  They're competing through

8    Scapes.  It was organized in April 2023.  Vic was terminated,

9    Nick was terminated, they had no restrictive covenants in

10   their personal capacity.  They're entitled to compete.

11            THE COURT:  Okay.  Then the -- and the Court --

12   I'll call it corporate, but I mean, we're now in personal

13   capacity.  Vic signed an agreement on behalf of Narrow Way?

14            MR. MULE:  On behalf of Narrow Way, correct.

15            THE COURT:  Okay.

16            MR. MULE:  So Narrow Way is the landlord of the

17   Coram site.  So there are three sites, Coram, Speonk, and Dix

18   Hills.

19            THE COURT:  Okay.

20            MR. MULE:  At this time, Siteone has basically

21   abandoned all three, it's my understanding.  Or they're about

22   to.  They have -- they're not operating at Speonk.  They're

23   on their way out --

24            THE COURT:  Well, that doesn't matter, though.

25            MR. MULE:  -- as far as Coram.  But I'm just --

19

1    that's just by way of --

2              THE COURT:  It's -- this has to do with the Coram

3    site, right?

4              MR. MULE:  This is the Coram site, correct.

5              THE COURT:  Okay.  And -- I'm sorry.  So, he --

6    Narrow Way signed a noncompete through Vic saying, we're not

7    going to compete with -- I'll call it the nursery, with

8    Siteone --

9              MR. MULE:  Yeah.

10             THE COURT:  -- at the nursery.

11             MR. MULE:  Well, it wasn't that.  It wasn't that.

12   Narrow Way -- the restrictive covenant in the lease with

13   respect to Narrow Way is that Narrow Way is not going to

14   lease, purchase --

15             THE COURT:  Okay.

16             MR. MULE:  -- or make land available to somebody

17   who does landscape supply, basically, so --

18             THE COURT:  Okay.  So they won't act as a landlord

19   to a competitor.  Loosely.

20             MR. MULE:  Exactly.

21             THE COURT:  Okay.

22             MR. MULE:  Or they don't want them to, you know, I

23   guess lease it out to, you know, some other landscape supply

24   business.

25             THE COURT:  No, no, I get that.  And then -- but

20

1    then the question with respect to that is whether Vic is a

2    beneficiary.

3              MR. MULE:  Right.  So that's the theory.  You know,

4    can an individual who signs in a representative capacity be a

5    beneficiary, and can they be a beneficiary --

6              THE COURT:  Say that sentence again slower.

7              MR. MULE:  Can an individual who signed this

8    covenant only in a representative capacity be -- legally be a

9    beneficiary of the restrictive covenant that he did not sign

10   in an individual capacity?

11             THE COURT:  But you're saying under no

12   circumstances could he be a beneficiary?

13             MR. MULE:  I believe that's the legal issue.

14   That's what I'm saying.

15             THE COURT:  No, I agree.  What I'm saying is -- I'm

16   asking you a question.  Is that your position that under no

17   circumstances could he be a beneficiary?

18             MR. MULE:  Well, I think it would be a stretch

19   under any circumstances, but I think certainly under the

20   circumstances that we have and the facts that --

21             THE COURT:  Well, let me ask you, who would be a

22   beneficiary?  Who in your mind would without question be --

23   would fall under that umbrella?

24             MR. MULE:  You know, I think that that category of

25   who is a beneficiary, since it's not a defined term --

21

1          THE COURT:  Right.

2          MR. MULE:  -- we -- we had offered back in April --

3   we suggested that a beneficiary might be -- and now I'm

4   trying to remember the exact arguments.  You got me on the

5   spot here and I'm forgetting, but there is an explanation

6   that I think does -- makes some sense, and it could be the

7   beneficiary (indiscernible).  The beneficiaries could be like

8   the property owners, for instance.  So --

9          THE COURT:  And who would -- give me an example of

10  what you mean by that.

11         MR. MULE:  So, you have the landlord.

12         THE COURT:  Right.

13         MR. MULE:  The landlord is an hour away.  The

14  landlord is the designated landlord.

15         THE COURT:  Right, but not the owner.

16         MR. MULE:  But not the owner.  There were four

17  different owners.

18         THE COURT:  I see.

19         MR. MULE:  So you have Group 5 Associates, you have

20  3670 Route 112, LLC., and you have 9 4th Street, LLC.  So --

21  I'm sorry, three.  So those three entities own the property.

22  It's three different -- or four different lots that comprise

23  --

24         THE COURT:  Okay.

25         MR. MULE:  -- of (indiscernible) Coram.  So in our

22

1    view, if you have a beneficiary that's undefined, it would be

2    these folks because they're the ones who benefitted from the

3    services.

4              THE COURT:  Were there any conversations about

5    that?

6              MR. MULE:  As far as I know, you know, I'm not

7    aware of any.

8              THE COURT:  Okay.  And, Mr. Gibbs, would you agree

9    with that?

10             MR. GIBBS:  I'm sorry.  What was that, Your Honor?

11             THE COURT:  Conversations about what a beneficiary

12   is under the terms of the Vic agreement.

13             MR. GIBBS:  Have we had conversation, Your Honor?

14             THE COURT:  No.

15             MR. GIBBS:  I'm sorry.

16             THE COURT:  Did the parties who signed this

17   agreement, meaning the Narrow Way agreement, ever talk about

18   what it is to be a beneficiary?

19             MR. GIBBS:  No, Your Honor.  We've not found any

20   specific negotiations back and forth.

21             THE COURT:  How are you going to prove it -- other

22   than making the legal argument, which you could win or lose,

23   how are you going to prove it at trial that Vics is the

24   beneficiary?

25             MR. GIBBS:  Well, Your Honor --

23

1              THE COURT:  In other words, who would testify?

2              MR. GIBBS:  Well, Your Honor, it's through

3    discovery.  So our main theory is that the way the term

4    beneficiary should be interpreted is that any person or

5    entity who is deriving a benefit from Narrow Way Realty

6    Limited is prohibited from competing.  The concept that this

7    is designed to encapsulate is that as long as Siteone is

8    paying someone to rent a site on which to operate a nursery

9    and landscaping supply business, that person, that entity, or

10   anyone who is deriving a benefit or receiving that rent money

11   should also not be entitled to use that rent money to

12   compete.

13             THE COURT:  And you don't think that if Vic was

14   standing right there and you wanted him to be bound, you

15   would have a slot that says, Vic, sign this in your

16   individual capacity?

17             MR. GIBBS:  Well, Your Honor, if the -- if I had

18   drafted the agreement --

19             THE COURT:  I get it, but you see my problem?

20             MR. GIBBS:  Oh, certainly, Your Honor.  Certainly.

21             THE COURT:  Because it would seem to me if he's

22   standing there and it was intended to cover him, you would

23   have him sign it, and you did nothing.  You -- not you you.

24             MR. GIBBS:  That's right.

25             THE COURT:  But you did not -- you did not do that.

24

1    Do you see how that might be a --

2                MR. GIBBS:  That is --

3                THE COURT:  -- what a litigator would call a bad

4    fact?

5                MR. GIBBS:  It is not a great fact, Your Honor.

6    I'll readily admit that, and I think that's the reason we're

7    here, right?  But he did -- I will point out, however, Your

8    Honor, Vic did sign the agreement.

9                Now he signed it in his capacity as the CEO of

10   Narrow Way Realty Limited, but nevertheless, his signature is

11   on the document.  And based on the financial records that

12   we've received to date, they support our theory that the

13   money is flowing from Siteone to Narrow Way and to Vic, and

14   to Vic's family members.

15               THE COURT:  I -- do you -- I mean, Nick owns these

16   companies.

17               MR. GIBBS:  He owns it.  He owns it.

18               THE COURT:  Vic.  I'm sorry, not Nick.  I

19   apologize.

20               MR. MULE:  So I mean, to me it's a preposterous

21   theory.  The --

22               THE COURT:  Well, forgetting that, though, but I'm

23   wondering -- we're going to get to his discovery --

24               MR. MULE:  Yes.

25               THE COURT:  -- and how much discovery you're

25

1    entitled to.

2            My point is to a certain degree, you can -- we'll

3    talk about this in more detail -- use discovery s overkill in

4    the sense that if they agree -- well, they obvious agree Vic

5    signed the agreement in his -- in the representative

6    capacity.  The agreed Scapes is a competitor, and they agree

7    that Vic will be -- will receive the money that eventually

8    funnels through the corporate entities in which he is the

9    sole owner.

10            So the -- I assume -- and I assume he'll testify to

11    that.  Is that right, Mr. Mule?

12            MR. MULE:  Absolutely.  I mean --

13            THE COURT:  So, then other than the amount of -- if

14    you're saying, well, okay, we've been damaged by this

15    violation, that there is a global number to which you're

16    damaged for discovery purposes, in addition to that number,

17    what else do you need with regard to Vic?

18            MR. GIBBS:  Well, to -- well, Your Honor, the other

19    issue that flows from this is, who -- what is the extent of

20    the term beneficiary?  Who -- which of these other

21    individuals and entities are encapsulated within this concept

22    by virtue of receiving these rent payments, these, you know,

23    20-plus thousand dollar monthly rent payments from Siteone to

24    operate this business.

25            And so in terms of the financial information we're

26

1    seeking, that's what we're trying to understand, to flush out

2    the beneficiary.

3              THE COURT:  So you're saying that it's conceivable

4    that -- assuming -- let's call Vic a signatory, and I mean,

5    that's sort of with a small S for the purposes of that

6    agreement, that people who didn't sign that agreement are

7    also bound?

8              MR. GIBBS:  That is correct, Your Honor.  So a

9    beneficiary -- and the reason -- the reason for that, Your

10   Honor, is the way that they structured the corporate entities

11   was specifically to try and solve for this issue so that Vic

12   can have the money in his pocket --

13             THE COURT:  Is to try and what for this issue?

14   Soften?

15             MR. GIBBS:  Is to try and solve for this very

16   issue.  Vic did not sign the lease in his personal capacity.

17             THE COURT:  But Don didn't sign it at all.

18             MR. GIBBS:  Don did not sign it at all.  However --

19             THE COURT:  And neither did Vic.

20             MR. GIBBS:  That's correct.  However -- I'll make

21   two points on that.

22             First of all, Scape Supply, if in essence the money

23   is going into Vic's pocket, Vic's money -- is taking that

24   money from his pocket and putting it directly into Scapes,

25   our position is that Vic is prohibited from doing that.  Vic

1    is not allowed to compete either personally --

2            THE COURT:  No, I understand your position in that

3    regard.

4            MR. GIBBS:  -- or if there were --

5            THE COURT:  What I'm suggesting is for individuals

6    who did not sign the agreement, how can they be bound by it?

7            MR. GIBBS:  Well, to be clear, Your Honor, and I

8    misspoke a bit, our breach of contract claim for breach of

9    the least restrictive covenant, we do not make that claim

10   against Don.  The other claims against Don are that he is

11   personally participating in the running of this business,

12   contrary to his noncompete --

13           THE COURT:  Well, no, that I understand.  I

14   understand.

15           MR. GIBBS:  And the other issues of

16   misappropriation (indiscernible) -- excuse me -- the unfair

17   competition, the civil conspiracy.  So it's not limited to

18   our -- I just want to be clear.

19           THE COURT:  Okay.

20           MR. GIBBS:  Our case is not limited to just the

21   beneficiary issue.  That's one of the key -- and that one is

22   so important because we're seeking the injunctive relief, and

23   so that's been a big focus of the case.  But we do have 12

24   other claims against --

25           THE COURT:  Okay.

28

1          MR. GIBBS:  -- all of the defendants.

2          THE COURT:  Okay.  Mr. Mule, please continue.

3          MR. MULE:  Yeah.

4          THE COURT:  I know I cut you off.

5          MR. MULE:  I mean, so you know, the whole

6     beneficiary is a -- it's a tremendous issue that we were

7     anticipating in light of -- in light of Judge Brown's

8     decision that, you know, the case move forward.  I think it

9     has to have a -- be put on a rapid path in discovery.  I

10    think we have to get completion rapidly.  That was at Page 34

11    of his February 27th decision.

12         THE COURT:  Let me help you both out.  You don't

13    have to quote Judge Brown to me.  Our experiences -- and

14    while we are friends, our experience or backgrounds are

15    considerably different, as is our understanding of

16    restrictive covenants and misappropriation law, that area of

17    the law.  So I can handle it without --

18         MR. MULE:  Okay, Your Honor.

19         THE COURT:  -- oversight is not the right word.

20         MR. MULE:  Yep.

21         THE COURT:  But I don't -- it's not helpful to me.

22         MR. MULE:  Right.  So, you know, so the -- we had

23    anticipated that there would be really targeted discovery,

24    number one on that issue, and that is something that hasn't

25    occurred.

29

1           Number two, the whole basis of federal jurisdiction

2      is the Defend Trade Secrets Act, and Computer Fraud Abuse

3      Act.  And we sent -- and it's in the -- it's in the record at

4      147-8, our June 28th, 2024 letter.

5           The case law is very clear that before engaging in

6      significant discovery on trade secret claims, there has to be

7      a reasonable specificity for trade secret claims.  They've

8      got to identify what's the trade secret.  They have to give

9      some type of --

10          THE COURT:  Let me jump in.  I understand

11     everything you're saying, and gripe is too pejorative and I

12     don't mean it like that.  I understand your complaints with

13     their claim -- with their case.  We're not here for that

14     right now, and if there is a jurisdictional argument, which

15     you're probably free to make at any time to Judge Brown who

16     may or may no refer to me, do that.  I get the argument and

17     it's -- I don't know whether it's a winner or a loser, but

18     it's not crazy.

19          MR. MULE:  Right.  Well so I wanted to -- I wanted

20     to connect it to the discovery.

21          THE COURT:  Okay.  Okay.

22          MR. MULE:  Your Honor.  So --

23          THE COURT:  Sure.

24          MR. MULE:  -- and the reason is that, you know, in

25     Interrogatory Number 11, to Siteone, we gave them -- we gave

30

1      them the opportunity, basically, to describe the trade

2      secret, describe each trade secret, how it was

3      misappropriated, all the damages.  Give us a sort of -- some

4      information on this.  And we basically got the boiler plate.

5              And then the connection on discovery is, they

6      identify a couple people who they said might have knowledge

7      of this, and two of them were Girard Cassaro, Alex Trama, and

8      then Greg Thisis (ph).  So a total of three individuals.

9              Now Siteone has claimed that they -- you know, they

10     gave you a nice chart, a million documents.  I want to note

11     that 99.4 percent of those documents we can't even discuss

12     with our client based on the blanket attorney's eyes only

13     designation.  That's a nonissue for another day, but I raise

14     it because the total production, when you exclude Don's email

15     account, which was his email account while he was employed by

16     Siteone, you have 1,075 documents.  You have documents that

17     they hadn't given us.  The site paths and all that.  So we

18     don't even know where these documents come from, and there's

19     very limited discovery.

20             So we wanted the opportunity to say, all right,

21     let's -- let's move forward with practical discovery so we

22     could -- we feel we should be able to resolve this case very

23     quickly, because they haven't identified the two basis of

24     federal jurisdiction.  We want to move on those basis, and we

25     want to have the opportunity since they didn't identify it

31

1    and provide responsive discovery.

2              We want to take the depositions of these folks and

3    say, what are you talking about here for trade secrets?  You

4    have a January 16 claim -- January 16, 2023 they say Nick

5    threw out a computer.  And then on that very same day, Mr.

6    Cassaro says, I discovered -- looked in the dumpster, it

7    wasn't there.  Nick is still -- was still employed for

8    another month before they terminated.  Well, if there's a

9    trade secret there, you would think they'd be jumping up and

10   down.  They didn't do it.

11             They bring a lawsuit in March, and here we are 19

12   months later, we don't have a single deposition.  We don't

13   have any dispersion of these defense trade secrets,

14   violations, Computer for Abuse Act that they -- we have in

15   the record, Computer for Abuse Act, and we've referred to a

16   website, a public website that anyone in the world could

17   reference.  We asked for information.  How did -- how did

18   anyone, Don, anyone -- any defendant basically break into --

19   the Computer for Abuse Act is supposed to be gates up/gates

20   down.  We don't have that.

21             So in the discovery, we were looking for an

22   opportunity to do something practical, and we have not yet

23   had that opportunity.

24             Now in -- with respect to the discovery that

25   Siteone requested, they took a different approach.  They

32

1    basically took the approach of, we don't have anything, so

2    we're going to search for everything.  We're going to look

3    under rocks.  We're going to go, you know, subpoena -- they

4    subpoenaed 14 document -- these are the non-parties, 14 non-

5    parties, another two non-parties for deposition, 16

6    subpoenas.  It's like, you know, for a control of the

7    docketed discovery, we were anticipating, all right, let's

8    get some party discovery going on first.

9            And then on the party discovery -- and this is an

10    overall issue on all these motions -- what they did is,

11    instead of making reasonable requests, they basically said,

12    we want everything.  We want all text messages.  All

13    communications between Don and Vic.  Don and -- Don and Vic.

14            You know, Nick was a member of Don's wedding party.

15    They have been friends for over 20 years.  Don and Vic

16    obvious, father/son relationship.  They have no basis to just

17    get everything.  And so we were working on some ways to try

18    to get them.  Anything that has to do with landscape related

19    business.  We bent over backwards to try to come with that.

20            So what happened on these motions, September 10,

21    they filed all these motions.  We came in as counsel for the

22    Vic defendants, I believe it was September 11, the day after.

23    So -- but the way it was left off with the Vic defendant was,

24    on August 1 -- I'm sorry, August 16, they provided proposed

25    search terms of what they planned to do, and unfortunately

33

1    when we came in, now we had to go from Rifkin Radler's e-

2    discovery platform to our e-discovery platform, and just two

3    weeks ago we were able to get -- you know, to get access.

4        So we're at a stage now where we could run these

5    searches.  We could do these searches.  And we're at the same

6    stage for Don with respect to anything landscape business

7    related, which we had offered in our supplemental responses

8    to provide.

9            So in our view of the discovery, they basically

10   took an approach, the best defense is an offense, and --

11           THE COURT:  When you offer landscape related

12   services, because there's this notion of you can't be the

13   landlord to another landscaper, you -- that's included.

14           MR. MULE:  Yeah.  Exactly.

15           THE COURT:  Okay.

16           MR. MULE:  So what we did is -- and we're looking

17   to -- we're working with our e-discovery vendor, and we're

18   going to propose it to opposing counsel, is to basically come

19   up with terms that -- and I think they have a definition in

20   there, the asset purchase agreement.  So we're going to plug

21   in these terms, but the idea of looking for everything would

22   be just, you know, something that they're not entitled to.

23           THE COURT:  You mean looking -- you mean them

24   looking for everything?

25           MR. MULE:  Yes, exactly.

34

1          THE COURT:  Okay.

2          MR. MULE:  So that's the approach we were looking

3    to take here, and which we have to take.  And so I appreciate

4    you letting me give that overview from our perspective.

5          THE COURT:  Okay.  Have a seat.  Here's where we

6    are.  We're 32 minutes into this and we have accomplished

7    nothing, so now we're going to go through these topics one by

8    one and I'm going to give you an order, and (indiscernible)

9    what it's going to be.  But the first topic we have on our

10   communications is communications between Vic, Nick, and Don.

11   Okay.  And I guess now there's a second set --

12         MR. GIBBS:  Yes, Your Honor.

13         THE COURT:  -- of other communications on it.

14   Let's start with -- let's do it first things first.  Okay.

15         MR. GIBBS:  Sounds good, Your Honor.

16         THE COURT:  As a matter of background, in terms of

17   communications between Vic, Nick, and Don, do you have -- so

18   far you've gotten zero, or you've gotten something less than

19   what you want?

20         MR. GIBBS:  Well, so I can tell you, Your Honor, we

21   have received -- I believe it is two emails between Don and

22   Vic on unrelated matters.

23         THE COURT:  Okay.

24         MR. GIBBS:  And that's all that --

25         THE COURT:  Okay.  So at least in theory, there's

35

1    more out there?

2            MR. GIBBS:  Presumably these three -- and they've

3    admitted --

4            THE COURT:  Okay.

5            MR. GIBBS:  -- in their interrogatories that they

6    speak very frequently, Nick and Don.

7            THE COURT:  No, no.  I'm -- well, they are either

8    -- and I'm going to use the terms best friends with lower-

9    case B here.  Best friends and father and son.

10           MR. GIBBS:  That's right.

11           THE COURT:  You are not getting what I think you

12   want, every communication they've ever had.

13           MR. GIBBS:  Correct.

14           THE COURT:  So the question -- but you are entitled

15   to something.

16           MR. GIBBS:  Right.

17           THE COURT:  Now, Mr. Mule, the question to you.  In

18   terms of conducting searches, when you are producing these

19   things -- and there will be orders by the end of this

20   conference -- I am instructing, incase that's not clear, and

21   I'm not saying anybody's done anything wrong, you are to

22   review everything.  You or somebody else from your firm --

23           MR. MULE:  Yes.

24           THE COURT:  -- to go through it.  Nothing where --

25   it's just because your client said, well, this is all I have.

36

1    No.  You're going to do it.

2              MR. MULE:  Absolutely.

3              THE COURT:  You're welcome, by the way.  And we'll

4    handle it that way.

5              So that being said, in terms of Mr. Mule's offer of

6    anything that's, I guess you call it landscape related.

7              MR. MULE:  Landscape related.

8              THE COURT:  And that will include -- would include

9    landlord, landscape related.  What is insufficient about

10   that?

11             MR. GIBBS:  So, Your Honor, a couple of issues.

12   First of all -- and I think it's helpful to think about the

13   communications into these three buckets here.  You have text

14   messages, you have emails, and you have call logs.  And those

15   three things --

16             THE COURT:  Well, we can back off because --

17             MR. GIBBS:  Sure.

18             THE COURT:  -- because I'm skeptical with your need

19   for call logs, because if they talk as much as I suspect they

20   -- if you've got a father and son in the same business for

21   decades, it's going to be infinite call logs, to the point

22   where --

23             MR. GIBBS:  Well, two points on that, Your Honor.

24             THE COURT:  Okay.

25             MR. GIBBS:  So the first is, the most -- I don't

37

1    want to say the most important, but I would say some of the

2    most important call logs we're interested in are the ones

3    between Don and Nick.  They no longer work together.  And let

4    me be clear, Your Honor, the time period we're talking about

5    here is not going back to 2020.  We're talking about -- we

6    have already narrowed this to the date of Don's termination

7    through the present, and so we're specifically looking at

8    communications where they're no longer in an employment --

9    employer/employee relationship.

10            And so the call logs, we want to know --

11            THE COURT:  Okay.

12            MR. GIBBS:  -- how often are Nick and Don speaking,

13    since they were terminated.

14            THE COURT:  I see what you're -- he was still --

15    well, was he the Godfather or something, or best man, or some

16    kind of something?  But okay, I'm skeptical.  Your point's

17    not illogical though.  I get it.

18            MR. GIBBS:  Yes, Your Honor.  So that's what we're

19    asking for are the call logs, just to show those -- and we're

20    really -- we're not asking for every single call, to see

21    every single call Don or Nick has ever made, but we are

22    looking for the calls among them because it's --

23            THE COURT:  No, no, I understand that.  I

24    understand that.

25            MR. GIBBS:  -- critical just to understand what the

38

1    nature -- the extent of their communications with one

2    another.

3                 THE COURT:  Let's --

4                 MR. GIBBS:  We don't expect -- Your Honor, let me

5    just be really clear, Your Honor.

6                 THE COURT:  Yeah.

7                 MR. GIBBS:  We don't expect -- Don, Vic, and Nick,

8    they're smart guys.  They're not going to be putting an email

9    sort of, you know, all of these, you know, smoking gun sort

10   of bad messages.  We don't expect -- I mean, who knows.  But

11   a lot of this we believe is going to be in-person meetings on

12   phone calls.  And so in this case in particular, those call

13   logs to us are particularly relevant to our understanding.

14                THE COURT:  Oh, no, no.  Okay.  I get -- I get all

15   that.  Let's go back to my first question then.

16                MR. GIBBS:  Sure.

17                THE COURT:  Which is, why is the use of landscape

18   related communications insufficient?

19                MR. GIBBS:  So the issue with that -- and you can

20   see this -- I think this is most clearly shown -- I'm

21   skeptical of how narrow this is going to be interpreted.  And

22   the reason for that is, if you look at our motion to compel

23   with respect to the sort of group -- the remaining group I'll

24   call them, of Vic defendants, that would be motion -- Docket

25   Entry 157.  They agreed in response to some of our RFPs

1    there, to provide communications that were related to the

2    landscape supply and nursery business on behalf of Narrow Way

3    2.

4            Their response, though -- the position they took,

5    though, in response, in their response brief to the Court was

6    that Narrow Way 2, all it is, is a property owner for two of

7    the competing properties, and therefore it's not a landscape,

8    nursery -- landscape and nursery supply business.

9            And to me, that doesn't make sense because if it's

10    a landlord that owns two properties that are intended to be

11    for the landscape supply and nursery business, then the

12    documents that that company would have are clearly -- they

13    would clearly fall under that umbrella, but they've taken the

14    position that it's not.

15            THE COURT:  Well, I actually --

16            MR. GIBBS:  And so that's all --

17            THE COURT:  -- with respect to Narrow Way 2, which

18    I understand is the landlord of the competing operation,

19    right?  Narrow Way 2?

20            MR. GIBBS:  Well, so it appears -- and again, this

21    is why we need some of these documents that are on the list.

22    We think that Narrow Way 2 owns the land on which the

23    original competing business, on Yaphank --

24            THE COURT:  Okay.

25            MR. GIBBS:  -- in Yaphank, that it owns that

40

1    entity, and we think but we're not sure that it may own

2    Scapes, or be, you know, the parent company, or maybe owns

3    the Horseblock Road property.

4              THE COURT:  Well, okay.  I understand what you're

5    saying.  The reason I'm asking is, I think some of this stuff

6    you can get them to admit and don't need discovery on,

7    because it's going to be -- it's kind of a binary answer.

8              MR. GIBBS:  Well, we would hope so.

9              THE COURT:  So --

10             MR. GIBBS:  We would hope so.

11             THE COURT:  -- but let's circle back, then, though

12   to the -- you say landscape related issues is insufficient

13   because you've got this experience regarding Narrow Way 2 --

14             MR. GIBBS:  That's right, Your Honor.

15             THE COURT:  -- as a property owner --

16             MR. GIBBS:  Of two competing --

17             THE COURT:  So would it then -- no, I understand.

18             MR. GIBBS:  As long -- here's the thing.  Let me --

19   let me be blunt with you, Your Honor.  I don't have a perfect

20   description of exactly, you know, here's a, you know, four or

21   five words that should be encompassed in their search.

22             I think that -- two points.  The first is, if as

23   they've described it generally, I think that is -- if it's

24   interpreted wrongly then that's an okay sort of concept to

25   drive the search for relevant documents.

41

1          I think, however, that especially with respect to

2     emails, search terms should be run through the emails,

3     appropriate search terms, that we've proposed.

4          THE COURT:  I don't -- I don't disagree with that,

5     but that's --

6          MR. GIBBS:  And then -- and then with the text

7     messages, I think those -- you know, because of the nature of

8     text messages, it's hard for them to really search for key

9     words, and so I think those have to be reviewed individually

10    --

11         THE COURT:  Oh, I agree.  They --

12         MR. GIBBS:  -- with the concept --

13         THE COURT:  -- they do have to be reviewed

14    individually.  But you're not going to --

15         MR. GIBBS:  That's right.

16         THE COURT:  -- review them individually.

17         MR. GIBBS:  Correct.

18         THE COURT:  He is.

19         MR. GIBBS:  Correct.  Correct, Your Honor.

20    Exactly.

21         THE COURT:  So -- no, no, I don't have a problem

22    with that.  Well, let me ask you this, because I'm not

23    obviously against you having a list of custodials and a list

24    of search terms, but then does it make sense to put this over

25    until you can agree on that or not, because my goal today was

42

1    to rule on all of this and get off the docket.

2         I could -- what I don't want is to issue rulings

3    now and then have you back here in two weeks because you

4    couldn't agree on the search terms.  So where are we on that?

5         MR. GIBBS:  So I have a list of search terms.  I

6    can -- I mean, I have a written list here I can propose, but

7    --

8         THE COURT:  Have you -- have you shared them with

9    your adversary yet?

10        MR. GIBBS:  So I've shared them in a letter.  I did

11   not give them the list today.  It's almost identical to the

12   one that was in the letter, I think.  We just sort of split

13   it up among the defendants a little better.  But -- so sort

14   of.  They've seen some; some or most of it.

15        THE COURT:  Do you have it with you?

16        MR. GIBBS:  I do.  I do, Your Honor.

17        THE COURT:  You want to take a 15-minute break, Mr.

18   Mule, and you can take a look and say, oh, this is the same,

19   it's okay, or not, and then see if we can incorporate that

20   into the ruling?

21        MR. MULE:  We can do that.

22        THE COURT:  Yeah, I didn't hear you.

23        MR. MULE:  Yes, Your Honor.  We could do that.

24        THE COURT:  All right.  Why don't you give it to

25   him?  We'll take 15 minutes.

43

1              MR. GIBBS:  Thank you, Your Honor.

2      (Recess from 11:41 a.m. to 11:58 a.m.)

3              THE COURT:  Okay, did we have a conversation about

4      custodians and search terms?

5              MR. GIBBS:  Yes, Your Honor, we did.

6              THE COURT:  And how did that go?

7              MR. GIBBS:  It went well, Your Honor.  It went

8      well.

9              THE COURT:  Okay.

10             MR. GIBBS:  I'd say they are agreeable.  I don't

11     want to speak -- put words in their mouth, but they're

12     agreeable to the terms that we provided as -- in the way we

13     described it is in essence, sort of a starting point.  We're

14     not saying you've got to review every single document on the

15     --

16             THE COURT:  Okay.

17             MR. GIBBS:  -- the hits on these terms, but see

18     what comes back and then we can negotiate to, you know,

19     what's a reasonable set to review.

20             THE COURT:  Okay.  Mr. Mule?

21             MR. MULE:  Yeah.  With one exception, was

22     Horseblock Road, which -- so basically they have requested

23     terms.  They want a hit list, and we believe these terms are

24     very broad because they're just names.

25             THE COURT:  Right.

44

1          MR. MULE:  But we'll go through, we'll give them a

2     hit list, and then -- with the exception of Horseblock, and

3     then -- and then our expectation is that we would have these

4     reviewed in connection with landscape related --

5          THE COURT:  Yeah.

6          MR. MULE:  -- business.

7          THE COURT:  I think that makes sense.  So I hate to

8     ask this.  Tell me about Horseblock.  What's the sticking

9     point?

10          MR. MULE:  So Horseblock is a -- you know, the

11     approach taken, sue everyone, every entity that's owned by

12     Vic or Don.  So Horseblock is another piece of property

13     that's owned by -- that's owned by Vic in Yapank, and it's

14     basically a dormant piece of property that he owns, and in

15     our view it's not a defendant in the action.

16          THE COURT:  Forget that it's not a defendant in the

17     action.  Is he plan to develop it for nursery related --

18     landscaping related purposes?

19          MR. MULE:  If he does in the future, I don't know

20     at this point.  All I know is, they're operating at Long

21     Island Avenue, and that's where they're operating.

22          THE COURT:  I get that, but to the degree Long

23     Island Avenue is relevant and Horseblock isn't fully built

24     out yet, that doesn't make it irrelevant.

25          MR. MULE:  As far as I know, there's no --

45

1              THE COURT:  As far -- forget the lawyer.  I don't

2      want to hear -- as far -- unless you can tell me, my client

3      said no, he's building an amusement park there, then it's on

4      the table.  Okay.

5              Hold on one second because I've got to start

6      drafting orders.

7          (Pause)

8              THE COURT:  Those terms are for emails and

9      documents, but not text, I assume.  Is that fair to say, or

10     --

11             MR. GIBBS:  Correct, Your Honor.  That's our

12     request.

13             THE COURT:  Well, let Mr. Mule --

14             MR. MULE:  I thought it was for all.  We were --

15     the expectation was --

16             THE COURT:  Well, my concern is, you can't search

17     texts.  That's what I'm -- that's where my thinking is, so

18     that it would be for documents which can -- you can search

19     for, and emails similarly.  But then for the texts, you're

20     going to have to -- Mr. Mule, you're going to have to read

21     them and pull out responsive stuff.  Okay.

22         (Pause)

23             THE COURT:  The Horse -- what's it called?

24     Horseblock?

25             MR. MULE:  Horseblock.

46

1          THE COURT:  Okay.

2          MR. MULE:  I don't know if it's one word or two.

3          MR. GIBBS:  I think it's one.  Yeah, it's

4    Horseblock.

5          THE COURT:  You'll know what it means.

6       (Pause)

7          THE COURT:  Okay.  That's the first bucket.

8          The second bucket now is, refuse to provide coms --

9    I'm assuming communications -- with former Siteone employees,

10   Siteone customers, Rose Casper, and Janet Demano.  Those two

11   individuals were described in the motion papers.

12         All right.  Mr. Gibbs, why don't you tell me?

13         MR. GIBBS:  Yes, Your Honor.  I think with respect

14   to the employees, they've agreed to provide some limited

15   subsets of those documents, particularly if I'm

16   characterizing this correctly, basically documents discussing

17   the employees coming to work for Scapes, which I think is

18   sort of -- it's an appropriate limitation at this point.

19         THE COURT:  Is an appropriate limitation.

20         MR. GIBBS:  Is an appropriate limitation.

21         THE COURT:  Okay.

22         MR. GIBBS:  We -- our main gripe with that, Your

23   Honor, is that we just don't -- we haven't gotten the

24   documents.

25         THE COURT:  Okay.

47

1          MR. GIBBS:  We haven't gotten the documents.

2          With respect to customers, it's a similar issue.  I

3   don't think -- I'd have to -- I'd have to go back and look at

4   my more detailed notes.  I think they agreed to provide some

5   of that.  What we're mostly interested in with the customers

6   is the time period, you know, between when Don is terminated

7   in October, through, you know, probably, you know, we'll say

8   the end of the summer last year, approximately, because that

9   would be the time when they would be actively discussing the

10  targeting of the Siteone customers.

11         I know that a lot of these customers have come over

12  now and they're active customers.

13         THE COURT:  Come over to Scapes?

14         MR. GIBBS:  Have come to Scapes.  That's right,

15  Your Honor.

16         THE COURT:  Okay.

17         MR. GIBBS:  And so that may be -- you know, there

18  may be, you know, a million documents that hit on that.

19  We're mostly interested in understanding, you know, when

20  those solicitations occurred.

21         THE COURT:  Okay, you know what?  Let's slow down

22  because I'm going to type as we go.

23         First, with respect to Siteone employees, you said

24  there's an agreement --

25         MR. GIBBS:  Mischaracterized, but I think --

48

1           THE COURT:  No, no, no.  We'll get to that, but --

2           MR. GIBBS:  Yes, sir.

3           THE COURT:  -- communications about coming to work

4    at Scapes.

5           MR. GIBBS:  Correct, Your Honor.  Leaving Siteone

6    and coming to Scapes.

7        (Pause)

8           THE COURT:  Now -- and, okay.  And you had said the

9    issue was just one of timing.

10          Mr. Mule, is your understanding consistent with Mr.

11   Gibbs' or something different on that one --

12          MR. MULE:  This is --

13          THE COURT:  -- sub-bucket.

14          MR. MULE:  -- for the employees?

15          THE COURT:  The employees.  Yes.

16          MR. MULE:  Hold on a second.  We had agreed to

17   conduct a reasonable search for responsive documents relating

18   to Siteone and its business, customers, or clients, and

19   communications related to leaving Siteone to work for Scapes.

20          THE COURT:  So that's both with respect to

21   employees and customers?  Or not?  Like, I'm not -- you sort

22   of made a larger bucket.

23          MR. MULE:  Yeah.  I think with respect to those

24   employees --

25          THE COURT:  Right.

49

1          MR. MULE:  -- so looking for communications

2     referring to the employees, Dale Nash, Antonio Vios Garcia,

3     Jose Ruby, Jorge Suarez Florez and Juan Suarez Florez, and

4     looking at that pocket of those communications which relate

5     to Siteone, its business, customers, or clients, or

6     communications relating to those particular employees leaving

7     Siteone to work for Scapes.

8          THE COURT:  Okay, so --

9          MR. GIBBS:  And on that point I would say, we are

10    not agreeable to the limitation just to those specific

11    employees.  Other employees --

12         THE COURT:  Well, that was my next question.

13         MR. GIBBS:  -- I mean, as recently as July of this

14    year, we had someone leave and go over there.  So it's -- we

15    don't want to limit it to just those named individuals.

16         THE COURT:  Okay.

17         MR. GIBBS:  Just any former Siteone --

18         MR. MULE:  We agree, including but not limited to.

19    So I believe we identified in our responses, 19 Scapes

20    employees who were, you know, former Siteone or Garden

21    Department --

22         THE COURT:  Here's what I'm doing.  I'm just

23    putting in Siteone employees.  I'm not limiting it at all.

24    That being said, you'll get some bucket of documents, Mr.

25    Gibbs.  If you think someone is missing --

50

1          MR. MULE:  Right.

2          THE COURT:  -- supplement the list and ask it.

3          MR. MULE:  Correct.

4          THE COURT:  You know, but I don't think this should

5    be the hill we all die on.

6          So you produce employee communications about

7    leaving Siteone to -- and then going to Scapes.

8          In terms of customers, what's next?

9          MR. GIBBS:  So for customers, Your Honor, we want

10   any communications with customers, I would say starting on

11   October 19th of 2020.  I don't know if you want to talk about

12   time --

13         THE COURT:  You know, I haven't -- I'm sorry.   I'm

14   sorry to cut you off.  I haven't put dates in any of this

15   yet.  Is this the first one where the dates matter, or no?

16         MR. GIBBS:  I mean, I think all these -- I think

17   putting the dates in here, I think is going to make this much

18   simpler.

19         THE COURT:  No, I agree.  So with respect to the

20   communications --

21         MR. GIBBS:  I think on your -- I think all of these

22   really -- at this point, we can agree to October 19th of 2022

23   as the start date, because that's the day that Don was

24   terminated so --

25         THE COURT:  Right.  Until the present, or what?

51

1          MR. GIBBS:  Yes, Your Honor, until the present.  I

2    mean, I think with the customers, depending on, you know,

3    sort of the volume of the documents -- and we can, you know,

4    negotiation this once we see what the volume is, but I mean,

5    I think through the present is appropriate, but we will

6    ultimately further limit that, because what we're most

7    interested in are those earlier solicitations.

8          Now, some of the, you know, subsequent

9    communications may become relevant more on a damages piece,

10   but I think initially we're --

11         THE COURT:  Okay.  What I'm going to do is from --

12   say, unless otherwise indicated from October 19th, 2022 to

13   the present, and we'll keep going.

14         (Pause)

15         THE COURT:  My computer is freezing.  Hold on one

16   second.

17         (Pause)

18         THE COURT:  Mr. Gibbs, as to customers -- the dates

19   you've just given me, what is it you want?

20         MR. GIBBS:  So October 19th, 2022.

21         THE COURT:  Right.

22         MR. GIBBS:  And we can initially start through the

23   present.

24         THE COURT:  Right, but what are the documents?  The

25   substance?  How would you describe the customer documents

52

1        that you're looking for?

2                MR. GIBBS:  Oh, I'm sorry, Your Honor.  Those will

3        be focused on the solicitation of the customers to go to

4        Scapes.  To leave -- leave Siteone and/or go to Scapes.

5                THE COURT:  Okay.  So --

6                MR. MULE:  If I may?  I'm sort of losing track of

7        what motion we're on, what --

8                THE COURT:  No, we're not doing it that way.  We're

9        on the summary of motions to compel, which is Page 7 of his

10       handout.

11               MR. MULE:  What document?

12               THE COURT:  There's the first column --

13               MR. MULE:  Okay.

14               THE COURT:  -- on the left.  We did the -- there's

15       a subheading, Nick and Don.  We're now under the next

16       subheading, refuse to provide coms with.  We just did Siteone

17       customer -- Siteone employees, pardon me, and we're now up to

18       Siteone customers.

19               MR. MULE:  All right.  I'm not sure what -- if I

20       could -- you could tell me what document requests those refer

21       to so I can keep track of this?

22               THE COURT:  Okay.  Mr. Mule, he handed you an

23       eight-page handout at the beginning of this, right?

24               MR. MULE:  Yep.

25               THE COURT:  Turn to Page 7.

53

1          MR. MULE:  I see.  Well, what it does not have,

2     Your Honor, is the document --

3          THE COURT:  No, it doesn't, which is why I asked at

4     the beginning, does this cover everything --

5          MR. MULE:  It covers the topics --

6          THE COURT:  Topically.

7          MR. MULE:  -- but --

8          THE COURT:  So I'm going to give you an order that

9     doesn't refer to things by docket number.  In other words,

10    I'm going to essentially grant all the motions in part and

11    deny them in part, and then give you a list of what you need

12    to produce.

13         MR. MULE:  Okay.  I just need to --

14         THE COURT:  So we're somewhat departing from the

15    request in that sense.

16         MR. MULE:  I'm just asking if Mr. Gibbs can give me

17    the reference to the document request so I can see where it

18    is in my papers.

19         THE COURT:  He can, but you're -- just so you know,

20    you're getting an order that's going to tell you what to

21    produce regardless of what it's connected to.  Obviously, it

22    should be connected.

23         MR. MULE:  I understand.

24         THE COURT:  But we got -- this has got to be

25    streamlined.

54

1          MR. MULE:  Yep.

2          THE COURT:  So I don't want to put form over

3     substance.  So with respect to the Siteone customers, Mr.

4     Gibbs says he wants solicitation to those customers during

5     the time period indicated.  What is your response to that?

6          MR. MULE:  If I have a document request, I can

7     identify what our response is, because I don't know where it

8     is in my documents, because I have gone through this, you

9     know, my --

10          THE COURT:  Mr. Gibbs, do you have that so that we

11     can kind of move this along?

12          MR. GIBBS:  Let's see, Your Honor.  Those are --

13     let me see.  Those are -- I've sort of had them listed all

14     together, so I'd have to go back and look at the actual RFPs

15     themselves.  We have several.  They're RFP, so sort of for

16     Vic -- and then the numbering is largely the same between the

17     individual defendants.  But it would be RFPs 38 to 42, RFPs 2

18     to 3, 11 to 26, and 31 to 32.  I believe as a general

19     grouping of those.

20          THE COURT:  Okay.

21          MR. MULE:  So, Your Honor, with respect to this,

22     I'm not -- you know, for Vic it wasn't, at least as far as I

23     can see, not really set forth.  You know, there were customer

24     lists that they requested, and we had an objection as to

25     customer list, particularly at this time, and the reason was

55

1     that, you know, until such time as they -- it's sort of a

2     cart before the horse request.  You know, they should

3     disclose the trade secret with specificity before we're

4     getting involved in --

5               THE COURT:  Okay.  That objection is overruled.

6     What's next?

7               MR. MULE:  Okay.  So, I don't know exactly what

8     other requests for -- precise -- what that request is.

9               THE COURT:  Okay.  He just said, I'm telling you

10    now, we are -- I'm not standing around all the niceties of

11    this.  I'm making a ruling.  He wants all the customer

12    solicitations starting in -- on October 19th, 2022.

13              MR. MULE:  So the names of all customers that have

14    been solicited?

15              THE COURT:  Presumably they're -- no.

16              MR. GIBBS:  Their communications.

17              THE COURT:  He said the solicitations.  Presumably,

18    they're emails or if you did it like -- I'm envisioning

19    electronic blast.  The truth is, I don't know what your

20    customer does.

21              MR. GIBBS:  Text message, emails.  However --

22    whatever form they --

23              THE COURT:  I can't imagine they're sending text.

24    That means they'd need everybody's phone number.  But --

25              MR. GIBBS:  I believe there are text messages, Your

56

1    Honor.  I have seen --

2              MR. MULE:  The idea of us going through and having

3    a search of -- you know, if they do text, I don't know.  But

4    if they do text with --

5              THE COURT:  Well, let me ask you a question, Mr.

6    Gibbs.

7              MR. MULE:  -- hundreds of customers --

8              THE COURT:  What -- if you got a sample, let's say

9    what they did on October 30th of 2022, they sent out a mass

10   email sort of blitz --

11             MR. GIBBS:  I can show you one.  I can show you one

12   right now.

13             THE COURT:  No, but I'm saying, why --

14             MR. GIBBS:  That would be --

15             THE COURT:  -- I don't think they would send one to

16   just one, so they would have sent it to -- I assume they keep

17   some kind of list, right?

18             MR. GIBBS:  Yes.  Yes, Your Honor.

19             THE COURT:  And they would have hit enter and it

20   would have gone to the whole list.  So why isn't just having

21   the one sufficient on that date as a sampling?

22             MR. GIBBS:  Well, so, Your Honor, it's not clear

23   whether it's sent out individually, and I would expect early

24   on, before the business is really up and operating, these are

25   -- these are one-off communications, probably targeted to,

57

1    you know, our top, you know, 20 clients for example.

2              And so those initial communications, I don't expect

3    that's going to be so sophisticated to be like a -- you know,

4    going through, you know, Mail Champ, and they've got a very

5    formal sort of solicitation email.  I think it's going to be

6    pretty informal stuff.  It's going to be text messages and

7    emails saying, hey, we're now opening Scapes down the road.

8    Come see us.  You know, we'll get the best prices.  Whatever

9    it is they said, I don't know.  But I don't think it's going

10   to be that formal, that organized.  Especially in the

11   beginning.

12             THE COURT:  Well, then if that's the case, like

13   we're opening our doors, why don't you come see us, then you

14   need to limit the dates more than we've establish --

15             MR. GIBBS:  Yes.

16             THE COURT:  -- I guess it's two years now.

17             MR. GIBBS:  Yeah, we can certainly limit the dates,

18   Your Honor.  I would say the beginning is October 19th of

19   2022, and we can say through August of last year.

20             THE COURT:  Okay.

21             MR. GIBBS:  I think that would --

22             THE COURT:  We're not doing that.  You're going to

23   look for the first 60 days of solicitations that were sent to

24   clients from August 19th to December 19th.

25             MR. GIBBS:  Well, Your Honor, just one thing --

58

```
1            THE COURT:  And then if you get anything, you can
2    --
3            MR. GIBBS:  Well, that's -- they had not opened the
4    business at that point, Your Honor.  Let me be really clear.
5            So in October, that's when Don was terminated, but
6    they don't start actually running the business until 2023.
7    So I'd ask --
8            THE COURT:  When in December 2023?
9            MR. GIBBS:  I would say February of 2023 is really
10   when they started.
11           THE COURT:  Okay.  Mr. Mule, in terms of open-door
12   date, is that February 2023?
13           MR. MULE:  Scapes was not even formed until April 9
14   of '23.
15           THE COURT:  When did -- I don't care about the,
16   quote, niceties.  When did the doors open?
17           MR. MULE:  I suspect it's around that time, it's
18   the same time.
19           THE COURT:  What, April 2023, or --
20           MR. MILMAN:  We didn't represent them at that time,
21   so we really don't have all that factual background, but I
22   would -- I would say that that date is probably a fair
23   guesstimate of when they opened.
24           THE COURT:  Okay.  I'm giving you a 60-day window.
25           MR. MILMAN:  Fine.
```

59

1            THE COURT:  You choose the dates because they don't

2      know.

3            MR. GIBBS:  Okay, Your Honor.  I would say --

4            THE COURT:  What date?  You pick dates.

5            MR. GIBBS:  -- April and May of 2023.

6            THE COURT:  Hold on.  April and May.

7            MR. MULE:  And, Your Honor, is this going to be

8      limited to emails?  I could do that.  I can't imagine --

9            THE COURT:  No, because I think -- they could be

10     old-school and they could use letters with stamps.  I don't

11     know.

12           MR. MULE:  Emails and letters.

13           THE COURT:  Whatever that's -- or -- no, if they're

14     texts, you've got to ask them.  If he says, oh no, we did it

15     by text because we have this new fangled way, then you've got

16     to produce the texts.

17           MR. GIBBS:  And I do --

18           THE COURT:  So I'm not going to limit it that way.

19     You've got to talk to your client and figure out what he did.

20           MR. MULE:  Okay.

21           THE COURT:  They did.

22           MR. MULE:  Now -- and solicitation, you're talking

23     about a mass solicitation.

24           THE COURT:  No, not necessarily.  Your -- they

25     could have started this business because Don's best friend is

60

1    a landscaper.  He's like, if you open a store, I'm going to

2    use all your stuff, and he may have just sent him a one-off

3    thing because they're pals.  You've got to ask your client

4    and figure it out.  You can't do this without your client

5    sitting with you the whole time.  Again, you're welcome.  All

6    right?

7         (Pause)

8              THE COURT:  You said -- did you say April to May

9    2023?

10             MR. GIBBS:  Correct, Your Honor.

11        (Pause)

12             MR. MULE:  One other question, Your Honor, which I

13   don't really know --

14             THE COURT:  You can ask it, but just let me finish

15   typing before you do.

16             MR. MULE:  Okay.

17        (Pause)

18             THE COURT:  Okay, Mr. Mule.

19             MR. MULE:  Yeah.  I wanted to know, are we going to

20   get a list of the Siteone customers that we're to look for?

21             THE COURT:  No, you've got to talk to your client

22   and ask him what he did.  I mean, yes, you can give the list

23   to help move this along, and you should, but you responding

24   to his list does not absolve you of your responsibility.

25   You've got to go to your client and say, this is where we

61

1    are.  Go look through your -- whatever they -- emails,

2    whatever they keep, and this is the time frame, so it's

3    narrow.  It can't be that many in a 60-day period.

4              MR. MULE:  Okay.

5              THE COURT:  And then depending on what you get, if

6    we need to expand it, we can talk about it, but, let's see.

7              MR. GIBBS:  And for the record we have -- we have

8    provided a full customer list.  A full customer --

9              THE COURT:  Okay.

10             MR. GIBBS:  -- every single customer.

11             THE COURT:  You mean your -- your customer list?

12             MR. GIBBS:  We have produced --

13             THE COURT:  Okay.

14             MR. GIBBS:  -- our entire customer list.

15             THE COURT:  Oh, no, that's worth putting on the

16   record.  Okay.

17             MR. GIBBS:  Sorted by revenue, contact information.

18             MR. MULE:  One other thing.

19             THE COURT:  Yeah.

20             MR. MULE:  I have to -- if I'm going to identify

21   customers, I don't want them to come to me and say, hey, we

22   gave you a customer list that's attorney's eyes only, you

23   can't disclose the names of those customers on the list.  I

24   have to be able to talk to the client of -- and be able to

25   understand --

62

1              THE COURT:  Well, he's got to work --

2              MR. MULE:  -- hey, were these customers?

3              MR. GIBBS:  Oh, sure.  Sure.  Of course.

4              THE COURT:  Okay.  You know, you can do that and

5    keep it confidential with your clients, but that's sensible.

6              MR. GIBBS:  Yeah.  I would think that, you know, we

7    give them a customer list and they're saying, hey, did you do

8    work with Fairfield Properties?  You know, did you do work

9    for so-and-so.  Going through that list and talking to them

10   is not -- in our view, that's not going to break attorney's

11   eyes only.  It would be attorney's eyes only if they said,

12   hey, review this entire thousand-page customer list, take a

13   copy home with you, I mean, that's -- you know, that's where

14   we would have an issue.  But just simply talking through

15   customers I think is going to be necessarily.

16             THE COURT:  I'll just add a line to that effect.

17        (Pause)

18             THE COURT:  Okay, I have another case on at 12:15,

19   so you guys need to take a breather.  If you're here on the

20   12:15, why don't you just come up to the bench, please?

21        (Recess from 12:21 p.m. to 12:29 p.m.)

22             THE COURT:  Okay, we're back on the record.  The

23   next two topics or sub-sub-topics are communications

24   regarding Rose Casper and Janet Demano.

25             MR. GIBBS:  Correct, Your Honor.

63

1          THE COURT:  All right, what's the story?

2          MR. GIBBS:  The two of them, we understand, are

3     bookkeepers, have been for some time for -- I think it's Don

4     and Vic, and maybe some or all of their entities.  It's not

5     entirely clear.  But we're looking particularly from them,

6     you know, communications about the competing business and

7     the, you know, financial transactions.  You know, to the

8     extent they're working on --

9          THE COURT:  Well, you've got to drill down a little

10    bit more than that in the sense that you don't need to prove

11    competing business.  They admit that.  They're competing at

12    Scapes.

13         MR. GIBBS:  That's right.

14         THE COURT:  So what can two bookkeepers provide to

15    you?

16         MR. GIBBS:  Primarily about the finances.  And

17    these perhaps should have belong better in the financial

18    information category.  But what we're really looking for are,

19    you know, communications or records from them that relate to

20    the competing business or to the, you know, the defendant

21    corporate entities.

22         THE COURT:  That relates to the competing business.

23    They're bookkeepers.  Presumably, that means everything they

24    touched.

25         MR. GIBBS:  Well, it's not clear.  I don't know

64

1    that for sure.  I don't --

2            THE COURT:  Well, let me flip this.  You're not

3    getting everything they touched, so tell me something

4    reasonable --

5            MR. GIBBS:  That's right.

6            THE COURT:  -- that you want.  I don't think you

7    want everything they touched.

8            MR. GIBBS:  No, Your Honor.  What we want really,

9    we're looking for are communications or documents that relate

10   to the finances of the competing business.  And so, for

11   example --

12           THE COURT:  Okay.

13           MR. GIBBS:  -- if they are -- if they're doing the

14   books for the competing businesses, they're talking about,

15   you know, the ledger entries and things like that, that's the

16   sort of thing we're looking for.  We don't expect them to

17   have documents or communications about customers and about --

18           THE COURT:  Yeah, but you're -- what you're -- the

19   level of -- so you want all of their operating accounts and

20   ledgers.

21           MR. GIBBS:  That is ultimately what we're getting

22   at here, and in this next column.  We're looking for -- to

23   get a financial picture of the entities, and in particular --

24   particular on the individual defendants, particularly with

25   respect to Vic, to understand, in other words, where the

65

1      money from Siteone is going.  And so it seems like the

2      bookkeeping records are going to probably have a pretty good

3      explanation of that piece, and so that's why we're focused on

4      the bookkeeping records.

5              THE COURT:  I guess my confusion here is, you're

6      going to say you paid for the business, $34 million, and you

7      got duped because they went out and competed.  Whether -- the

8      entity that's going to owe you the $34 million or whatever

9      the damage is, are going to be the entities that are in

10     violation of the agreements or committed some other tortuous

11     act.

12             MR. GIBBS:  Correct.

13             THE COURT:  Right?  So why do the granular nuts and

14     bolts of their business matter?  It's not going to affect

15     their liability.  Assuming you get a total number of what the

16     business was.  They are now doing $20 million a year or

17     whatever it is.  I don't understand why you need the

18     information at this granular level.

19             MR. GIBBS:  Yes, Your Honor, and the purpose is,

20     again, to understand the flow --

21             THE COURT:  Yeah, but this proctological exam

22     you're trying to give all these entities I don't think helps

23     your case.  In other words, I don't know who's going to win

24     this case, but in terms of relevance, it seems to me you need

25     the amount you were damaged, assuming liability for the

66

1    purpose of these requests, and that's all you need.

2              MR. GIBBS:  Yeah, and so if that's what they have,

3    Your Honor, if those are the types of records that they have,

4    which, again, I'm not sure.  I don't know exactly who they're

5    doing bookkeeping services for, the nature or extent of those

6    services.  So that's what we're ultimately after is to

7    understand the nature of those services and whether --

8              THE COURT:  Yeah, but --

9              MR. GIBBS:  I can't even say for sure they're

10   involved at this juncture.

11             THE COURT:  Well, they may not be, but my point is

12   I think you may be asking the wrong question and seeking too

13   much --

14             MR. GIBBS:  Yes, Your Honor.

15             THE COURT:  -- in an effort to belt and suspenders

16   everything.

17             MR. GIBBS:  Well, we can certainly -- if Your Honor

18   believes that that is over broad, we could withdraw that

19   portion of the request and we can really focus on the other

20   things --

21             THE COURT:  Okay, well --

22             MR. GIBBS:  -- that we've identified, which I think

23   go more to the meat.

24             THE COURT:  Mr. Mule, did you hear my colloquy with

25   your adversary?

67

1          MR. MULE:  I heard the trial (indiscernible).

2          THE COURT:  Okay, here's the situation.  With

3   respect -- they're seeking documents regarding bookkeeping

4   entries, to which I think it's too granular a request.  I'm

5   going to deny the motion with respect to those with the

6   understanding that they are entitled to know the amount of

7   business your client is doing, right?  So if we assume that

8   there's been some kind of violation or tortuous conduct, that

9   would be the damage amount.  They're entitled not just to a

10  piece of paper with a number on it, but some kind of backup

11  for that.

12          I am not going to give them every kind of backup

13  for that.  It's too much.  It's not proportional to the needs

14  of the case.  So what I'm telling you is, you're going to get

15  a revised request, or perhaps you can even talk about it,

16  maybe even after you talk to your client, Mr. Mule, about,

17  look, the judge said you've got to give them a number -- the

18  gross number for the business you're doing, whether it's on a

19  yearly basis or a -- some kind of basis that makes accounting

20  sense, to the point where they can use it for a damage

21  calculation so that -- in other words, your client's going to

22  have to make an admission so that the Court can save your

23  client producing reams and reams of documents that might

24  answer Mr. Gibbs' question, but I think it's too much.  Do

25  you see what I'm saying?

68

1          MR. MULE:  Yes, sir.

2          THE COURT:  Okay.  So you'll talk to your client

3     about that and come up with a way to get a number.

4          MR. MULE:  Okay.

5          THE COURT:  Okay.

6          MR. MILMAN:  Just --

7          THE COURT:  Hold on one second.

8          MR. MILMAN:  Just for the record, Your Honor.

9          THE COURT:  Yeah.

10         MR. MILMAN:  We're not sure that either one of

11    these are actually employees of Scapes doing Scapes'

12    bookkeeping.  These are two --

13         THE COURT:  Well, I've denied the motion with

14    respect to that, so it doesn't matter.

15         MR. MILMAN:  Okay.  Yeah.  Okay.

16      (Pause)

17          THE COURT:  Are we working on a complaint or an

18    amended complaint in this case?

19         MR. GIBBS:  Amended complaint, Your Honor.

20         THE COURT:  Yeah, that's what I thought.

21      (Pause)

22         THE COURT:  For the sake of clarity, Mr. Mule, if

23    you're unable to come up with a number that demonstrates --

24    let's call it the yearly business they do, he's going to be

25    back here.  I'm going to make you produce a whole lot of

69

1    stuff that A, you don't want to produce because you might

2    think it's private, but, B, you don't want to spend time

3    looking at to produce to get us right back to where we

4    started.  So consider that when talking to your client.

5        Okay.  Next bucket are -- is financial information.

6    These, I'm a little unsure of because some of the opposition

7    said, well, this is the only bank we do business with, and

8    you've got the subpoena and all of that.

9             MR. GIBBS:  Well, that's -- well, let me -- to be

10   clear, Your Honor.

11            THE COURT:  Okay.

12            MR. GIBBS:  So the way that the response is -- and

13   I don't want to be, you know, hyper-technical here, but the

14   responses, the way they're worded, it says Vic does business

15   with American Community Bank.

16            THE COURT:  Right.

17            MR. GIBBS:  But it doesn't say, this is the only

18   bank.

19            THE COURT:  No, but then in the papers --

20            MR. GIBBS:  So if it is --

21            THE COURT:  -- they said --

22            MR. GIBBS:   -- if that's the only one --

23            THE COURT:  -- they followed up on the papers and

24   said that.  Or am I wrong?  Maybe I'm wrong.

25            MR. MULE:  Right.  You're correct, Your Honor.

70

1    And also, the request said identify each bank.

2                THE COURT:  Okay.  Whatever.

3                MR. GIBBS:  Yes.

4                THE COURT:  The only bank your guys -- your guys --

5    the defendant do business with is American Community Bank,

6    yes or no?

7                MR. GIBBS:  I believe that's the bank.  Yeah.

8                THE COURT:  Yes.

9                MR. GIBBS:  And we got -- that was for this.  Now

10   Nick has completely objected and has refused to provide that

11   information.

12               THE COURT:  Okay.  Why --

13               MR. GIBBS:  Nick Giordano.

14               MR. MULE:  That's for -- in his individual banking.

15   Basically, you know, they learned -- and this is before, but

16   if you are -- if they identify a bank, the next thing that's

17   going to come is they're going to subpoena his personal

18   banking information.

19               THE COURT:  Well, they're definitely going to do

20   that.  So for Nick, who's an individual and doesn't have an

21   ownership in any of these corporate entities --

22               MR. GIBBS:  Well, he did.  He did, Your Honor.

23   Initially, he had an ownership interest in Scapes.  We don't

24   know when or the nature of that ownership, the nature of his

25   financial contribution, or -- we don't know any of it.  But

71

1    we do know that they've acknowledged in their papers that

2    Nick at some point was an owner of Scapes.

3              THE COURT:  Okay.  And if you have the banking

4    information from Scapes that shows what was given to Nick,

5    then don't you have what you need?

6              MR. GIBBS:  Well, we don't have it.  So we haven't

7    gotten to Scapes.  So they've also refused to provide any of

8    the banking or financial information from Scapes.  So we

9    don't have it.  So --

10             THE COURT:  Okay.  Let --

11             MR. GIBBS:  -- perhaps you're right.

12             THE COURT:  Well, if -- let's assume you get

13   something about Scapes.

14             MR. GIBBS:  Okay.

15             THE COURT:  Bank documents, because that's the

16   competing entity.

17             MR. GIBBS:  Yes, Your Honor.

18             THE COURT:  That account will have money in, money

19   out, right?  And probably -- and amounts of nothing else, I

20   would assume.  Why doesn't that give you everything you need?

21             MR. GIBBS:  Well, I think that for Nick, we can

22   narrow that to a pretty truncated time line, you know,

23   particularly in the lead-up to the opening of the business,

24   because our perception based on the facts that we know is

25   that, you know, it was relatively disorganized early on.

72

1          And so I don't know -- you know, the Scapes -- the

2    corporate entity, wasn't formed until April of 2023.  But

3    they had already started opening the business in January of

4    2023.  Nick was going to the site and physically prepping it

5    while he was still working for us.

6          And so Nick's financial arrangements with Vic

7    leading up to the opening of the business, and at least for,

8    you know, 60 days after it's open, those particular financial

9    transactions are relevant because it shows, you know, is Nick

10   receiving payments to open this competing business from Vic,

11   who Vic is getting from Siteone, while Nick is employed with

12   us, because that's a direct breach of fiduciary duty, which

13   we have claims for.

14          THE COURT:  No, no, I understand that.

15          MR. GIBBS:  So that's the relevance of Nick's

16   personal financial information.  We're not looking for

17   everything for all of time, but for at least a reasonable

18   period, particularly early on before we think they got, you

19   know, really organized as a business.

20          THE COURT:  What is the period you're talking

21   about?

22          MR. GIBBS:  I would say January 1st of 2023 through

23   the end of May of 2023.

24          THE COURT:  Mr. Mule?

25          MR. MULE:  So as far as -- they have in their

73

1     possession the bank records, which they subpoenaed from Vic,

2     his American Community Bank records.  They also have the

3     corporate records, which I believe is Narrow Way.  So I

4     believe they have, you know, the information that -- any

5     information that they would need.  So, really, this is

6     unnecessary.

7              THE COURT:  Well, that's not really responsive to

8     what Mr. Gibbs is saying, I don't think.  He's saying he

9     wants -- recognizing the needs of the case, I think, in terms

10    of proportionality, he's suggesting he wants financial

11    records for Vic for five months.  So that it's not -- it's

12    not this --

13             MR. GIBBS:  Well, what is the limit?

14             THE COURT:  Bank records, I assume.

15             MR. GIBBS:  Yeah, the --

16             THE COURT:  Well, I guess Nick would identify the

17    bank for that period of time and then you would subpoena the

18    bank.  Is that the gist?

19             MR. GIBBS:  Yes, Your Honor.  I think that's

20    probably they --

21             MR. MULE:  For all his bank records?  I mean -- or

22    just the transactions?

23             THE COURT:  No, just for -- just for five -- it

24    would be --

25             MR. MULE:  Are we talking about just the

74

1    transactions between the defendants and Nick for that time

2    period?

3            THE COURT:  Well, let's actually talk about that.

4    Hold on one second.  Let me just make one note about

5    something.

6            (Pause)

7            MR. MULE:  Your Honor --

8            THE COURT:  Okay, go ahead.

9            MR. MULE:  -- what I want to point out is --

10           THE COURT:  Yeah.

11           MR. MULE:  -- they have the bank record.  We

12   provided for Don, all the financial transactions between the

13   -- that are between him and other defendants.  For Vic, the

14   same thing.  So it's -- they're going to get -- it's the same

15   duplicative information.  It's just another source.

16           THE COURT:  I understand your logic.  I'm not sure

17   it's right.  So -- well, let me put it this way.  Is that --

18   they're looking for five months' worth of information.  Your

19   objection is that it's duplicative, or is there more to the

20   objection?

21           MR. MULE:  It's both, duplicative and also to the

22   extent it's with respect to the defendants, that's one thing,

23   but it should not be --

24           THE COURT:  Well there -- I assume if they go -- if

25   you -- if Nick says, I also bank at American Community Bank,

75

1    and they send the subpoena to American Community Bank limited

2    to this time frame, the bank is not going to parse those

3    records out.

4            MR. MULE:  Right.

5            THE COURT:  So the other option is, you go get the

6    records --

7            MR. MULE:  Yeah.

8            THE COURT:  -- and produce them.

9            MR. MULE:  That's -- and that, I think -- that's

10   something that we could do.  As long as it's, you know,

11   records with respect to the defendants, because I don't want

12   to -- I don't think he should --

13           THE COURT:  Well, no, that's the point, is to --

14           MR. MULE:  Exactly.

15           THE COURT:  -- so that if he's paying tuition for

16   his daughter's school or whatever, which I don't think Mr.

17   Gibbs wants anyway, that wouldn't come -- be involved.

18           MR. GIBBS:  And I think just on that, just to put a

19   bit of a finer point, Your Honor, our only objection to that

20   is the limiting -- limiting it to the named defendants.  And

21   the reason I say that, there are at least two entities, Don

22   Caroleo Ventures, LLC, which is also owned by Vic, which

23   received --

24           THE COURT:  Speak -- pull the mic up.  Don

25   something --

76

1           MR. GIBBS:  Oh, I'm sorry.  Don Caroleo Ventures,

2    LLC is another corporate entity owned by Don, which Vic --

3    I'm sorry, owned by Vic.  It's confusing because it's Don

4    Caroleo Ventures, LLC., but Vic is the sole owner.

5           Vic, through a Narrow Way, paid that entity

6    $440,000 of Siteone rent payments.  But it's not a party to

7    this case.  And so in terms of just the named defendants, I

8    think that's too narrow and it should be, you know, any

9    entity or person who is -- who is funneling money by the

10   defendants to Nick.  And I know if there's a more artful way

11   to that, surely, but --

12           THE COURT:  All right.

13           MR. GIBBS:   But that's in essence is -- not just

14   the named defendants in the complaint, but any entities or

15   persons controlled or directed by defendants to add funds to

16   to this.

17           THE COURT:  Okay.  I think you may have to -- Mr.

18   Mule, respond to that.

19           MR. MULE:  Yeah.  So he wants with respect to

20   non-parties, so transactions with the named --

21           THE COURT:  Well, but not all non-parties.  Parties

22   that are -- non-parties controlled by the defendants.

23           MR. MULE:  Yes.  Parties and non-parties controlled

24   by defendants, including Don Caroleo Ventures.  And was that

25   it?

1          MR. GIBBS:  Horseblock Realty, LLC.  Just -- I

2     mean, those are the ones that we know of for sure.  So just

3     any others, any entity.

4          THE COURT:  Okay.  Here's how this is going to go.

5     It will be any individuals or entities controlled by the

6     defendants.

7          Well, Mr. Mule, you've got to have a conversation

8     with your client about what -- if there's anything else out

9     there.  They may say no, in which case then we're done.

10    There may be one other.  Okay.  Look at those two.  I can't

11    believe that in that full five months -- and then there also

12    has to be non-party entities with whom Nick had some kind of

13    financial transaction.  So I think that the -- I don't want

14    to make this a heavier lift than it actually will likely be.

15    Do you understand?

16        (Pause)

17          THE COURT:  Okay.  So then next is Scapes.

18          MR. GIBBS:  Correct, Your Honor.

19          THE COURT:  Okay.  What do you need from Scapes?

20          MR. GIBBS:  I think what we really need from them

21    are your sort of block-and-tackle type accounting records,

22    right?  So like, general ledger.  You know, I'm not sure

23    exactly what they use, you know, profit-loss statements,

24    balance sheets, those types of sort of accounting records for

25    two reasons.

78

1          The first of which, we want to understand, you

2     know, the revenue that they've received.  We want to

3     understand, you know, which of our customers -- because maybe

4     they have customers that weren't Siteone customers.

5          THE COURT:  I would imagine they do, but --

6          MR. GIBBS:  Presumably.  But particularly, you

7     know, we want to see sort of, you know, top-line revenue

8     expenses.  We'd like to see --

9          THE COURT:  Well, I don't have a problem with

10     top-line revenues and expenses.  My concern is everything

11     else.

12          MR. MULE:  Your Honor, if I may?  I thought this

13     was under the category we had before.

14          THE COURT:  It kind -- it's related, to be sure.

15          MR. MULE:  It is.

16          THE COURT:  I mean, we've touched upon this

17     topically.  Actually, I kind of think it -- it's a point

18     three here.  What I have is, as the amount of business Scapes

19     does in competition with plaintiff, defendants will produce

20     figures demonstrating the amount of business they do on a

21     yearly or other basis, such that in the event plaintiff is

22     able to establish a violation of their rights as asserted in

23     the amended complaint, a damages calculation can be made.

24     That is my effort to truncate this.

25          I think that sentence may cover the Scapes

79

1    subheading in Column 2.  That's what I'm asking you.

2             MR. GIBBS:  It sounds like it does, Your Honor.

3    The only thing -- the only just slightly finer point I would

4    tie into to that, and this is just to prevent us from coming

5    back later --

6             THE COURT:  I like the idea of that.

7             MR. GIBBS:  I could see an issue coming up where we

8    get sort of the big bucket figures.  Here's our revenue,

9    expenses, et cetera.

10            THE COURT:  Right.

11            MR. GIBBS:  But then the defendants make an

12   argument, but not all of the -- all of -- not all of that

13   revenue is from Siteone customers, and therefore, you know,

14   X amount of the revenue is not attributable to the theft of

15   your customer.  So if there can also be a category of, you

16   know, records that showed revenue attributable to specific

17   customers, I think that would go a long way to preventing

18   future disputes about which customer the Siteone versus not.

19            THE COURT:  Hold on just one second.

20            Okay.  So if it said revenue -- if revenues were

21   broken down by -- were in total and broken down by customer,

22   that would satisfy your concern?

23            MR. GIBBS:  Yes, Your Honor.

24            THE COURT:  Okay.  What about that, Mr. Mule?  That

25   doesn't sound crazy to me.

80

1          MR. MULE:  Well, I don't know how the record

2     keeping is for this.  I mean, so I would have to --

3          THE COURT:  I assume they're on a computer

4     somewhere.

5          MR. MULE:  Right.

6          MR. MILMAN:  I would hope, but remember this is --

7          THE COURT:  It's -- yes, it's hard to --

8          MR. MILMAN:   -- this is not -- this is not --

9          MR. MULE:  This is not Siteone.

10          THE COURT:  Okay.

11          MR. MILMAN:  This is --

12          THE COURT:  Well, all right.  I'm going to -- I'm

13     going to -- that application is granted.  Just give me one

14     second.

15          MR. MILMAN:  I hope it's better than just writing

16     numbers on a piece of paper.  But I don't know what -- I

17     don't know

18          THE COURT:  Well, the problem is if you're going to

19     write numbers on a piece of paper, you're going to have to

20     give them all the paper.

21          MR. MILMAN:  Yeah, exact -- and I understand that,

22     Your Honor.  I mean, listen, I don't know what software

23     system they're on.  Maybe they're on QuickBooks, and then

24     it's very easy to --

25          THE COURT:  Right.

81

```
1                    MR. MILMAN:  -- print out that type of data.
2                    THE COURT:  But given that QuickBooks is the basic,
3         you know, form of this --
4                    MR. MILMAN:  Yeah.
5                    THE COURT:  -- you would think anything else would
6         do it, too.
7                    MR. MILMAN:  I would hope.
8              (Pause)
9                    MR. MULE:  And if it's not a Siteon customer,
10        obviously we don't have to write that.
11                   THE COURT:  Well, you still have to produce the
12        totals.
13                   MR. MULE:  Totals.   Yeah.
14                   THE COURT:  The other thing is, you have the
15        customer list, right?  It was produced to you on attorney's
16        eyes basis.
17                   MR. MULE:  We have their --
18                   THE COURT:  Right.
19                   MR. MULE:  -- Siteone --
20                   THE COURT:  So you -- I'm just reiterating.  You
21        are the one to go through that and compare the customer to
22        customer.  And if something is ambiguous, you need to talk to
23        Mr. Gibbs about it.  Maybe it's the same.  Maybe it's not.
24        But it all has to be transparent.
25                   MR. MULE:  Just one question for Evan.
```

82

```
1              Evan, the list, is that a Long Island-based list,

2     or --

3              MR. GIBBS:  Yes.  Yes.  It's just -- it's tied only

4     to the Legacy Garden Department stores.

5              MR. MULE:  Okay.

6              THE COURT:  Okay.  So next is Narrow Way Realty.

7              MR. GIBBS:  And I think that one is probably pretty

8     easy.  I think that as long as counsel confirms there was

9     only one bank.

10             THE COURT:  Right.  That -- I think that's --

11             MR. GIBBS:  Same issue (indiscernible).

12             THE COURT:  -- you said that's American Community

13    Bank also, right?

14             MR. MULE:  Yes.

15             THE COURT:  Okay.  So that's confirmed.  Let me

16    just make a note on the record, though.

17        (Pause)

18             THE COURT:  Okay.  Remaining corporate defendants.

19    I don't see why you need -- if Scapes is the competitor and

20    you have their stuff, you've got your damages calculation

21    assuming you've proved liability.  Who cares how much money

22    goes to these other defendants?

23             MR. GIBBS:  Again, Your Honor, it goes to the --

24    primarily to the beneficiary issue to understand what Vic is

25    doing with the Siteone funds.  And it -- because it's not
```

83

1    clear how much -- to what extent, you know, that money is

2    coming to these other entities through, for example, Don

3    Caroleo Ventures, which is a non-party, we don't have any

4    records for, that's received 400 and something thousand.

5            THE COURT:  So what?  As long as you paid the

6    money, you were damaged.

7            MR. GIBBS:  That's correct.  But it goes not to

8    damages, but to the substance of the beneficiary argument.

9    It's sort of seeing -- understanding where the money is going

10   via Vic.

11           THE COURT:  Okay.

12           MR. GIBBS:  Through these -- through these other

13   entities.

14           THE COURT:  Well, right.  But isn't the operative

15   thing you just said via Vic?  This whole thing hinges on, is

16   Vic a beneficiary?  I mean --

17           MR. GIBBS:  That's right.

18           THE COURT:  -- that's a practical matter.

19           MR. GIBBS:  That's right.

20           THE COURT:  So if Vic takes the money and he's

21   like, well, I'm going to do some real estate with the money

22   this month, and I'm going to do some farming this month, who

23   cares?  If you've got Vic, you've got it, don't you?

24           MR. GIBBS:  Presumably.  We don't -- I guess that's

25   the issue, is we don't know what's being done through these

84

1      corporate entities.  That's the point.

2                THE COURT:  Okay.  The motion to compel those

3      records is denied.  I believe it's disproportional to the

4      needs of the case, particularly at this point.  The Court is

5      still of the opinion that if plaintiffs are to succeed on the

6      Vic related claims as opposed to the Don or Nick related

7      claims, success requires proving that the money went to Vic,

8      and then whatever Vic did with it subsequent in terms of his

9      business or otherwise is not relevant to the case.  So that's

10     that.

11                Let's go to Column 4 -- 3.  Wishful thinking there.

12                Information and documents related to competing

13     business.  Okay.

14                MR. GIBBS:  That's right, Your Honor.  And so first

15     what we're looking for is for them to identify all the

16     companies and properties that they own.  We don't have a

17     comprehensive list of that.  They, in essence, just objected

18     and said, you know, we're aware of the defendant entities,

19     but we're not aware if there are other properties out there

20     that may be potentially going to be, or were planned to be

21     used as competing properties.  So it's a fairly

22     straightforward request for --

23                THE COURT:  No, I think I get it.

24                Mr. Mule, what about -- it seems to me that if you

25     were to produce a list of all the -- let's just call it

85

1    corporations for the purposes of this, all the corporations

2    that Vic and Nick own, and then just say one sentence about,

3    this is the business they're in, because they may have

4    interests that have -- you know, they could own restaurants.

5    I don't know.  Do that and I think you'll now start to create

6    boundaries to this universe and we'll be able to move on.

7            MR. GIBBS:  I completely --

8            THE COURT:  Do you see what I'm saying?

9            MR. MULE:  I guess the concern is, you know,

10    additional subpoenas, you know, making this thing broader

11    than it is.

12            THE COURT:  Well, you know -- I mean, you know

13    where we are.  I'm sure you will object accordingly and say,

14    look, this is a pizza place, why does it matter, and I, from

15    where I'm sitting right now would probably say, I agree, I

16    don't think it does matter.

17            But unwillingness to create the limits of the

18    universe is not going to serve this litigation or move the

19    ball.  Do you see what I'm saying?

20            MR. MULE:  Yeah.

21            THE COURT:  Okay.

22            MR. GIBBS:  And this one in particular, Your Honor,

23    these were interrogatories, and we really just want to know,

24    you know, what are all the entities and what do they do.

25    That's really --

1          THE COURT:  Well, that's kind of where I'm coming

2     down on it so --

3          MR. MULE:  All right.  So the -- what they do is, I

4     guess -- I mean, we've identified, and I guess we'll identify

5     further.  And most of these are single-entity real estate,

6     you know -- they own real estate.

7          THE COURT:  That's fine, but with that, you've got

8     real estate that does what, and principally so they can

9     assess.  Is it -- I mean, real estate, they could own

10    apartment buildings and just rent them out.  Okay.  Say that.

11         MR. GIBBS:  Okay.

12         THE COURT:  And then we get rid of that as a point

13    of contention.

14         MR. GIBBS:  Yes, Your Honor.  One in particular

15    I'll throw out there was for Neway Management.  The

16    description was, it's a management company.

17         THE COURT:  Okay.  Wait.  Let me type this and then

18    we'll do those.

19         MR. GIBBS:  Oh, I'm sorry.  I'm sorry.

20    (Pause)

21         THE COURT:  Okay.  Next, competing business.

22    There's a Scapes Supply.

23         MR. GIBBS:  Yes, Your Honor.  Oh, and that --

24    there's sort of a -- I'm sorry, there's like -- there's --

25    there's really sort of two topics in that first block.  It

87

1    was Nick and Vic.

2              THE COURT:  Okay.

3              MR. GIBBS:  There are really two things.  We have

4    the first, identify the companies and the properties owned.

5              THE COURT:  Right.

6              MR. GIBBS:  The second piece are documents relating

7    to the formation of Scapes Supply and the lease, purchase,

8    and use of those, all three properties that are issued here.

9    So you've got the initial one that was closed down, the one

10   they're operating at now, and then Horseblock Road.  So we're

11   also asking for the documents, all the documents relating to

12   the formation of Scapes Supply, and the lease of the

13   properties.

14             THE COURT:  Okay.  All the documents relating to

15   the formation of Scapes Supply.

16             MR. GIBBS:  Yes, Your Honor.

17             THE COURT:  Okay.

18             MR. GIBBS:  So corporate formation documents,

19   bylaws, things like that.

20             THE COURT:  I understand.  Okay.  Mr. Mule?

21             MR. MULE:  Yeah.  I mean, as far as Scapes Supply,

22   I believe we said that we would produce the formation

23   documents to the extent we had them.  But the one thing we

24   objected to was, you know, minutes, board minutes.  They have

25   no business to seek that information.  Corporate formation --

88

1              THE COURT:  No, I disagree.  Produce the minutes.

2    You can produce them on an attorney's eyes only basis.  To

3    the degree they don't say anything relevant, they'll throw

4    them out.

5              MR. MILMAN:  I would -- just so Your Honor -- just

6    so Your Honor knows, we did not handle the formation for any

7    of these companies, so I'm sure --

8              THE COURT:  I have no problem believing that.

9              MR. MILMAN:  Right.

10             THE COURT:  So --

11             MR. MILMAN:  And I'm sure it's just the form -- you

12   know, the corporate --

13             THE COURT:  I know what -- I understand what you're

14   saying.

15             MR. MILMAN:  And whether they did anything beyond

16   that for corporate formalities, I would be surprised.  But we

17   will look and turn over --

18             THE COURT:  No, I get it.  Okay.

19             MR. GIBBS:  And these are also, Your Honor -- this

20   would, I guess, go to any type of, you know, communications

21   about the formation of the companies or the corporate

22   purpose.

23             THE COURT:  Well, no, you would get that in

24   response to the communications orders, I think.

25             MR. GIBBS:  Yeah, I think you're right, Your Honor.

1    I think you're right.  That's right.  Sorry.  I just had it

2    in my notes here.

3              THE COURT:  Okay.

4              MR. GIBBS:  And then also the other subcategory

5    would be the documents relating to the leasing of three

6    properties as well.  And this really falls under -- I think

7    this is really kind of getting both of these blocks of text

8    for Vic and Nick and Scapes.  You know, we're really looking

9    for these same documents from both of those groups.

10             THE COURT:  What was the last part?  We're also

11   looking for these documents for what?

12             MR. GIBBS:  So, it's the lease, purchase, and use

13   of the three properties, and we're asking for the materials

14   --

15             THE COURT:  Well, the lease, I understand.  What

16   purchase and use?  Did they own them or did they lease them?

17             MR. GIBBS:  So they own two of them and they are

18   leasing one of them.

19             THE COURT:  I see.

20             MR. GIBBS:  Yes, Your Honor.  They're leasing the

21   one that they're currently operating on, and they own the

22   original one, and the Horseblock Road property.  I don't know

23   if it --

24             THE COURT:  Okay.  Next, it's -- there's a Scapes

25   Supply bucket.

90

1           MR. GIBBS:  That's right, Your Honor.  I think

2    we've really kind of gone through that.  I mean, what --

3           THE COURT:  I think so, too.  I think that's

4    repetitive.

5           MR. GIBBS:  It is.

6           THE COURT:  Okay.  So, then Narrow Way Realty as

7    opposed to NW2, which is Narrow Way 2, right?

8           MR. GIBBS:  Correct, Your Honor.

9           THE COURT:  Okay.

10           MR. GIBBS:  Correct.

11           THE COURT:  And these are the two --

12           MR. GIBBS:  These are the other Vic defendant

13    entities.  We're particularly looking for -- we want to know

14    who the owners are.  Just a list.  Just -- we don't have any

15    need of any documents.  We just want to --

16           THE COURT:  Well, I think they can --

17           MR. MULE:  We identified them.

18           THE COURT:  Vic is the sole owner of everything.

19    Is that --

20           MR. MULE:  Sole owner of each one.

21           THE COURT:  Okay.  So you've got that.

22           MR. GIBBS:  Yeah, and that was really -- it wasn't

23    -- it was another one of those where it wasn't clear if there

24    may have been others.

25           THE COURT:  Well, it doesn't matter.  You've got it

91

1   now.

2              MR. GIBBS:  If that's it, then we're good.

3              THE COURT:  So, okay.

4              MR. GIBBS:  And then I think for those, we also

5   asked for -- and this is most relevant, I think, for Narrow

6   Way Realty and for Narrow Way 2.

7              THE COURT:  Okay.  Just hold on one sec.

8              MR. GIBBS:  Yes, Your Honor.

9        (Pause)

10             THE COURT:  Okay.  Vic is the owner of those

11  entities, and then you -- you said something else.

12             MR. GIBBS:  Yes, Your Honor.  Then the sort of last

13  block here, Narrow Way Realty and Narrow Way 2, I think for

14  those in particular, we're asking for the board minutes to

15  understand -- because those are the two entities that owned

16  the competing properties, and so to understand sort of the

17  nature of the purchase of the properties, the reason for the

18  --

19             THE COURT:  Well, okay.  Narrow Way owns your

20  properties, right?

21             MR. GIBBS:  Narrow Way Realty Limited owns the

22  property that we operate on, correct.  Where it's the -- it's

23  the landlord.  It's the landlord.

24             THE COURT:  Well, I'm sorry.  I'm sorry, yes.  You

25  did say that.  You did.

92

```
1              MR. GIBBS:  That's right.

2              THE COURT:  The landlord of the property you

3       operate on.

4              MR. GIBBS:  Correct.

5              THE COURT:  NW2 is --

6              MR. GIBBS:  It owns the first property that they

7       bought that they were going to compete on in Yapank.

8              THE COURT:  Okay.

9              MR. GIBBS:  And it may or may not own some or all

10      of Horseblock Road and/or Horseblock Road, LLC, which is the

11      other property.

12             THE COURT:  Okay.  And --

13             MR. GIBBS:  And so understanding that -- those two

14      corporate entities in particular are also --

15             THE COURT:  Well, what -- in a perfect world, you

16      get the minutes of the -- from those entities.  What do they

17      tell you?

18             MR. GIBBS:  What do they tell --

19             THE COURT:  Yeah.

20             MR. GIBBS:  They tell us, in essence, the plan for

21      the business.  You know, what is -- what was the plan to

22      compete.  What --

23             THE COURT:  Well, but the ones on the competing,

24      they already have -- you have it.  They said they compete.

25             MR. GIBBS:  That's right, Your Honor.  But
```

93

1    understanding, I guess, the full context of the timing of

2    that, that -- I think that's probably the most important

3    aspect.

4            THE COURT:  I disagree.  If Scrapes -- if Scapes

5    admits, we're a competitor, that's basically an element you

6    don't have to prove anymore.  Right?  They admit it.  So what

7    then --

8            MR. GIBBS:  Correct.  The timing -- so I think,

9    Your Honor, for our purposes, the timing becomes relevant

10   because it goes to sort of when the competitive activity

11   began, because they didn't form Scapes until April, but we

12   know that they had start -- at least started forming the

13   business and had started servicing some customers before they

14   actually formed the corporate entity.  And we believe that it

15   was done with these -- one or both of these corporate

16   entities.  And so that's why these two are particularly

17   relevant, because we believe they were conducting --

18           THE COURT:  So if the point you want to make is,

19   you hypothesize that there are documents demonstrating that

20   prior to April 2023, that will demonstrate an intent to

21   compete or actual competition --

22           MR. GIBBS:  Correct, Your Honor.

23           THE COURT:  -- earlier.  And if that's the case

24   then what?  What's the benefit to your claim?

25           MR. GIBBS:  So at that point we have a clearer

94

1    picture of exactly when the competition started, and --

2                THE COURT:  So what?  I'm saying, what like --

3                MR. GIBBS:  Well, damages would begin from that

4    point.  So the damages would begin from, you know, whenever

5    the first customer was taken.  Whenever the -- whenever the

6    competition began.  And so in those, you know, probably, you

7    know, three --

8                THE COURT:  Right.

9                MR. GIBBS:  -- four months.

10               THE COURT:  But wouldn't Scapes' documents tell you

11   that?

12               MR. GIBBS:  I'm not sure that they would, Your

13   Honor, because that entity wasn't formed until April of 2023.

14   But our understanding is that they started competing before

15   that, so we think there will be additional records with these

16   other two entities.  Possibly.

17               THE COURT:  Mr. Mule, I'd like your response,

18   keeping in mind I suspect that we're probably talking about

19   10 pieces of paper here.

20               MR. MULE:  Yeah.  I mean, I don't know exactly what

21   they're talking about, because Narrow Way, again, is the

22   landlord.  Narrow Way 2 owned this separate piece of

23   property.  They requested from Nick and Vic already,

24   customers, identifying customers, which we've gone over.

25               THE COURT:  Well, no, this is just about basically

95

1    formation documents.

2             MR. MULE:  Yeah.  So I --

3             THE COURT:  With respect -- well, why would you

4    need -- I understand what you said, Mr. Gibbs, with respect

5    to NW2, G5, and Neway, but why would you need it for Narrow

6    Way Realty?

7             MR. GIBBS:  Well, we don't know if that entity,

8    which is the landlord entity --

9             THE COURT:  Right.

10            MR. GIBBS:  -- if it may have initially been used

11   for the competition.  And that -- because that ending is

12   certainly I mean, black letter, prohibited from competing.

13            THE COURT:  Yeah, I agree with that.  I find it

14   hard to believe there is anything that exists, or that that's

15   even the case.

16            Okay.  Mr. Mule, back to you in the sense that I

17   think we're talking about 10 pieces of paper and I kind of

18   feel like, who cares.

19            MR. MULE:  I --

20            THE COURT:  You see what I'm saying?

21            MR. MULE:  Yeah.  I mean, as far as like, minutes

22   from --

23            THE COURT:  Yeah, formation documents and minutes.

24            MR. MULE:  -- if they have any?

25            THE COURT:  Okay.  That's -- I think you and I are

96

1    on the same page.

2         (Pause)

3         THE COURT:  Okay.  So that leaves Column 4, vendors

4    and cell phone carries.

5         MR. GIBBS:  And I think this is really -- at this

6    point, we're really just focused on the vendors.  You know, I

7    think we went through the communications that they're going

8    to be required to provide, so I don't think we'll need to

9    separately subpoena the phone carries, so I think that one's

10   probably pretty --

11        THE COURT:  Okay.  Hold on.  With respect to that,

12   you wanted -- it was call logs as part of the communications,

13   right?

14        MR. GIBBS:  Correct, Your Honor.  Correct.

15        THE COURT:  Okay.  I just want to make sure I put

16   it in there.  Hold on.

17        (Pause)

18        THE COURT:  Okay.  Okay.  I think that's right.

19   What -- go ahead, Mr. Gibbs.

20        MR. GIBBS:  Yes, Your Honor.  So I think really

21   what's remaining here is just an identification of all the IT

22   vendors that have provided services to the individual

23   defendants and the businesses that they own or control.

24        THE COURT:  Why would you need that if they produce

25   call logs?  Presumably, they're not going to type up --

97

1          MR. GIBBS:  Oh, no, I'm sorry.  I'm sorry.  These -

2  - those two things are unrelated.  Those two things, the call

3  logs as --

4          THE COURT:  Right.

5          MR. GIBBS:  -- we -- we can --

6          THE COURT:  Oh, IT, like internal -- okay.  I --

7          MR. GIBBS:  Yes, Your Honor.  Yes.

8          THE COURT:  -- I got you.

9          MR. GIBBS:  So we're talking about the IT vendors.

10  So for example, whomever it is that set up their -- you know,

11  I don't know if they're using Counterpoint, or what

12  particular system they're using.

13          THE COURT:  Okay.  And what would that tell you?

14          MR. GIBBS:  So, Your Honor, our trade secrets claim

15  is that Nick took the computer -- or actually two computers

16  that had --

17          THE COURT:  Okay.

18          MR. GIBBS:  -- all of these materials.

19          THE COURT:  What material?  What is the trade

20  secret?  What -- what are the materials --

21          MR. GIBBS:  Yes.

22          THE COURT:  -- that the computer soft --

23          MR. GIBBS:  Your Honor, and that's a great point.

24  I brought the trade secrets that we've produced, we've --

25  we've produced them.

98

1              THE COURT:  No, tell me in like, normal English.  I

2     don't want lawyerese in binders.

3              MR. GIBBS:  Absolutely.  We had a system called

4     Counterpoint --

5              THE COURT:  Okay.

6              MR. GIBBS:  -- which was our --

7              THE COURT:  Is that a computer platform, or --

8              MR. GIBBS:  It is.  It is.

9              THE COURT:  Okay.

10             MR. GIBBS:  It's a computer software platform, and

11    it's basically your CRM, your Customer Relations Management

12    platform.

13             THE COURT:  Your C --

14             MR. GIBBS:  CRM.

15             THE COURT:  Oh, CRM.  Okay.

16             MR. GIBBS:  Platform.  So Customer Relations

17    Management platform.

18             THE COURT:  Got it.

19             MR. GIBBS:  And so this system, they had at the

20    Legacy Garden Department stores, and they had it the entire

21    time the defendants worked for Garden Department, and at

22    Siteone.  They were not integrated onto a different system.

23             And so this particular system, the Counterpoint

24    system, it contains --

25             THE COURT:  So let me just -- so this Counterpoint

99

1    system was originally owned by Garden Department and you

2    bought it as part of the assets.  That's a question.  That's

3    right?

4              MR. GIBBS:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MR. GIBBS:  That is absolutely correct.

7              So this system, it housed, in essence, all of the

8    business and much of the financial information for the legacy

9    Garden Department --

10             THE COURT:  Okay.

11             MR. GIBBS:  -- and then Siteone for the period of

12   time the defendants continued to work for Siteone.

13             And so that particular system, it's really easy to

14   generate reports out of the system.  You can say, give me a

15   full customer list, and it spits you out a full customer

16   list.  You can say, for this particular customer, show me

17   their entire order history for the whole time they've been a

18   customer for Siteone Garden Department.  It will show you

19   that information.  It will show you profit margins.  It will

20   show you -- I mean, it gets as granular as you want to get on

21   a customer by customer, a product by product, vendor by

22   vendor.

23             THE COURT:  Okay.

24             MR. GIBBS:  I mean, it's really everything --

25             THE COURT:  So --

100

1          MR. GIBBS:  -- that you would need to know.

2          THE COURT:  -- if I were to parrot back -- reflect

3    back to you.  Let me parrot back to you.  It's confidential

4    customer information?  Is that the trade secret?

5          MR. GIBBS:  Customer and business information.

6          THE COURT:  Well, that -- does business mean

7    customer and vendor then?  Is that the other part of

8    business, or --

9          MR. GIBBS:  The other piece would be the financial

10   component.  So profit.

11         THE COURT:  Okay.  Got it.

12         MR. GIBBS:  Profitability of particular products.

13         THE COURT:  I see.

14         MR. GIBBS:  See the process that we're offering

15   those products and the margins that we get on those products.

16         THE COURT:  And that's all maintained

17   confidentially, meaning it's not published anywhere?

18         MR. GIBBS:  Correct.  Correct.

19         THE COURT:  Okay.

20         MR. GIBBS:  It was -- it was in this Counterpoint

21   system.  And so, you know, the allegation in the complaint is

22   that Nick took two computers that had this material on those

23   computers.

24         THE COURT:  So not just the platform, but the

25   actual information.

101

1              MR. GIBBS:  Exactly.  Exactly.  Now there are --

2    you know, there are different ways that that could have been

3    done.  It could have been -- you know, the entire system

4    could have been saved locally.  He could have just generated

5    reports, kept those reports.  But to bring this back to the

6    discovery issue that's relevant here, we don't know -- what

7    we want to know is, who is their IT vendor, and did that IT

8    vendor help upload that information --

9              THE COURT:  Okay.

10             MR. GIBBS:  -- to them, and some way facilitate the

11   transfer of the trade secrets to the new business.

12             THE COURT:  No, no, I understand what you're

13   saying.

14             Mr. Mule, it seems to me that if you identify your

15   IT vendor, and your IT vendor comes to a deposition and says,

16   no, no, no, I -- they wanted something to do the following 10

17   things, I created a platform for them, and then I went home,

18   that's helpful to you, right?

19             MR. MULE:  I mean, it's --

20             THE COURT:  I mean, it would seem to be.  I'm

21   trying to think of information that you could produce that

22   will end this case one way or the other.

23             MR. MULE:  Yeah.  Who is the -- who is the IT

24   vendor.

25             MR. MILMAN:  Like I said, this is Vic and Nick

102

1    again, and we just got involved and --

2           THE COURT:  No, no, I under --

3           MR. MILMAN:  -- you know, there were

4    representations made by two prior law firms that we're not

5    really familiar with.

6           THE COURT:  No, no, I understand that, but I could

7    -- I could envision a world where they, A, they took the

8    computers and everything and uploaded it, stole it, and boom,

9    they're off to the races.

10          I can also envision a world where your prior

11   lawyers out lawyered their prior lawyers, and two guys who

12   are not bound went and competed.  A third guy said, I'd love

13   to help you, Dad and best friend.  I can't.  I'm bound.  But

14   on May 16th, 2027, when my noncompete ends, count me in in

15   the new one.

16          But either way, it seems to me like this

17   information would be helpful to somebody in resolving this.

18   So I guess my ultimate question is, do you have an objection

19   to producing this information?  And if so, what is that

20   objection, Mr. Mule?

21          MR. MULE:  Yeah.  I mean, as far as -- I'm just

22   trying to look for what they're request was, because --

23          THE COURT:  They just want to identify your IT

24   vendors.

25          MR. MULE:  Well, I think that's --

103

1          THE COURT:  I think you -- I think it's in -- well,

2     it's in some -- it's in the Court's interest that you do

3     that.  Let's put it that way.  Okay.

4          (Pause)

5          THE COURT:  What is the difference between ID and

6     IT vendors?

7          MR. GIBBS:  Oh, that -- ID is just shorthand.  So

8     that was supposed to say, refuse to identify.

9          THE COURT:  Oh, I see.  Duh.  Never mind.  Okay.

10    Got it.

11         MR. GIBBS:  Yes, Your Honor.

12         THE COURT:  Okay.  That does the charge, right?

13         MR. GIBBS:  That is the charge, Your Honor, and I

14    believe from our perspective, that deals with motions --

15    Docket Entries 141, 152, 153, 154, 155, 156, 157, and 158.

16         THE COURT:  Okay.  Let's flip that on its head.

17    What remains?

18         MR. GIBBS:  What remains would be Docket Numbers

19    142.  If we go back to the beginning, it will be 142, the

20    motion to quash the Don defendants bank subpoenas.

21         THE COURT:  Okay.  Let me just -- all right.  What

22    else?

23         MR. GIBBS:  The other would be the motion to extend

24    the deadline to add parties and amend pleadings.

25         THE COURT:  And that's -- what number is that?  I

104

1    just --

2                MR. GIBBS:  Oh, I'm sorry.  That's 144.

3                THE COURT:  Okay.  And then what -- what else, if

4    anything?

5                MR. GIBBS:  163, which is a motion filed by

6    plaintiffs to quash the AT&T subpoenas, which I think based

7    on the Court's ruling --

8                MR. MULE:  You mean the defendants.

9                MR. GIBBS:  I'm sorry, defendants.  Based on the

10   rulings around the communications, I think at this juncture

11   we can withdraw that subpoena because --

12               THE COURT:  I think you can too.

13               MR. GIBBS:  I think that one's easily dealt with.

14               THE COURT:  So what's -- I'm going to say -- what's

15   the -- that you get for that?  I'm sorry.

16               MR. GIBBS:  Oh, I'm sorry.  That's 163.

17          (Pause)

18               THE COURT:  Okay.  So that puts us back at 142 and

19   144.

20               MR. GIBBS:  And there's one last -- there's one

21   very last one, it's 171, which we just filed last Thursday,

22   and that's to enforce the four subpoenas, the Rose Casper,

23   Janet Demano, which I think based on the Court's rulings on

24   those, we can probably withdraw those at this time.

25               THE COURT:  Okay.  What --

105

1          MR. GIBBS:  Sorry if I'm going too fast, Your

2     Honor.

3          THE COURT:  No, no, that's fine.  I'm just going to

4     mark the motions as withdrawn, and then we'll talk about what

5     you get when you get it, I guess.

6          Okay.  So with that, what's left are 142 and 144.

7     Is that right?

8          MR. GIBBS:  Yes, Your Honor.  I think a one -- the

9     one sort of caveat is on 171, we can withdraw it with respect

10    to Rose Casper and Janet Demano, but there were two other

11    entities there.  The Don Caroleo Ventures and the Horseblock

12    Road properties.  We had asked for documents from them as

13    well.

14         THE COURT:  I'm just read -- just bear with me.

15    I'm reading it.

16         MR. GIBBS:  Yes, Your Honor.

17         THE COURT:  Yeah, I don't see how either of these

18    are relevant to your claims.  I think once Vic gets the money

19    --

20         MR. GIBBS:  Okay.

21         THE COURT:  -- you paid him, and then he's going to

22    produce some kind of -- this is the business Scapes does, and

23    your extensive damages analysis gets condensed very nightly

24    -- nicely and neatly to a chart that if you're successful in

25    liability, the jury will digest.  Unless this is to the

106

1    bench, in which case Judge Brown will digest it.

2              So the motion --

3              MR. GIBBS:  If it's Your Honor's preference, we can

4    withdraw that, we can deny the motion.

5              THE COURT:  Withdraw the motion because I'm going

6    to deny it for now.

7              MR. GIBBS:  Okay.  We'll withdraw --

8              THE COURT:  And if there's a more crystalized

9    reason for that information that arises because of something

10   else that's produced --

11             MR. GIBBS:  Yes, Your Honor.

12             THE COURT:  -- you'll make a specific request.

13   Okay.  So back to 142 and 144.  142 being really the only

14   substantive one.

15             MR. GIBBS:  Yep.

16             THE COURT:  This is a motion to quash subpoenas,

17   and there's some under-seal filings also that go with this.

18             MR. GIBBS:  Yes, Your Honor.  Yeah.  And I'm sorry

19   I didn't mention that.

20             THE COURT:  That's okay.

21             MR. GIBBS:  142 is the main one, and then 148 is

22   the under seal motion.

23             THE COURT:  Okay.  Now the subpoenas -- it's a

24   motion to quash subpoenas from Mr. Mule, right?

25             MR. GIBBS:  Yes, Your Honor.

107

1          THE COURT:  And three of them are to --

2          MR. GIBBS:  Yes.

3          THE COURT:  Mr. Mule, you go first.  Tell me.

4   It's your motion.

5          MR. MULE:  Okay.  Yes, Your Honor.

6          MR. GIBBS:  Well, it's actually -- it's our motion.

7          THE COURT:  I'm sorry, it's your motion.

8          MR. GIBBS:  Yes, Your Honor.

9          THE COURT:  Sorry.  All right.  You go first.  Do

10  that.

11         MR. GIBBS:  Okay.  So this one's relatively

12  straight forward, I think.  They subpoenaed Siteone's banks

13  for information.  There's two components to this.

14         The first is, they subpoenaed Siteone's banks for

15  information relating to payments to five particular current

16  Siteone employees.

17         THE COURT:  Oh, the idea that you paid for their

18  testimony and affidavits.

19         MR. GIBBS:  That -- correct, Your Honor.  Correct,

20  Your Honor.

21         THE COURT:  Okay.  Mr. Mule, what's your basis for

22  thinking they were paid?

23         MR. MULE:  Yeah.  So, Your Honor, for this it's

24  basically -- we just want to know and get a picture if there

25  are any payments to these --

108

1          THE COURT:  Do you have any reason to believe --

2          MR. MULE:  -- to these folks.

3          THE COURT:  -- other than you want to be belt and

4     suspenders, that there was a payment above their -- what

5     salary compensations were?

6          MR. MULE:  Well, there -- this is multiple

7     components.  So for instance, the Earls firm and --

8          THE COURT:  Let me -- let me help you out with

9     that.

10          MR. MULE:  Yes.

11          THE COURT:  That's been -- that's granted.  That --

12     you're not getting anything from the Earls firm about the

13     sexual harassment.  Don settled his claims with them.  That

14     is done in my opinion, has nothing to do with this.

15          MR. MULE:  Oh, that and the Hawkins firm.  This is

16     the -- this has to do with -- and I just want to make sure

17     you understand it, Your Honor.

18          THE COURT:  Oh, sorry.  I may have -- I may have

19     spoken out of turn.

20          MR. MULE:  It's Earls and the Hawkins firm.

21     They're the ones who did the investigation --

22          THE COURT:  Right.

23          MR. MULE:  -- supposedly, which we never got any

24     information about --

25          THE COURT:  Okay.

109

1          MR. MULE:  -- you know, which we had requested

2     during --

3          THE COURT:  So what?

4          MR. MULE:  -- negotiations.

5          THE COURT:  He sat and then he settled the claims

6     for $2 million.  Right?

7          MR. MULE:  This -- the -- there you go.  And --

8          THE COURT:  All right.  Walk me -- walk me through

9     it then.  Walk me through it.

10         MR. MULE:  Well, misrepresentation.  The --

11         MR. MILMAN:  We didn't get -- we didn't get a

12    severance package.  We got a payout which was less than what

13    he was entitled to, because we took the position that this

14    was a wrongful termination.  They basically took the lesser

15    of two evils.  They took the word of the HR director versus

16    Don, and said, we'll pay him instead of dealing with having

17    to worry about our HR director bringing an action.

18         THE COURT:  Yeah, that doesn't change anything I've

19    said.

20         MR. MILMAN:  Well, we really believe this was --

21    this sting --

22         THE COURT:  I believe you believe it.  And then you

23    settled that claim.  It's not part of this case.

24         MR. MILMAN:  But if a payment was made to Ms.

25    Charla above and beyond her salary, that would show that they

110

1    paid her off.

2         THE COURT:  I agree.  You have no evidence that

3    would support something like that.

4         MR. MILMAN:  Well, we do have evidence to support

5    something like that because this is such a sham discharge.

6    All they had to do was employ him for two and a half more

7    months and his term would have expired on its own, and they

8    could have easily separated them.

9         So we -- we truly believe that they were facing an

10   action from her.  This was the most -- there was no

11   transparency whatsoever in this incident, the investigation,

12   and the termination, and we feel we should -- you know, what

13   I thought was riches, you know, in their papers, they

14   basically say, this is -- well, we're on a fishing

15   expedition.  They're on a fishing expedition.

16        THE COURT:  You can both be on a fishing

17   expedition.

18        MR. MILMAN:  And so we should be granted some

19   latitude here.  And at the very least, you know, we should be

20   given payroll records or records of monies that were paid to

21   her.

22        THE COURT:  They offered you the payroll records.

23        MR. MILMAN:  But the payroll records wouldn't come

24   up in a separate -- you know, there's all types of ways they

25   can --

111

1           THE COURT:  Correct.  And some of those ways do not

2      include the information you seek.  They could walk in with a

3      suitcase of cash to pay them, and you wouldn't get that

4      information.  And I suspect a company of this sophistication

5      would not have the documents that would demonstrate what

6      you're hypothesizing in the records you seek in any event.

7      In fact, I am extremely skeptical that that would be the

8      case, where they create an obvious paper trail of abroad, for

9      someone who works for them anyway and might feel -- if they

10     were going to lie, would feel the pressure regardless.

11          MR. MILMAN:  I agree.  If we were invested -- if we

12     were -- had a dispute over the termination, I might

13     understand your point a little bit better.  But all we're --

14     and I probably am not going to push too far back on

15     (indiscernible).

16          THE COURT:  Okay.

17          MR. MILMAN:  But I do believe that we should be

18     provided with information regarding whether or not she was

19     paid off for the sexual harassment claim, which would --

20     which I think would be a defense before the jury that should

21     be -- you know, if this case goes to trial, should be

22     presented.  And, you know, I think it's a very easy response

23     and document that they could provide to us.

24          THE COURT:  Okay.

25          MR. GIBBS:  Your Honor, the --

112

1          THE COURT:  Anything else?

2          MR. MULE:  Yeah.  And the other part is, you know,

3    the timing between the settlement that occurred and the

4    timing of this case.  I mean, it's right on the heels of the

5    settlement.  Bam, this case came.  So that's dealing just

6    with the -- with the bank subpoenas.  We haven't really gone

7    into the deposition.  I assume that will be -- we'll address

8    that next.

9          THE COURT:  The motion for the protective order is

10    granted.  I think this is a -- I think the matter was

11    resolved for a settlement, which you characterize otherwise,

12    that's fine.  You've made your record.  You can take it to

13    Judge Brown.  The motion for the protective order is granted.

14          I see -- none of that is relevant, and I think

15    there's a separate section, though, right?  Weren't there two

16    things in here, or am I misremembering?

17          MR. GIBBS:  Yes, Your Honor.  So there was the --

18    there was the -- there was a bank record for the payments of

19    the employees, and then the notice to depose Laura Shartle

20    (ph), who was the HR --

21          THE COURT:  Okay.

22          MR. GIBBS:  -- employee.

23          THE COURT:  But the employees -- there are also two

24    employees who are separate from the sexual harassment claim,

25    right?

113

1          MR. GIBBS:  Well, they're separate just in that

2      they want records to show that they received payment.  So

3      their -- let me -- here's a better way to explain it, Your

4      Honor.

5          THE COURT:  Oh, these are people who just provided

6      the supporting affidavits to you when you made a motion for

7      an injunction.

8          MR. GIBBS:  That's right.  That's right.  They're

9      supporting affidavits --

10         THE COURT:  Okay.

11         MR. GIBBS:  -- and then Laura Shartle.  So those

12     are the two groups of people.

13         THE COURT:  Okay.  Do you want to be heard on that,

14     Mr. Mule?

15         MR. MULE:  Yeah.  I mean for those -- Mr. Cassaro

16     and Mr. Trama, those are the ones that had the supporting

17     declarations.

18         THE COURT:  Right.

19         MR. MULE:  And, you know, at this point like we

20     said, the -- they're the ones who were identified --

21         THE COURT:  Understood.

22         MR. MULE:  -- as people with interest, with -- I'm

23     sorry, with knowledge as to supposed protection of trade

24     secrets, what these --

25         THE COURT:  And I assume you'll depose them at some

114

1    point.

2              MR. MULE:  Yeah, that's right.

3              THE COURT:  Right?  You've already indicated you

4    want to.

5              MR. MULE:  And we were looking to do it sooner

6    rather than later.

7              THE COURT:  I understand.  I understand that.

8    Okay.  Motion for protective order is granted in its

9    entirety.  I think the whole thing is a fishing expedition in

10   this regard.  I understand the logic of defendant's point, I

11   just think this is -- to say it's disproportionate to the

12   needs of this case is an understatement, and so that motion

13   is granted.  Does that cover everything that's pending on the

14   docket?

15             MR. GIBBS:  Other than the deadline issues, yes,

16   Your Honor.

17             THE COURT:  Okay.  We'll do that.  That's a motion,

18   but that's like with a small M.  Hold on.

19             MR. GIBBS:  Yes, Your Honor.

20        (Pause)

21             THE COURT:  Okay.  Mr. Mule, you're getting --

22   you're ordered to produce a variety of information.  How long

23   will it take you to get it all together, do you think?

24        (Pause)

25             MR. MULE:  So, Your Honor, we were thinking with

115

1    getting -- you know, this -- the hit list and all those --

2              THE COURT:  All of it.  Yes.

3              MR. MULE:  -- but then we -- after that to review

4    the documents and produce what is responsive, I would say six

5    weeks.

6              THE COURT:  Okay.  You've got it.  And then after

7    six weeks you're going to do depositions?

8              MR. MULE:  Yes.

9              THE COURT:  Okay.  Six weeks is November 26th.

10             MR. GIBBS:  And I'm assuming, Your Honor, the

11   November 26th deadline, that would be a substantial

12   completion of production.  Is that what -- is that how you're

13   interpreting that deadline?

14             THE COURT:  I'm interpreting it as there's an order

15   that says, produce this.  Produce it by November 26th.  I

16   don't want to --

17             MR. GIBBS:  Okay.

18             THE COURT:  -- I don't want to really see you

19   again, but I -- we will.

20             So you'll produce all that, and then in terms of

21   depositions, remind me.  What are the magnitude?  How many

22   are we talking about?

23             MR. GIBBS:  Well, it's going to be a lot, Your

24   Honor, for both sides.  We were thinking -- we had initially

25   discussed 10 to 15 per side.

116

1              THE COURT:  Okay.  And are we still -- is that

2      still our universe?

3              MR. MULE:  We're -- we had, it looked like around

4      30 or so total.

5              THE COURT:  Okay.  Why don't we do this?  After

6      that, I'll instruct you to file a status report that includes

7      a deposition schedule.  This way we can keep the momentum

8      going.  And I'll give you a week after the production to do

9      that.  I'm just pulling up a calendar again.  I'll give you a

10     little more because it's Thanksgiving.

11         (Pause)

12             THE COURT:  Will there be experts in this case?  It

13     doesn't seem like it.  You tell me.

14             MR. GIBBS:  There will -- yes, Your Honor.

15             THE COURT:  On what?

16             MR. GIBBS:  Economics.  Economics expert.

17             THE COURT:  Okay.

18             MR. GIBBS:  At a minimum.  Could be -- I don't know

19     if there are landscape supply industry experts, but --

20             THE COURT:  Good question.

21             MR. GIBBS:  -- I think probably just economist.

22             THE COURT:  Okay.

23         (Pause)

24             MR. MULE:  Your Honor, one thing we were looking at

25     --

117

1          THE COURT:  Okay, just give me one second --

2          MR. MULE:  Sure.

3          THE COURT:  -- and we'll get to it.

4      (Pause)

5          THE COURT:  Mr. Mule, yes.

6          MR. MULE:  Okay.  So just a couple of things we

7  just wanted to raise.

8          One is, we've had the rulings, obviously on --

9  regarding to customers and identifying gross with respect to

10 total, and then with respect to breaking it down by former

11 Siteone customers.

12         THE COURT:  Yes.

13         MR. MULE:  We -- we still have out there -- and we

14 may want to -- I guess we'll address it by maybe separate

15 application, is the idea of moving maybe on the -- you know,

16 on the pleadings because there hasn't -- and we feel we're

17 disadvantaged in the sense of -- you know, usually they would

18 identify what those supposed trade secrets are.  But here, to

19 the extent that they're getting customer lists, they're going

20 to say, ah-ha, there it is.  Now you've --

21         THE COURT:  What do you mean to the extent they're

22 getting customer lists?

23         MR. MULE:  Well, they're going to get -- we're

24 going to identify by breakdown by customers --

25         THE COURT:  Oh, you mean, Jane did $1,000 in

118

1    business.  Sue --

2                    MR. MULE:  Yeah, exactly.

3                    THE COURT:  Okay.

4                    MR. MULE:  And they're going to -- they're going to

5    come back and say, ah-ha, that's the, you know, evidence of,

6    you know, trade secret --

7                    THE COURT:  Okay.

8                    MR. MULE:  -- violation.  So this is part of why we

9    want to be able to perhaps move on that, and also --

10                   THE COURT:  Okay.

11                   MR. MULE:  -- on the beneficiary theory, these two

12   different things --

13                   THE COURT:  I think you could -- I mean, you have

14   to make those motions to Judge Brown in the first instance,

15   but there's -- nothing here is going to prevent anything

16   there, and we'll see what he does with it.  I get your

17   arguments.  I don't know are they appropriate now or --

18                   MR. MULE:  Okay.

19                   THE COURT:  -- or are they better saved for the end

20   of discovery --

21                   MR. MULE:  Yeah.

22                   THE COURT:  I honestly don't --

23                   MR. MULE:  All right.  And I think some of these,

24   like even the beneficiary, I don't think we necessarily need

25   depositions --

119

1          THE COURT:  Well, no.  I could envision a

2   circumstance where depositions would help.  This may not be

3   that case.

4          MR. MULE:  No.

5          THE COURT:  I mean, it's strange in the sense that

6   I guess the only person who signed them that's here is Vic,

7   right?  Because Don is going to say I didn't compete.  I mean

8   -- but he's not going to deny that he was bound, right?

9          So it's -- you'll say beneficiary means you

10  provided a definition.  He's going to say, I thought it meant

11  not that.  And then, I don't know, is that -- maybe that's

12  summary judgment.  Maybe it's -- I don't know.  I don't know.

13   I certainly don't have an opinion on it, but there's nothing

14  preventing you from making that application --

15          MR. MULE:  Okay.

16          THE COURT:  -- and filling a premotion letter.

17          MR. MULE:  All right.

18          THE COURT:  Anything else?

19          MR. MULE:  No.

20          THE COURT:  Anything else?

21          MR. MULE:  Not from our side.

22          THE COURT:  I'm getting a nod of no.  No, nothing

23  else.  Mr. Gibbs, anything else?

24          MR. GIBBS:  Not from us, Your Honor.

25          THE COURT:  Okay.  Have a good day, everybody.

120

1              MR. MULE:  All right.  Thank you.

2              MR. MILMAN:  Thank you.

3              MR. GIBBS:  Thank you.

4       (Proceedings concluded at 1:31 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

121

1

2          I, CHRISTINE FIORE, court-approved transcriber and

3     certified electronic reporter and transcriber, certify that

4     the foregoing is a correct transcript from the official

5     electronic sound recording of the proceedings in the above-

6     entitled matter.

7

8          *Christine Fiore*

9     _____          November 1, 2024

10    Christine Fiore, CERT

11         Transcriber

12

13

14

15

16

17

18

19

20

21

22