# EXHIBIT "A"

```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK

-------------------------------X Docket#
SITEONE LANDSCAPE SUPPLY, LLC, : 23-cv-02084-GRB-SIL
                               :
               Plaintiff,      :
                               :
       - versus -             : U.S. Courthouse
                               : Central Islip, NY
NICHOLAS GIORDANO et al.,      :
                               : March 26, 2025
             Defendants       : 2:37 p.m.
-------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE STEVEN I. LOCKE
UNITED STATES MAGISTRATE JUDGE


**A P P E A R A N C E S:**


<u>**For the Plaintiffs**</u>:           **Kevin P. Mulry, Esq.**
                             Farrell Fritz, PC
                             400 RXR Plaza
                             Uniondale, NY 11556

                             **Matthew Adler, Esq.**
                             Troutman Pepper Hamilton
                              Sanders LLP
                             3000 Two Logan Square
                             18th And Arch Streets
                             Philadelphia, PA 19103

                             **John Sikes Gibbs, III, Esq.**
                             Troutman Pepper Hamilton
                              Sanders LLP
                             600 Peachtree Street, N.E.
                             Suite 3000
                             Atlanta, GA 30308


              (Appearances continue on next page)


<u>**Transcription Service**</u>:       **Transcriptions Plus II, Inc.**
                             61 Beatrice Avenue
                             West Islip, New York 11795
                             RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

**APPEARANCES CONTINUED**

<u>**For the Defendants**</u>:          **Thomas A. Bizzaro, Jr., Esq.**
                              Law Offices of Thomas A.
                               Bizzaro, Jr., P.C.
                              133C New York Avenue
                              Huntington, NY 11743


                              **Michael C. Mule, Esq.**
                              **Robert Milman, Esq.**
                              Milman Labuda Law Group PLLC
                              3000 Marcus Avenue, Suite 3W8
                              Lake Success, NY 11556

3

Proceedings

1          THE CLERK:  All rise.  Calling case 23-cv-2084,

2  *SiteOne Landscape Supply, LLC v. Giordano et al.*

3          Counsel, please state your appearance for the

4  record.

5          MR. GIBBS:  Good afternoon.  This is Evan Gibbs

6  on behalf --

7          THE COURT:  The mic is not on.

8          MR. GIBBS:  Good afternoon.  This is Evan Gibbs

9  on behalf of SiteOne Landscape Supply, LLC.

10          MR. ADLER:  Good afternoon, your Honor.

11  Matthew Adler also on behalf of SiteOne.

12          MR. MULRY:  Kevin Mulry from Farrell Fritz also

13  for SiteOne.  Good afternoon.

14          THE COURT:  Good afternoon.

15          MR. MULE:  Good afternoon, your Honor.  Michael

16  Mule from Milman Labuda Law Group, PLLC for the

17  defendants.

18          MR. MILMAN:  Robert Milman; Milman Labuda Law

19  Group, for the defendants.

20          MR. BIZZARO:  Good morning, your Honor.  Thomas

21  A. Bizzaro, Jr.  I just filed a notice of appearance.

22  I've joined the party for the defendants.  Thank you for

23  having me.

24          THE COURT:  Good luck to you.  Well, good

25  afternoon, everybody.  Please be seated.

37

Proceedings

1           THE COURT:  It has to be -- well, I'm sorry.

2   Let me continue.  I'm envisioning that you'll assert a

3   privilege, the work product doctrine, with respect to

4   some of it.  You will then provide me with those

5   documents and I will review them and will determine

6   what's privileged and what's not because my view and

7   lawyers' views are not always identical when it comes to

8   that, with a log.  It's just that my experience reviewing

9   logs is even though it's made with the best intentions

10  are never sufficient to explain what the heck the

11  document actually is.  It just doesn't.

12                  (Pause in proceedings)

13          THE COURT:  Okay.  That's 195.  So the last

14  thing we have is 193 which is really 189.  That has

15  moving parts or several parts to it, so I'd like to sort

16  of break that out into its constituent parts.

17          Okay.  The first part, and I'm just looking at

18  what you would call the prayer for relief, is produce

19  text messages from 13 custodians.  Right?  Let's do it

20  issue by issue.  So Mr. Mule, let's start with that.

21          MR. MULE:  Yeah.  Your Honor, as far as the

22  texts, I don't know if it makes sense, would you like to

23  give like a little timeline and the process for

24  background?

25                  THE COURT:  Yes.  It's a lot to absorb.

38

Proceedings

1          MR. MULE:  All right.  So look, the objection

2   over the last seven and a half months since we brought

3   these issues to SiteOne has been cost and

4   proportionality.  That's basically been their objection.

5   They're both meritless.  And it's, you know, it's telling

6   their opposition basically makes it --

7          THE COURT:  That's one objection or two you

8   said?  Cost and proportionality?

9          MR. MULE:  And proportionality.

10          THE COURT:  Okay.  Keep going then.  Got it.

11          MR. MULE:  So the objections plural.

12          THE COURT:  Okay.

13          MR. MULE:  You know, in their opposition they

14   make conclusory statements as to proportionality but

15   really that's it.

16          As far as the timeline, as this Court noted at

17   the last hearing, there is no PSI protocol.  There never

18   was.  The parties conducted their own, came up with their

19   own searches of what was relevant and responsive to the

20   requests.

21          THE COURT:  Did they share that with you?  I'm

22   talking about opposition now.  In other words, I

23   understand they came up with a list of let's just say ten

24   terms.  And did they say to you we're going to give you

25   these ten terms and you said okay?  Or tell me about

Proceedings

1    that.

2            MR. MULE:  That is absolutely false.  So what

3    happened is back in June they did their first production.

4    And we said this production is totally inadequate.

5    You've only identified a few custodians.  And then the

6    end of July they provided their own search terms and they

7    provided responses.  And on August 1st, we sent them a

8    letter and we said look, your own searches addresses only

9    40 percent of the document requests that we made.  It

10   doesn't even identify a search of 60 percent of the

11   searches, 70 out of 100 and --

12           THE COURT:  It doesn't identify 60 percent of

13   the searches?  What does that mean?

14           MR. MULE:  In other words, they came with what

15   their search terms were.

16           THE COURT:  Right.

17           MR. MULE:  And they applied -- they put the

18   request for production to which that particular search

19   applied.

20           THE COURT:  Okay.

21           MR. MULE:  And when I counted the requests for

22   production, I said 60 percent of our request --

23           THE COURT:  I see what you're saying.

24           MR. MULE:  -- for productions are not even on

25   here.

Proceedings

1          THE COURT:  So none of those link up with 60

2    percent of the request.

3          MR. MULE:  Correct, correct.

4          THE COURT:  Got it.

5          MR. MULE:  So in mid-August, that's when I

6    first requested -- I said well what are your -- we didn't

7    see any (indiscernible) in your efforts to collect texts

8    that are responsive to the documents.

9          We had meet and confers from July through early

10   September.  And the process, the way it worked, and we

11   had agreed to it, was they asked for I'm going to say

12   about five meet and confers concerning our responses

13   first.  And then we had two days at the end concerning

14   their responses.  So they had first dibs essentially in

15   coming to us and then we went to them.  In mid-September,

16   we came back to them and said -- and that's docket 189-5.

17   We gave them a list of -- we said, you know, your

18   responses are still deficient on all these particular

19   topics and we identified specific requests --

20          THE COURT:  Topics and requests to produce or

21   just topics?

22          MR. MULE:  Yes, requests to produce.  So we --

23          THE COURT:  No, but I'm saying you linked them

24   to requests --

25          MR. MULE:  I identified the specific numbers.

41

Proceedings

1          THE COURT:  Okay.

2          MR. MULE:  It's 189-5.  And I also gave a list

3    of 24 names.  We said we want these custodians searched

4    for texts as well.

5          THE COURT:  Right.

6          MR. MULE:  And meanwhile, as you'll recall,

7    September 11 comes, we get a barrage of motions.  This is

8    like -- there's been over 30 motions by SiteOne here.

9    They've spent $2 million in fees since this case.

10   There's been tremendous motions.  Not one substantive

11   deposition yet or discovery.

12         So by SiteOne's own searches left to their own

13   devices, they say they reviewed 25,000 documents.  And

14   they have a narrative in here saying we agreed to their

15   searches.  We didn't agree to their search terms.  We

16   basically had meet and confers.  They said we'll

17   supplement some.  Let us consider these.  You know, maybe

18   we'll do that.  And then they came back, they provided

19   one other search, updated search term on August 2nd.  And

20   that updated search term was still insufficient and the

21   subject of the meat and confers and the additional

22   letters that we sent them for additional meet and confers

23   that these are not responsive.

24         Then you'll recall in mid-October we were here

25   and they said we want you to review these specific search

42

Proceedings

1    terms and give us a headcount.  And we agreed to that.

2    The Court ordered us to go through that and we did that

3    exercise.

4            And just to back up, on September 4 in one of

5    those meet and confers, we specifically said hey,

6    whatever process we're doing here, there's got to be a

7    reciprocal process.  So if you're requesting it from us,

8    we expect the same reciprocal fair process as it comes to

9    our requests.

10           So in October, they did the search terms.  We

11   ran those.  We spent tons of attorney hours and time

12   reviewing and preparing and getting those documents that

13   were responsive.  Meanwhile, while we are getting all

14   that together, we followed up again in November of 2024.

15   And this was because they kept making the same refrain,

16   costs, proportionality, costs, proportion, we can't do

17   it, it's too much.  Even though we spent 2 million in

18   fees, you know, apparently spending 200,000 reviewing

19   documents when it comes to evidence we need is too much.

20           So in the event of moving, the desire of moving

21   the case forward and getting to substance we said look,

22   we've culled this list down from 24 to 13 and we went

23   down to 13.  And again, they responded but it took them a

24   month and a half to respond.  January 3rd they respond

25   and their refrain was the same.  Costs too much,

43

Proceedings

1    proportionality.

2          Then January 17th comes and they say we'll pick

3    our own ones that we want to produce.  These three,

4    Thistle, Ketter, and Catalano.  That was January 17.  And

5    we said wait a minute, this is not what we agreed to.  We

6    agreed to a process.  Whatever process we're going to

7    apply to you was going to apply to us.  And we had not

8    been making progress.

9          So we made the first motion which is 189 and on

10   February 10th we were before the Court and we right

11   before that we went through the painstaking task of

12   making a document with specific searches.  And we have

13   that.  It's in the record as Exhibit H.  Exhibit H and

14   Exhibit G, docket 198-7 and 198-8, are really the key

15   exhibits here.

16          THE COURT:  Okay.  It's not 198 though.

17   It's --

18          MR. MULE:  I'm sorry 193.  Excuse me.

19          MR. GIBBS:  I think it's 189.

20          THE COURT:  It's 189 I think.

21          MR. MULE:  189.

22          THE COURT:  And it's --

23          MR. MULE:  Dyslexia I guess.

24          THE COURT:  All right.  So you're saying

25   it's -- because when I print it, it doesn't come out

44

Proceedings

1  quite the way you say.  So it's docket entry -- it's dash

2  7 and dash 8?

3          MR. MULE:  Dash 8.  Dash 7, dash 8, which is

4  Exhibit G and Exhibit H.

5          So you know, at the conference the motion to

6  compel was withdrawn because there was an agreement that

7  SiteOne would compromise.  We agreed, you know, they

8  agreed that they'd run the search terms that we provided.

9  So I took this as the same process that we went through

10 in October.  And we specifically said to the Court that

11 by the end of the week we would provide a further

12 limitation as to the number of custodians.  And we said

13 somewhere between 13 and three, and greater than three,

14 because they agreed to three previously.

15         THE COURT:  Which leaves ten.

16         MR. MULE:  Which leaves somewhere between 13

17 and --

18         THE COURT:  All right.  So leave the three out.

19 That leaves ten others.

20         MR. MULE:  Well ten others.  Correct.

21         THE COURT:  Right.  So of --

22         MR. MULE:  And then so --

23         THE COURT:  Wait, wait.  Let me ask you a

24 question and then you can continue.

25         MR. MULE:  Yeah.

Transcriptions Plus II, Inc.

45

Proceedings

1          THE COURT:  Did you come up with the --

2          MR. MULE:  I did.

3          THE COURT:  Who were they?

4          MR. MULE:  So on February 14 we gave them a

5    list of ten and those ten were --

6          THE COURT:  Well, that was the remaining ten

7    then, all ten.

8          MR. MULE:  No, no, because they already agreed

9    to three of them.

10          THE COURT:  Oh, so seven more.

11          MR. MULE:  So it's really just seven more.

12          THE COURT:  Okay.  And who are they?

13          MR. MULE:  That was Doug Black.  They had

14    agreed to Catalano already.  Gerard Passaro --

15          THE COURT:  Wait, wait.  I'm looking at the

16    exhibits.

17          MR. MULE:  Yes.  Sure.

18          THE COURT:  Gerard?

19          MR. MULE:  If you look at --

20          THE COURT:  Oh, he's number two.  Okay.

21          MR. MULE:  Yeah.  At Exhibit G.

22          THE COURT:  Got it.  I have it.  Who else?

23          MR. MULE:  Kevin Peatie is number eight on

24    Exhibit G.

25          THE COURT:  Yes.  Who else?

46

Proceedings

1          MR. MULE:  Phil Sausto who's number three.

2          THE COURT:  Yes.

3          MR. MULE:  Alex Trama, who is number one.  Greg

4    Thistle they agreed to produce.  Jerry Justice, who is

5    number seven.  Joe Ketter, who is --

6          THE COURT:  Number 12.

7          MR. MULE:  Number 12.  And they agreed to

8    produce his texts.

9          THE COURT:  All right.  So is that every --

10          MR. MULE:  And then --

11          THE COURT:  What else?

12          MR. MULE:  -- Mr. Brian Kersnowski.

13          THE COURT:  Number five.

14          MR. MULE:  Number five.  And you know, so we

15    came back and we said seven more.  I further compromised

16    to our position in the interest of moving us forward

17    again.  They came back February 24 two much, costs too

18    much, proportionality.  And you know, so out of these

19    numbers if you look at Exhibit G, numbers one and two,

20    Trama and Passaro --

21          THE COURT:  Right.

22          MR. MULE:  Numbers three and five are

23    specifically mentioned in the complaint and they filed

24    declarations in this case.

25          THE COURT:  Right.

Transcriptions Plus II, Inc.

47

Proceedings

1          MR. MULE:  You know, your Honor referenced at

2    pages 41 through 42 at the last hearing about I can

3    envision a 30(b)(6) and you're going to have the review

4    relevant information anyway.

5          So as to those, I don't see any basis for not

6    getting the relevant information on them and pulling

7    those texts.

8          As to the others, we have specific reasons why

9    they should, their information should be culled and

10   relevant information produced.

11         So Doug Black, number four, is the CEO of

12   SiteOne.  Don regularly was in communication with him.

13   He's the CEO but he's the one that Don communicated to

14   regarding the operations here.  He was a key figure in

15   terminating Don.  Any types of decisions that Mr. Thistle

16   is going to make, Catalano is going to make --

17         THE COURT:  Okay.  Now, let me ask you a

18   question.

19         MR. MULE:  Yes.

20         THE COURT:  I understand what you're saying.

21   But with respect to searching the texts --

22         MR. MULE:  Yeah.

23         THE COURT:  -- how is that done?  What is

24   your --

25         MR. MULE:  Okay.  So they could do one of two

48

Proceedings

1  things.  And this hasn't been decided because --

2          THE COURT:  But what are you asking for?  Let

3  me put it that way.

4          MR. MULE:  Because they haven't agreed to

5  anything.  But we gave them, as Exhibit H, we gave them

6  that specific --

7          THE COURT:  The table.

8          MR. MULE:  -- table which gives very -- it

9  identifies even the allegations to which the particular

10  request and the search refers to.  We gear the requested

11  terms to particular allegations.

12          THE COURT:  Right.

13          MR. MULE:  We gear it toward particular claims.

14          THE COURT:  I see.  So each custodian to an

15  allegation.  That's how you --

16          MR. MULE:  That's right.

17          THE COURT:  All right.

18          MR. MULE:  That's right.

19          THE COURT:  Yes.

20          MR. MULE:  So we did that.  We went through

21  that task.  And really what this comes down to is they're

22  complaining about cost.  Now --

23          THE COURT:  No, I got that.  You don't have to

24  repeat it.

25          MR. MULE:  Okay.  So that's texts.  I don't

49

Proceedings

1  know if you want me to get into emails which is -- I mean

2  it's similar.

3          THE COURT:  We're going to do -- well how

4  similar?  Because we're going to --

5          MR. MILMAN:  I think you should know though on

6  the costs that they keep raising, only roughly 10 percent

7  of that cost is to do the search.

8          THE COURT:  No, I got it, I got it.

9          MR. MILMAN:  Everything else is legal fees.

10         THE COURT:  No, I got it.  Mr. Milman, Mr. Mule

11  is doing a good job.

12         MR. MILMAN:  I know.  Thank you.  Sorry.

13         THE COURT:  Let him do his thing.  I'm just

14  going to handle this one at a time but if it's basically

15  the same argument with respect to emails, then --

16         MR. MULE:  It is, yeah.  And it's really

17  just -- look, when they did the searches under their

18  terms, they came up with 25,000.  And we said, you know,

19  60 percent of our requests aren't captured by this.  So

20  we came with these searches.  And not surprisingly, they

21  come back, and that's document 189 -- I think that's 198-

22  8.  Sorry.  189-8.  I keep mixing that up.

23         THE COURT:  That's the table, isn't it?

24         MR. MULE:  You know, that -- they came back and

25  they said it produces 204,000 documents.  But it's no

Transcriptions Plus II, Inc.

50

Proceedings

1   surprise that the searches that are relevant to the case
2   to our defense will come up with documents.  Basically
3   we're entitled to a defense and we should be able to get
4   these documents.  They brought this lawsuit.
5              THE COURT:  I got all that.
6              MR. MULE:  It's been a one-way street so far,
7   your Honor.
8              THE COURT:  I got all that.  Okay.  Mr. Gibbs?
9              MR. GIBBS:  Thank you, your Honor.
10             THE COURT:  Let me just say before you get
11  started, the answer to this question is not you don't
12  have to do any more searches.  So gauge your response
13  accordingly, please.
14             MR. GIBBS:  Yes, your Honor.  So I think --
15             THE COURT:  And I think I said that before.
16             MR. GIBBS:  -- I think that it is very
17  important to start off with a -- I want to frame first
18  the basis for these additional requests.
19             So if you read their motion papers, they
20  specifically say they are seeking additional evidence
21  about this vendetta lawsuit.  That is the thrust of what
22  they're asking for.  They've really listed six different
23  types of things they're looking for.  Specifically,
24  purchase of the assets, the activities leading up to
25  Don's termination, the decision to terminate Don, the

51

Proceedings

1  investigation into Nick's activities, the decision to

2  terminate Nick, and the decision to commence this

3  lawsuit.

4         So it's a really narrow universe of topics that

5  they're seeking this additional discovery about.  So I

6  just want to frame that up first --

7         THE COURT:  Okay.

8         MR. GIBBS:  -- because that's the focus of this

9  vendetta lawsuit theory.

10        Now, I want to walk through -- because I'm

11 sorry, your Honor, but when we went through this process

12 last year, we met and conferred for hours.  I mean it was

13 something like 14 or 15 hours.  We met and conferred over

14 each other's discovery responses and what we were going

15 to do.

16        And the letters, I've attached them as exhibits

17 where I expressly tell them -- the August 2nd letter I

18 think is the most important one.

19        THE COURT:  Okay.

20        MR. GIBBS:  And that one specifically says hey,

21 here are our discussions, our joint discussions up to

22 this date.  You proposed, you defendants, you proposed to

23 us 15 additional search terms.  So at the end of July we

24 sent them our search terms.  And it's not just search

25 terms.  It was a chart that said here's the search terms,

52

Proceedings

1    here are the requests for production to which they are I
2    guess seeking materials for.  Here are the custodians
3    that are being search.  Here are the hit counts for these
4    particular search terms.  We initially sent them -- we
5    initially ran 12 separate sets of search terms, included
6    all that information, and we sent it to them I think it
7    was the last week of July.

8              We then had another meet and confer over that
9    where we discussed additional terms.  They sent us 15
10   additional search terms.  We ran all of those search
11   term's and we sent it back to them.  And we said, I mean
12   I can quote it from the letter, we said look, 12 of the
13   search terms that you sent us, that gives us an
14   additional 4,300 pages --

15             THE COURT:  This is the August 2 letter?

16             MR. GIBBS:  Correct, your Honor.

17             THE COURT:  Okay.  What page number?

18             MR. GIBBS:  Page 5.

19             THE COURT:  Okay.

20             MR. GIBBS:  Page 5.  And I said that gives us
21   an additional 4,300 pages of documents, 12 of your search
22   terms.  But the other three, those three alone because I
23   think it was, you know, one was for like just Don I think
24   was one of the search terms.

25             THE COURT:  When you say 12,000 you're

53

Proceedings

1   referring to the 11,904 number in the letter?

2           MR. GIBBS:  I'm sorry, say that one more time,

3   your Honor?

4           THE COURT:  When you say 12,000, you're

5   referring to this below the point B where it says 11,904?

6           MR. GIBBS:  No, your Honor.  So the 12 I'm

7   referring to, so they gave us 15 total search terms.

8           THE COURT:  Right.

9           MR. GIBBS:  And we ran those and we agreed to

10  review the documents that were responsive to 12 of those

11  search terms.

12          THE COURT:  Oh, I see.  Okay.  Sorry.

13          MR. GIBBS:  Yeah.  And that total number of

14  documents that was responsive to those 12 search terms

15  they gave us, it was 4,300 documents.  And we said okay,

16  we will review those additional 4,300 documents in

17  addition to the 20 something, 30 something thousand that

18  we're already respond -- that we were already reviewing.

19          And we said specifically hey, but these three

20  that you gave us, these other three, that's almost 58,000

21  additional documents.  That's not proportional or

22  reasonable, so we're not agreeing to review those.  They

23  took no issue with that.  We invited them.  Hey, if you

24  got other search terms you want us to run, if you've got

25  questions about this -- and we included with this, just

54

Proceedings

1    to be clear, we sent them the full hit count report that

2    had all 12 of ours, all 15 of the ones that they

3    proposed.  We sent that to them.  It's like as plain as

4    day.

5             And then we proceed, we go and review all those

6    documents.  It totals up to a little over 35,000

7    documents.  So we collected email data for 24 different

8    people and we ran these search terms across those 24

9    people in various iterations.  We reviewed those 35,000

10   and change documents.  We produced more than 1,000

11   documents from the emails.  We started producing in June.

12   We finished our last email production September 6 and we

13   finished our non-email production on October 18th.

14             So after that on November 27th, that's when

15   they come to us and say hey, you applied, and this is a

16   quote, "You applied limited search terms to a limited

17   number of custodians."  And that is attached as Exhibit 3

18   to our motion, docket 196.

19             And so they came to us and in that particular

20   email they demanded that we run 15 additional terms over

21   a period of more than two years and across 13 custodians.

22   Three of the folks who were included in that group are

23   new custodians for whom we had not collected data because

24   we did not identify them as relevant.  So they were also

25   asking not only run additional search terms but collect

55

Proceedings

1   email data from three additional people.

2           So we responded in the two separate letters,

3   Exhibits 4 and 5 to our motion and we explained in really

4   great detail why the requested searches were not

5   reasonable, why we were not willing to do this.  It was

6   going to cost -- we ran the hit counts, sent them the hit

7   counts, and it was going to be a total of almost 18,000

8   documents.  And we said hey, that'll take, you know, 250

9   hours of attorney time to review, that'll be more than

10  $100,000.  Considering everything that we've already done

11  including running all the search terms that you asked us

12  to do which we reviewed the documents for, we don't think

13  it's unreasonable for us to have to do this.  There are

14  18,000 more.  When it's really untethered from, you know,

15  any specific relevance.

16          And so that was -- so we explained that in

17  January.  We went back and said hey, look, if there's

18  some way to narrow it or something like that, please let

19  us know.  They did not respond.  Instead, the night

20  before the February 10th hearing they filed their motion

21  to compel.  Attached to that motion, those search terms,

22  your Honor, that is the first time we ever saw them.  And

23  that chart, I will say Exhibit H, your Honor, that is 25

24  pages, 39 separate search terms or search parameters that

25  they've asked us to run.  It's only increased.  Every

56

Proceedings

 1  time they ask us to run more searches, the number gets

 2  bigger.

 3          THE COURT:  Well, but now the number is getting

 4  smaller because they've come down to seven custodians.

 5          MR. GIBBS:  No, your Honor.  No, your Honor.

 6  So I'm only talking right now about email.  This is only

 7  email.  Everything I've just said to you --

 8          THE COURT:  Okay.

 9          MR. GIBBS:  Everything I've said so far is only

10  email.

11          THE COURT:  Okay.  We were talking about texts

12  though.

13          MR. GIBBS:  We --

14          THE COURT:  I asked Mr. Mule about texts, start

15  with texts.

16          MR. GIBBS:  Well, I think we've gotten in -- so

17  the text messages sort of come a little later.  And I

18  think what Mr. Mule said, he addressed texts and emails.

19          THE COURT:  Well, then he sort of said the

20  email argument is the same, but you're drawing a

21  distinction between the two, which is okay.  I'm just

22  trying to understand it.

23          MR. GIBBS:  Yes, your Honor.  I think this

24  provides the context and the timeline with the text

25  messages.

57

Proceedings

1          THE COURT:  Okay.

2          MR. GIBBS:  So the demands again -- so February

3   7th we get this expanded set of search terms for the

4   email data which we've never seen.  So this expanded from

5   15 specific search terms that they sent us on November

6   27th now to 39.  So it almost tripled the number of

7   search parameters they wanted us to run with no

8   explanation.  Well, we had already sent hit counts for

9   the original 15 and said what more?  This is too much.

10  Explain why you need this and let's see if we can make it

11  something smaller.  And instead, they sent us something

12  that's almost three times as large.

13          So we get that.  We had the hearing on February

14  10th.  We adjourned.  We agreed that we would run the hit

15  counts, provide that data to them, which we did.  And so

16  again, this was just an email.  The number of documents,

17  the number of emails that hit on the search terms, so it

18  was almost 204,000 documents.  To promote it into the

19  database, host it, review it, produce it would be about

20  $400,000.  And that is for the 24 custodians for whom we

21  have already collected email data.

22          And so they're asking for three additional

23  custodians as well.  And to collect the data from those

24  three people, to run the search terms, the original

25  search terms and the new ones, that would be about

58

Proceedings

1    $76,000.  And so we're talking about just for the emails

2    we're talking about an additional half a million dollars

3    to do what they've asked.

4             THE COURT:  Okay.  My recollection of this

5    issue the first time we had the motion hearing was that I

6    certainly raised some concern about there being no

7    electronic ESI protocol.

8             MR. GIBBS:  Yes, your Honor.

9             THE COURT:  This has only confirmed my original

10   thought.  And there are two ways to go.  One was I was

11   hoping we could sort of Band-Aid something together to

12   give a response to this motion.

13            I'm looking at Exhibit H which is the cross-

14   referencing of custodians to particular requests and it's

15   not clear -- well, I understand the purpose of it and it

16   makes sense.  It still says well we want documents about

17   this allegation from this person.  That is not an ESI

18   protocol.  An ESI protocol would then have search terms

19   that could be run.  But I don't see that in Exhibit H.

20            MR. MULE:  Your Honor, it's in there.  It says

21   additional proposed search terms.  It has SiteOne's

22   terms --

23            THE COURT:  Slow down, slow down.  Oh, I see.

24   I see it.  Okay.

25            MR. MULE:  -- on the -- and then it has the

59

Proceedings

1  additional proposed search terms which are the terms that

2  we requested be run.

3           THE COURT:  Okay.  And that is (indiscernible)

4  text?

5           MR. MULE:  That's -- what I'm saying is it

6  could be applied to both because we --

7           THE COURT:  Are they both searched the same way

8  that --

9           MR. MULE:  Yeah, exactly.  Like they just add

10  to text and put these search terms, this could be a way

11  it could be done.  You know, for us, they put the burden

12  on us manually reviewing the texts because they said you

13  can't, you know, it's hard to get searches.  But you

14  know, they didn't even come back to us with any type of

15  proposed edits on this or even saying that any of these

16  were not relevant.  They're relevant.  They're geared --

17           THE COURT:  Okay.  Well, I'm not going to talk

18  about relevance for a moment.

19           MR. MULE:  No?  Sorry.

20           THE COURT:  But okay.  Understanding that now,

21  with respect to the seven custodians, I want to focus on

22  those.  Did you run the counts for those seven custodians

23  using the terms from the additional proposed terms

24  column?

25           MR. GIBBS:  Well, so your Honor, so do you mean

60

Proceedings

1  for emails?

2          THE COURT:  Emails, well emails and texts.  But

3  if there's two separate answers, one for each, that's

4  fine.

5          MR. GIBBS:  It's separate, it's separate.

6          THE COURT:  Okay.  So tell me what's the answer

7  to both?

8          MR. GIBBS:  So the answer for emails is yes, we

9  have run all of their proposed search parameters exactly

10 as they asked us to do.

11         THE COURT:  Okay.

12         MR. GIBBS:  Exactly what's in their chart,

13 Exhibit H --

14         THE COURT:  And so for emails, the number --

15 what was the total?  You said it but tell me again.

16         MR. GIBBS:  204,000 documents.

17         THE COURT:  Okay.  And then did you do it for

18 texts?

19         MR. GIBBS:  No, your Honor.  We did not do it

20 for text messages.

21         THE COURT:  Okay.  And text hasn't been done.

22         MR. GIBBS:  I did not understand that that

23 would be an appropriate way.  So I'll tell you that for

24 text messages, for the three that we searched -- and now,

25 you know, I'll move on to the text message piece.  So for

61

Proceedings

1   the text messages, we told them last year hey look, we're
2   agreeable to searching text for a reasonable number of
3   people and started with the 24.  And we said there's no
4   way.  So the conversation was what do you really want?
5   Like who are you really after here?  And the list stayed
6   at 24 until late last year and then it was culled down to
7   the 13.

8           And we continued to say look, 13 is still --
9   that's a lot.  And we've already done all these other
10  things.  What's your real list?  And they wouldn't tell
11  us who the real people are.

12          So we selected the three people, the management
13  people --

14          THE COURT:  No, I remember that.

15          MR. GIBBS:  Okay.  So we made what we thought
16  was an informed selection of who would be most likely to
17  have the data relevant to this vendetta lawsuit.  The
18  people who investigated Don and Vic and Nick and actually
19  terminated them, made the decision to terminate them.

20          THE COURT:  And you look at their texts as
21  well, most of them.

22          MR. GIBBS:  So what we did, let me tell you
23  what we did for them, your Honor.  So we got their -- we
24  collected their text messages, and we got our list of the
25  26 people.  So I guess 27 people.  It's all of the

62

Proceedings

1   original custodians for whom we collected email data plus

2   the three other new custodians they proposed.

3           THE COURT:  Right.

4           MR. GIBBS:  And we got those, those

5   individuals, and we pulled every single text message

6   between these three custodians and any of those 27

7   people.  And then we pulled all of those messages and we

8   manually reviewed every single one of those.  I can't

9   remember the exact number that we reviewed.  It was a few

10  or several hundred.  And then we produced the messages,

11  the relevant responsive messages.  We produced those on

12  March 18th and there were I think we'll just say

13  approximately 100 text messages.  And so that's the

14  process that we went through with the text messages.

15          THE COURT:  Okay.  Let me ask you --

16          MR. GIBBS:  So we did not run search terms in

17  the text messages.  We reviewed them manually just like

18  they did.

19          THE COURT:  Okay.  Let me ask you a question,

20  Mr. Mule.  A lot of the time frames in your Exhibit H,

21  the date range, it seems to me as a matter of logic that

22  there was probably a certain number of months window that

23  would be the hot time, for lack of a better phrase, where

24  things were going on.  It seems to me that one way to

25  manage it might be to limit the time frame.

63

Proceedings

1          For example, I'm making up dates now, but if

2     the hot four months was January 1 to April 1, I guess

3     that's three months, if they did the search and there

4     were no texts responsive from that window collected in a

5     subsequent text being responsive would approach zero, it

6     would certainly go down.  Right?

7          So perhaps the one way to make this more

8     manageable is to (A), limit the time frame because I'm

9     inclined to grant searches for these seven individuals

10    having looked at Exhibit G and reviewing Mr. Mule's

11    rationale.  I think it is a reasonable rationale.  It

12    just may be too cumbersome for the amount of data we're

13    talking about.

14         So I'm also concerned that perhaps the search

15    terms may generate too many responses.  For example, the

16    one that just says Don or Vic or Nick.  That it may need

17    additional search terms to limit it.  But if you were to

18    create a hot window, what would that be, Mr. Mule, in

19    your opinion?

20         MR. MULE:  Yeah.  So your Honor, I guess it

21    would depend on the particular search.  And you know,

22    even in SiteOne's date ranges, they had different dates

23    with respect to different searches.  So we could

24    certainly do that exercise.

25         THE COURT:  Well, it seems to me the time

64

Proceedings

1  period you would be interested in, Mr. Gibbs, would be

2  from your perspective is several months before.  Right?

3  Leading up to what happened.

4          MR. GIBBS:  October.  Starting October.  To our

5  view, the hot period is October of 2022 through late

6  March, or April 1, 2023.

7          THE COURT:  Right.  And your hot period though,

8  Mr. Mule, would probably postdate that because you want

9  evidence of some kind of, you call it vengeance, I don't

10  know, whatever you want to call it.  Right?  They're

11  trying to get back at you guys because the deal went

12  south.

13          MR. MULE:  Yeah.  Well, we would go back to

14  October 2022 as well because in our view, they were

15  planning to basically number one, get rid of Don.  And

16  then they were negotiating with him.  And at the same

17  time they're negotiating with him, they are plotting this

18  lawsuit against him.  So --

19          THE COURT:  But what would that window -- from

20  when to when is the window?

21          MR. MULE:  So this would be like, you know, at

22  least from sometime -- we have like -- because most of

23  this, October 1, 2022 --

24          THE COURT:  So okay, then to -- if your theory

25  is going to bear fruit, right, it seems like you don't

65

Proceedings

1   need two years of texts.  I mean it could be -- unless

2   the first -- if the first three months of texts let's

3   say, I'm just picking a number, reveal exactly what you

4   suspected and this whole thing was just a conspiracy,

5   then it might makes sense to go through another three

6   months to see how this conspiracy played out.

7           But on the other hand, if the first few months

8   reveal absolutely nothing but what you'd expect in your

9   normal asset purchase situation, it seems unlikely that a

10  conspiracy would develop after the fact.  You see what

11  I'm saying?

12          MR. MULE:  So I have one idea.  Maybe if Mr.

13  Milman can jump in?  But as far as the -- I think there

14  is a distinction between the texts and the emails so --

15          THE COURT:  Meaning there'd be two different

16  windows?

17          MR. MULE:  Right.

18          THE COURT:  Okay, okay.

19          MR. MULE:  Exactly.  So you know, to the extent

20  we're talking about, you know, to try to cull down the

21  universe and we talked about texts between the seven

22  additional to have a total of ten for the texts --

23          THE COURT:  But they already did the three,

24  the --

25          MR. MULE:  They did three, so seven more,

66

Proceedings

1   getting a total of ten.  And perhaps that could be a more

2   limited time period from October 1, 2022 to sometime in

3   2023 shortly after this lawsuit started.  And that might

4   be a more limited framing.

5           THE COURT:  Well, here's what I'm prepared to

6   give you.  I'm prepared to give you four months.  You can

7   pick the four months.  You said emails and texts may be

8   different.  But I'm prepared to grant the motion as to

9   the seven additional individuals for a four-month period

10  which you can get.  Talk to your client or among the

11  team.

12          MR. MULE:  Okay.

13          THE COURT:  And provide that to Mr. Gibbs, and

14  he will conduct the search.  If the search -- the top

15  number was 204,000 I think you said, Mr. Gibbs, right?

16          MR. GIBBS:  Well, I think -- so that's for --

17          THE COURT:  For emails.

18          MR. GIBBS:  Those are for emails.  Yes, your

19  Honor.

20          THE COURT:  Okay.  Why don't we continue to --

21  we'll continue to break it down, do one sort of number

22  for emails and one number for texts only because I have

23  to be able to follow whatever you're going to submit.

24          MR. GIBBS:  Yes, your Honor.

25          MR. MULE:  Your Honor --

67

Proceedings

1          MR. MILMAN:  Your Honor, I just think the four-

2   month period is limited.  I'm going to say this, because

3   we did get some responses from them last week.  We had

4   gone through a cursory review and --

5          THE COURT:  Pull the mic towards you.

6          MR. MILMAN:  What?

7          THE COURT:  Pull the mic towards you so that

8   you're recorded.

9          MR. MILMAN:  Oh, I'm sorry.  Sorry.  Yeah.  So

10  we did get some responses last week.  We've only had a

11  limited period of time to go through them.  But we have

12  found some texts in January of 2023 which will support

13  our theory of this case.

14          I think four months is problematic for us

15  because if we start in October, that only takes us to

16  February.  We think these conversations probably started

17  in October and went to maybe June.

18          THE COURT:  Let me give you a caveat here.  I'm

19  inclined to give you the four months.  If it produces

20  essentially nothing, you're done.  If it is a hotbed of

21  information, then I would be inclined to listen to an

22  application for more months,

23          MR. MULE:  Well again, I too, like you --

24          THE COURT:  Do you see what I'm saying though?

25          MR. MILMAN:  Yeah, I do.  But like you, I agree

68

Proceedings

1    that I can't always count on what is being said in the

2    courtroom as to what we are actually getting in

3    documents.  For example --

4              THE COURT:  I don't understand what you mean by

5    that.

6              MR. MILMAN:  Well, what I mean by that is we

7    did get a response from them and it's a text and it's one

8    employee texting another but there's no reciprocating

9    text from that other employee from his -- I'm pretty sure

10   these were texts, right?  Yeah.  So I just think a longer

11   period, I was going to say six months, three months

12   before January and three months after.

13             THE COURT:  The answer is four months.  No.

14             MR. MILMAN:  Okay.

15             THE COURT:  Four months for now.  Like I said,

16   this is -- Judge Tomlinson used to do this a lot.  We're

17   sort of sampling to sort of keep the costs down.  And if

18   it turns out, Mr. Gibbs, your clients were behaving

19   nefariously or with an ulterior motive, we're going to

20   listen to this and I suspect you will --

21             MR. MILMAN:  And they're searching deleted

22   texts like we searched deleted texts (indiscernible),

23   correct?  It's all texts and (inaudible) --

24             THE COURT:  It would be all --

25             MR. MILMAN:  I just want to make sure.

69

Proceedings

1          THE COURT:  I don't know how texts are

2   maintained as a matter of electronics.  The search should

3   include whatever is recoverable.

4          MR. MILMAN:  Okay.  And your Honor --

5          THE COURT:  But let me -- if I don't start

6   taking any type of notes, this isn't going to be worth a

7   whole lot.  So bear with me.

8                  (Pause in proceedings)

9          THE COURT:  Okay.  So what's going to happen

10  then is Mr. Gibbs, you'll do a search for the two three-

11  month windows.

12         MR. MULE:  Oh, I thought you said four-month

13  windows.

14         THE COURT:  Oh, I'm sorry, I did say four-month

15  windows.  I did.  Sorry.

16         MR. MULE:  Yes.  And your Honor, I just want to

17  make sure a couple of things.  One, that's regarding

18  texts.

19         THE COURT:  Oh, I put four in.

20         MR. MULE:  The search terms and the hit lists

21  or what they have, they call it something else.  But what

22  they provided which referred to the 204,000 documents

23  concerned emails.  And so they already had 16 custodians

24  total which they had collected the emails for I believe.

25         MR. GIBBS:  24.

Transcriptions Plus II, Inc.

70

Proceedings

1          MR. MULE:  24.  Okay.  24.  And basically what
2    we had wanted them to do, because what they did is for
3    particular searches they had all right, we're going to do
4    these two custodians here, we're going to do five
5    custodians here.  We said across the board we want you to
6    run all the custodians for these particular searches.

7          So I just want to be clear that the searches
8    for the emails is an entirely separate, you know, it's a
9    separate endeavor.

10          THE COURT:  No, that was it.  You said the
11   arguments were the same so I said the searches are the
12   same.

13          MR. MULE:  The arguments are the same.  So if
14   they collected all the texts and all the email and put it
15   all in a database, they could run these searches, the
16   same searches that we have.

17          THE COURT:  Yes.

18          MR. MULE:  However, you know, they still have
19   to, for these particular searches, they still got to
20   search the emails.

21          THE COURT:  For the seven people.

22          MR. MULE:  Not for the seven, for all the ones
23   that they already have on their database plus the seven.

24          THE COURT:  Mr. Gibbs?  That's now what I
25   understood it but that's --

71

Proceedings

1          MR. GIBBS:  I'm not following quite, your

2    Honor.  So I understand that you're ordering just talking

3    about text messages, that there's a --

4          THE COURT:  Well right now what I've drafted is

5    an order that -- I've drafted an order that says Mr. Mule

6    is going to give you two four-month windows, one for

7    email, one for texts as to those seven additional

8    custodians and you will search for terms as they request

9    in Exhibit H as to those custodians during those windows.

10   That's all the order says right now.

11         MR. GIBBS:  That's right, and --

12         THE COURT:  That's all I understood you to be

13   asking for.  So I'm not sure what we're talking about.

14         MR. GIBBS:  Well, so I mean that's fine with

15   me, your Honor.  That's fine with me.  I think -- I don't

16   know that that's what they were talking about.  But what

17   you have described is fine with us.

18         THE COURT:  Okay.  But so let's see, Mr. Mule,

19   what else are we talking about here?

20         MR. MULE:  Yeah.  So what we had proposed,

21   there are some additional -- those seven names are going

22   to be additional, or may be additional custodians.  I'm

23   not exactly sure.  Mr. Gibbs could answer if they are

24   additional custodians than what they had already included

25   in the 24.  So I don't know the answer to that.

72

Proceedings

1        THE COURT:  I don't understand what you're

2   asking though.  So there are 24 other custodians?

3        MR. MULE:  No.  They already had and collected

4   the emails for 24 custodians.

5        THE COURT:  And any of those the seven that

6   we've already identified?

7        MR. MULE:  That's what I'm not sure what the

8   answer is.  Some of them may be and some of them may not

9   be.

10        THE COURT:  Okay.  Mr. Gibbs?

11        MR. GIBBS:  I just need to see the --

12        THE COURT:  It's fine.  Take your time.

13        MR. GIBBS:  -- the list of seven.  I think the

14   answer is yes.

15        THE COURT:  It's in the exhibit -- it's docket

16   entry 189 I think 7.

17        MR. GIBBS:  Oh, 7?  Dash 7?

18        THE COURT:  7.

19        MR. GIBBS:  Okay.  Let me see.  Yep, I've got

20   that.  It's a list of the names.

21        THE COURT:  And that's a longer list.  The

22   seven are -- do you have it in front of you, the exhibit?

23        MR. GIBBS:  I do.

24        THE COURT:  It's individuals one, two -- one

25   through five, seven, and eight which is Alex Trama,

73

Proceedings

1  Gerard Passaro, Phil Sausto, Doug Black, Brian

2  Kersnowski, Jerry Justice, Kevin Peatie.

3          MR. GIBBS:  Yes.  Those seven individuals, we

4  have collected their email data.

5          THE COURT:  Okay.  So you've already done that.

6          MR. GIBBS:  It's been collected and searched.

7          MR. MULE:  So what I'm saying is searching for

8  the seven with respect to the texts, that's great.

9  That's what we're asking for.

10         But with respect to the emails, we still need

11 them to do their searches.

12         THE COURT:  What does that mean?

13         MR. MULE:  So the searches would be for all 24

14 because they didn't search all 24 custodians in their

15 original searches.  Like I said, they sort of pick and

16 choose between we're going to search these --

17         THE COURT:  That's how they got 204,000

18 responses.

19         MR. MULE:  Right.  By 204,000 responses, it was

20 using our search terms for all 24.

21         THE COURT:  Right.

22         MR. MULE:  So as long as they do that for the

23 emails as well --

24         THE COURT:  No, that's what I'm telling you.

25 204 -- the problem is that that's so much.  I'm trying to

74

Proceedings

1    come up with a scaled search that will at least get you a

2    window into what's going on and allow you to test whether

3    your theory holds up.

4              MR. MULE:  Well, the seven is problematic

5    because we don't know, those seven may be relevant for

6    texts and particular searches but for a particular

7    request for production and emails, there may be other

8    people and they themselves conceded that.

9              THE COURT:  There may be, but you need to -- we

10   have to narrow this down in a way where you pick a

11   limited number of people so that's less than 204,000.

12   And if you get the email or part of an email chain that

13   aha, well then you have a reason to come back to court

14   and say well look, wait a minute, there's also these

15   other eight people and they're clearly involved because

16   look at this email.  Okay, I'll listen to that.  But a

17   blanket search of 204,000 emails without the texts is a

18   lot.  And so I'm trying to get a way to get a more

19   manageable number that still allows you to probe your

20   theory.

21             MR. MULE:  Yeah, I understand the intent, your

22   Honor.  I guess the question that I have is on their lone

23   searches, they have for certain of the document requests,

24   they might have had ten custodians that they themselves

25   looked at and we said wait a minute, the searches that

Transcriptions Plus II, Inc.

75

Proceedings

1    you did was inadequate, here's some additional, you know,

2    search terms.  But it should be applied, you know, to

3    more than just the ten.  But even that ten is more than

4    the seven that we're talking about.

5         THE COURT:  Well, they said they already -- did

6    you already do it for the three, Mr. Gibbs, the last

7    three on their list at 189-7?

8         MR. GIBBS:  You mean the three that we

9    collected texts for?

10        THE COURT:  Right.  Thistle, Ketter, and

11   Catalano.

12        MR. GIBBS:  So for those three, we didn't run

13   search terms.  We collected all of their texts between

14   them on the one hand and any of the other 27 custodians

15   for whom we collected data because they're the relevant

16   people in the case that are really -- that's a full list

17   of everybody that both sides have said oh, they might

18   have some knowledge of the case.

19        THE COURT:  Okay.

20        MR. GIBBS:  And so we got those texts and we

21   manually reviewed all of those.  We did not apply search

22   terms because that's what they did, so we did the same

23   thing.

24        THE COURT:  Okay.  Well, maybe you need to use

25   search terms then because manual review of all these

Transcriptions Plus II, Inc.

76

Proceedings

1  texts seems like --

2          MR. GIBBS:  Well, I think well, your Honor, if

3  we're --

4          THE COURT:  -- (inaudible).  I don't know.

5          MR. GIBBS:  If at this point we are talking

6  about expanding our searching into seven other

7  individuals, then I'm not suggesting that we should

8  manually review all this.

9          THE COURT:  Oh, okay.

10          MR. GIBBS:  I am not.  I was just telling you

11  what we did for the 30.

12          THE COURT:  Okay.  Yes.  I don't think I want

13  that either.  That doesn't seem like a good use of time.

14          MR. MULE:  So your Honor, I guess, you know, as

15  far as the emails, I mean one thing we could do is do a

16  more limited time period with respect to these searches

17  to get down from the 204,000 number.

18          THE COURT:  Well, I've already done that.  I

19  told them you were going to give them a four-month

20  window.

21          MR. MILMAN:  But it should be for the 24

22  people.

23          MR. MULE:  But it should be for the 24 people

24  that they, you know, that they've identified as people

25  who are relevant custodians.

77

Proceedings

1          THE COURT:  You keep saying 24 people.  Have
2    you -- do you know who the 24 are?
3          MR. MULE:  Yeah, we've identified custodians.
4    We have 16 that we identified basically across the board
5    on these particular searches for responses to particular
6    requests.  So we limit it to 16 on all of them.  They did
7    24.  That's them.  But we limited it to 16 on these
8    numbers.
9          MR. GIBBS:  I think I can explain, your Honor.
10          THE COURT:  Great, because I have no idea
11    what's going on.
12          MR. GIBBS:  Okay.  All right.  So us, SiteOne,
13    at the beginning of last July we go through and we think
14    okay, who are all of the people -- there are sort of two
15    buckets of people.  Who are all the people who are
16    involved with the deal, you know, back in 2020?  Who are
17    those people talking about the deal?  And then those same
18    people weren't necessarily involved with these particular
19    locations that we purchased, the garden department
20    locations.  You know, some of those folks, for example,
21    ones like the M&A guy for SiteOne, he doesn't deal with
22    operations, right?  So he's only relevant to the asset
23    purchase agreement and the deal itself.  Right?
24          So we got the bucket of people who are involved
25    with the deal, and then more the people who are, you

78

Proceedings

1  know, involved with the actual locations themselves.  And

2  so take both those buckets together and there are 24

3  people that we identify, 24 total SiteOne employees.

4           THE COURT:  Okay.  How many of them are

5  operations people?

6           MR. GIBBS:  I'm not sure.  I'd have to go back.

7  It's been a long time since I looked at that.

8           THE COURT:  Okay.

9           MR. GIBBS:  But anyway, so there are a total of

10  24.  We then pulled those out and pulled all their emails

11  I think back to eternity and then we applied date filters

12  in the search software.  So those 24 people, we searched

13  their emails for it would be 24 total search terms and

14  those are the best of 36,000 documents that we already

15  reviewed.  And so those are the -- that's the 24

16  custodians.  Those are the 24 people we're talking about

17  that we searched for just generally responsive documents

18  for the various RFPs.

19           THE COURT:  And did you produce the responses?

20           MR. GIBBS:  Yes.  Yes, your Honor.  They've all

21  been produced.  Yes.  We reviewed 36,000 documents.  We

22  produced all of the email stuff September 6th of last

23  year.  It's been produced.

24           THE COURT:  So then what else --

25           MR. MULE:  The problem is, your Honor, and

79

Proceedings

1   we've gone back to them a number of times is remember

2   right at the beginning I said 60 percent of the document

3   requests that we did they didn't even have search terms

4   for.  So that was like 60 out of 117 requests they had

5   nothing.  And then so we proposed these specific terms to

6   specific document requests and said hey run them for your

7   custodians.

8         MR. GIBBS:  And I can explain that rationale

9   exactly, your Honor.  So there were 180 requests for

10  production.  Let me just say that.  So it's not as though

11  there were ten and we said oh, we're not going to search

12  for five of them.

13        THE COURT:  No, I get it.

14        MR. GIBBS:  So a lot of the requests for

15  production are things like, you know, they requests for

16  example, financial data, financial information, financial

17  reporting and information, documents related to the deal.

18  You know, due diligence.  Things like that.

19        THE COURT:  Right.

20        MR. GIBBS:  That stuff is not capable of -- you

21  don't -- when we went and looked at the request, there's

22  no -- we wouldn't search emails for this.  We go and we

23  find the actual documents --

24        THE COURT:  And did you do that and produce

25  them though?

80

Proceedings

1          MR. GIBBS:  Yes.  Yes, your Honor.

2          THE COURT:  So if I'm understanding you

3     correctly, there were responses to the other requests,

4     they're just not email responses and therefore not

5     connected in your production.

6          MR. GIBBS:  Exactly, your Honor.  So when we

7     created our request and then ran theirs last year in July

8     and August, that was the purpose.  A lot of them, yes,

9     absolutely --

10         THE COURT:  Okay.

11         MR. GIBBS:  -- we said we don't think any

12    documents exist and we can go through the specific RFPs.

13    Our responses to a lot of them were we're not aware of

14    any responsive documents.  If we find any, we'll let you

15    know.  But for every single request they sent us, we did

16    some type of searching.  Either we went to employees and

17    said hey, they've asked for these types of financial

18    records, what do we have?  Hey, they've asked for these

19    deal documents, what do we have?  We were pretty

20    exhaustive in our searches.  I mean we have produced a

21    lot.

22         THE COURT:  Okay.

23         MR. MULE:  Your Honor, these requests that are

24    on this chart, Exhibit H, concern communications.

25    They're not concerning financial records.  And that's

81

Proceedings

1  where we said your custodian list was insufficient and

2  your searches were insufficient.  And that's why we said

3  hey, we're proposing to run these search terms because

4  prior hereto you haven't produced responsive documents to

5  these particular document requests and we're entitled to

6  responsive documents.

7            THE COURT:  Okay.  And you gave a list 1, 6,

8  42, 55 --

9            MR. MULE:  Yeah.  So we have 22 and it's all --

10  you know, these communications involving communications

11  with -- and we identify specific allegations in the

12  complaint too on a lot of these.  So these are very

13  granular requests.

14            THE COURT:  What are you reading from when

15  you're looking at that?

16            MR. MULE:  I'm reading from Exhibit H which is

17  189 --

18            THE COURT:  No, no, dash 8.

19            MR. MULE:  Dash 8, correct.

20            THE COURT:  Okay.  So pull up an example of

21  that from that exhibit.

22            MR. MULE:  Yeah, sure.  So for example, if you

23  go to the second page --

24            THE COURT:  Yes.

25            MR. MULE:  -- all documents referencing

82

Proceedings

1    communication with or among SiteOne employees concerning

2    the allegation in paragraph 56 of the complaint.  And

3    then 56, the amended complaint, is next to it.

4                THE COURT:  Right.

5                MR. MULE:  It states what that is.  And then we

6    came up with search terms proposed, repair and computer

7    or laptop or desktop and drive because that's

8    specifically what that particular allegation concerned.

9                The next one, it's a very similar thing

10   concerning paragraph 57.  And we culled out from the

11   complaint allegations and sought --

12               THE COURT:  No, let's just stick with the one

13   example.

14               MR. MULE:  Sure.

15               THE COURT:  All right.  So this -- let me just

16   read paragraph 56 a minute.  So you've 16 proposed

17   custodians there and the search is repair and computer or

18   laptop or desktop and drive.  And you got no responses to

19   that.  That's a question, not a statement.  Is that

20   right?  Is that what you're saying?

21               MR. MULE:  Yes.  So we didn't get a -- they

22   didn't have any search term relative to that particular

23   document request.

24               MR. GIBBS:  So your Honor, we did.  And that's

25   why this is such an exercise.  This is what

83

Proceedings

 1  demonstrates this is an exercise for us to just churn

 2  fees on this.  So if you look at document 196-2 --

 3            THE COURT:  Okay, got it.  What page?

 4            MR. GIBBS:  That's the -- it's just a --

 5            THE COURT:  No, it's a letter, but what page?

 6            MR. GIBBS:  Oh, I'm sorry.  It's the last page.

 7  I'm sorry.  So page 7 of 7.  This is the list of the

 8  search terms that we ran.  And if you look down towards

 9  the bottom there's Casper and laptop.  It's run across a

10  number of custodians again because this is --

11            THE COURT:  Okay.

12            MR. GIBBS:  -- this is dealing with a laptop

13  that went missing that belonged to a lady named Rose

14  Casper.

15            THE COURT:  Okay.

16            MR. GIBBS:  And so we searched.  We want those

17  documents.  We have no reason to hide those.  We want to

18  know all we can about this particular laptop.

19            THE COURT:  Okay.  So what you did with respect

20  to paragraphs -- did not run their search terms but you

21  ran Casper and laptop for --

22            MR. GIBBS:  Correct.

23            THE COURT:  -- it looks like seven or six --

24            MR. GIBBS:  Correct, your Honor.  And a number

25  of the -- the other issue is that a number of the

84

Proceedings

1   searches, they overlap topically with other things that

2   we've already done.

3           THE COURT:  Right.

4           MR. GIBBS:  And so it's coming at us from a

5   perspective of let's look at every word in the complaint

6   and let's run in essence like every word out of the

7   complaint and see if we can find emails that hit on those

8   terms.  And we --

9           THE COURT:  I understand that.

10          MR. GIBBS:  And look, we really are, we're fine

11  doing some additional searching.  But I mean it's just

12  got to be reasonable in scope considering what we've --

13  the lengths we've really gone to to try and get them the

14  documents.

15          THE COURT:  Well, this is a question -- again,

16  I'm not saying anybody hasn't gone to any lengths or

17  anything like that.  I'm trying to create a situation

18  where defendants are allowed to test the theory --

19          MR. GIBBS:  Sure.

20          THE COURT:  -- in a sensible way.  And if

21  they're 100 percent correct, their testing will continue.

22  But using the example you just pulled out at random, Mr.

23  Mule, it seems pretty broad to me.

24          MR. MULE:  Yeah.  Well --

25          THE COURT:  You're going to get a lot of false

85

Proceedings

1   positives with something like that.

2          MR. MULE:  Let me just point out for that they

3   gave the preview documents to promote.  It was 536

4   document with respect to that particular example.  So you

5   know, that is not a really significant amount on that

6   particular one.  There are other ones that have a large

7   amount.  There's no doubt.  Like the first one, number 22

8   and 23, they came back and said for 22, which is all

9   documents concerning communications among SiteOne

10  employees concerning Don's non-compete, and that's, you

11  know, concededly it's a broad search.  We have Don

12  Caroleo and non-competition or non-solicitation or

13  compete or solicit.  And that one it says for their

14  preview documents to promote it was 60,000.

15         So I'm not saying that these search terms that

16  we provided were perfect.  This was our attempt.  But we

17  didn't get any response as far as how to --

18         THE COURT:  I get it, I get it.  But now we're

19  going to drill down and we're going to create.  So so far

20  what you've got is a search of seven more custodians for

21  emails --

22         MR. GIBBS:  For texts.

23         THE COURT:  -- and texts for a four-month

24  period that you will select.  I'm prepared to give that

25  to you.  I'm trying to listen to what you're saying that

Transcriptions Plus II, Inc.

86

Proceedings

1    won't make the exception the rule kind of thing here if

2    there's more that you would need to test it.  But so far

3    I haven't heard anything that makes me think that this

4    order is insufficient, that if there's documents -- if

5    there are other custodians outside the seven or the ten

6    if you include the three, I will listen to that and you

7    can explain why.  But I'm not inclined (A), to expand the

8    window at this moment --

9            MR. MULE:  Well, your Honor, they've identified

10   more than ten.  You know, these particular -- we were

11   looking for particular -- we were trying to compromise

12   with respect to texts and say all right, for texts let's

13   just view these particular people.  But for emails among

14   the company --

15           THE COURT:  Look at the other, whatever the

16   other remainder is (inaudible).

17           MR. MULE:  Yeah.

18           THE COURT:  And who is it that you think is

19   going to have the smoking gun that would support your

20   theory?  Who else is there?

21           MR. MULE:  Well, I mean they've identified 24.

22   I mean if I'm going to cull down from 24 which they

23   themselves provided, I'd have to talk with, you know,

24   talk with my client.

25           THE COURT:  Okay.  Okay.

Transcriptions Plus II, Inc.

87

Proceedings

1          MR. MULE:  You know, if I could have some time

2   to discuss it I guess.

3          THE COURT:  Sure.  Go take it right now.

4          MR. MULE:  Okay.  Great.  Thank you.

5          THE COURT:  How much time is -- ten minutes?

6   You tell me.

7          MR. MULE:  To what?  To discuss?  Yeah, sure.

8          THE COURT:  How much time is enough?  How much

9   time do you need?

10          MR. MULE:  Yeah, that should be enough.

11          THE COURT:  Okay.  So go into the attorney room

12   where you can have some privacy.

13          MR. MULE:  Okay.  All right.  Thank you.

14          THE COURT:  And tell me who and approximately

15   why.  And then if it's for emails, or emails and texts

16   also.

17          MR. MULE:  Okay.

18          THE COURT:  (Inaudible).  Go ahead.

19          MR. GIBBS:  Just really quick.  So in terms

20   of -- just so I think this may help their discussion as

21   well and so that I'm clear, so at this point do you have,

22   your Honor, in your mind what specific search terms would

23   be run?  Are you envisioning that we would run all of the

24   ones that are in --

25          THE COURT:  I'm envisioning running their

88

Proceedings

1   search terms that they've identified in the column, the

2   third column from the right on Exhibit H.

3              MR. GIBBS:  Got it.

4              THE COURT:  And I'm hoping that taking two

5   years and making them four months will have a

6   proportional limitation.  And if you produce stuff that's

7   nothing on nothing, then you're done.

8              MR. GIBBS:  Understood.

9              THE COURT:  Okay.  Mr. Mule, you got that.  Now

10  you can go.

11             MR. MULE:  Okay.  Thank you.

12                     (Off the record)

13             THE CLERK:  All rise.

14             THE COURT:  Please be seated.  All right.  Mr.

15  Mule, what do you propose?

16             MR. MULE:  All right, your Honor.  So I've

17  discussed --

18             THE COURT:  You lost somebody too.  What, you

19  both cut somebody?

20             MR. MULE:  He should be right here.  We could

21  start without him.

22             THE COURT:  Yes.

23             MR. MULE:  So for the total of ten, which is

24  the seven additional to the three, what we would propose

25  for the text is, you know, obviously we said four months.

89

Proceedings

1    So what we would want to do is basically -- because the

2    different requests pertain to different time periods and

3    people -- so like for instance, Nick's termination is

4    February, Don's termination is October, is to apply a

5    separate four-month period for each request.  It has the

6    same affect of culling down the --

7              THE COURT:  That's eight months.

8              MR. MULE:  No, no.  It's going to be for

9    each -- they just run the search --

10             THE COURT:  Oh, so you'll say for witness one,

11   January and March.

12             MR. MULE:  For request number 22, these four

13   months.  For request number 23, these four months.

14   Because they're different topics.  They're different time

15   periods.  And what that does is it gives the same exact

16   goal of what your Honor wants which is to limit the time

17   period, cull it down.

18             THE COURT:  Yes.  No, I get it.  The math is

19   the same is what you're saying.

20             MR. MULE:  The math is the same.  So that's

21   what we propose on texts.  Does that make sense?

22             THE COURT:  Mr. Gibbs?  The math is the same it

23   sounds like, but --

24             MR. GIBBS:  So let me make sure I understand.

25   So -- and we're just talking about text messages.

Transcriptions Plus II, Inc.

Proceedings

1    THE COURT:  Basically, the way that I think to

2  think of it is any search that's described will only be

3  for a four-month period but search A may be for different

4  search months from search B which may be different from

5  search C, but still four months total.

6    MR. GIBBS:  So each of the --

7    THE COURT:  So theoretically the result is the

8  same in terms of --

9    MR. GIBBS:  So we would -- let me just make --

10  let me think about this logistically.  So we'll just take

11  one for example, the very first one in their chart

12  because I just want to make sure I totally understand.

13    THE COURT:  Yes.

14    MR. GIBBS:  So this one, there are 16 in the

15  chart, there are 16 proposed custodians so --

16    THE COURT:  Right, but we're not using that

17  anymore.

18    MR. GIBBS:  So that would be culled down to the

19  list of the ten or the seven?

20    MR. MULE:  Ten.

21    THE COURT:  The ten, the ten.  The three you

22  have plus seven.

23    MR. MULE:  Ten total for texts.  We're talking

24  texts only right now.

25    THE COURT:  (Inaudible).  It says October 1,

91

Proceedings

1   2022 to the present.  That would no longer be the case.

2   That could go from October 1 to February 1 I guess.

3           But then for the next one it could be February

4   1 to June 1.  No, March 1.  No.  Whatever.  May 1.

5           MR. GIBBS:  I'm sorry.  What I was hearing was

6   that so there are ten people.  So the actual search, the

7   proposed search terms are Don Caroleo and non-competition

8   or non-solicitation or non-compete.  So that search term

9   is going to be run across ten people for the same four-

10  month time period for each person?

11          THE COURT:  For that one search.

12          MR. GIBBS:  Yes.

13          THE COURT:  Yes.  But then if you go to the

14  next search --

15          MR. GIBBS:  But it's not -- but just to make

16  sure I'm clear what it is not is for this first search

17  term the proposed search terms, it's not those search

18  terms for a different time period for each person.

19          THE COURT:  Correct.

20          MR. MULE:  No, it is not.

21          MR. GIBBS:  Okay, okay.  Got it, got it.

22          THE COURT:  So that otherwise that would mean

23  ten searches would become 40.

24          MR. MULE:  Right.

25          MR. GIBBS:  Got it.

92

Proceedings

1          THE COURT:  Maybe if I'm even understanding how

2     this works.  Okay.  So --

3          MR. GIBBS:  But there will be a different four-

4     month -- what Mr. --

5          THE COURT:  Could be.

6          MR. MULE:  Could be.

7          MR. GIBBS:  What Mr. Mule is proposing is each

8     one or however, each search term will have a specific

9     four-month period associated with it.

10         MR. MULE:  That's correct.

11         THE COURT:  Okay.  Hold on.  Let me just modify

12    something.

13         MR. GIBBS:  And your Honor, I think there are

14    39 separate searches, so you're saying to run all 39

15    terms?

16         THE COURT:  Yes.  Give me one second and then

17    I'll circle back to you.

18                    (Pause in proceedings)

19         THE COURT:  Okay.

20         MR. MULE:  Okay.  So that settles the text

21    issue.  For emails --

22         THE COURT:  Wait, you know what?  (Inaudible).

23         MR. GIBBS:  Okay.

24         THE COURT:  Yes.  Go ahead.

25         MR. GIBBS:  So that was just, that's just for

93

Proceedings

1    text messages.

2              MR. MULE:  Okay.  So for emails what we propose

3    is this.  The same ten plus four because they had

4    identified 24.

5              THE COURT:  Okay.  (Indiscernible).

6              MR. MULE:  So those four are Brian Hoffman --

7              THE COURT:  Oh, I've got to write it down so

8    just go slow.

9              MR. MULE:  Anthony Farante, Taylor Koch.

10             THE COURT:  Whoa, whoa, I'm writing, I'm

11   writing.  Hold on.

12             MR. MULE:  Oh, I apologize.

13             THE COURT:  Okay.  What was the third one?

14             MR. MULE:  Taylor Koch.  It's Koch, Koch.

15             THE COURT:  Spell it.

16             MR. MULE:  K-O-C-H.

17             THE COURT:  Got it.

18             MR. MULE:  And the last one Briley Brisendine.

19             THE COURT:  Spell it.

20             MR. MULE:  B-R-I-S-E-N-D-I-N-E, Briley, B-R-I-

21   L-E-Y.

22             MR. GIBBS:  Your Honor, that is our general

23   counsel.

24             THE COURT:  How's that going to work?

25             MR. MULE:  Well, he was involved I know in the

94

Proceedings

1  early parts and not with the acquisition, not necessarily

2  as a --

3          THE COURT:  I'm inclined to allow it but he may

4  just give a log of stuff that's all attorney-client

5  privilege.

6          MR. MULE:  If it is attorney-client, it is.  If

7  it's not an attorney-client communication, then it's not.

8          THE COURT:  I'm inclined to allow it.  You're

9  waiving any rights as to him.  I mean there's always

10  argument that there's some non-privileged stuff from an

11  attorney but are you sure you want to do that one?

12          MR. MULE:  I'll double check with my client.

13          THE COURT:  I mean it's okay with me.  I just,

14  I think there's a risk of basically giving up a slot I

15  mean if there's another person who can sub in.

16          MR. GIBBS:  Can I ask for one quick -- I don't

17  want to --

18          THE COURT:  Let him answer this question and

19  then you can do it.

20          MR. GIBBS:  Okay.

21          THE COURT:  And I'm not trying to dissuade you.

22  I just could see where it's like giving up a draft pick.

23  Okay.  Mr. Mule, you heard that?  I'm not trying to

24  dissuade you.  I'm just concerned it might be a -- you

25  might be buying something you don't want.

95

Proceedings

1          MR. MULE:  We'll stick with that.  Thank you,

2   your Honor.

3          THE COURT:  Okay.  I just need to add a note to

4   the order.

5                    (Pause in proceedings)

6          MR. MULE:  Your Honor, can we have a moment,

7   please?

8                         (Off the record).

9          THE COURT:  Okay.  Now we're back on the

10  record.  I've added your full names to the searches.

11         MR. MULE:  And I appreciate that, your Honor,

12  and I would request after now speaking with the client,

13  we'll just take Mr. Brisendine or Ms. Brisendine off the

14  list.

15         THE COURT:  Okay.

16         MR. MULE:  So just three more.

17         THE COURT:  Okay.

18         MR. GIBBS:  So who are the, I'm sorry, who are

19  the other --

20         THE COURT:  It's Brian Hoffman, Taylor Koch,

21  and -- wait a minute.

22         MR. MULE:  Anthony Ferrante.

23         THE COURT:  Thank you.

24         MR. GIBBS:  And these three individuals, they

25  are in addition to --

96

Proceedings

1           MR. MULE:  The ten.

2           THE COURT:  The ten for emails.  All right.  So

3   that's done.

4           MR. MULE:  Okay.

5           MR. GIBBS:  A couple of quick questions.

6           THE COURT:  Yes.

7           MR. GIBBS:  Just to clarify.  I really don't

8   want to have to come back and ask for clarification.

9           THE COURT:  Me too.

10          MR. GIBBS:  Okay.  So on the text messages, the

11  group of ten that you proposed, includes the three people

12  for whom we've already collected and searched text

13  messages?

14          THE COURT:  The three people that you searched?

15  Yes.  Okay, yes.

16          MR. GIBBS:  It would.  So it's Greg Thistle,

17  Joe Ketter and Anthony Catalano.

18          THE COURT:  Yes.

19          MR. GIBBS:  They would be three of the ten.

20          THE COURT:  Correct.

21          MR. GIBBS:  So I mean we pulled their text

22  messages and manually reviewed those.  Does your Honor

23  still envision that we would re-search those?

24          THE COURT:  Yes.  No.  If you've -- although

25  no, because they have search terms now.

97

Proceedings

1          MR. MULE:  Search terms.

2          THE COURT:  Run the search terms on the three.

3          MR. GIBBS:  Run the search terms.

4          THE COURT:  Yes is the answer to your question.

5          MR. MULE:  Your Honor, one thing on the text

6  messages, we provided -- we'd like to get from opposing

7  counsel the total number of messages that are pulled

8  within those search -- and the date range.

9          THE COURT:  Well, you're going to get the date

10 range.

11         MR. MULE:  We're going to get the date range.

12 But we want to know like first text, last text within

13 those time periods.

14         MR. GIBBS:  Well, your Honor, they have never

15 provided that to us.

16         THE COURT:  But they're going to search the

17 date range and then --

18         MR. MULE:  If they have one -- if they produce

19 texts and they produce like one text, we don't know how

20 many texts that person had during that time period.

21         THE COURT:  You mean like the non-responsive?

22         MR. MULE:  Exactly.  And the quantity.

23         THE COURT:  So you're asking basically for a

24 hit count.

25         MR. MULE:  Hit count essentially.  How many?

Transcriptions Plus II, Inc.

98

                          Proceedings

1           THE COURT:  And then (indiscernible) if

2    that's --

3           MR. GIBBS:  Which is not something they've

4    provided us, your Honor, just to be clear.

5           MR. MULE:  Well, we did provide --

6           MR. GIBBS:  We've asked for that.  We've asked

7    for that repeatedly and they've never given us that, so I

8    don't know why we would do that.

9           THE COURT:  Okay.  If you do it for them or --

10   and if you already produced it, you can just say see my

11   letter of June 7th, but if you haven't then you've got to

12   do it.

13          MR. MULE:  What we provided, you know, we'll

14   ask for the same.

15          THE COURT:  Okay.  (Indiscernible) but let me

16   just add it to the order.

17                   (Pause in proceedings)

18          THE COURT:  Okay.  So that's done.  What else?

19          MR. MULE:  I think that's it.

20          MR. GIBBS:  Okay.  So the same then, just to

21   make sure I've got it clear, so we're going to run the

22   same search terms across the email data and the text

23   message data and the four-month period, it'll be a

24   four-month period associated with each search term and

25   that's it.  Right?

99

Proceedings

1          THE COURT:  Yes, but the four months may change

2    for different searches.

3          MR. MULE:  Per request.

4          MR. GIBBS:  Per request.  That's right.

5          THE COURT:  But yes.  Otherwise yes.

6          MR. GIBBS:  Okay.  Got it.

7          THE COURT:  And this will all be memorialized

8    in an order that hopefully captures it.  Yes, I think

9    that's it.

10          MR. MULE:  I think that's it.

11          MR. GIBBS:  Those are all the motions, your

12    Honor.

13          THE COURT:  Go away.

14          MR. MULE:  For now.  Hopefully --

15          THE COURT:  I need a few minutes --

16          THE CLERK:  That's fine.

17          THE COURT:  -- to make sure this is --

18          MR. MULE:  Thank you, your Honor.

19          THE COURT:  Have a good day, everybody.

20          MR. GIBBS:  Yes.  Thank you, your Honor.

21                    (Off the record)

22          THE COURT:  Okay.  Mr. Mule, we're back on.

23          MR. MULE:  The question is the time frame which

24    we didn't get.

25          MR. GIBBS:  Oh, that's right.  Yes.

100

Proceedings

1          THE COURT:  Oh, okay.  What makes sense that's

2     reasonable?

3          MR. GIBBS:  Well --

4          MR. MILMAN:  How about the end of the month?

5     Don't we have end of the month deadlines?

6          THE COURT:  I'm asking what's reasonable.  I'm

7     not (indiscernible).  That's reasonable.

8          MR. GIBBS:  I think 60 days because we've got

9     to collect data.  The searches are not easy.

10          THE COURT:  You don't even have to tell me why.

11     60 days.  60 days, Mr. Mule?

12          MR. MULE:  Yes.

13          THE COURT:  Okay.  Do you want to have a status

14     conference after the 60 days?

15          MR. MULE:  I think that makes sense.

16          THE COURT:  All right.  We'll pull up a date

17     and give it to you.

18          THE CLERK:  How about May 28th at 11:30?

19          THE COURT:  May 28th at 11:30.  What I'm going

20     to suggest is I typically start conferences for 15

21     minutes to 30 minutes.  If you need more, let me know.  I

22     mean I can adjourn to give you more time, that's fine.

23     But I rather you not make the trip and then we have to

24     push you aside because I have six other conferences

25     waiting.  But ultimately it's up to you.  We could also

Transcriptions Plus II, Inc.

101

                          Proceedings

1   just put you at the end if it comes to that.

2           MR. GIBBS:  I will actually be out of town on a

3   family vacation that week, your Honor.

4           THE COURT:  Okay.  So let's pick another date.

5   You can just take the family up here, you know.  Take

6   them out to the Hamptons.

7           MR. GIBBS:  What's that?

8           THE COURT:  Take them up here for vacation.

9   Mr. Mule will show you a good time in the Hamptons.

10          MR. GIBBS:  There you go.  That's right.

11          THE CLERK:  How about June 5th?

12          THE COURT:  No, we can't do it then.

13          THE CLERK:  How about June 12th at 10 a.m.

14          THE COURT:  June 12th at 10 a.m.  Yes?  Mr.

15  Mule

16          MR. MULE:  That's good by me, your Honor.

17          MR. GIBBS:  Yes, your Honor.  That's good on my

18  end.

19          THE COURT:  All right.  We will see you all in

20  June.

21                    (Matter concluded)

22                         -oOo-

23

24

25

                    Transcriptions Plus II, Inc.

102

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **29th** day of **March**, 2025.

*Mary Greco*

Transcriptions Plus II, Inc.