Troutman Pepper Locke LLP
Bank of America Plaza, 600 Peachtree Street NE, Suite 3000
Atlanta, GA 30308

**troutman pepper locke**

troutman.com

**J. Evan Gibbs III**
evan.gibbs@troutman.com

June 19, 2025

**BY EMAIL AND PERSONAL SERVICE**

Nextpoint Law Group LLC
Attn: Anand Mathew
2375 East Camelback Road
Suite 600
Phoenix, AZ 85016
amathew@nextpointlawgroup.com

**Re:** *SiteOne Landscape Supply, LLC v. Nicholas Giordano et al.* **(2:23-CV-02084)**
**Service of Renewed Motion to Compel Production of Documents to NextPoint Law**
**Group LLC**

Mr. Mathew:

In accordance with the Court's directives during the June 12, 2025 hearing in the above-referenced action and the Court's Order of the same day, please see attached for service SiteOne's motion to compel against Nextpoint Law Group, LLC ("NLG"), attached as Exhibit A hereto. The Court is requiring that SiteOne Landscape Supply, LLC re-serve its motion to compel against NLG and provide proof of service on the docket. A copy of the Court's June 12, 2025 Order is attached hereto as Exhibit B.

NLG's response to the motion, if any, is not to exceed three pages in length, exclusive of attachments, and must be served by July 9, 2025. SiteOne will serve its reply on or before July 19, 2025 and file all motion papers with the Court on July 20, 2025.

Thank you.

J. Evan Gibbs III

# EXHIBIT A

Troutman Pepper Locke LLP
875 Third Avenue
New York, NY 10022

**troutman**
**pepper locke**

troutman.com

**Daniel E. Gorman**
daniel.gorman@troutman.com

June 19, 2025

Magistrate Judge Steven Locke
Eastern District Court New York

Re:    ***SiteOne Landscape Supply, LLC v. Giordano, et al.* (2:23-CV-02084)**
       **Renewed Motion to Compel Production of Documents to NextPoint Law Group**
       **LLC**

Dear Judge Locke:

We write on behalf of SiteOne Landscape Supply, LLC ("SiteOne") to compel NextPoint Law Group LLC ("NLG") to comply with SiteOne's subpoena dated April 9, 2025 (the "Subpoena," Exhibit 1) and the Court's Order dated March 26, 2025 (ECF No. 203).[1]

**I.     Background.**

The prior two years of litigation have been replete with endless assertions by Defendants Nicholas Giordano ("Nick"), Victor Caroleo ("Vic"), and Dominick Caroleo ("Don", and collectively, "Defendants") that SiteOne has no evidence of its claims, only for it to be revealed that Defendants (i.e., all three individually named Defendants) intentionally destroyed text messages since before the action's inception. SiteOne now seeks the data to uncover these critical facts and to assess the extent of Don's destruction, but it faces yet another meritless roadblock in enforcing its subpoenas, meritless objections by Don's vendor NextPoint Law Group, LLC ("NLG").

The Subpoena, directed at NLG, concerns Don's destruction of this critical evidence. According to Defendants, WeRecoverData ("WRD") was initially engaged by Don to create a forensic copy of his phone, but the data was found to be unreadable. Subsequently, NLG was retained by the counsel for Defendants, Milman Labuda Law Group PLLC ("Milman") to analyze WRD's file, but the analysis apparently revealed that the data was still unusable. SiteOne therefore seeks to obtain documents and communications from NLG to understand the extent of the data destruction and to perform a forensic analysis.

**II.    Procedural History.**

On February 25, 2025, SiteOne issued subpoenas to NextPoint Inc. and WRD seeking the relevant documents. Defendants moved to quash the subpoenas as work product and declaring privilege. (ECF No. 195.) The Court denied the motion to quash in its entirety. (ECF No. 203.)

---

[1] Defendants confirmed at the June 12, 2025 hearing before Your Honor that they do not take a position with respect to this letter motion.

June 19, 2025
Page 2

troutman
pepper locke

---

The Court held that the documents should be produced in a password-protected file, with Milman reviewing for privilege and the Court conducting an in-camera review.

Despite this Order, NLG then informed SiteOne and Defendants that since the original subpoenas had been issued to NextPoint Inc. and not NLG, NLG would not comply with the subpoena. NLG also raised issue with Defendants' failure to pay NLG's fees.

On April 9, 2025, SiteOne issued the Subpoena, this time naming NLG, and again informed NLG of the Court's order mandating production.

In response, NLG issued an objection letter dated April 18, 2025 (Exhibit 2), demanding payment of its outstanding invoices from Milman/Defendants as a prerequisite to complying with SiteOne's subpoena.

## III.    NLG Must Comply with SiteOne's Subpoena and the Court's Order.

NLG's objections to SiteOne's subpoena are without merit. The Court already issued an order mandating the production of the requested documents. (ECF No. 203.) This order remains applicable to the Subpoena, and the initial "mistake" regarding the correct NextPoint entity is irrelevant to the enforceability of the Court's directive.

NLG's demand for payment of its unpaid invoices for services rendered to Milman/Defendants is not SiteOne's responsibility. The obligation to comply with the Court's order remains, regardless of any payment disputes between NLG and the Defendants. In *Tri-Ex Enterprises, Inc. v. Morgan Guar. Tr. Co. of New York*, the court granted a litigant's motion to compel documents that were subject to a retaining lien with their adversary since it would be "inequitable to deny a litigant access to relevant and perhaps essential proof merely because his adversary has refused to pay his attorney's fees." 583 F. Supp. 1116, 1118 (S.D.N.Y. 1984) ("It would be strange indeed if one could insulate himself from proof tending to establish his liability to another by placing that proof in the hands of an attorney and then refusing to pay the attorney's charges."); *see also Textil RV LtdA v. Italuomo, Inc.*, No. 92 CIV. 526, 1994 WL 48815, at *5 (S.D.N.Y. Feb. 17, 1994) (explaining that a retaining lien does not excuse failure to comply with discovery obligations).

NLG's assertion of privilege and retaining lien does not absolve them from complying with the subpoena. The Court has provided clear directives on how privileged documents should be handled, including in-camera review and the creation of a privilege log. Furthermore, NLG's claim that the subpoena imposes an undue burden is unfounded, as the documents sought are crucial for understanding the extent of evidence destruction by Defendants.

SiteOne respectfully requests that the Court compel NLG to comply with the subpoena dated April 9, 2025, and produce the documents listed in Exhibit A of the subpoena without further delay.

Any issues regarding a retaining lien for payment of the documents are between NLG, Milman, and the Court – not SiteOne. Compliance with the Court's order is essential for SiteOne to pursue its claims and address the intentional destruction of evidence by Defendants.

June 19, 2025
Page 3

**troutman**
**pepper locke**

---

IV.    <u>**Conclusion.**</u>

      For the reasons stated above, SiteOne respectfully requests that the Court compel NLG to comply with the subpoena dated April 9, 2025, and produce the documents listed in Exhibit A of the subpoena without further delay.

                  Respectfully submitted,

                  /s/ *Daniel E. Gorman*

# EXHIBIT 1

Troutman Pepper Locke LLP
875 Third Avenue
New York, NY 10022

**troutman** **pepper locke**

troutman.com

---

**Daniel E. Gorman**
daniel.gorman@troutman.com

April 9, 2025

Nextpoint Law Group LLC
2375 East Camelback Road
Suite 600
Phoenix, AZ 85016

**Re:**     ***SiteOne Landscape Supply LLC v. Giordano et al.*, 2:23-cv-2084-GRB-SL**

We represent SiteOne Landscape Supply LLC in the above referenced matter. Please find enclosed a subpoena requesting that you produce documents as described in Exhibit A, attached thereto.  Attached thereto as Exhibits B and C are the transcript of proceedings and minute order, respectively, directing Nextpoint to produce the documents and communications described in Exhibit A.

Please contact us directly at 212-704-6333 or daniel.gorman@troutman.com should you have any questions.

Sincerely,

*/s/ Daniel E. Gorman*
Daniel E. Gorman

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| SITEONE LANDSCAPE SUPPLY, LLC, | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:23-CV-02084-GRB-SL |
| NICHOLAS GIORDANO; DOMINICK CAROLEO; VICTOR CAROLEO; et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Nextpoint Law Group LLC
2375 East Camelback Road Suite 600, Phoenix, AZ 85016

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A attached hereto.

| Place: Attn: Daniel E. Gorman, Veritext, LLC, 3101 N. Central Avenue, Suite 290, Phoenix, AZ 85012 | Date and Time: 04/18/2025 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  04/09/2025

| CLERK OF COURT | OR | |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
SiteOne Landscape Supply, LLC _____ , who issues or requests this subpoena, are:
John S. Gibbs III, Troutman Pepper Locke LLP, 600 Peachtree St., Ste. 3000, Atlanta, GA 30308, evan.gibbs@troutman.com, (404)885-3000

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  2:23-CV-02084-GRB-SL

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____                    _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## <u>EXHIBIT A</u>

Produce all documents and communications from January 2022 to the present concerning Nextpoint Law Group LLC's services provided to Dominick "Don" Caroleo (and/or his attorneys), expressly including Nextpoint Law Group LLC's work with respect to the UFDR files from WeRecoverData.

# EXHIBIT B

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

-------------------------------X  Docket#
SITEONE LANDSCAPE SUPPLY, LLC, : 23-cv-02084-GRB-SIL
                               :
              Plaintiff,       :
                               :
    - versus -                 : U.S. Courthouse
                               : Central Islip, NY
NICHOLAS GIORDANO et al.,      :
                               : March 26, 2025
              Defendants       : 2:37 p.m.
-------------------------------X
```

        TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
          BEFORE THE HONORABLE STEVEN I. LOCKE
            UNITED STATES MAGISTRATE JUDGE


**A  P  P  E  A  R  A  N  C  E  S:**


**For the Plaintiffs**:        **Kevin P. Mulry, Esq.**
                               Farrell Fritz, PC
                               400 RXR Plaza
                               Uniondale, NY 11556

                               **Matthew Adler, Esq.**
                               Troutman Pepper Hamilton
                                Sanders LLP
                               3000 Two Logan Square
                               18th And Arch Streets
                               Philadelphia, PA 19103

                               **John Sikes Gibbs, III, Esq.**
                               Troutman Pepper Hamilton
                                Sanders LLP
                               600 Peachtree Street, N.E.
                               Suite 3000
                               Atlanta, GA 30308


            (Appearances continue on next page)


**Transcription Service**:     **Transcriptions Plus II, Inc.**
                               61 Beatrice Avenue
                               West Islip, New York 11795
                               RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

## APPEARANCES CONTINUED

**For the Defendants**:      **Thomas A. Bizzaro, Jr., Esq.**
Law Offices of Thomas A.
 Bizzaro, Jr., P.C.
133C New York Avenue
Huntington, NY 11743


**Michael C. Mule, Esq.**
**Robert Milman, Esq.**
Milman Labuda Law Group PLLC
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11556

3

Proceedings

```
 1              THE CLERK:  All rise.  Calling case 23-cv-2084,
 2   SiteOne Landscape Supply, LLC v. Giordano et al.
 3              Counsel, please state your appearance for the
 4   record.
 5              MR. GIBBS:  Good afternoon.  This is Evan Gibbs
 6   on behalf --
 7              THE COURT:  The mic is not on.
 8              MR. GIBBS:  Good afternoon.  This is Evan Gibbs
 9   on behalf of SiteOne Landscape Supply, LLC.
10              MR. ADLER:  Good afternoon, your Honor.
11   Matthew Adler also on behalf of SiteOne.
12              MR. MULRY:  Kevin Mulry from Farrell Fritz also
13   for SiteOne.  Good afternoon.
14              THE COURT:  Good afternoon.
15              MR. MULE:  Good afternoon, your Honor.  Michael
16   Mule from Milman Labuda Law Group, PLLC for the
17   defendants.
18              MR. MILMAN:  Robert Milman; Milman Labuda Law
19   Group, for the defendants.
20              MR. BIZZARO:  Good morning, your Honor.  Thomas
21   A. Bizzaro, Jr.  I just filed a notice of appearance.
22   I've joined the party for the defendants.  Thank you for
23   having me.
24              THE COURT:  Good luck to you.  Well, good
25   afternoon, everybody.  Please be seated.
```

4

Proceedings

1          MR. MULE:  Your Honor, could I introduce my

2    client, Don Caroleo here, and also law clerk James

3    Oreoli.

4          THE COURT:  Welcome.  All right.  We have

5    multiple motions to deal with.  Docket entries 198,

6    190 -- no wait, I'm giving you the wrong numbers.  Hold

7    on one second.  198 was a motion and then it was re-

8    docketed and somehow was not a motion.  That's the motion

9    for sanctions.  That's more like a motion to compel.

10          There's another motion about responding to

11    deposition questions.  And then there's what I'll call

12    the original motion to compel from the defendants.  Was

13    filed at 189, now it's 193.

14          In terms of the order, let's do this in

15    reverse.

16          The first is plaintiff's have a motion -- this

17    was actually filed by Mr. Mulry.  I don't know if you're

18    doing the talking on this.  To compel defendants to

19    respond to deposition questions with respect to the duty

20    to preserve all relevant evidence.  That's one.  And two,

21    document -- oh and questions regarding documentary and

22    oral communications with attorneys concerning the

23    preservation of evidence.

24          I have read the papers.  Mr. Mulry, are you

25    doing the talking on this one?  Or Mr. Gibbs, you're

5

Proceedings

1    doing the talking even though you didn't sign it?  That's

2    fine, but is that right?

3              MR. GIBBS:  Yes, your Honor.

4              THE COURT:  Okay.  Is there anything you want

5    to tell me?

6              MR. GIBBS:  Well, I think I'll just say, your

7    Honor, you know, the issues that were addressed in the

8    motion, we discussed those at length during the

9    deposition on the record while we were there.

10             THE COURT:  Okay.

11             MR. GIBBS:  We did attempt to call chambers.

12   We called at about 11:20 a.m. on Thursday, March 13th

13   during the deposition.

14             THE COURT:  Yes.

15             MR. GIBBS:  And we were told you were available

16   likely for the rest of the day.  The deposition only

17   lasted about another hour after that and so we did not

18   try to call again.

19             The next day we stipulated again on the record

20   that we would, you know, try to resolve the issues.  We

21   provided them the case law that we had.  We cited in the

22   brief to your Honor and tried to resolve the issues but

23   were unable to.

24             But I think, you know, the questions that we

25   are specifically asking the Court, you know, it's the

6

Proceedings

1  sort of who, what, where, when of the litigation holds.

2            THE COURT:  Sure.

3            MR. GIBBS:  Those communications.  That's the

4  thrux.  I can get into any particular issues, but that's

5  the --

6            THE COURT:  No, your letter was I guess

7  clear --

8            MR. GIBBS:  Okay.

9            THE COURT:  -- so I don't have any questions on

10  that.  Mr. Mule, do you want to be heard?  Obviously I

11  read your papers too.

12            MR. MILMAN:  I think I'm going to handle that

13  one, your Honor.

14            THE COURT:  Okay.  Mr. Milman, do you want

15  to --

16            MR. MILMAN:  So you know, sorry for the late

17  response last night --

18            THE COURT:  Don't worry about it.

19            MR. MILMAN:  -- but we did put in a response.

20  I'm sure you saw that.  I think we also laid out what the

21  questions were.

22            I think our position is pretty straightforward.

23  They got their answer.  You know, Don Caroleo answered

24  and said I did not get a litigation hold letter.  I think

25  the case law is very clear after that.  Anything beyond

7

Proceedings

1    that is attorney-client privilege.  And at this stage of

2    the game, it's put the cart before the horse.  They've

3    got enough by that.  And like you pointed out in our last

4    hearing a month ago, they've got Vic Caroleo indicating

5    that he deleted his messages and who would agree to that

6    if he -- you know, in their right mind would agree to

7    that?  And we were just trying to be very up front.

8           And so I think they have their answer to the

9    question.  All these other issues, if you feel it's

10   necessary, which I don't think it should be, but it could

11   be done at a regular deposition.  We're two years into

12   paper discovery.  We need to get into depositions so that

13   we can move the case forward.

14          THE COURT:  Okay.  We'll call this a motion to

15   compel.  The motion to compel is granted.  I do not read

16   the case the way the defendants read this case.  I'm

17   relying on Judge Wicks' in *Roytlender,*

18   R-O-Y-T-L-E-N-D-E-R.  You all have this cite.  You both

19   cited it.  I'm also relying on Judge Netburn's decision

20   *FTC v. Roomster Corp.* cited by the plaintiffs.  I think

21   the law is clear and the clear answer under the law is

22   you got to answer those questions.

23          We are not on a level playing field anymore.

24   Defendants apparently destroyed evidence that they should

25   not have destroyed.  Plaintiff now has a right to ask

8

Proceedings

1    about.

2              As a result of the -- and to be clear, as I

3    think Judge Netburn said, that with some indication that

4    the destruction of evidence has occurred, the plaintiff

5    satisfies that burden here to my mind, and clearly so.

6              MR. MILMAN:  Just for clarification, I mean I

7    don't know if it makes a difference but you're coupling

8    all defendants as one.  I think --

9              THE COURT:  Oh, this is -- I'm sorry.

10             MR. MILMAN:  I think Vic is a different story

11   than Don.  Don preserved his information.  The issue

12   there is that they're claiming that he shouldn't have

13   done a backup.  So the questions are really different to

14   the two defendants.  And I really --

15             THE COURT:  Mr. Gibbs, do you want to be heard

16   on that?

17             MR. GIBBS:  Yeah, sure.  Absolutely, your

18   Honor.  So Don did not in fact preserve his documents.

19   That is not a true statement, your Honor.  What happened

20   was Don had a phone and at some point in July of 2023

21   attempted to have the phone backed up.  That failed.

22   Before and after then apparently he had a 30 day auto

23   delete feature on his phone.

24             THE COURT:  That's right.  Now I remember.

25             MR. GIBBS:  And the messages were continuously

9

Proceedings

1    deleted until they recovered the phone in late 2024.  And

2    then Mr. Caroleo turned that phone in and gave it back to

3    Verizon to get a new phone.  And so that phone is now

4    lost forever.  So --

5            THE COURT:  Yes.  No, I remember now.  You

6    refresh my recollection.  The motion is granted with

7    respect to both defendants for the reasons I've

8    indicated.

9            MR. GIBBS:  Thank you, your Honor.

10            THE COURT:  There's no award of fees associated

11    with that but they will come back and -- or costs I

12    should say.  But they will come back and sit for their

13    continued depositions.  So that is docket entry 199.

14            MR. GIBBS:  Can we, your Honor, can we ask just

15    for a date certain by which those will occur?

16            THE COURT:  Well, so what's the availability

17    like?

18            MR. MILMAN:  I would have to confer with my

19    client but --

20            THE COURT:  No, I'm not going to give you a

21    specific date.  I'll give you an outside deadline.  So is

22    30 days --

23            MR. MILMAN:  Yeah.  No, and we will

24    cooperate --

25            THE COURT:  I'm not concerned about that.  30

10

Proceedings

1  days enough?

2          MR. MILMAN:  I would think so, yes.

3          THE COURT:  Okay.  All right.  So I don't even

4  know what's today?  The 26th.

5          MR. MILMAN:  Yeah.

6          THE COURT:  So you'll get it done by April

7  26th.

8          MR. GIBBS:  Thank you, your Honor.

9          THE COURT:  Just give me a second to make some

10  notes.  By the way, that's the Saturday, so we'll make it

11  April 28th.

12          MR. MILMAN:  Can we just extend that to that

13  Friday of that week, your Honor.  I know I have some

14  stuff at the end of April.

15          THE COURT:  Oh, what's the Friday of that week?

16          THE CLERK:  (Inaudible).

17          THE COURT:  May 2nd.

18          MR. MILMAN:  Evan, would you be able to do it

19  quicker than -- I mean I'm looking for an outside date

20  but can you do something in the next two weeks?

21          THE COURT:  You can work it out without me.

22          MR. GIBBS:  Yeah, should be able to.

23              (Pause in proceedings)

24          THE COURT:  Okay.  Next let's talk about th

25  emotion at docket entry 198.  For some reason it's no

Transcriptions Plus II, Inc.

11

Proceedings

1   longer indicated as a motion on the docket but I think
2   it's still intended to be.  Is that correct, Mr. Gibbs?
3           MR. GIBBS:  Yes, your Honor, it is.  I misnamed
4   it a motion for sanctions.  It's actually motion to
5   compel.
6           THE COURT:  Okay.
7           MR. GIBBS:  That was my, completely my fault.
8   I filed it myself and that was my error.
9           THE COURT:  No, I get it.  Hold on.  Just bear
10  with me one sec.
11              (Pause in proceedings)
12          THE COURT:  Okay.  Yes, what do you want to
13  tell me, Mr. Gibbs?
14          MR. GIBBS:  Your Honor, I'd like to start, if I
15  may, I have a demonstrative exhibit I'd like to share
16  with Court.
17          THE COURT:  Do they have a copy?
18          MR. GIBBS:  Yes, your Honor, they do.
19          THE COURT:  Okay.  Then that's fine.
20          MR. MILMAN:  Your Honor, I just got to, if I
21  may, just comment on it.
22          THE COURT:  Well, when I have it in front of
23  me.  But yes, sure.
24          MR. MILMAN:  Sure.
25          THE COURT:  I assume you'll tell me what I'm

12

Proceedings

1    looking at, Mr. Gibbs?

2              MR. GIBBS:  Yes, your Honor.  So the first

3    page, these are highlighted excerpts from filings.  Well,

4    the first is the -- the first excerpt, that's from a

5    letter that was sent to us.  That's critical here.  The

6    language that's highlighted is critical.

7              THE COURT:  Okay.

8              MR. GIBBS:  The next is from highlighted

9    language from one of their filings on January 29th.  And

10   then there are some excerpts from the hearing, our

11   last --

12             THE COURT:  Okay.

13             MR. GIBBS:  -- from the last hearing.  And then

14   there are two charts at the end that are for illustration

15   purposes as to a couple of the points that I plan to

16   make.

17             THE COURT:  Okay.  Before we get, do you want

18   to say something, Mr. Mule, or do you want to --

19             MR. MULE:  Yes.  If I may.  Just the charts at

20   the end I just want to say are a just gross

21   misrepresentation.  To the extent they're meant to

22   portray that there's some huge gap, it's just false, it's

23   just based on speculation.  You know, they're just giving

24   an average of texts and they're saying oh, there's no

25   text or substantially not many texts between October and

13

Proceedings

1   March, which is prior to the lawsuit.  Therefore, you

2   know, this is how many if we went on an average excluding

3   those months, which is not exactly what occurred.  And

4   we've explained it many times.  You know, from April on

5   when Nick was advised with duty to preserve, that's what

6   he did.  And you know, so the number of messages per

7   month really are subsequent to April and on.  That is

8   much higher.  These representations are not anywhere near

9   accurate.

10           THE COURT:  Okay.  You've already said that in

11  your letter.

12           MR. MULE:  Okay.

13           THE COURT:  But you can reiterate.  All right.

14  Mr. Gibbs, go ahead.

15           MR. GIBBS:  Certainly.  Thank you, your Honor.

16  So I want to start I think by saying it really appears

17  here that Nick has deleted likely thousands, tens of

18  thousands of messages during the most critical time

19  period of the case.  So that's October 22nd through March

20  2023.

21           The reason that time period is so critical is

22  because that is, in October, that is when Don was

23  terminated from SiteOne.

24           In November, that's when we first learned that

25  they're looking at purchasing a property to operate the

Transcriptions Plus II, Inc.

14

Proceedings

1    competing business.

2                December, January, we start to learn that Nick

3    is physically visiting that new site while it's being

4    prepared for the competing business.

5                February, you know, things start to go missing.

6    We get photographs of Nick at the new competing property

7    site.  And then we ultimately terminate him.

8                THE COURT:  Pull the mic a little closer.

9                MR. GIBBS:  Here we go.  Is that better?

10               THE COURT:  It's on.  You can move it, you can

11   move it.  Move it closer to you, please.

12               MR. GIBBS:  How is that?

13               THE COURT:  Better.

14               MR. GIBBS:  Okay.

15               THE COURT:  Keep going.  I've heard you, but

16   keep going.

17               MR. GIBBS:  And so February comes around.  We

18   confront Nick with the evidence, you know, that he's

19   helping to prepare this competing business.  During the

20   meeting, he resets his SiteOne issued phone to factory

21   settings which deletes all the text messages on there.

22               And then of course we know February going

23   forward they're operating the competing business, getting

24   it off the ground and running throughout March and we

25   filed the lawsuit on March 21st.  We filed a motion for

15

Proceedings

1  preliminary injunction and whatnot.  So the most critical

2  time period in the case is from October of 2022 through

3  March 2023.

4          And so with that in mind, there are some I

5  think very important things to go over about what we know

6  and what we don't know about Nick's text message data at

7  this point.  So I mean what this really comes down to is

8  there's really sort of -- we've been presented with a

9  moving target and some very unclear information.

10          So first of all, January 8th, we being myself,

11  one of the other attorneys at my firm, and then counsel

12  for defendants, we had a meet and confer call because we

13  had --

14          THE COURT:  January of this year?

15          MR. GIBBS:  Correct, correct, January 8th of

16  this year.  We had a meet and confer call to discuss a

17  joint status report that was due on January 9th.  During

18  that call, that's the first time that defense counsel

19  tells us hey, there have been, text messages have been

20  deleted.  And during that particular call, Nick was

21  included in that.  And they said look, Nick, before April

22  2023, it appears Nick deleted all of his text messages

23  and there's none to produce for that particular time

24  period.  And so you'll see in our January 9th status

25  report --

16

Proceedings

1          THE COURT:  That call was with Mr. Mule?

2          MR. GIBBS:  That's correct.

3          THE COURT:  Okay.

4          MR. GIBBS:  That's correct.  Mr. Mule is the

5   one who relayed this information to me.

6          The next day, so we filed a joint status report

7   the next day.  That's included in there.  I restated what

8   they told me.  Nick deleted his text messages prior to

9   April 2023.  And then we had the other stuff about Don

10  and Vic in there as well.

11         So then on January 15 -- and this is where

12  things start to go off the rails.  So we get the letter

13  on January 15th and the narrative changes.  These

14  highlighted portions here show what was said.  So it says

15  with respect to Nick, Nick's phone contained 151,952

16  messages dating back to November 4, 2020 which not only

17  contained messages among the defendants but all messages

18  Nick sent and received which if any existed would include

19  messages with the other identified individuals, SiteOne

20  employees, customers, et cetera.

21         And there's a footnote.  This is really how we

22  ultimately -- this issue came to light.  It says based on

23  our review of a bar chart starting in October 2022 that

24  had small scaling which made it appear there were no text

25  messages between October of 2022 and March 2023, we

Transcriptions Plus II, Inc.

17

Proceedings

1  initially understood the text data dates back to April

2  2023, but in reality it dates back further beyond that

3  loop back period.

4            And so then we flash forward to our hearing and

5  defense counsel made numerous statements that they had

6  collected all of Nick's data and most important -- I mean

7  there are really two points that are really important.

8  But one of the really core points is that we know that

9  Don and Vic deleted their text message data not just for

10  this relevant time period but going forward as well.

11           But the argument that's been presented by

12  defense counsel is hey, there's really no harm no foul

13  because we collected all of Nick's text data.  And if

14  there are any texts between Nick and Vic or Nick and Don,

15  or you know, both of them together, they would be on

16  Nick's phone and we've collected the data and searched it

17  and there are none, and therefore, they don't exist.  And

18  so therefore, you have no evidence to support your

19  claims.

20           THE COURT:  I remember.

21           MR. GIBBS:  And so that is the general

22  progression of the statements that have been made.  And

23  those were, you know, from the record and in the filings

24  with the Court.

25           And so that gets to the charts at the end of

18

Proceedings

1  the handout and there are two.  And these are, absolutely

2  I created these myself just purely for illustrative

3  purposes for today.

4           THE COURT:  Yes.

5           MR. GIBBS:  And so as they have said

6  repeatedly, repeatedly, repeatedly, they pulled 150,000

7  text messages from Nick's phone.  And so these two charts

8  show two different scenarios.

9           Chart number one is if you take 150,000 text

10  messages and they date back all the way to November of

11  2020 and they go through, you know, the date the phone

12  was collected in November of 2024, that's 48 months.  And

13  you take out the six months where there are no messages.

14  There are 17 messages, so no messages for all intents and

15  purposes.

16           THE COURT:  Right.

17           MR. GIBBS:  And you average that out and it's

18  3,500 text messages on average per month.  And so this to

19  me is a representation of -- you know, again, these are

20  just averages.  But this is what that bar chart

21  referenced in footnote 3 would have looked like, or

22  something akin to this, if -- on the other hand, this is

23  what chart two accounts for.  If the chart, if the bar

24  chart they were referring to only accounted for the

25  months of October 2022 through November 2024, then it

19

Proceedings

1    seems even more egregious because that's only a period of

2    19 months and that would mean there are almost 18,000

3    text messages per month on average.  And so this is what

4    that chart would look like.  You would see 8,000 messages

5    in all these other months and then zero here.

6             And so if you were looking at a chart, it would

7    make sense to say yeah, we don't have any texts for that

8    particular time period.

9             And so I brought this up with opposing counsel

10   on two separate occasions.  We first talked about this

11   following, I can't remember if it was Vic's or Don's

12   deposition, but one of the depositions.  We talked about

13   this -- it was after Don's because it was on Friday.  So

14   we talked about this issue.  I asked for an explanation.

15   I said look, you know, what are we misunderstanding?  I

16   mean this seems like there is in fact no text message

17   data for that time period.

18            And so what they said was -- and I asked for a

19   chart, a copy of the chart that they initially referred

20   to in footnote 3.  They did not send that.  What they

21   sent was what I've included here as chart 3, and this is

22   what we received on March 19th.  And this shows the

23   actual number of messages for this particular time period

24   for Nick.

25            And so if you put all this together, we're just

20

Proceedings

1   not really clear, you know, what's going on.  And we

2   received the response in opposition to a motion and this,

3   for the very first time, and this is a quote from the

4   response.  "Nick's usual practice regarding his text

5   messages was to view, respond to, or act on a message and

6   then delete it."  But that is not anywhere else in any of

7   the other discussion on the record with the Court, in the

8   filings, in communications with us where they say oh

9   know, we have all of Nick's messages.  That seems

10  completely inconsistent to me.  And I don't know the

11  explanation for that.

12          THE COURT:  Okay.

13          MR. GIBBS:  But we're here today because at

14  this point Nick has now admitted to destroying text

15  messages and we're asking for the same thing we asked for

16  for Vic and Don, we're asking a deposition.

17          THE COURT:  I understand.  Mr. Mule, you can

18  obviously respond but let me tell you what my concerns

19  are before you respond, that Mr. Gibbs' recollection of

20  our prior meeting where you said it's okay because we've

21  still got all Nick's messages is consistent with my

22  recollection of the conversation which is why I said he

23  doesn't need to appear for what you've called a

24  spoliation deposition.  I don't know if that's a real

25  thing.  But a deposition on the subject.  And now lo and

21

Proceedings

1    behold that appears not to be the case based on your

2    representation in docket entry 200.  So what is going on

3    here?

4              I'll also put on the record that it seems to me

5    that Mr. Mule has been nothing been straight with his

6    adversaries as he's obtained information and disclosed

7    which has allowed these two -- and maybe I'll say it

8    probably applies to the whole firm, but Mr. Mule is the

9    point of the spear here.  So I want to acknowledge that

10   before you go ahead.  So go ahead.

11             MR. MULE:  Yeah.  Sure.

12             MR. MILMAN:  Thank you, your Honor.

13             MR. GIBBS:  Your Honor, so what I said at the

14   courtroom, I don't believe anything's changed, was that

15   for -- and I'm just trying to locate the section --

16             THE COURT:  Well, do you recall saying to me

17   it's no harm no foul because --

18             MR. MULE:  Yeah, I do.  And the reason was

19   because, you know, they're looking for information before

20   April of 2023 and this lawsuit started in mid-March.  So

21   it's basically -- you know, there was no obligation prior

22   thereto.  So all of the -- you know, Nick could not have

23   been aware of any --

24             THE COURT:  There's something parallel going on

25   here that which is if -- I'm not saying everything went

Transcriptions Plus II, Inc.

22

Proceedings

1   down the way plaintiffs allege.  But if it did, one

2   interpretation of what happened is that Nick destroyed

3   texts, electronic evidence, to avoid liability.  I'm not

4   saying that is what happened.  I'm saying that's one

5   interpretation --

6             MR. MULE:  Right.

7             THE COURT:  -- of what is before the Court

8   right now.

9             MR. MILMAN:  I know you don't like two people

10  to speak on behalf --

11            THE COURT:  I do not.

12            MR. MILMAN:  I would ask if you would give me

13  just one comment.

14            THE COURT:  Okay.

15            MR. MILMAN:  I think the record should reflect

16  that our firm did not represent Nick out of the gate.

17            THE COURT:  No, I know, I know.

18            MR. MILMAN:  Okay.  So that's that.  And also,

19  I think there's a high -- I get it.  You just

20  acknowledged that that's their point of view but that is

21  really speculative.

22            THE COURT:  Right.  But we're in discovery.

23  We're not finding -- there's no adjudication of liability

24  going on today.  And the question is whether or not

25  essentially Mr. Gibbs is allowed to kick the tires of the

23

Proceedings

1    story he's been told.  That's all we're doing.

2           Okay.  Mr. Mule, you want to continue?

3           MR. MULE:  Yeah.  So in our view really nothing

4    has changed since January.  And I'm trying to look at his

5    chart here.  You know, we gave information --

6           THE COURT:  Speaking of the chart, you've not

7    turned over the bar chart?

8           MR. MULE:  We gave him exactly what he asked

9    for which was information as to the number of texts

10   between October and --

11          THE COURT:  But in one of your correspondence,

12   assuming he's accurate and I'm sure he is, you referenced

13   a bar chart with a scaling situation.

14          MR. MULE:  Yes.

15          THE COURT:  Did you produce that bar chart in

16   the form of the scaling --

17          MR. MULE:  I have it.  I can give it to him.  I

18   have no problem.

19          THE COURT:  I'm saying why -- I guess my

20   question is why wouldn't you give it to him?

21          MR. MULE:  Yeah.

22          THE COURT:  I mean everything else is in the

23   record.

24          MR. MULE:  I mean basically I told him the

25   information, I told him that.

24

Proceedings

1          THE COURT:  (Indiscernible) him.

2          MR. MULE:  That's fine.

3          MR. GIBBS:  Your Honor, I'm sorry, your Honor,

4   that is absolutely not true.

5          THE COURT:  Well, we're now past that.  Give

6   him the thing.

7          MR. MULE:  I have to go get a copy of that.

8          THE COURT:  Okay.  So there's that.  All right.

9   Mr. Mule, continue please.

10          MR. MULE:  Yeah.  So you know if you're looking

11   at their presentation, January 8th -- look, I don't have

12   my notes from January --

13          THE COURT:  Are you on the chart at the back of

14   his demonstrative?

15          MR. MULE:  Well, the charts, first his

16   demonstrative goes through a timeline, January 15th what

17   we said, January 15 --

18          THE COURT:  Oh, okay.  Yes.

19          MR. MULE:  And then what was said on January

20   29, what was said at the February 10 hearing.

21          THE COURT:  Right.

22          MR. MULE:  And you know, all the statements are

23   really consistent in there.  To the extent there was, you

24   know, if there was any confusion as to before April, I

25   mean I'm not exactly sure what the confusion was because

25

Proceedings

1    I did say that the amount, you know, before April was so

2    small I couldn't even see it.  And then I told him that.

3    So --

4              THE COURT:  Right.  But then you didn't give

5    him the bar chart.

6              MR. MULE:  I didn't give him the bar chart but

7    I gave him the number of conversations.

8              THE COURT:  No, I get it but he's paid to be

9    skeptical the same way you are.  And it seems strange to

10   me that you would say I'm looking at the bar chart and

11   then don't give it to him.

12             MR. MULE:  Yeah.  Well, this is what happened

13   also.  He called me on I believe it was a Friday.

14             THE COURT:  Okay.

15             MR. MULE:  And you know, I guess the weekend

16   came and then he already had filed a motion before I even

17   had the opportunity to respond.

18             THE COURT:  Okay.  Then let's get off the bar

19   chart and keep going.

20             MR. MULE:  So in any event as far as what they

21   presented, our position has been exactly the same.  And

22   then we gave more information.  That's what they're

23   trying -- they just, you know, they're never satisfied.

24   We gave them more information which was basically look,

25   before April, that was Nick's practice.  He basically

Transcriptions Plus II, Inc.

26

Proceedings

1   used his texts as a reminder and he would typically

2   delete them.  And he had no claim against him, and he had

3   no restrictive covenant.  How would he know that they're

4   going to bring a claim against him?

5          THE COURT:  Okay.  Anything else?

6          MR. MULE:  That's pretty much it, your Honor.

7          THE COURT:  Okay.  The motion is granted.  My

8   understanding of how things were retained by Nick is not

9   consistent with what you just said and nor do I think

10  it's consistent without.  I think this is a moving

11  target.  I think it's a fair characterization by Mr.

12  Gibbs.

13         And as I said, I don't know whether or not the

14  plaintiff's rights had ultimately been violated.  I have

15  some skepticism about the claims.  I don't know what's

16  going on.  But there's something to explore here and I'm

17  going to allow the plaintiff to explore it.  You now have

18  the chart which was the first thing you requested.  But

19  the relief set forth, requested on page 3 of documentary

20  198 is granted.  So Nick will sit for a deposition.  You

21  can look at a date within the same time frame.  And his

22  phone will undergo an analysis to see if we can figure

23  out what's going on because whether or not was a

24  defendant in the suit at the time indicated, and I do not

25  doubt anything Mr. Mule is representing in that regard,

27

Proceedings

1   there is a scenario or a story under which the deletion

2   of texts, and they were deleted by all three I guess

3   defendants now, paints an unusual picture.  And what I'm

4   anticipating is that Mr. Gibbs will ultimately ask for an

5   adverse inference at trial.  And in order to obtain that,

6   part of the inquiry goes to the state of the mind of the

7   people deleting the evidence.  He has got to be --

8   there's enough evidence here to permit him to explore

9   that so that ultimately the determination about the

10  adverse inference can be made either in this court or I

11  suppose more likely by Judge Brown.

12          But that's out there.  And so he's going to get

13  his opportunity and we'll see where this leads.  So --

14          MR. GIBBS:  Your Honor?

15          THE COURT:  Yes.

16          MR. GIBBS:  One small thing.  So the chart that

17  Mr. Mule handed me, so this goes October of 2022 through

18  October of 2024.  I would ask for the chart for the data

19  preceding October 2022 as well.

20          THE COURT:  Well, it's a little different.  Mr.

21  Mule, what I want you to give him is the chart that you

22  looked at when you said the scaling made it hard to see.

23          MR. MULE:  Yes.

24          THE COURT:  Whether that's -- if that's the

25  chart you used to make the representation, that's the

28

Proceedings

1    chart you get.  If you are looking for other discovery,

2    that's a little different.  I'm not saying you're not

3    entitled to information yes or no, but that's a little --

4    not bait and switch because you're not duping me, but

5    it's not apples to apples.

6            MR. GIBBS:  I understand.

7            THE COURT:  Okay.  Give me one second.

8                  (Pause in proceedings)

9            THE COURT:  Okay.  We're going to take five

10   minutes because I neglected to print out the motion to

11   quash.  That's my mistake.  So take five minutes.  We'll

12   grab some documents and then we'll come back out and

13   we'll continue.

14           MR. GIBBS:  Thank you, your Honor.

15                   (Off the record)

16           THE COURT:  Okay.  We are back on the record.

17           The next motion I'm going to talk about is

18   docket entry 195 which is defendant's motion to quash

19   subpoenas to vendors I guess.  We'll call them data

20   vendors.  Mr. Mule, what do you want to tell me?

21           MR. MULE:  Yes.  Your Honor, we're sort of at a

22   loss as to, you know, what it is they're seeking.  I mean

23   they say oh, we're not seeking mental impressions or

24   strategies but their subpoena, you know, specifically

25   says produced documents and communications from January

29

Proceedings

1   2022 concerning Nextpoint services provided to Don and

2   also concerning all work performed for Don from We

3   Recover Data.

4          We represented to opposing counsel that we

5   retained that.  I mean Nextpoints are e-discovery --

6          THE COURT:  Okay.

7          MR. MULE:  -- you know, data.  They provide

8   that service to us, our e-discovery services.  We Recover

9   Data, we retained them back in July of 2023.  We said

10  make a copy of the cell phone.  And you know, so we

11  provided this information and we told them exactly -- and

12  it's a letter to the Court January 15, 2025.  And it's

13  referred to on a chart that Evan provided you.  He quoted

14  from that letter which is 184 on the docket.  We

15  explained to them precisely, you know, what occurred.

16  Nextpoint got the hard drive data and they asked We

17  Recover Data do you have the UFDR file?  And We Recover

18  Data responded we don't have it due to our client

19  retention policy.

20          So I mean that's it factually.  You know, I

21  don't know what they are seeking.  We offered them the

22  hard drive.  Maybe they're smarter than, you know, the

23  people we have who looked at this and maybe they can get

24  some other information.

25          We also explained and provided to them that we

30

Proceedings

1    look that the Cellebrite report --

2                THE COURT:  You looked at the?

3                MR. MULE:  The Cellebrite report that was

4    provided by We Recover Data.

5                THE COURT:  Yes.

6                MR. MULE:  I had text messages.  None of them

7    had anything to do with landscape related issues.  And

8    that's basically, you know, where we are with that.  So I

9    don't really know why they're trying to seek this

10   information.  It's as if -- to me is clearly protected

11   information.  These are our agents.  We use them as if

12   they were in-house, you know, if we had our own in-house

13   people.

14               THE COURT:  No, I get that.  Okay.  Mr. Gibbs?

15               MR. GIBBS:  Yes, your Honor.  So the --

16               THE COURT:  And I want to phrase it this way.

17   In a perfect world, what would that data tell you?

18               MR. GIBBS:  So this goes to so when we were at

19   Don's, we'll start with Don's deposition first because --

20               THE COURT:  Okay.

21               MR. GIBBS:  -- the We Recover Data only relates

22   to Don's phone.  So We Recover Data was the vendor they

23   hired to make a copy of the phone.  So there were many

24   points during Don's deposition that he couldn't remember

25   about engaging with the We Recover Data, the scope of

31

Proceedings

1   that project, exactly what was done.  And so there are

2   real questions about exactly the scope of that work, what

3   it would tell us about Don's state of mind with respect

4   to preserving the text messages.  And so that's what

5   we're looking for there are the engagement letters.  We

6   also don't know the exact date they were engaged, the

7   manner or scope of the engagement.

8            And so for We Recover Data, which our

9   understanding is they were only retained for that

10  discrete purpose, we're looking for, you know, email or

11  other communications between them and either the law firm

12  or the parties themselves, you know, any kind of

13  engagement letters, scoping, that sort of thing.  That's

14  what we're looking for from We Recover Data.

15           THE COURT:  Let me ask you this.  If you were

16  not in an environment where there was at least a

17  reasonable cause to believe that evidence had been

18  destroyed, would you be making this request?

19           MR. GIBBS:  Maybe.

20           THE COURT:  Why?

21           MR. GIBBS:  I don't -- if there's absolutely no

22  suggestion of destroyed evidence, probably not.  I don't

23  think it would -- it certainly wouldn't be a high

24  priority.

25           THE COURT:  Well, do you make this request in

32

Proceedings

1  every case with electronic evidence?

2          MR. GIBBS:  No, I do not, your Honor.

3          THE COURT:  Okay.  All right.  You can respond

4  to what he said if you'd like, Mr. Mule.

5          MR. GIBBS:  Oh, and I did not talk --

6          THE COURT:  Oh, I'm sorry.  I thought --

7          MR. GIBBS:  I'm sorry.  I did not talk about

8  Nextpoint because --

9          THE COURT:  Oh, yes, yes, sorry.  Yes.

10          MR. GIBBS:  -- it's a little different.

11          THE COURT:  Right.

12          MR. GIBBS:  And it does deserve its own

13  attention I think.

14          THE COURT:  Okay.

15          MR. GIBBS:  So Nextpoint Mr. Mule is correct,

16  they explained to us that Nextpoint is, you know, is the

17  e-discovery vendor for all purposes for the case.

18          So we don't want all of the communications

19  about other issues in the case, you know, just their

20  general back and forth about e-discovery stuff.  We're

21  only interested in the stuff that is related specifically

22  to the retrieval or review of the information from Don's

23  original cell phone.  And one of the reasons for that is

24  we don't have that cell phone that was the subject of

25  both of these vendors' efforts.  That phone is now gone

Transcriptions Plus II, Inc.

33

Proceedings

1   and can't be forensically analyzed by us.  We can't sort

2   of, you know, check their work.  And so understanding

3   exactly what was done by whom and when and for what

4   purpose we think justifies getting, with respect to

5   Nextpoint, the limited communications just around this

6   issue and not all e-discovery communications.

7            THE COURT:  Okay.  Did you get that?

8            MR. MULE:  I'm not exactly sure if he's

9   saying -- you know, I don't know where -- is he saying

10  what did Nextpoint do with the original phone?

11           MR. GIBBS:  What did Nextpoint do with the

12  original phone?  No, what I'm saying is whatever

13  Nextpoint did with respect to the hard drive from We

14  Recover Data and any work that Nextpoint did specifically

15  trying to I guess recover data from Don's phone that's

16  gone, that's what we're specifically focused on.

17           MR. MULE:  I mean I can answer this.  I mean

18  basically we have a hard drive.  We put it into the

19  computer.  It goes into the database and that's it.  I

20  mean --

21           THE COURT:  Okay.  Well, if that's the case

22  then I don't know what your objection is.  If you're

23  saying that he produced it, then they'd just be producing

24  it again.  So what are we doing?

25           Let me tell you my thinking on this.  I

34

Proceedings

1  understand the basis for the motion to quash.  As I

2  mentioned before, I have concerns about the evidence in

3  this case obviously.  And you haven't seen the -- do you

4  have the communications with the vendor?

5          MR. MULE:  I communicate with them all the

6  time.

7          THE COURT:  No, no, about this case.

8          MR. MULE:  About this case?  All the time.

9          THE COURT:  Why so much?

10         MR. MULE:  Well, I mean we have during the

11 course -- we had between October and January.  We were,

12 you know, compiling all that information.

13         THE COURT:  I have concerns that a blanket

14 motion to quash, not everything in those communications

15 would be subject to the attorney work product doctrine.

16 I don't believe that to be true.  Do you?

17         MR. MULE:  I mean we could give them a

18 statement of work I mean if that's something -- I mean

19 I --

20         THE COURT:  No.  I'll tell you what I'm

21 envisioning and you can react to this is that I'm going

22 to deny the motion with the caveat the documents will be

23 produced but you will get to review them first.  And if

24 you have assertions of specific attorney work product

25 assertions about certain correspondence that you say

35

Proceedings

1  reflects your firm's mental impressions of the case, you

2  know, there's something, in other words, something other

3  than you're hired to do this and then they say well we

4  copied this and we ran this search and it showed 10,000

5  things or (indiscernible).  None of that to me is

6  attorney work product.  You're trying to get an adverse

7  inference and they're using circumstantial evidence

8  because the actual evidence has been deleted.  Is that a

9  fair summary, Mr. Gibbs in a sense?

10          MR. GIBBS:  Yes, your Honor, it is.

11          MR. MULE:  Your Honor --

12          THE COURT:  This goes to that.

13          MR. MULE:  Well, I'm trying to understand when

14  I go to Nextpoint, you know --

15          THE COURT:  You're not going to Nextpoint.

16  They're going to respond to the subpoena.  They're going

17  to send it to Mr. Gibbs who's going to give it to you.

18          MR. MULE:  They're going to send it to me first

19  and then I review it?

20          THE COURT:  No.  Mr. Gibbs, I'm going to take

21  him at his word, is going to open it just to make sure

22  it's the response, and then without reviewing it, give it

23  to you because this is your vendor who you have a long-

24  term relationship with, and they have an understandable

25  interest in keeping you happy.  And I'm not saying

36

Proceedings

1    anything, casting no aspersions on anybody when I say

2    that.  But I am a realist.

3                MR. MULE:  So your Honor, this is regarding --

4    so Nextpoint is going to make -- they're going to get a

5    subpoena that says respond, provide -- I mean this says

6    all documents and communications from January 2022 to

7    present concerning --

8                THE COURT:  About this case.

9                MR. MULE:  -- concerning Nextpoint's services

10   provided to Don or his attorneys.  That's a lot of

11   communications.

12               THE COURT:  Your client should not have

13   destroyed evidence.  Period.  The motion to quash is

14   denied.  But that's how it's going to go, Mr. Gibbs.

15   You'll get a box or a file, I don't know what you're

16   going to get.  Confirm what it is and give it to -- don't

17   read it until Mr. Mule has a chance to go through it.

18   You want a chance to go through it?

19               MR. MULE:  Absolutely.

20               THE COURT:  Okay.  And that's what you get.

21               MR. GIBBS:  And your Honor, just to --

22               THE COURT:  Yes.

23               MR. GIBBS:  -- just to tie a finer point on it,

24   would you envision that they would just produce the

25   documents to us with any type of log or anything that --

37

Proceedings

1          THE COURT:  It has to be -- well, I'm sorry.

2     Let me continue.  I'm envisioning that you'll assert a

3     privilege, the work product doctrine, with respect to

4     some of it.  You will then provide me with those

5     documents and I will review them and will determine

6     what's privileged and what's not because my view and

7     lawyers' views are not always identical when it comes to

8     that, with a log.  It's just that my experience reviewing

9     logs is even though it's made with the best intentions

10    are never sufficient to explain what the heck the

11    document actually is.  It just doesn't.

12                  (Pause in proceedings)

13         THE COURT:  Okay.  That's 195.  So the last

14    thing we have is 193 which is really 189.  That has

15    moving parts or several parts to it, so I'd like to sort

16    of break that out into its constituent parts.

17         Okay.  The first part, and I'm just looking at

18    what you would call the prayer for relief, is produce

19    text messages from 13 custodians.  Right?  Let's do it

20    issue by issue.  So Mr. Mule, let's start with that.

21         MR. MULE:  Yeah.  Your Honor, as far as the

22    texts, I don't know if it makes sense, would you like to

23    give like a little timeline and the process for

24    background?

25              THE COURT:  Yes.  It's a lot to absorb.

Proceedings

38

1          MR. MULE:  All right.  So look, the objection

2    over the last seven and a half months since we brought

3    these issues to SiteOne has been cost and

4    proportionality.  That's basically been their objection.

5    They're both meritless.  And it's, you know, it's telling

6    their opposition basically makes it --

7          THE COURT:  That's one objection or two you

8    said?  Cost and proportionality?

9          MR. MULE:  And proportionality.

10         THE COURT:  Okay.  Keep going then.  Got it.

11         MR. MULE:  So the objections plural.

12         THE COURT:  Okay.

13         MR. MULE:  You know, in their opposition they

14   make conclusory statements as to proportionality but

15   really that's it.

16         As far as the timeline, as this Court noted at

17   the last hearing, there is no PSI protocol.  There never

18   was.  The parties conducted their own, came up with their

19   own searches of what was relevant and responsive to the

20   requests.

21         THE COURT:  Did they share that with you?  I'm

22   talking about opposition now.  In other words, I

23   understand they came up with a list of let's just say ten

24   terms.  And did they say to you we're going to give you

25   these ten terms and you said okay?  Or tell me about

39

Proceedings

1  that.

2           MR. MULE:  That is absolutely false.  So what

3  happened is back in June they did their first production.

4  And we said this production is totally inadequate.

5  You've only identified a few custodians.  And then the

6  end of July they provided their own search terms and they

7  provided responses.  And on August 1st, we sent them a

8  letter and we said look, your own searches addresses only

9  40 percent of the document requests that we made.  It

10 doesn't even identify a search of 60 percent of the

11 searches, 70 out of 100 and --

12          THE COURT:  It doesn't identify 60 percent of

13 the searches?  What does that mean?

14          MR. MULE:  In other words, they came with what

15 their search terms were.

16          THE COURT:  Right.

17          MR. MULE:  And they applied -- they put the

18 request for production to which that particular search

19 applied.

20          THE COURT:  Okay.

21          MR. MULE:  And when I counted the requests for

22 production, I said 60 percent of our request --

23          THE COURT:  I see what you're saying.

24          MR. MULE:  -- for productions are not even on

25 here.

Transcriptions Plus II, Inc.

40

Proceedings

1          THE COURT:  So none of those link up with 60

2    percent of the request.

3          MR. MULE:  Correct, correct.

4          THE COURT:  Got it.

5          MR. MULE:  So in mid-August, that's when I

6    first requested -- I said well what are your -- we didn't

7    see any (indiscernible) in your efforts to collect texts

8    that are responsive to the documents.

9          We had meet and confers from July through early

10   September.  And the process, the way it worked, and we

11   had agreed to it, was they asked for I'm going to say

12   about five meet and confers concerning our responses

13   first.  And then we had two days at the end concerning

14   their responses.  So they had first dibs essentially in

15   coming to us and then we went to them.  In mid-September,

16   we came back to them and said -- and that's docket 189-5.

17   We gave them a list of -- we said, you know, your

18   responses are still deficient on all these particular

19   topics and we identified specific requests --

20         THE COURT:  Topics and requests to produce or

21   just topics?

22         MR. MULE:  Yes, requests to produce.  So we --

23         THE COURT:  No, but I'm saying you linked them

24   to requests --

25         MR. MULE:  I identified the specific numbers.

41

Proceedings

1          THE COURT:  Okay.

2          MR. MULE:  It's 189-5.  And I also gave a list

3   of 24 names.  We said we want these custodians searched

4   for texts as well.

5          THE COURT:  Right.

6          MR. MULE:  And meanwhile, as you'll recall,

7   September 11 comes, we get a barrage of motions.  This is

8   like -- there's been over 30 motions by SiteOne here.

9   They've spent $2 million in fees since this case.

10  There's been tremendous motions.  Not one substantive

11  deposition yet or discovery.

12         So by SiteOne's own searches left to their own

13  devices, they say they reviewed 25,000 documents.  And

14  they have a narrative in here saying we agreed to their

15  searches.  We didn't agree to their search terms.  We

16  basically had meet and confers.  They said we'll

17  supplement some.  Let us consider these.  You know, maybe

18  we'll do that.  And then they came back, they provided

19  one other search, updated search term on August 2nd.  And

20  that updated search term was still insufficient and the

21  subject of the meat and confers and the additional

22  letters that we sent them for additional meet and confers

23  that these are not responsive.

24         Then you'll recall in mid-October we were here

25  and they said we want you to review these specific search

42

Proceedings

1   terms and give us a headcount.  And we agreed to that.

2   The Court ordered us to go through that and we did that

3   exercise.

4           And just to back up, on September 4 in one of

5   those meet and confers, we specifically said hey,

6   whatever process we're doing here, there's got to be a

7   reciprocal process.  So if you're requesting it from us,

8   we expect the same reciprocal fair process as it comes to

9   our requests.

10          So in October, they did the search terms.  We

11  ran those.  We spent tons of attorney hours and time

12  reviewing and preparing and getting those documents that

13  were responsive.  Meanwhile, while we are getting all

14  that together, we followed up again in November of 2024.

15  And this was because they kept making the same refrain,

16  costs, proportionality, costs, proportion, we can't do

17  it, it's too much.  Even though we spent 2 million in

18  fees, you know, apparently spending 200,000 reviewing

19  documents when it comes to evidence we need is too much.

20          So in the event of moving, the desire of moving

21  the case forward and getting to substance we said look,

22  we've culled this list down from 24 to 13 and we went

23  down to 13.  And again, they responded but it took them a

24  month and a half to respond.  January 3rd they respond

25  and their refrain was the same.  Costs too much,

43

Proceedings

1    proportionality.

2            Then January 17th comes and they say we'll pick

3    our own ones that we want to produce.  These three,

4    Thistle, Ketter, and Catalano.  That was January 17.  And

5    we said wait a minute, this is not what we agreed to.  We

6    agreed to a process.  Whatever process we're going to

7    apply to you was going to apply to us.  And we had not

8    been making progress.

9            So we made the first motion which is 189 and on

10   February 10th we were before the Court and we right

11   before that we went through the painstaking task of

12   making a document with specific searches.  And we have

13   that.  It's in the record as Exhibit H.  Exhibit H and

14   Exhibit G, docket 198-7 and 198-8, are really the key

15   exhibits here.

16           THE COURT:  Okay.  It's not 198 though.

17   It's --

18           MR. MULE:  I'm sorry 193.  Excuse me.

19           MR. GIBBS:  I think it's 189.

20           THE COURT:  It's 189 I think.

21           MR. MULE:  189.

22           THE COURT:  And it's --

23           MR. MULE:  Dyslexia I guess.

24           THE COURT:  All right.  So you're saying

25   it's -- because when I print it, it doesn't come out

44

Proceedings

1    quite the way you say.  So it's docket entry -- it's dash

2    7 and dash 8?

3              MR. MULE:  Dash 8.  Dash 7, dash 8, which is

4    Exhibit G and Exhibit H.

5              So you know, at the conference the motion to

6    compel was withdrawn because there was an agreement that

7    SiteOne would compromise.  We agreed, you know, they

8    agreed that they'd run the search terms that we provided.

9    So I took this as the same process that we went through

10   in October.  And we specifically said to the Court that

11   by the end of the week we would provide a further

12   limitation as to the number of custodians.  And we said

13   somewhere between 13 and three, and greater than three,

14   because they agreed to three previously.

15             THE COURT:  Which leaves ten.

16             MR. MULE:  Which leaves somewhere between 13

17   and --

18             THE COURT:  All right.  So leave the three out.

19   That leaves ten others.

20             MR. MULE:  Well ten others.  Correct.

21             THE COURT:  Right.  So of --

22             MR. MULE:  And then so --

23             THE COURT:  Wait, wait.  Let me ask you a

24   question and then you can continue.

25             MR. MULE:  Yeah.

45

Proceedings

1          THE COURT:  Did you come up with the --

2          MR. MULE:  I did.

3          THE COURT:  Who were they?

4          MR. MULE:  So on February 14 we gave them a

5    list of ten and those ten were --

6          THE COURT:  Well, that was the remaining ten

7    then, all ten.

8          MR. MULE:  No, no, because they already agreed

9    to three of them.

10          THE COURT:  Oh, so seven more.

11          MR. MULE:  So it's really just seven more.

12          THE COURT:  Okay.  And who are they?

13          MR. MULE:  That was Doug Black.  They had

14    agreed to Catalano already.  Gerard Passaro --

15          THE COURT:  Wait, wait.  I'm looking at the

16    exhibits.

17          MR. MULE:  Yes.  Sure.

18          THE COURT:  Gerard?

19          MR. MULE:  If you look at --

20          THE COURT:  Oh, he's number two.  Okay.

21          MR. MULE:  Yeah.  At Exhibit G.

22          THE COURT:  Got it.  I have it.  Who else?

23          MR. MULE:  Kevin Peatie is number eight on

24    Exhibit G.

25          THE COURT:  Yes.  Who else?

Transcriptions Plus II, Inc.

46

Proceedings

1        MR. MULE:  Phil Sausto who's number three.

2        THE COURT:  Yes.

3        MR. MULE:  Alex Trama, who is number one.  Greg

4   Thistle they agreed to produce.  Jerry Justice, who is

5   number seven.  Joe Ketter, who is --

6        THE COURT:  Number 12.

7        MR. MULE:  Number 12.  And they agreed to

8   produce his texts.

9        THE COURT:  All right.  So is that every --

10        MR. MULE:  And then --

11        THE COURT:  What else?

12        MR. MULE:  -- Mr. Brian Kersnowski.

13        THE COURT:  Number five.

14        MR. MULE:  Number five.  And you know, so we

15   came back and we said seven more.  I further compromised

16   to our position in the interest of moving us forward

17   again.  They came back February 24 two much, costs too

18   much, proportionality.  And you know, so out of these

19   numbers if you look at Exhibit G, numbers one and two,

20   Trama and Passaro --

21        THE COURT:  Right.

22        MR. MULE:  Numbers three and five are

23   specifically mentioned in the complaint and they filed

24   declarations in this case.

25        THE COURT:  Right.

47

Proceedings

1          MR. MULE:  You know, your Honor referenced at

2    pages 41 through 42 at the last hearing about I can

3    envision a 30(b)(6) and you're going to have the review

4    relevant information anyway.

5          So as to those, I don't see any basis for not

6    getting the relevant information on them and pulling

7    those texts.

8          As to the others, we have specific reasons why

9    they should, their information should be culled and

10   relevant information produced.

11         So Doug Black, number four, is the CEO of

12   SiteOne.  Don regularly was in communication with him.

13   He's the CEO but he's the one that Don communicated to

14   regarding the operations here.  He was a key figure in

15   terminating Don.  Any types of decisions that Mr. Thistle

16   is going to make, Catalano is going to make --

17         THE COURT:  Okay.  Now, let me ask you a

18   question.

19         MR. MULE:  Yes.

20         THE COURT:  I understand what you're saying.

21   But with respect to searching the texts --

22         MR. MULE:  Yeah.

23         THE COURT:  -- how is that done?  What is

24   your --

25         MR. MULE:  Okay.  So they could do one of two

Transcriptions Plus II, Inc.

Proceedings

48

1    things.  And this hasn't been decided because --

2              THE COURT:  But what are you asking for?  Let

3    me put it that way.

4              MR. MULE:  Because they haven't agreed to

5    anything.  But we gave them, as Exhibit H, we gave them

6    that specific --

7              THE COURT:  The table.

8              MR. MULE:  -- table which gives very -- it

9    identifies even the allegations to which the particular

10   request and the search refers to.  We gear the requested

11   terms to particular allegations.

12             THE COURT:  Right.

13             MR. MULE:  We gear it toward particular claims.

14             THE COURT:  I see.  So each custodian to an

15   allegation.  That's how you --

16             MR. MULE:  That's right.

17             THE COURT:  All right.

18             MR. MULE:  That's right.

19             THE COURT:  Yes.

20             MR. MULE:  So we did that.  We went through

21   that task.  And really what this comes down to is they're

22   complaining about cost.  Now --

23             THE COURT:  No, I got that.  You don't have to

24   repeat it.

25             MR. MULE:  Okay.  So that's texts.  I don't

49

Proceedings

1  know if you want me to get into emails which is -- I mean

2  it's similar.

3          THE COURT:  We're going to do -- well how

4  similar?  Because we're going to --

5          MR. MILMAN:  I think you should know though on

6  the costs that they keep raising, only roughly 10 percent

7  of that cost is to do the search.

8          THE COURT:  No, I got it, I got it.

9          MR. MILMAN:  Everything else is legal fees.

10          THE COURT:  No, I got it.  Mr. Milman, Mr. Mule

11  is doing a good job.

12          MR. MILMAN:  I know.  Thank you.  Sorry.

13          THE COURT:  Let him do his thing.  I'm just

14  going to handle this one at a time but if it's basically

15  the same argument with respect to emails, then --

16          MR. MULE:  It is, yeah.  And it's really

17  just -- look, when they did the searches under their

18  terms, they came up with 25,000.  And we said, you know,

19  60 percent of our requests aren't captured by this.  So

20  we came with these searches.  And not surprisingly, they

21  come back, and that's document 189 -- I think that's 198-

22  8.  Sorry.  189-8.  I keep mixing that up.

23          THE COURT:  That's the table, isn't it?

24          MR. MULE:  You know, that -- they came back and

25  they said it produces 204,000 documents.  But it's no

50

Proceedings

1  surprise that the searches that are relevant to the case

2  to our defense will come up with documents.  Basically

3  we're entitled to a defense and we should be able to get

4  these documents.  They brought this lawsuit.

5          THE COURT:  I got all that.

6          MR. MULE:  It's been a one-way street so far,

7  your Honor.

8          THE COURT:  I got all that.  Okay.  Mr. Gibbs?

9          MR. GIBBS:  Thank you, your Honor.

10         THE COURT:  Let me just say before you get

11  started, the answer to this question is not you don't

12  have to do any more searches.  So gauge your response

13  accordingly, please.

14         MR. GIBBS:  Yes, your Honor.  So I think --

15         THE COURT:  And I think I said that before.

16         MR. GIBBS:  -- I think that it is very

17  important to start off with a -- I want to frame first

18  the basis for these additional requests.

19         So if you read their motion papers, they

20  specifically say they are seeking additional evidence

21  about this vendetta lawsuit.  That is the thrust of what

22  they're asking for.  They've really listed six different

23  types of things they're looking for.  Specifically,

24  purchase of the assets, the activities leading up to

25  Don's termination, the decision to terminate Don, the

51

Proceedings

1   investigation into Nick's activities, the decision to

2   terminate Nick, and the decision to commence this

3   lawsuit.

4           So it's a really narrow universe of topics that

5   they're seeking this additional discovery about.  So I

6   just want to frame that up first --

7           THE COURT:  Okay.

8           MR. GIBBS:  -- because that's the focus of this

9   vendetta lawsuit theory.

10          Now, I want to walk through -- because I'm

11  sorry, your Honor, but when we went through this process

12  last year, we met and conferred for hours.  I mean it was

13  something like 14 or 15 hours.  We met and conferred over

14  each other's discovery responses and what we were going

15  to do.

16          And the letters, I've attached them as exhibits

17  where I expressly tell them -- the August 2nd letter I

18  think is the most important one.

19          THE COURT:  Okay.

20          MR. GIBBS:  And that one specifically says hey,

21  here are our discussions, our joint discussions up to

22  this date.  You proposed, you defendants, you proposed to

23  us 15 additional search terms.  So at the end of July we

24  sent them our search terms.  And it's not just search

25  terms.  It was a chart that said here's the search terms,

52

Proceedings

1   here are the requests for production to which they are I
2   guess seeking materials for.  Here are the custodians
3   that are being search.  Here are the hit counts for these
4   particular search terms.  We initially sent them -- we
5   initially ran 12 separate sets of search terms, included
6   all that information, and we sent it to them I think it
7   was the last week of July.
8           We then had another meet and confer over that
9   where we discussed additional terms.  They sent us 15
10  additional search terms.  We ran all of those search
11  term's and we sent it back to them.  And we said, I mean
12  I can quote it from the letter, we said look, 12 of the
13  search terms that you sent us, that gives us an
14  additional 4,300 pages --
15          THE COURT:  This is the August 2 letter?
16          MR. GIBBS:  Correct, your Honor.
17          THE COURT:  Okay.  What page number?
18          MR. GIBBS:  Page 5.
19          THE COURT:  Okay.
20          MR. GIBBS:  Page 5.  And I said that gives us
21  an additional 4,300 pages of documents, 12 of your search
22  terms.  But the other three, those three alone because I
23  think it was, you know, one was for like just Don I think
24  was one of the search terms.
25          THE COURT:  When you say 12,000 you're

53

Proceedings

1  referring to the 11,904 number in the letter?

2          MR. GIBBS:  I'm sorry, say that one more time,

3  your Honor?

4          THE COURT:  When you say 12,000, you're

5  referring to this below the point B where it says 11,904?

6          MR. GIBBS:  No, your Honor.  So the 12 I'm

7  referring to, so they gave us 15 total search terms.

8          THE COURT:  Right.

9          MR. GIBBS:  And we ran those and we agreed to

10 review the documents that were responsive to 12 of those

11 search terms.

12         THE COURT:  Oh, I see.  Okay.  Sorry.

13         MR. GIBBS:  Yeah.  And that total number of

14 documents that was responsive to those 12 search terms

15 they gave us, it was 4,300 documents.  And we said okay,

16 we will review those additional 4,300 documents in

17 addition to the 20 something, 30 something thousand that

18 we're already respond -- that we were already reviewing.

19         And we said specifically hey, but these three

20 that you gave us, these other three, that's almost 58,000

21 additional documents.  That's not proportional or

22 reasonable, so we're not agreeing to review those.  They

23 took no issue with that.  We invited them.  Hey, if you

24 got other search terms you want us to run, if you've got

25 questions about this -- and we included with this, just

54

Proceedings

1  to be clear, we sent them the full hit count report that

2  had all 12 of ours, all 15 of the ones that they

3  proposed.  We sent that to them.  It's like as plain as

4  day.

5          And then we proceed, we go and review all those

6  documents.  It totals up to a little over 35,000

7  documents.  So we collected email data for 24 different

8  people and we ran these search terms across those 24

9  people in various iterations.  We reviewed those 35,000

10  and change documents.  We produced more than 1,000

11  documents from the emails.  We started producing in June.

12  We finished our last email production September 6 and we

13  finished our non-email production on October 18th.

14          So after that on November 27th, that's when

15  they come to us and say hey, you applied, and this is a

16  quote, "You applied limited search terms to a limited

17  number of custodians."  And that is attached as Exhibit 3

18  to our motion, docket 196.

19          And so they came to us and in that particular

20  email they demanded that we run 15 additional terms over

21  a period of more than two years and across 13 custodians.

22  Three of the folks who were included in that group are

23  new custodians for whom we had not collected data because

24  we did not identify them as relevant.  So they were also

25  asking not only run additional search terms but collect

Transcriptions Plus II, Inc.

Proceedings

1   email data from three additional people.

2           So we responded in the two separate letters,

3   Exhibits 4 and 5 to our motion and we explained in really

4   great detail why the requested searches were not

5   reasonable, why we were not willing to do this.  It was

6   going to cost -- we ran the hit counts, sent them the hit

7   counts, and it was going to be a total of almost 18,000

8   documents.  And we said hey, that'll take, you know, 250

9   hours of attorney time to review, that'll be more than

10  $100,000.  Considering everything that we've already done

11  including running all the search terms that you asked us

12  to do which we reviewed the documents for, we don't think

13  it's unreasonable for us to have to do this.  There are

14  18,000 more.  When it's really untethered from, you know,

15  any specific relevance.

16          And so that was -- so we explained that in

17  January.  We went back and said hey, look, if there's

18  some way to narrow it or something like that, please let

19  us know.  They did not respond.  Instead, the night

20  before the February 10th hearing they filed their motion

21  to compel.  Attached to that motion, those search terms,

22  your Honor, that is the first time we ever saw them.  And

23  that chart, I will say Exhibit H, your Honor, that is 25

24  pages, 39 separate search terms or search parameters that

25  they've asked us to run.  It's only increased.  Every

56

Proceedings

1  time they ask us to run more searches, the number gets

2  bigger.

3          THE COURT:  Well, but now the number is getting

4  smaller because they've come down to seven custodians.

5          MR. GIBBS:  No, your Honor.  No, your Honor.

6  So I'm only talking right now about email.  This is only

7  email.  Everything I've just said to you --

8          THE COURT:  Okay.

9          MR. GIBBS:  Everything I've said so far is only

10  email.

11          THE COURT:  Okay.  We were talking about texts

12  though.

13          MR. GIBBS:  We --

14          THE COURT:  I asked Mr. Mule about texts, start

15  with texts.

16          MR. GIBBS:  Well, I think we've gotten in -- so

17  the text messages sort of come a little later.  And I

18  think what Mr. Mule said, he addressed texts and emails.

19          THE COURT:  Well, then he sort of said the

20  email argument is the same, but you're drawing a

21  distinction between the two, which is okay.  I'm just

22  trying to understand it.

23          MR. GIBBS:  Yes, your Honor.  I think this

24  provides the context and the timeline with the text

25  messages.

57

Proceedings

1          THE COURT:  Okay.

2          MR. GIBBS:  So the demands again -- so February

3    7th we get this expanded set of search terms for the

4    email data which we've never seen.  So this expanded from

5    15 specific search terms that they sent us on November

6    27th now to 39.  So it almost tripled the number of

7    search parameters they wanted us to run with no

8    explanation.  Well, we had already sent hit counts for

9    the original 15 and said what more?  This is too much.

10   Explain why you need this and let's see if we can make it

11   something smaller.  And instead, they sent us something

12   that's almost three times as large.

13          So we get that.  We had the hearing on February

14   10th.  We adjourned.  We agreed that we would run the hit

15   counts, provide that data to them, which we did.  And so

16   again, this was just an email.  The number of documents,

17   the number of emails that hit on the search terms, so it

18   was almost 204,000 documents.  To promote it into the

19   database, host it, review it, produce it would be about

20   $400,000.  And that is for the 24 custodians for whom we

21   have already collected email data.

22          And so they're asking for three additional

23   custodians as well.  And to collect the data from those

24   three people, to run the search terms, the original

25   search terms and the new ones, that would be about

58

Proceedings

1  $76,000.  And so we're talking about just for the emails

2  we're talking about an additional half a million dollars

3  to do what they've asked.

4          THE COURT:  Okay.  My recollection of this

5  issue the first time we had the motion hearing was that I

6  certainly raised some concern about there being no

7  electronic ESI protocol.

8          MR. GIBBS:  Yes, your Honor.

9          THE COURT:  This has only confirmed my original

10 thought.  And there are two ways to go.  One was I was

11 hoping we could sort of Band-Aid something together to

12 give a response to this motion.

13         I'm looking at Exhibit H which is the cross-

14 referencing of custodians to particular requests and it's

15 not clear -- well, I understand the purpose of it and it

16 makes sense.  It still says well we want documents about

17 this allegation from this person.  That is not an ESI

18 protocol.  An ESI protocol would then have search terms

19 that could be run.  But I don't see that in Exhibit H.

20         MR. MULE:  Your Honor, it's in there.  It says

21 additional proposed search terms.  It has SiteOne's

22 terms --

23         THE COURT:  Slow down, slow down.  Oh, I see.

24 I see it.  Okay.

25         MR. MULE:  -- on the -- and then it has the

59

Proceedings

1   additional proposed search terms which are the terms that

2   we requested be run.

3             THE COURT:  Okay.  And that is (indiscernible)

4   text?

5             MR. MULE:  That's -- what I'm saying is it

6   could be applied to both because we --

7             THE COURT:  Are they both searched the same way

8   that --

9             MR. MULE:  Yeah, exactly.  Like they just add

10  to text and put these search terms, this could be a way

11  it could be done.  You know, for us, they put the burden

12  on us manually reviewing the texts because they said you

13  can't, you know, it's hard to get searches.  But you

14  know, they didn't even come back to us with any type of

15  proposed edits on this or even saying that any of these

16  were not relevant.  They're relevant.  They're geared --

17            THE COURT:  Okay.  Well, I'm not going to talk

18  about relevance for a moment.

19            MR. MULE:  No?  Sorry.

20            THE COURT:  But okay.  Understanding that now,

21  with respect to the seven custodians, I want to focus on

22  those.  Did you run the counts for those seven custodians

23  using the terms from the additional proposed terms

24  column?

25            MR. GIBBS:  Well, so your Honor, so do you mean

60

Proceedings

1   for emails?

2          THE COURT:  Emails, well emails and texts.  But

3   if there's two separate answers, one for each, that's

4   fine.

5          MR. GIBBS:  It's separate, it's separate.

6          THE COURT:  Okay.  So tell me what's the answer

7   to both?

8          MR. GIBBS:  So the answer for emails is yes, we

9   have run all of their proposed search parameters exactly

10  as they asked us to do.

11         THE COURT:  Okay.

12         MR. GIBBS:  Exactly what's in their chart,

13  Exhibit H --

14         THE COURT:  And so for emails, the number --

15  what was the total?  You said it but tell me again.

16         MR. GIBBS:  204,000 documents.

17         THE COURT:  Okay.  And then did you do it for

18  texts?

19         MR. GIBBS:  No, your Honor.  We did not do it

20  for text messages.

21         THE COURT:  Okay.  And text hasn't been done.

22         MR. GIBBS:  I did not understand that that

23  would be an appropriate way.  So I'll tell you that for

24  text messages, for the three that we searched -- and now,

25  you know, I'll move on to the text message piece.  So for

61

Proceedings

1   the text messages, we told them last year hey look, we're

2   agreeable to searching text for a reasonable number of

3   people and started with the 24.  And we said there's no

4   way.  So the conversation was what do you really want?

5   Like who are you really after here?  And the list stayed

6   at 24 until late last year and then it was culled down to

7   the 13.

8           And we continued to say look, 13 is still --

9   that's a lot.  And we've already done all these other

10  things.  What's your real list?  And they wouldn't tell

11  us who the real people are.

12          So we selected the three people, the management

13  people --

14          THE COURT:  No, I remember that.

15          MR. GIBBS:  Okay.  So we made what we thought

16  was an informed selection of who would be most likely to

17  have the data relevant to this vendetta lawsuit.  The

18  people who investigated Don and Vic and Nick and actually

19  terminated them, made the decision to terminate them.

20          THE COURT:  And you look at their texts as

21  well, most of them.

22          MR. GIBBS:  So what we did, let me tell you

23  what we did for them, your Honor.  So we got their -- we

24  collected their text messages, and we got our list of the

25  26 people.  So I guess 27 people.  It's all of the

62

Proceedings

1  original custodians for whom we collected email data plus

2  the three other new custodians they proposed.

3            THE COURT:  Right.

4            MR. GIBBS:  And we got those, those

5  individuals, and we pulled every single text message

6  between these three custodians and any of those 27

7  people.  And then we pulled all of those messages and we

8  manually reviewed every single one of those.  I can't

9  remember the exact number that we reviewed.  It was a few

10 or several hundred.  And then we produced the messages,

11 the relevant responsive messages.  We produced those on

12 March 18th and there were I think we'll just say

13 approximately 100 text messages.  And so that's the

14 process that we went through with the text messages.

15            THE COURT:  Okay.  Let me ask you --

16            MR. GIBBS:  So we did not run search terms in

17 the text messages.  We reviewed them manually just like

18 they did.

19            THE COURT:  Okay.  Let me ask you a question,

20 Mr. Mule.  A lot of the time frames in your Exhibit H,

21 the date range, it seems to me as a matter of logic that

22 there was probably a certain number of months window that

23 would be the hot time, for lack of a better phrase, where

24 things were going on.  It seems to me that one way to

25 manage it might be to limit the time frame.

63

Proceedings

1        For example, I'm making up dates now, but if

2   the hot four months was January 1 to April 1, I guess

3   that's three months, if they did the search and there

4   were no texts responsive from that window collected in a

5   subsequent text being responsive would approach zero, it

6   would certainly go down.  Right?

7        So perhaps the one way to make this more

8   manageable is to (A), limit the time frame because I'm

9   inclined to grant searches for these seven individuals

10  having looked at Exhibit G and reviewing Mr. Mule's

11  rationale.  I think it is a reasonable rationale.  It

12  just may be too cumbersome for the amount of data we're

13  talking about.

14       So I'm also concerned that perhaps the search

15  terms may generate too many responses.  For example, the

16  one that just says Don or Vic or Nick.  That it may need

17  additional search terms to limit it.  But if you were to

18  create a hot window, what would that be, Mr. Mule, in

19  your opinion?

20       MR. MULE:  Yeah.  So your Honor, I guess it

21  would depend on the particular search.  And you know,

22  even in SiteOne's date ranges, they had different dates

23  with respect to different searches.  So we could

24  certainly do that exercise.

25       THE COURT:  Well, it seems to me the time

64

Proceedings

1    period you would be interested in, Mr. Gibbs, would be

2    from your perspective is several months before.  Right?

3    Leading up to what happened.

4            MR. GIBBS:  October.  Starting October.  To our

5    view, the hot period is October of 2022 through late

6    March, or April 1, 2023.

7            THE COURT:  Right.  And your hot period though,

8    Mr. Mule, would probably postdate that because you want

9    evidence of some kind of, you call it vengeance, I don't

10   know, whatever you want to call it.  Right?  They're

11   trying to get back at you guys because the deal went

12   south.

13           MR. MULE:  Yeah.  Well, we would go back to

14   October 2022 as well because in our view, they were

15   planning to basically number one, get rid of Don.  And

16   then they were negotiating with him.  And at the same

17   time they're negotiating with him, they are plotting this

18   lawsuit against him.  So --

19           THE COURT:  But what would that window -- from

20   when to when is the window?

21           MR. MULE:  So this would be like, you know, at

22   least from sometime -- we have like -- because most of

23   this, October 1, 2022 --

24           THE COURT:  So okay, then to -- if your theory

25   is going to bear fruit, right, it seems like you don't

65

Proceedings

1  need two years of texts.  I mean it could be -- unless

2  the first -- if the first three months of texts let's

3  say, I'm just picking a number, reveal exactly what you

4  suspected and this whole thing was just a conspiracy,

5  then it might makes sense to go through another three

6  months to see how this conspiracy played out.

7           But on the other hand, if the first few months

8  reveal absolutely nothing but what you'd expect in your

9  normal asset purchase situation, it seems unlikely that a

10 conspiracy would develop after the fact.  You see what

11 I'm saying?

12          MR. MULE:  So I have one idea.  Maybe if Mr.

13 Milman can jump in?  But as far as the -- I think there

14 is a distinction between the texts and the emails so --

15          THE COURT:  Meaning there'd be two different

16 windows?

17          MR. MULE:  Right.

18          THE COURT:  Okay, okay.

19          MR. MULE:  Exactly.  So you know, to the extent

20 we're talking about, you know, to try to cull down the

21 universe and we talked about texts between the seven

22 additional to have a total of ten for the texts --

23          THE COURT:  But they already did the three,

24 the --

25          MR. MULE:  They did three, so seven more,

66

Proceedings

1    getting a total of ten.  And perhaps that could be a more

2    limited time period from October 1, 2022 to sometime in

3    2023 shortly after this lawsuit started.  And that might

4    be a more limited framing.

5              THE COURT:  Well, here's what I'm prepared to

6    give you.  I'm prepared to give you four months.  You can

7    pick the four months.  You said emails and texts may be

8    different.  But I'm prepared to grant the motion as to

9    the seven additional individuals for a four-month period

10   which you can get.  Talk to your client or among the

11   team.

12             MR. MULE:  Okay.

13             THE COURT:  And provide that to Mr. Gibbs, and

14   he will conduct the search.  If the search -- the top

15   number was 204,000 I think you said, Mr. Gibbs, right?

16             MR. GIBBS:  Well, I think -- so that's for --

17             THE COURT:  For emails.

18             MR. GIBBS:  Those are for emails.  Yes, your

19   Honor.

20             THE COURT:  Okay.  Why don't we continue to --

21   we'll continue to break it down, do one sort of number

22   for emails and one number for texts only because I have

23   to be able to follow whatever you're going to submit.

24             MR. GIBBS:  Yes, your Honor.

25             MR. MULE:  Your Honor --

67

Proceedings

1          MR. MILMAN:  Your Honor, I just think the four-

2    month period is limited.  I'm going to say this, because

3    we did get some responses from them last week.  We had

4    gone through a cursory review and --

5          THE COURT:  Pull the mic towards you.

6          MR. MILMAN:  What?

7          THE COURT:  Pull the mic towards you so that

8    you're recorded.

9          MR. MILMAN:  Oh, I'm sorry.  Sorry.  Yeah.  So

10   we did get some responses last week.  We've only had a

11   limited period of time to go through them.  But we have

12   found some texts in January of 2023 which will support

13   our theory of this case.

14          I think four months is problematic for us

15   because if we start in October, that only takes us to

16   February.  We think these conversations probably started

17   in October and went to maybe June.

18          THE COURT:  Let me give you a caveat here.  I'm

19   inclined to give you the four months.  If it produces

20   essentially nothing, you're done.  If it is a hotbed of

21   information, then I would be inclined to listen to an

22   application for more months,

23          MR. MULE:  Well again, I too, like you --

24          THE COURT:  Do you see what I'm saying though?

25          MR. MILMAN:  Yeah, I do.  But like you, I agree

68

Proceedings

1  that I can't always count on what is being said in the

2  courtroom as to what we are actually getting in

3  documents.  For example --

4            THE COURT:  I don't understand what you mean by

5  that.

6            MR. MILMAN:  Well, what I mean by that is we

7  did get a response from them and it's a text and it's one

8  employee texting another but there's no reciprocating

9  text from that other employee from his -- I'm pretty sure

10 these were texts, right?  Yeah.  So I just think a longer

11 period, I was going to say six months, three months

12 before January and three months after.

13           THE COURT:  The answer is four months.  No.

14           MR. MILMAN:  Okay.

15           THE COURT:  Four months for now.  Like I said,

16 this is -- Judge Tomlinson used to do this a lot.  We're

17 sort of sampling to sort of keep the costs down.  And if

18 it turns out, Mr. Gibbs, your clients were behaving

19 nefariously or with an ulterior motive, we're going to

20 listen to this and I suspect you will --

21           MR. MILMAN:  And they're searching deleted

22 texts like we searched deleted texts (indiscernible),

23 correct?  It's all texts and (inaudible) --

24           THE COURT:  It would be all --

25           MR. MILMAN:  I just want to make sure.

69

Proceedings

1          THE COURT:  I don't know how texts are

2    maintained as a matter of electronics.  The search should

3    include whatever is recoverable.

4          MR. MILMAN:  Okay.  And your Honor --

5          THE COURT:  But let me -- if I don't start

6    taking any type of notes, this isn't going to be worth a

7    whole lot.  So bear with me.

8                    (Pause in proceedings)

9          THE COURT:  Okay.  So what's going to happen

10   then is Mr. Gibbs, you'll do a search for the two three-

11   month windows.

12         MR. MULE:  Oh, I thought you said four-month

13   windows.

14         THE COURT:  Oh, I'm sorry, I did say four-month

15   windows.  I did.  Sorry.

16         MR. MULE:  Yes.  And your Honor, I just want to

17   make sure a couple of things.  One, that's regarding

18   texts.

19         THE COURT:  Oh, I put four in.

20         MR. MULE:  The search terms and the hit lists

21   or what they have, they call it something else.  But what

22   they provided which referred to the 204,000 documents

23   concerned emails.  And so they already had 16 custodians

24   total which they had collected the emails for I believe.

25         MR. GIBBS:  24.

70

Proceedings

1        MR. MULE:  24.  Okay.  24.  And basically what
2   we had wanted them to do, because what they did is for
3   particular searches they had all right, we're going to do
4   these two custodians here, we're going to do five
5   custodians here.  We said across the board we want you to
6   run all the custodians for these particular searches.
7        So I just want to be clear that the searches
8   for the emails is an entirely separate, you know, it's a
9   separate endeavor.
10       THE COURT:  No, that was it.  You said the
11  arguments were the same so I said the searches are the
12  same.
13       MR. MULE:  The arguments are the same.  So if
14  they collected all the texts and all the email and put it
15  all in a database, they could run these searches, the
16  same searches that we have.
17       THE COURT:  Yes.
18       MR. MULE:  However, you know, they still have
19  to, for these particular searches, they still got to
20  search the emails.
21       THE COURT:  For the seven people.
22       MR. MULE:  Not for the seven, for all the ones
23  that they already have on their database plus the seven.
24       THE COURT:  Mr. Gibbs?  That's now what I
25  understood it but that's --

71

Proceedings

1          MR. GIBBS:  I'm not following quite, your

2    Honor.  So I understand that you're ordering just talking

3    about text messages, that there's a --

4          THE COURT:  Well right now what I've drafted is

5    an order that -- I've drafted an order that says Mr. Mule

6    is going to give you two four-month windows, one for

7    email, one for texts as to those seven additional

8    custodians and you will search for terms as they request

9    in Exhibit H as to those custodians during those windows.

10   That's all the order says right now.

11         MR. GIBBS:  That's right, and --

12         THE COURT:  That's all I understood you to be

13   asking for.  So I'm not sure what we're talking about.

14         MR. GIBBS:  Well, so I mean that's fine with

15   me, your Honor.  That's fine with me.  I think -- I don't

16   know that that's what they were talking about.  But what

17   you have described is fine with us.

18         THE COURT:  Okay.  But so let's see, Mr. Mule,

19   what else are we talking about here?

20         MR. MULE:  Yeah.  So what we had proposed,

21   there are some additional -- those seven names are going

22   to be additional, or may be additional custodians.  I'm

23   not exactly sure.  Mr. Gibbs could answer if they are

24   additional custodians than what they had already included

25   in the 24.  So I don't know the answer to that.

72

Proceedings

1          THE COURT:  I don't understand what you're

2   asking though.  So there are 24 other custodians?

3          MR. MULE:  No.  They already had and collected

4   the emails for 24 custodians.

5          THE COURT:  And any of those the seven that

6   we've already identified?

7          MR. MULE:  That's what I'm not sure what the

8   answer is.  Some of them may be and some of them may not

9   be.

10         THE COURT:  Okay.  Mr. Gibbs?

11         MR. GIBBS:  I just need to see the --

12         THE COURT:  It's fine.  Take your time.

13         MR. GIBBS:  -- the list of seven.  I think the

14  answer is yes.

15         THE COURT:  It's in the exhibit -- it's docket

16  entry 189 I think 7.

17         MR. GIBBS:  Oh, 7?  Dash 7?

18         THE COURT:  7.

19         MR. GIBBS:  Okay.  Let me see.  Yep, I've got

20  that.  It's a list of the names.

21         THE COURT:  And that's a longer list.  The

22  seven are -- do you have it in front of you, the exhibit?

23         MR. GIBBS:  I do.

24         THE COURT:  It's individuals one, two -- one

25  through five, seven, and eight which is Alex Trama,

Transcriptions Plus II, Inc.

73

Proceedings

1    Gerard Passaro, Phil Sausto, Doug Black, Brian

2    Kersnowski, Jerry Justice, Kevin Peatie.

3            MR. GIBBS:  Yes.  Those seven individuals, we

4    have collected their email data.

5            THE COURT:  Okay.  So you've already done that.

6            MR. GIBBS:  It's been collected and searched.

7            MR. MULE:  So what I'm saying is searching for

8    the seven with respect to the texts, that's great.

9    That's what we're asking for.

10           But with respect to the emails, we still need

11   them to do their searches.

12           THE COURT:  What does that mean?

13           MR. MULE:  So the searches would be for all 24

14   because they didn't search all 24 custodians in their

15   original searches.  Like I said, they sort of pick and

16   choose between we're going to search these --

17           THE COURT:  That's how they got 204,000

18   responses.

19           MR. MULE:  Right.  By 204,000 responses, it was

20   using our search terms for all 24.

21           THE COURT:  Right.

22           MR. MULE:  So as long as they do that for the

23   emails as well --

24           THE COURT:  No, that's what I'm telling you.

25   204 -- the problem is that that's so much.  I'm trying to

74

Proceedings

1  come up with a scaled search that will at least get you a

2  window into what's going on and allow you to test whether

3  your theory holds up.

4         MR. MULE:  Well, the seven is problematic

5  because we don't know, those seven may be relevant for

6  texts and particular searches but for a particular

7  request for production and emails, there may be other

8  people and they themselves conceded that.

9         THE COURT:  There may be, but you need to -- we

10 have to narrow this down in a way where you pick a

11 limited number of people so that's less than 204,000.

12 And if you get the email or part of an email chain that

13 aha, well then you have a reason to come back to court

14 and say well look, wait a minute, there's also these

15 other eight people and they're clearly involved because

16 look at this email.  Okay, I'll listen to that.  But a

17 blanket search of 204,000 emails without the texts is a

18 lot.  And so I'm trying to get a way to get a more

19 manageable number that still allows you to probe your

20 theory.

21        MR. MULE:  Yeah, I understand the intent, your

22 Honor.  I guess the question that I have is on their lone

23 searches, they have for certain of the document requests,

24 they might have had ten custodians that they themselves

25 looked at and we said wait a minute, the searches that

75

Proceedings

1  you did was inadequate, here's some additional, you know,

2  search terms.  But it should be applied, you know, to

3  more than just the ten.  But even that ten is more than

4  the seven that we're talking about.

5          THE COURT:  Well, they said they already -- did

6  you already do it for the three, Mr. Gibbs, the last

7  three on their list at 189-7?

8          MR. GIBBS:  You mean the three that we

9  collected texts for?

10         THE COURT:  Right.  Thistle, Ketter, and

11  Catalano.

12         MR. GIBBS:  So for those three, we didn't run

13  search terms.  We collected all of their texts between

14  them on the one hand and any of the other 27 custodians

15  for whom we collected data because they're the relevant

16  people in the case that are really -- that's a full list

17  of everybody that both sides have said oh, they might

18  have some knowledge of the case.

19         THE COURT:  Okay.

20         MR. GIBBS:  And so we got those texts and we

21  manually reviewed all of those.  We did not apply search

22  terms because that's what they did, so we did the same

23  thing.

24         THE COURT:  Okay.  Well, maybe you need to use

25  search terms then because manual review of all these

Transcriptions Plus II, Inc.

76

Proceedings

1   texts seems like --

2            MR. GIBBS:  Well, I think well, your Honor, if

3   we're --

4            THE COURT:  -- (inaudible).  I don't know.

5            MR. GIBBS:  If at this point we are talking

6   about expanding our searching into seven other

7   individuals, then I'm not suggesting that we should

8   manually review all this.

9            THE COURT:  Oh, okay.

10           MR. GIBBS:  I am not.  I was just telling you

11  what we did for the 30.

12           THE COURT:  Okay.  Yes.  I don't think I want

13  that either.  That doesn't seem like a good use of time.

14           MR. MULE:  So your Honor, I guess, you know, as

15  far as the emails, I mean one thing we could do is do a

16  more limited time period with respect to these searches

17  to get down from the 204,000 number.

18           THE COURT:  Well, I've already done that.  I

19  told them you were going to give them a four-month

20  window.

21           MR. MILMAN:  But it should be for the 24

22  people.

23           MR. MULE:  But it should be for the 24 people

24  that they, you know, that they've identified as people

25  who are relevant custodians.

77

Proceedings

1     THE COURT:  You keep saying 24 people.  Have
2  you -- do you know who the 24 are?
3     MR. MULE:  Yeah, we've identified custodians.
4  We have 16 that we identified basically across the board
5  on these particular searches for responses to particular
6  requests.  So we limit it to 16 on all of them.  They did
7  24.  That's them.  But we limited it to 16 on these
8  numbers.
9     MR. GIBBS:  I think I can explain, your Honor.
10     THE COURT:  Great, because I have no idea
11  what's going on.
12     MR. GIBBS:  Okay.  All right.  So us, SiteOne,
13  at the beginning of last July we go through and we think
14  okay, who are all of the people -- there are sort of two
15  buckets of people.  Who are all the people who are
16  involved with the deal, you know, back in 2020?  Who are
17  those people talking about the deal?  And then those same
18  people weren't necessarily involved with these particular
19  locations that we purchased, the garden department
20  locations.  You know, some of those folks, for example,
21  ones like the M&A guy for SiteOne, he doesn't deal with
22  operations, right?  So he's only relevant to the asset
23  purchase agreement and the deal itself.  Right?
24     So we got the bucket of people who are involved
25  with the deal, and then more the people who are, you

78

Proceedings

1  know, involved with the actual locations themselves.  And

2  so take both those buckets together and there are 24

3  people that we identify, 24 total SiteOne employees.

4          THE COURT:  Okay.  How many of them are

5  operations people?

6          MR. GIBBS:  I'm not sure.  I'd have to go back.

7  It's been a long time since I looked at that.

8          THE COURT:  Okay.

9          MR. GIBBS:  But anyway, so there are a total of

10  24.  We then pulled those out and pulled all their emails

11  I think back to eternity and then we applied date filters

12  in the search software.  So those 24 people, we searched

13  their emails for it would be 24 total search terms and

14  those are the best of 36,000 documents that we already

15  reviewed.  And so those are the -- that's the 24

16  custodians.  Those are the 24 people we're talking about

17  that we searched for just generally responsive documents

18  for the various RFPs.

19          THE COURT:  And did you produce the responses?

20          MR. GIBBS:  Yes.  Yes, your Honor.  They've all

21  been produced.  Yes.  We reviewed 36,000 documents.  We

22  produced all of the email stuff September 6th of last

23  year.  It's been produced.

24          THE COURT:  So then what else --

25          MR. MULE:  The problem is, your Honor, and

79

Proceedings

1   we've gone back to them a number of times is remember

2   right at the beginning I said 60 percent of the document

3   requests that we did they didn't even have search terms

4   for.  So that was like 60 out of 117 requests they had

5   nothing.  And then so we proposed these specific terms to

6   specific document requests and said hey run them for your

7   custodians.

8            MR. GIBBS:  And I can explain that rationale

9   exactly, your Honor.  So there were 180 requests for

10  production.  Let me just say that.  So it's not as though

11  there were ten and we said oh, we're not going to search

12  for five of them.

13           THE COURT:  No, I get it.

14           MR. GIBBS:  So a lot of the requests for

15  production are things like, you know, they requests for

16  example, financial data, financial information, financial

17  reporting and information, documents related to the deal.

18  You know, due diligence.  Things like that.

19           THE COURT:  Right.

20           MR. GIBBS:  That stuff is not capable of -- you

21  don't -- when we went and looked at the request, there's

22  no -- we wouldn't search emails for this.  We go and we

23  find the actual documents --

24           THE COURT:  And did you do that and produce

25  them though?

80

                              Proceedings

1          MR. GIBBS:  Yes.  Yes, your Honor.

2          THE COURT:  So if I'm understanding you

3    correctly, there were responses to the other requests,

4    they're just not email responses and therefore not

5    connected in your production.

6          MR. GIBBS:  Exactly, your Honor.  So when we

7    created our request and then ran theirs last year in July

8    and August, that was the purpose.  A lot of them, yes,

9    absolutely --

10         THE COURT:  Okay.

11         MR. GIBBS:  -- we said we don't think any

12   documents exist and we can go through the specific RFPs.

13   Our responses to a lot of them were we're not aware of

14   any responsive documents.  If we find any, we'll let you

15   know.  But for every single request they sent us, we did

16   some type of searching.  Either we went to employees and

17   said hey, they've asked for these types of financial

18   records, what do we have?  Hey, they've asked for these

19   deal documents, what do we have?  We were pretty

20   exhaustive in our searches.  I mean we have produced a

21   lot.

22         THE COURT:  Okay.

23         MR. MULE:  Your Honor, these requests that are

24   on this chart, Exhibit H, concern communications.

25   They're not concerning financial records.  And that's

81

Proceedings

1  where we said your custodian list was insufficient and

2  your searches were insufficient.  And that's why we said

3  hey, we're proposing to run these search terms because

4  prior hereto you haven't produced responsive documents to

5  these particular document requests and we're entitled to

6  responsive documents.

7          THE COURT:  Okay.  And you gave a list 1, 6,

8  42, 55 --

9          MR. MULE:  Yeah.  So we have 22 and it's all --

10  you know, these communications involving communications

11  with -- and we identify specific allegations in the

12  complaint too on a lot of these.  So these are very

13  granular requests.

14          THE COURT:  What are you reading from when

15  you're looking at that?

16          MR. MULE:  I'm reading from Exhibit H which is

17  189 --

18          THE COURT:  No, no, dash 8.

19          MR. MULE:  Dash 8, correct.

20          THE COURT:  Okay.  So pull up an example of

21  that from that exhibit.

22          MR. MULE:  Yeah, sure.  So for example, if you

23  go to the second page --

24          THE COURT:  Yes.

25          MR. MULE:  -- all documents referencing

Transcriptions Plus II, Inc.

82

Proceedings

1   communication with or among SiteOne employees concerning

2   the allegation in paragraph 56 of the complaint.  And

3   then 56, the amended complaint, is next to it.

4            THE COURT:  Right.

5            MR. MULE:  It states what that is.  And then we

6   came up with search terms proposed, repair and computer

7   or laptop or desktop and drive because that's

8   specifically what that particular allegation concerned.

9            The next one, it's a very similar thing

10  concerning paragraph 57.  And we culled out from the

11  complaint allegations and sought --

12           THE COURT:  No, let's just stick with the one

13  example.

14           MR. MULE:  Sure.

15           THE COURT:  All right.  So this -- let me just

16  read paragraph 56 a minute.  So you've 16 proposed

17  custodians there and the search is repair and computer or

18  laptop or desktop and drive.  And you got no responses to

19  that.  That's a question, not a statement.  Is that

20  right?  Is that what you're saying?

21           MR. MULE:  Yes.  So we didn't get a -- they

22  didn't have any search term relative to that particular

23  document request.

24           MR. GIBBS:  So your Honor, we did.  And that's

25  why this is such an exercise.  This is what

Transcriptions Plus II, Inc.

83

Proceedings

1    demonstrates this is an exercise for us to just churn

2    fees on this.  So if you look at document 196-2 --

3                THE COURT:  Okay, got it.  What page?

4                MR. GIBBS:  That's the -- it's just a --

5                THE COURT:  No, it's a letter, but what page?

6                MR. GIBBS:  Oh, I'm sorry.  It's the last page.

7    I'm sorry.  So page 7 of 7.  This is the list of the

8    search terms that we ran.  And if you look down towards

9    the bottom there's Casper and laptop.  It's run across a

10   number of custodians again because this is --

11               THE COURT:  Okay.

12               MR. GIBBS:  -- this is dealing with a laptop

13   that went missing that belonged to a lady named Rose

14   Casper.

15               THE COURT:  Okay.

16               MR. GIBBS:  And so we searched.  We want those

17   documents.  We have no reason to hide those.  We want to

18   know all we can about this particular laptop.

19               THE COURT:  Okay.  So what you did with respect

20   to paragraphs -- did not run their search terms but you

21   ran Casper and laptop for --

22               MR. GIBBS:  Correct.

23               THE COURT:  -- it looks like seven or six --

24               MR. GIBBS:  Correct, your Honor.  And a number

25   of the -- the other issue is that a number of the

84

Proceedings

1   searches, they overlap topically with other things that

2   we've already done.

3          THE COURT:  Right.

4          MR. GIBBS:  And so it's coming at us from a

5   perspective of let's look at every word in the complaint

6   and let's run in essence like every word out of the

7   complaint and see if we can find emails that hit on those

8   terms.  And we --

9          THE COURT:  I understand that.

10         MR. GIBBS:  And look, we really are, we're fine

11  doing some additional searching.  But I mean it's just

12  got to be reasonable in scope considering what we've --

13  the lengths we've really gone to to try and get them the

14  documents.

15         THE COURT:  Well, this is a question -- again,

16  I'm not saying anybody hasn't gone to any lengths or

17  anything like that.  I'm trying to create a situation

18  where defendants are allowed to test the theory --

19         MR. GIBBS:  Sure.

20         THE COURT:  -- in a sensible way.  And if

21  they're 100 percent correct, their testing will continue.

22  But using the example you just pulled out at random, Mr.

23  Mule, it seems pretty broad to me.

24         MR. MULE:  Yeah.  Well --

25         THE COURT:  You're going to get a lot of false

Transcriptions Plus II, Inc.

85

Proceedings

1  positives with something like that.

2          MR. MULE:  Let me just point out for that they

3  gave the preview documents to promote.  It was 536

4  document with respect to that particular example.  So you

5  know, that is not a really significant amount on that

6  particular one.  There are other ones that have a large

7  amount.  There's no doubt.  Like the first one, number 22

8  and 23, they came back and said for 22, which is all

9  documents concerning communications among SiteOne

10 employees concerning Don's non-compete, and that's, you

11 know, concededly it's a broad search.  We have Don

12 Caroleo and non-competition or non-solicitation or

13 compete or solicit.  And that one it says for their

14 preview documents to promote it was 60,000.

15          So I'm not saying that these search terms that

16 we provided were perfect.  This was our attempt.  But we

17 didn't get any response as far as how to --

18          THE COURT:  I get it, I get it.  But now we're

19 going to drill down and we're going to create.  So so far

20 what you've got is a search of seven more custodians for

21 emails --

22          MR. GIBBS:  For texts.

23          THE COURT:  -- and texts for a four-month

24 period that you will select.  I'm prepared to give that

25 to you.  I'm trying to listen to what you're saying that

86

Proceedings

1    won't make the exception the rule kind of thing here if

2    there's more that you would need to test it.  But so far

3    I haven't heard anything that makes me think that this

4    order is insufficient, that if there's documents -- if

5    there are other custodians outside the seven or the ten

6    if you include the three, I will listen to that and you

7    can explain why.  But I'm not inclined (A), to expand the

8    window at this moment --

9         MR. MULE:  Well, your Honor, they've identified

10   more than ten.  You know, these particular -- we were

11   looking for particular -- we were trying to compromise

12   with respect to texts and say all right, for texts let's

13   just view these particular people.  But for emails among

14   the company --

15        THE COURT:  Look at the other, whatever the

16   other remainder is (inaudible).

17        MR. MULE:  Yeah.

18        THE COURT:  And who is it that you think is

19   going to have the smoking gun that would support your

20   theory?  Who else is there?

21        MR. MULE:  Well, I mean they've identified 24.

22   I mean if I'm going to cull down from 24 which they

23   themselves provided, I'd have to talk with, you know,

24   talk with my client.

25        THE COURT:  Okay.  Okay.

87

Proceedings

1          MR. MULE:  You know, if I could have some time

2  to discuss it I guess.

3          THE COURT:  Sure.  Go take it right now.

4          MR. MULE:  Okay.  Great.  Thank you.

5          THE COURT:  How much time is -- ten minutes?

6  You tell me.

7          MR. MULE:  To what?  To discuss?  Yeah, sure.

8          THE COURT:  How much time is enough?  How much

9  time do you need?

10         MR. MULE:  Yeah, that should be enough.

11         THE COURT:  Okay.  So go into the attorney room

12  where you can have some privacy.

13         MR. MULE:  Okay.  All right.  Thank you.

14         THE COURT:  And tell me who and approximately

15  why.  And then if it's for emails, or emails and texts

16  also.

17         MR. MULE:  Okay.

18         THE COURT:  (Inaudible).  Go ahead.

19         MR. GIBBS:  Just really quick.  So in terms

20  of -- just so I think this may help their discussion as

21  well and so that I'm clear, so at this point do you have,

22  your Honor, in your mind what specific search terms would

23  be run?  Are you envisioning that we would run all of the

24  ones that are in --

25         THE COURT:  I'm envisioning running their

88

Proceedings

1   search terms that they've identified in the column, the

2   third column from the right on Exhibit H.

3          MR. GIBBS:  Got it.

4          THE COURT:  And I'm hoping that taking two

5   years and making them four months will have a

6   proportional limitation.  And if you produce stuff that's

7   nothing on nothing, then you're done.

8          MR. GIBBS:  Understood.

9          THE COURT:  Okay.  Mr. Mule, you got that.  Now

10  you can go.

11         MR. MULE:  Okay.  Thank you.

12                  (Off the record)

13         THE CLERK:  All rise.

14         THE COURT:  Please be seated.  All right.  Mr.

15  Mule, what do you propose?

16         MR. MULE:  All right, your Honor.  So I've

17  discussed --

18         THE COURT:  You lost somebody too.  What, you

19  both cut somebody?

20         MR. MULE:  He should be right here.  We could

21  start without him.

22         THE COURT:  Yes.

23         MR. MULE:  So for the total of ten, which is

24  the seven additional to the three, what we would propose

25  for the text is, you know, obviously we said four months.

89

Proceedings

1   So what we would want to do is basically -- because the

2   different requests pertain to different time periods and

3   people -- so like for instance, Nick's termination is

4   February, Don's termination is October, is to apply a

5   separate four-month period for each request.  It has the

6   same affect of culling down the --

7           THE COURT:  That's eight months.

8           MR. MULE:  No, no.  It's going to be for

9   each -- they just run the search --

10          THE COURT:  Oh, so you'll say for witness one,

11  January and March.

12          MR. MULE:  For request number 22, these four

13  months.  For request number 23, these four months.

14  Because they're different topics.  They're different time

15  periods.  And what that does is it gives the same exact

16  goal of what your Honor wants which is to limit the time

17  period, cull it down.

18          THE COURT:  Yes.  No, I get it.  The math is

19  the same is what you're saying.

20          MR. MULE:  The math is the same.  So that's

21  what we propose on texts.  Does that make sense?

22          THE COURT:  Mr. Gibbs?  The math is the same it

23  sounds like, but --

24          MR. GIBBS:  So let me make sure I understand.

25  So -- and we're just talking about text messages.

90

Proceedings

1          THE COURT:  Basically, the way that I think to
2   think of it is any search that's described will only be
3   for a four-month period but search A may be for different
4   search months from search B which may be different from
5   search C, but still four months total.
6          MR. GIBBS:  So each of the --
7          THE COURT:  So theoretically the result is the
8   same in terms of --
9          MR. GIBBS:  So we would -- let me just make --
10  let me think about this logistically.  So we'll just take
11  one for example, the very first one in their chart
12  because I just want to make sure I totally understand.
13         THE COURT:  Yes.
14         MR. GIBBS:  So this one, there are 16 in the
15  chart, there are 16 proposed custodians so --
16         THE COURT:  Right, but we're not using that
17  anymore.
18         MR. GIBBS:  So that would be culled down to the
19  list of the ten or the seven?
20         MR. MULE:  Ten.
21         THE COURT:  The ten, the ten.  The three you
22  have plus seven.
23         MR. MULE:  Ten total for texts.  We're talking
24  texts only right now.
25         THE COURT:  (Inaudible).  It says October 1,

Transcriptions Plus II, Inc.

91

Proceedings

1  2022 to the present.  That would no longer be the case.

2  That could go from October 1 to February 1 I guess.

3            But then for the next one it could be February

4  1 to June 1.  No, March 1.  No.  Whatever.  May 1.

5            MR. GIBBS:  I'm sorry.  What I was hearing was

6  that so there are ten people.  So the actual search, the

7  proposed search terms are Don Caroleo and non-competition

8  or non-solicitation or non-compete.  So that search term

9  is going to be run across ten people for the same four-

10  month time period for each person?

11            THE COURT:  For that one search.

12            MR. GIBBS:  Yes.

13            THE COURT:  Yes.  But then if you go to the

14  next search --

15            MR. GIBBS:  But it's not -- but just to make

16  sure I'm clear what it is not is for this first search

17  term the proposed search terms, it's not those search

18  terms for a different time period for each person.

19            THE COURT:  Correct.

20            MR. MULE:  No, it is not.

21            MR. GIBBS:  Okay, okay.  Got it, got it.

22            THE COURT:  So that otherwise that would mean

23  ten searches would become 40.

24            MR. MULE:  Right.

25            MR. GIBBS:  Got it.

92

Proceedings

1          THE COURT:  Maybe if I'm even understanding how
2    this works.  Okay.  So --
3          MR. GIBBS:  But there will be a different four-
4    month -- what Mr. --
5          THE COURT:  Could be.
6          MR. MULE:  Could be.
7          MR. GIBBS:  What Mr. Mule is proposing is each
8    one or however, each search term will have a specific
9    four-month period associated with it.
10          MR. MULE:  That's correct.
11          THE COURT:  Okay.  Hold on.  Let me just modify
12    something.
13          MR. GIBBS:  And your Honor, I think there are
14    39 separate searches, so you're saying to run all 39
15    terms?
16          THE COURT:  Yes.  Give me one second and then
17    I'll circle back to you.
18                    (Pause in proceedings)
19          THE COURT:  Okay.
20          MR. MULE:  Okay.  So that settles the text
21    issue.  For emails --
22          THE COURT:  Wait, you know what?  (Inaudible).
23          MR. GIBBS:  Okay.
24          THE COURT:  Yes.  Go ahead.
25          MR. GIBBS:  So that was just, that's just for

Transcriptions Plus II, Inc.

93

Proceedings

1    text messages.

2              MR. MULE:  Okay.  So for emails what we propose

3    is this.  The same ten plus four because they had

4    identified 24.

5              THE COURT:  Okay.  (Indiscernible).

6              MR. MULE:  So those four are Brian Hoffman --

7              THE COURT:  Oh, I've got to write it down so

8    just go slow.

9              MR. MULE:  Anthony Farante, Taylor Koch.

10             THE COURT:  Whoa, whoa, I'm writing, I'm

11   writing.  Hold on.

12             MR. MULE:  Oh, I apologize.

13             THE COURT:  Okay.  What was the third one?

14             MR. MULE:  Taylor Koch.  It's Koch, Koch.

15             THE COURT:  Spell it.

16             MR. MULE:  K-O-C-H.

17             THE COURT:  Got it.

18             MR. MULE:  And the last one Briley Brisendine.

19             THE COURT:  Spell it.

20             MR. MULE:  B-R-I-S-E-N-D-I-N-E, Briley, B-R-I-

21   L-E-Y.

22             MR. GIBBS:  Your Honor, that is our general

23   counsel.

24             THE COURT:  How's that going to work?

25             MR. MULE:  Well, he was involved I know in the

94

Proceedings

1   early parts and not with the acquisition, not necessarily

2   as a --

3           THE COURT:  I'm inclined to allow it but he may

4   just give a log of stuff that's all attorney-client

5   privilege.

6           MR. MULE:  If it is attorney-client, it is.  If

7   it's not an attorney-client communication, then it's not.

8           THE COURT:  I'm inclined to allow it.  You're

9   waiving any rights as to him.  I mean there's always

10  argument that there's some non-privileged stuff from an

11  attorney but are you sure you want to do that one?

12          MR. MULE:  I'll double check with my client.

13          THE COURT:  I mean it's okay with me.  I just,

14  I think there's a risk of basically giving up a slot I

15  mean if there's another person who can sub in.

16          MR. GIBBS:  Can I ask for one quick -- I don't

17  want to --

18          THE COURT:  Let him answer this question and

19  then you can do it.

20          MR. GIBBS:  Okay.

21          THE COURT:  And I'm not trying to dissuade you.

22  I just could see where it's like giving up a draft pick.

23  Okay.  Mr. Mule, you heard that?  I'm not trying to

24  dissuade you.  I'm just concerned it might be a -- you

25  might be buying something you don't want.

95

Proceedings

1          MR. MULE:  We'll stick with that.  Thank you,

2    your Honor.

3          THE COURT:  Okay.  I just need to add a note to

4    the order.

5                    (Pause in proceedings)

6          MR. MULE:  Your Honor, can we have a moment,

7    please?

8                         (Off the record).

9          THE COURT:  Okay.  Now we're back on the

10   record.  I've added your full names to the searches.

11         MR. MULE:  And I appreciate that, your Honor,

12   and I would request after now speaking with the client,

13   we'll just take Mr. Brisendine or Ms. Brisendine off the

14   list.

15         THE COURT:  Okay.

16         MR. MULE:  So just three more.

17         THE COURT:  Okay.

18         MR. GIBBS:  So who are the, I'm sorry, who are

19   the other --

20         THE COURT:  It's Brian Hoffman, Taylor Koch,

21   and -- wait a minute.

22         MR. MULE:  Anthony Ferrante.

23         THE COURT:  Thank you.

24         MR. GIBBS:  And these three individuals, they

25   are in addition to --

96

Proceedings

1          MR. MULE:  The ten.

2          THE COURT:  The ten for emails.  All right.  So

3    that's done.

4          MR. MULE:  Okay.

5          MR. GIBBS:  A couple of quick questions.

6          THE COURT:  Yes.

7          MR. GIBBS:  Just to clarify.  I really don't

8    want to have to come back and ask for clarification.

9          THE COURT:  Me too.

10          MR. GIBBS:  Okay.  So on the text messages, the

11    group of ten that you proposed, includes the three people

12    for whom we've already collected and searched text

13    messages?

14          THE COURT:  The three people that you searched?

15    Yes.  Okay, yes.

16          MR. GIBBS:  It would.  So it's Greg Thistle,

17    Joe Ketter and Anthony Catalano.

18          THE COURT:  Yes.

19          MR. GIBBS:  They would be three of the ten.

20          THE COURT:  Correct.

21          MR. GIBBS:  So I mean we pulled their text

22    messages and manually reviewed those.  Does your Honor

23    still envision that we would re-search those?

24          THE COURT:  Yes.  No.  If you've -- although

25    no, because they have search terms now.

97

Proceedings

1           MR. MULE:  Search terms.

2           THE COURT:  Run the search terms on the three.

3           MR. GIBBS:  Run the search terms.

4           THE COURT:  Yes is the answer to your question.

5           MR. MULE:  Your Honor, one thing on the text

6  messages, we provided -- we'd like to get from opposing

7  counsel the total number of messages that are pulled

8  within those search -- and the date range.

9           THE COURT:  Well, you're going to get the date

10 range.

11          MR. MULE:  We're going to get the date range.

12 But we want to know like first text, last text within

13 those time periods.

14          MR. GIBBS:  Well, your Honor, they have never

15 provided that to us.

16          THE COURT:  But they're going to search the

17 date range and then --

18          MR. MULE:  If they have one -- if they produce

19 texts and they produce like one text, we don't know how

20 many texts that person had during that time period.

21          THE COURT:  You mean like the non-responsive?

22          MR. MULE:  Exactly.  And the quantity.

23          THE COURT:  So you're asking basically for a

24 hit count.

25          MR. MULE:  Hit count essentially.  How many?

Transcriptions Plus II, Inc.

98

Proceedings

1          THE COURT:  And then (indiscernible) if

2    that's --

3          MR. GIBBS:  Which is not something they've

4    provided us, your Honor, just to be clear.

5          MR. MULE:  Well, we did provide --

6          MR. GIBBS:  We've asked for that.  We've asked

7    for that repeatedly and they've never given us that, so I

8    don't know why we would do that.

9          THE COURT:  Okay.  If you do it for them or --

10   and if you already produced it, you can just say see my

11   letter of June 7th, but if you haven't then you've got to

12   do it.

13         MR. MULE:  What we provided, you know, we'll

14   ask for the same.

15         THE COURT:  Okay.  (Indiscernible) but let me

16   just add it to the order.

17              (Pause in proceedings)

18         THE COURT:  Okay.  So that's done.  What else?

19         MR. MULE:  I think that's it.

20         MR. GIBBS:  Okay.  So the same then, just to

21   make sure I've got it clear, so we're going to run the

22   same search terms across the email data and the text

23   message data and the four-month period, it'll be a

24   four-month period associated with each search term and

25   that's it.  Right?

99

Proceedings

1          THE COURT:  Yes, but the four months may change

2    for different searches.

3          MR. MULE:  Per request.

4          MR. GIBBS:  Per request.  That's right.

5          THE COURT:  But yes.  Otherwise yes.

6          MR. GIBBS:  Okay.  Got it.

7          THE COURT:  And this will all be memorialized

8    in an order that hopefully captures it.  Yes, I think

9    that's it.

10          MR. MULE:  I think that's it.

11          MR. GIBBS:  Those are all the motions, your

12    Honor.

13          THE COURT:  Go away.

14          MR. MULE:  For now.  Hopefully --

15          THE COURT:  I need a few minutes --

16          THE CLERK:  That's fine.

17          THE COURT:  -- to make sure this is --

18          MR. MULE:  Thank you, your Honor.

19          THE COURT:  Have a good day, everybody.

20          MR. GIBBS:  Yes.  Thank you, your Honor.

21                    (Off the record)

22          THE COURT:  Okay.  Mr. Mule, we're back on.

23          MR. MULE:  The question is the time frame which

24    we didn't get.

25          MR. GIBBS:  Oh, that's right.  Yes.

100

Proceedings

 1          THE COURT:  Oh, okay.  What makes sense that's

 2  reasonable?

 3          MR. GIBBS:  Well --

 4          MR. MILMAN:  How about the end of the month?

 5  Don't we have end of the month deadlines?

 6          THE COURT:  I'm asking what's reasonable.  I'm

 7  not (indiscernible).  That's reasonable.

 8          MR. GIBBS:  I think 60 days because we've got

 9  to collect data.  The searches are not easy.

10          THE COURT:  You don't even have to tell me why.

11  60 days.  60 days, Mr. Mule?

12          MR. MULE:  Yes.

13          THE COURT:  Okay.  Do you want to have a status

14  conference after the 60 days?

15          MR. MULE:  I think that makes sense.

16          THE COURT:  All right.  We'll pull up a date

17  and give it to you.

18          THE CLERK:  How about May 28th at 11:30?

19          THE COURT:  May 28th at 11:30.  What I'm going

20  to suggest is I typically start conferences for 15

21  minutes to 30 minutes.  If you need more, let me know.  I

22  mean I can adjourn to give you more time, that's fine.

23  But I rather you not make the trip and then we have to

24  push you aside because I have six other conferences

25  waiting.  But ultimately it's up to you.  We could also

101

Proceedings

1    just put you at the end if it comes to that.

2            MR. GIBBS:  I will actually be out of town on a

3    family vacation that week, your Honor.

4            THE COURT:  Okay.  So let's pick another date.

5    You can just take the family up here, you know.  Take

6    them out to the Hamptons.

7            MR. GIBBS:  What's that?

8            THE COURT:  Take them up here for vacation.

9    Mr. Mule will show you a good time in the Hamptons.

10           MR. GIBBS:  There you go.  That's right.

11           THE CLERK:  How about June 5th?

12           THE COURT:  No, we can't do it then.

13           THE CLERK:  How about June 12th at 10 a.m.

14           THE COURT:  June 12th at 10 a.m.  Yes?  Mr.

15   Mule

16           MR. MULE:  That's good by me, your Honor.

17           MR. GIBBS:  Yes, your Honor.  That's good on my

18   end.

19           THE COURT:  All right.  We will see you all in

20   June.

21                   (Matter concluded)

22                       -oOo-

23

24

25

102

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **29th** day of **March**, 2025.

_Mary Greco_
Transcriptions Plus II, Inc.

# EXHIBIT C

**UNITED STATES DISTRICT COURT**        **CIVIL CONFERENCE**
**EASTERN DISTRICT OF NEW YORK**       **MINUTE ORDER**

BEFORE: STEVEN I. LOCKE        DATE:  3/26/25
       U.S. MAGISTRATE JUDGE       TIME:   2:30 pm

CASE:  **CV 23-2084(GRB) Siteone Landscape Supply, LLC v. Giordano et al**
TYPE OF CONFERENCE:     MOTION     FTR: 2:37-3:07;3:10-4:24;4:51-4:58;5:00-5:07
APPEARANCES:
     For Plaintiff:   Evan Gibbs, Kevin Mulry and Matthew Adler

     For Defendant: Michael Mule, Robert Milman and Thomas Bizzaro

**THE FOLLOWING RULINGS WERE MADE:**
☒     Other: Oral argument held.  Plaintiff's motion to compel, DE [199], is granted for the reasons set forth on the record.  The depositions will occur no later than May 2, 2025.

          Plaintiff's motion to compel. DE [198], is granted for the reasons set forth on the record.

          Defendants' motion to quash, DE [195], is denied for the reasons set forth on the record, provided, that once Plaintiff receives the responsive documents, Plaintiff will confirm what they are and then provide them to Defendants so that Defendants may assert a work product objection to specific documents on a log.   The log will be provided to Plaintiff and the log and the documents will be provided to the Court for in camera review.

          As to Defendants' motion to compel, DE [193], incorporating DE [189], the motion is granted in part and denied in part.  No later than April 2, 2025, Defendants will provide Plaintiff with a four-month windows as to texts and another four-month window for emails to conduct searches of the seven custodians addressed on the record in addition to the three custodians for whom emails have been produced consistent with the search terms identified in DE [189-8] (a total of ten witnesses.)   Each search as to texts may be for a different four-month period designated by Defendants.  Also, the total search hits for each search will be produced as well as the responsive texts.  The hit count for text searches will be provided by each side including for prior searches.  As to emails, the searches will also include additional custodians Brian Hoffman, Anthony Ferrante and Taylor Koch.  Plaintiff will then make a production of the responsive information, and if it proves to be relevant to Defendants' theory of the case, they can make an application to expand the window of time for the search, after the parties meet and confer on the issues.

**COURT APPEARANCES:**
The following conference(s) will be held in courtroom 820 of the Central Islip courthouse:

       6/12/25 at 10:00 am       : Status conference

                    **SO ORDERED**
                    /s/Steven I. Locke
                    STEVEN I. LOCKE
                    United States Magistrate Judge

# EXHIBIT 2

**Nextpoint Law Group**



UNIQUELY DATA-DRIVEN LEGAL SERVICES

Anand C. Mathew
NEXTPOINT LAW GROUP, LLC
2375 East Camelback Road, Suite 600
Phoenix, AZ 85016
amathew@nextpointlawgroup.com

April 18, 2025

**Via Email**

John S. Gibbs III
Troutman Pepper Locke LLP
600 Peachtree Street, Suite 3000
Atlanta, GA 30308
evan.gibbs@troutman.com

RE:     ***SiteOne Landscape Supply, LLC v. Giordano, et al.***
        **Case No. 23-CV-02084**

Dear John:

Pursuant to Federal Rule of Civil Procedure 45(d)(2)(B), Nextpoint Law Group, LLC ("NLG") hereby asserts the following objections to the subpoena dated April 9, 2025:

## I.    BACKGROUND APPLICABLE TO ALL OBJECTIONS

Milman Labuda Law Group PLLC ("Milman Labuda") is counsel for Defendants.  As Milman Labuda previously noted, Milman Labuda retained NLG on June 6, 2024 to assist in the above-captioned matter.  (ECF No. 195.)  NLG is an Arizona Alternative Business Structure (ABS) law firm that provides legal services to clients and law firms.  All work NLG performed in this matter was performed at the direction of Milman Labuda pursuant to Milman Labuda's June 6, 2024 engagement agreement with NLG.  NLG ultimately stopped its work for Milman Labuda because of a growing number of unpaid invoices owed by Milman Labuda to NLG.

In or around February 2025, NLG became aware that SiteOne Landscape Supply LLC ("SiteOne"), through its counsel, Troutman Pepper Locke LLP ("Troutman Pepper"), had sent a subpoena to "NextPoint Inc." (the "NextPoint Subpoena").  The NextPoint Subpoena requested that "NextPoint Inc." produce all documents and communications "concerning Nextpoint, Inc.'s services provided to Dominick 'Don' Caroleo (and/or his attorneys)."  (Ex. A hereto, NextPoint Subpoena.)

On March 11, 2025, Milman Labuda moved to quash the NextPoint Subpoena.  (ECF No. 195.) Milman Labuda obviously knew that the NextPoint Subpoena was issued to "NextPoint Inc." and not NLG but nevertheless incorrectly referenced "Nextpoint Law Group" as the recipient of the



NextPoint Subpoena.  (ECF No. 195.)  While Milman Labuda made several arguments to quash the NextPoint Subpoena, it did not disclose that the "NextPoint" Subpoena was not in fact issued to NLG but rather to "NextPoint, Inc."

On March 14, 2025, Troutman Pepper filed a response to Milman Labuda's motion to quash the NextPoint Subpoena.  (ECF No. 197.)  Incredibly, Troutman Pepper's response *also* incorrectly referenced "NextPoint Law Group" as the recipient of the "NextPoint Subpoena" even though it obviously knew that it had *not* issued a subpoena to NLG—but rather had issued a subpoena to "NextPoint Inc."  (ECF No. 197) ("The two subpoenas at issue, directed at WeRecoverData ('WRD') and NextPoint Law Group, Inc. ('NP')…").  Troutman Pepper also did not disclose its bait and switch attempt to the Court.

In short, Milman Labuda and Troutman Pepper both *knew* that NLG had not been subpoenaed, yet nonchalantly and intentionally *misrepresented* to the Court that the NextPoint Subpoena was directed to NLG.

On March 27, 2025, Troutman Pepper sent an email to NLG stating that the Court denied Milman Labuda's motion to quash and demanding that NLG produce documents in response to the NextPoint Subpoena.  On April 9, 2025, the parties spoke and NLG asked for clarity on the NextPoint Subpoena given that it was directed towards "NextPoint Inc." and not NLG.  Troutman Pepper demanded that NLG comply with the existing NextPoint Subpoena, claimed that the Court had ordered that "all Nextpoint entities" comply with the NextPoint Subpoena, refused to explain why it had issued a subpoena to "NextPoint Inc." rather than NLG, and explicitly threatened NLG with sanctions if it did not comply with the NextPoint Subpoena.  NLG told counsel that NLG could not comply with a subpoena directed to "NextPoint Inc." because NLG was not "NextPoint Inc." but that NLG would be happy to turn over its file to Milman Labuda (or whomever Milman Labuda authorized) *without a subpoena* upon payment of NLG's outstanding accounts receivable.

The same day at 6:23pm ET, Troutman Pepper e-mailed the undersigned a copy of a new subpoena directed towards "Nextpoint Law Group LLC" (the "NLG Subpoena") requesting documents "concerning Nextpoint Law Group LLC's services provided to Dominick 'Don' Caroleo (and/or his attorneys)."  (Ex. B hereto, NLG Subpoena.)  The next day, NLG confirmed that it would accept service of the NLG Subpoena and would file its objections and responses accordingly.

## II.    NLG OBJECTS TO THE SUBPOENA TO THE EXTENT THAT THE PARTIES INTEND FOR PRIOR RULINGS, ORDERS, OR AGREEMENTS WITH RESPECT TO THE NEXTPOINT SUBPOENA TO BE APPLICABLE TO NLG.

It should go without saying, but given the various threats that Troutman Pepper has levied to date it bears clarifying, the NextPoint Subpoena is not enforceable against NLG.  To be clear, despite Milman Labuda and Troutman Pepper's blatant misrepresentations to the Court, NLG is *not* "NextPoint Inc." and the NextPoint Subpoena was not directed towards NLG.

NLG accordingly objects to the application of any rulings, orders, or agreements pertaining to the NextPoint Subpoena to NLG as the NextPoint Subpoena was not directed to NLG and such rulings, orders, or agreements are not enforceable against NLG.



## III.    NLG OBJECTS TO THE SUBPOENA BECAUSE IT REQUESTS DOCUMENTS COVERED BY NLG'S RETAINING LIEN.

NLG objects to the NLG Subpoena because it requests documents covered by NLG's valid retaining lien. An attorney has a "retaining lien" that allows counsel to retain "documents in counsel's possession until counsel is paid for his or her work." *Rivkin v. A.J. Hollander & Co.,* No. 95 CIV 9314, 1996 WL 633217, at *2 (S.D.N.Y. Nov. 1, 1996) (citing cases); *see also Robinson v. Rogers*, 237 N.Y. 467, 470, 143 N.E. 647 (N.Y. 1924); *Matter of Heinsheimer*, 214 N.Y. 361, 364, 108 N.E. 636 (N.Y. 1915). The retaining lien is "recognized and followed in the federal courts, as a matter of state or federal law, unless a specific federal law alters the parties' rights." *Rivkin*, 1996 WL 633217, at *2.

Because the retaining lien is a ***possessory*** lien, counsel cannot be compelled to turn over documents before assuring that payment for his or her services is adequately secured. *The Mint Factors v. Ceder Tide Corp.*, 519 N.Y.S.2d 27, 133 A.D.2d 222, 223 (N.Y. App. Div. 1987) (holding that it was error for the trial court to direct prior counsel to transfer their file before assuring that payment was adequately secured); *Lebovic v. Ballantine & Sons, Inc.*, 206 N.Y.S.2d 858, 12 A.D.2d 494, 495 (N.Y. App. Div. 1960) ("[T]he attorney should not have been compelled to turn over the papers except upon payment in full for his services and disbursements."). "In the absence of exigent circumstances (such as papers essential to the defense of a criminal charge, or the client's indigency), under either New York or federal law, counsel should not be required to release papers that are subject to a retaining lien before counsel's fees are paid or at least secured." *Rivkin*, 1996 WL 633217, at *3.

Indeed, the Second Circuit has repeatedly held that absent exigent circumstances, it is an ***abuse of discretion*** to require counsel to turn over documents subject to a retaining lien without conditioning it on payment or posting security for payment of outstanding legal fees. *Pomerantz v. Schandler*, 704 F.2d 681, 683 (2d Cir. 1983) (failure to condition client's payment of outstanding charges or posting adequate security for payment before requiring turnover of files is "an abuse of discretion"); *In re San Juan Gold, Inc.*, 96 F.2d 60 (2d Cir. 1938) (reversing district court order requiring turnover of file); *Concrete Flotation Sys., Inc. v. Tadco Construction Corp.*, 2009 WL 1209141, at *1 (E.D.N.Y. May 2, 2009) ("Principals long recognized and clearly announced by the Second Circuit prohibit the court from requiring an attorney to produce papers subject to a retaining lien to a former client without a resolution of the fee dispute or the posting of an adequate bond.").

It is immaterial that the files are sought via subpoena or that SiteOne, rather that Milman Labuda, seeks NLG's files.

*First*, courts have repeatedly held that "[t]he existence of a retaining lien is a valid reason for [counsel] not to respond to a subpoena, and it is inappropriate for a party to use the subpoena power in an attempt to defeat such retaining lien." *Inclan v. New York Hospitality Group, Inc.*,

No. 12 Civ. 4498, 2013 WL 5969721, at *1 (Oct. 31, 2013);[1] *Concrete Flotation Systems, Inc. v. Tadco Const. Corp.*, No. CV-07-319, 2009 WL 1209141, at *1 (former counsel "need not produce any documents in response to Tadco's subpoena unless and until his firm's fees are paid or a bond in the full amount of the fees claimed has been posted"); *Sorin v. Shahmoon Indus., Inc.*, 191 N.Y.S.2d 14, 21, 20 Misc.2d 149, 155 (N.Y. Sup. Ct. 1959) (holding documents subject to a retaining lien "may be retained even as against a subpoena"); *Mecantini v. Innamorati*, 209 N.Y.S.2d 581, 27 Misc.2d 881 (N.Y. Sup. Ct. 1960) (granting motion to quash subpoena directed towards former counsel unless adequate security was posted for retaining lien).

*Second*, the subpoena would require NLG to deliver the files to both SiteOne **and** Milman Labuda (and, indeed, Troutman Pepper has directed that NLG should deliver the files to Milman Labuda *first* so that they can be reviewed for privilege). Delivery of the files to Milman Labuda would destroy the possessory lien on the files. *Mint Factors*, 519 N.Y.S.2d 27, 133 A.D.2d 222 (N.Y. App. Div. 1987) (retaining lien depends on "possession of the file"); *Lebovic v. Ballantine & Sons, Inc.*, 206 N.Y.S.2d 858, 12 A.D.2d. 494 (N.Y. App. Div. 1960) (retaining lien "depends upon continued possession").[2]

*Third*, as Judge Peck noted in *Rivkin*, the retaining lien cannot be evaded by coercing alternative production of documents in a manner that would undermine the lien. In *Rivkin*, the Court noted that it could not even compel the *opposing counsel* to provide whatever files they had in *their* possession to new counsel because that "effectively would eliminate the retaining lien's protection for withdrawing defense counsel. While the Court always is anxious to move its docket expeditiously, it will not do so at the expense of prior defense counsel's retaining lien." *Rivkin*, 1996 WL 633217, at *4. The same is true here.

There are no exigent circumstances here such as a criminal defense proceeding or indigency. Certainly, Milman Labuda has the funds to pay the outstanding balance due to NLG. Because NLG cannot be compelled to turn over documents subject to its retaining lien, NLG objects to production under the NLG Subpoena before payment of its outstanding balance or the posting of adequate security.

## IV.    NLG OBJECTS TO THE SUBPOENA BECAUSE IT IMPOSES AN UNDUE BURDEN.

NLG objects to the NLG Subpoena because it imposes an undue burden on NLG. Federal Rule of Civil Procedure 45(d)(1) requires that the attorney issuing the subpoena take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. It is abundantly

---

[1] In *Inclan*, the court ordered the subpoenaing party to show cause why Rule 11 sanctions should not be awarded given the "seemingly frivolous" nature of the party's motion to compel compliance.

[2] Given the nature of the requested documents here, all of which would be covered by attorney client privilege and/or attorney work product, it would be impossible to produce the documents just to Troutman Pepper.



clear that SiteOne and Troutman Pepper have made virtually no effort to avoid undue burden or expense on NLG.

Troutman Pepper's intentions have been clear from the start. Troutman Pepper emailed NLG a copy of its intended subpoena for the first time on April 9, 2025 at 6:22pm ET and demanded that NLG "confirm by 10 a.m. tomorrow" that it would accept service and not raise any objections— and threatened frivolous sanctions against NLG if NLG did not accept service. (See April 10, 2025 correspondence between the parties, attached hereto as Ex. C.) Troutman gave NLG just over one week—until April 18, 2025—to respond to the subpoena for a matter on which NLG had been engaged for 10 months.

Further, Troutman Pepper confirmed to NLG that it has made no attempt to seek the requested documents from Milman Labuda itself. As NLG already told Troutman Pepper, all the work NLG performed was done at the direction of Milman Labuda, and the substantive communications and documents they are seeking would likely already be in the possession of Milman Labuda. Troutman Pepper confirmed that they have made no attempt to seek the requested information from Milman Labuda, and do not intend to do so.

Production under the NLG Subpoena would cause an undue financial burden to NLG because, as noted above, NLG is already owed significant money by Milman Labuda and producing documents under the NLG Subpoena would destroy its current retaining lien on the documents. NLG has already suggested that it could simply turn over its file to Milman Labuda upon payment of its outstanding balance and then Milman Labuda could authorize its release as needed. NLG objects to the subpoena to the extent that Troutman Pepper requires NLG to follow some other convoluted procedure to produce its documents as it would cause an unnecessary and undue burden.

Lastly, given that the NLG Subpoena requests information that could be obtained elsewhere and relates to a matter for which NLG was specifically retained to do work, NLG objects to the NLG Subpoena to the extent NLG is not compensated for its fees in responding to the NLG Subpoena.

## V.    NLG OBJECTS TO THE SUBPOENA BECAUSE THE INFORMATION REQUESTED IS PROTECTED BY THE ATTORNEY CLIENT AND WORK PRODUCT PRIVILEGE.

As noted above, Milman Labuda retained NLG for this specific matter and all work NLG has performed related to the above-captioned matter was performed at the direction of Milman Labuda pursuant to the June 6, 2024 engagement agreement between Milman Labuda and NLG after this litigation commenced. All the documents NLG has were generated specifically for this litigation and all documents and communications NLG has that are related to this action would constitute attorney client communications and/or attorney work product.

The work product doctrine "shields from disclosure materials prepared in anticipation of litigation by a party or the party's representative, absent a showing of substantial need." *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995) (internal quotation and citation omitted). "The purpose of the doctrine is to establish a zone of privacy for strategic litigation planning." *Id*. NLG objects to producing information requested by the NLG Subpoena because all the requested documents



would be covered by the attorney client and/or work product privileges. NLG will comply with the NLG Subpoena only to the extent that NLG can turn over its file to Milman Labuda (upon payment of the balance owed as noted above) so that Milman Labuda can assert or waive the applicable privilege as needed.

Sincerely,

Anand C. Mathew
Partner, Litigation Services
Nextpoint Law Group, LLC

cc:     Daniel Gorman (daniel.gorman@troutman.com)
        Michael Mule (michaelmule@mllaborlaw.com)
        Thomas A. Bizzaro, Jr. (tbizzaro@tab-law.com)

# Exhibit

# A

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of New York

| | | |
|---|---|---|
| SITEONE LANDSCAPE SUPPLY, LLC, | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  2:23-CV-02084-GRB-SL |
| NICHOLAS GIORDANO; DOMINICK CAROLEO; VICTOR CAROLEO; et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  NextPoint Inc.
4545 N. Ravenswood Avenue, Suite 301, Chicago, IL 60640

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A attached hereto.

| Place:  Attn: Daniel E. Gorman, Troutman Pepper Locke LLP, 111 South Wacker Dr., Suite 4100, Chicago, IL 60606 | Date and Time:  03/12/2025 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  02/26/2025

CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
SiteOne Landscape Supply, LLC _____ , who issues or requests this subpoena, are:
John S. Gibbs III, Troutman Pepper Locke LLP, 600 Peachtree St., Ste. 3000, Atlanta, GA 30308,
evan.gibbs@troutman.com, (404)885-3000

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:23-CV-02084-GRB-SL

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____    on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                    *Server's signature*

                                          _____
                                                    *Printed name and title*

                                          _____
                                                    *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

### (c) Place of Compliance.

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

### (d) Protecting a Person Subject to a Subpoena; Enforcement.

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

### (e) Duties in Responding to a Subpoena.

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

### (g) Contempt.
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## <u>EXHIBIT A</u>

Produce all documents and communications from January 2022 to the present concerning Nextpoint, Inc.'s services provided to Dominick "Don" Caroleo (and/or his attorneys), expressly including Nextpoint Inc.'s work with respect to the UFDR files from WeRecoverData.

# Exhibit

# B

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Eastern District of New York

| | |
|---|---|
| SITEONE LANDSCAPE SUPPLY, LLC, | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  2:23-CV-02084-GRB-SL |
| NICHOLAS GIORDANO; DOMINICK CAROLEO; VICTOR CAROLEO; et al. | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Nextpoint Law Group LLC
2375 East Camelback Road Suite 600, Phoenix, AZ 85016

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A attached hereto.

| Place: Attn: Daniel E. Gorman, Veritext, LLC, 3101 N. Central Avenue, Suite 290, Phoenix, AZ 85012 | Date and Time: 04/18/2025 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  04/09/2025

| CLERK OF COURT | OR | |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
SiteOne Landscape Supply, LLC _____ , who issues or requests this subpoena, are:
John S. Gibbs III, Troutman Pepper Locke LLP, 600 Peachtree St., Ste. 3000, Atlanta, GA 30308, evan.gibbs@troutman.com, (404)885-3000

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  2:23-CV-02084-GRB-SL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                        *Server's signature*

                                                        _____
                                                        *Printed name and title*

                                                        _____
                                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## **EXHIBIT A**

Produce all documents and communications from January 2022 to the present concerning Nextpoint Law Group LLC's services provided to Dominick "Don" Caroleo (and/or his attorneys), expressly including Nextpoint Law Group LLC's work with respect to the UFDR files from WeRecoverData.

# Exhibit

# C

**Anand Mathew**

---

| | |
|---|---|
| From: | Anand Mathew |
| Sent: | Thursday, April 10, 2025 3:26 PM |
| To: | Gorman, Daniel E. |
| Cc: | Gibbs, J. Evan; Thomas A. Bizzaro, Jr.; Michael Mule; Sonali Ray; Mulry, Kevin P.; Jeffery Petrich; Kent, Paris L.; Adler, Matt |
| Subject: | RE: SiteOne v. Giordano - Mx to Quash NextPoint and WRD Subpoenas |

We will accept service of the subpoena to Nextpoint Law Group, LLC that you emailed yesterday at 6:23pm ET.  We will plan to file our objections or response based on that subpoena.  Nextpoint Law Group, LLC does not intend to respond to the subpoena issued to Nextpoint Inc.

I disagree with most of what you write in your emails below and I do not find it necessary to respond to each one of your threats, misstatements, and positions.  Do not construe that as consent, agreement, or waiver of our position.

Anand

**Nextpoint**LawGroup

**Anand Mathew**
Partner, Litigation Services
_____
**480.520.8157**
nextpointlawgroup.com

From: Gorman, Daniel E. <Daniel.Gorman@troutman.com>
Sent: Thursday, April 10, 2025 2:58 PM
To: Anand Mathew <amathew@nextpointlawgroup.com>
Cc: Gibbs, J. Evan <Evan.Gibbs@troutman.com>; Thomas A. Bizzaro, Jr. <tbizzaro@tab-law.com>; Michael Mule <MichaelMule@mllaborlaw.com>; Sonali Ray <sray@nextpointlawgroup.com>; Mulry, Kevin P. <kmulry@farrellfritz.com>; Jeffery Petrich <jpetrich@nextpointlawgroup.com>; Kent, Paris L. <Paris.Kent@troutman.com>; Adler, Matt <Matt.Adler@troutman.com>
Subject: RE: SiteOne v. Giordano - Mx to Quash NextPoint and WRD Subpoenas

Anand:

If we do not hear back by 5 p.m. EDT we will be sending out a process server first thing tomorrow morning, and expressly reserve the right to seek all fees and costs associated with NextPoint's meritless position, which is in contravention of the Court's directives.

Thank you,
Dan

**Daniel E. Gorman***
**Partner**
**troutman pepper locke**
Direct: 212.704.6333
daniel.gorman@troutman.com

*Licensed to practice law in New York and New Jersey.

---

From: Gorman, Daniel E.
Sent: Wednesday, April 9, 2025 6:22 PM
To: Anand Mathew <amathew@nextpointlawgroup.com>
Cc: Gibbs, J. Evan <Evan.Gibbs@troutman.com>; Thomas A. Bizzaro, Jr. <tbizzaro@tab-law.com>; Michael Mule <MichaelMule@mllaborlaw.com>; Sonali Ray <sray@nextpointlawgroup.com>; Mulry, Kevin P. <kmulry@farrellfritz.com>; Jeffery Petrich <jpetrich@nextpointlawgroup.com>; Kent, Paris L. <Paris.Kent@troutman.com>; Adler, Matt <Matt.Adler@Troutman.com>
Subject: RE: SiteOne v. Giordano - Mx to Quash NextPoint and WRD Subpoenas

Anand:

The subpoena is attached.

Please confirm by 10 a.m. tomorrow that (a) you are accepting service by email on behalf of NextPoint; and (b) you will not be raising any objections with respect to the "NextPoint" entity named in the subpoena (i.e., all documents and communications related to any NextPoint entity provided to the Millman law firm or Defendants will be produced).

Finally, as discussed at length on our call, any purported objections as to attorney-client privilege will be addressed by the Court and is not a grounds for delaying the timely and complete production – which you previously agreed would be by this Friday 4/11.

Thank you,
Dan

**Daniel E. Gorman***
**Partner**
**troutman pepper locke**
Direct: 212.704.6333
daniel.gorman@troutman.com

*Licensed to practice law in New York and New Jersey.

---

From: Anand Mathew <amathew@nextpointlawgroup.com>
Sent: Wednesday, April 9, 2025 5:33 PM
To: Gorman, Daniel E. <Daniel.Gorman@troutman.com>
Cc: Gibbs, J. Evan <Evan.Gibbs@troutman.com>; Thomas A. Bizzaro, Jr. <tbizzaro@tab-law.com>; Michael Mule <MichaelMule@mllaborlaw.com>; Sonali Ray <sray@nextpointlawgroup.com>; Jeffery Petrich <jpetrich@nextpointlawgroup.com>
Subject: RE: SiteOne v. Giordano - Mx to Quash NextPoint and WRD Subpoenas

CAUTION: This message came from outside the firm. DO NOT click links or open attachments unless you recognize this sender (look at the actual email address) and confirm the content is safe.

I will need to see the new subpoena in order to respond. If you send it to me today, I will confirm by COB tomorrow.

**NextpointLawGroup**
**Anand Mathew**

2

Partner, Litigation Services
_____
**480.520.8157**
nextpointlawgroup.com

From: Gorman, Daniel E. <Daniel.Gorman@troutman.com>
Sent: Wednesday, April 9, 2025 3:33 PM
To: Anand Mathew <amathew@nextpointlawgroup.com>
Cc: Gibbs, J. Evan <Evan.Gibbs@troutman.com>; Thomas A. Bizzaro, Jr. <tbizzaro@tab-law.com>; Michael Mule <MichaelMule@mllaborlaw.com>; Sonali Ray <sray@nextpointlawgroup.com>; Jeffery Petrich <jpetrich@nextpointlawgroup.com>
Subject: RE: SiteOne v. Giordano - Mx to Quash NextPoint and WRD Subpoenas

Anand:

Please confirm you will accept service of the revised subpoena by e-mail - no later than 10 a.m. EDT tomorrow.  We understand you were going to speak with your "ops team" today.

As noted on the call, SiteOne reserve the right to seek costs and fees associated with the revised subpoena, including, but not limited to, costs and attorneys' fees incurred in connection with service, and any motions to compel.  We will send you a copy of the Order and Transcript that mandate production in response to SiteOne's subpoena.

Thank you,
Dan

**Daniel E. Gorman***
**Partner**
**troutman pepper locke**
Direct: 212.704.6333
daniel.gorman@troutman.com

*Licensed to practice law in New York and New Jersey.

From: Anand Mathew <amathew@nextpointlawgroup.com>
Sent: Wednesday, April 9, 2025 4:25 PM
To: Gorman, Daniel E. <Daniel.Gorman@troutman.com>
Cc: Gibbs, J. Evan <Evan.Gibbs@troutman.com>; Thomas A. Bizzaro, Jr. <tbizzaro@tab-law.com>; Michael Mule <MichaelMule@mllaborlaw.com>; Sonali Ray <sray@nextpointlawgroup.com>; Jeffery Petrich <jpetrich@nextpointlawgroup.com>
Subject: RE: SiteOne v. Giordano - Mx to Quash NextPoint and WRD Subpoenas

CAUTION: This message came from outside the firm. DO NOT click links or open attachments unless you recognize this sender (look at the actual email address) and confirm the content is safe.

All-

As discussed on the call today, the Milman Labuda firm retained Nextpoint Law Group, LLC to provide services on this matter.  We are happy to provide our file to Milman Labuda, or whomever else they authorize release to, without a subpoena upon payment of the outstanding AR owed by Milman Labuda for our services.  If you intend to serve a subpoena on Nextpoint Law Group, LLC instead, then we will file our objection and let the Court resolve it.

# EXHIBIT B

**UNITED STATES DISTRICT COURT**      **CIVIL CONFERENCE**
**EASTERN DISTRICT OF NEW YORK**     **MINUTE ORDER**

BEFORE: STEVEN I. LOCKE          DATE: 6/12/25
      U.S. MAGISTRATE JUDGE       TIME: 10:00 am

CASE: **CV 23-2084(GRB) Siteone Landscape Supply, LLC v. Giordano et al**
TYPE OF CONFERENCE:  MOTION       FTR: 10:01-10:36

APPEARANCES:
     For Plaintiff:  Evan Gibbs and Kevin Mulry

     For Defendant: Michael Mule
                  Thomas Bizzaro Jr.

**THE FOLLOWING RULINGS WERE MADE:**

☒    ORDER:  Oral argument held.  Plaintiff's motion to compel directed to non-party, NextPoint, is denied without prejudice to be renewed upon service to NextPoint, with service indicated on the docket.  The motion will be served on June 19, 2025.  Opposition, if any, will be served by NextPoint, on July 9, 2025.  Reply will be served on July 19, 2025.  Plaintiff will file all the motion papers on July 20, 2025 and provide a courtesy copy to the Court.  Defendant takes no position on this motion.

        DE [207] is withdrawn.  Defendant will take IT-retention depositions.  These will be completed on or before July 24, 2025.
        DE [210] is granted.  Plaintiff's remaining documents will be produced by June 30, 2025.
        DE [212] is granted.  The Court is reviewing the documents, which have already been submitted.
        DE [213] is granted.  Plaintiff will produce the names and home contact information for the following individuals:  Gerard Passaro, Kevin Peattie and Alex Trauma so that they may be served with subpoenas at their homes.  The subpoenas will be directed to cell phone access.  Plaintiff will provide this information no later than June 19, 2025.  Plaintiff's counsel will also provide a copy of this order to these individuals.

        On July 10, 2025 the parties will file a joint status report concerning merits depositions, including the identities of individuals to be deposed and a schedule.

**COURT APPEARANCES:**
The following conference(s) will be held in courtroom 820 of the Central Islip courthouse:

     9/29/25 at 12:00 pm         : Status conference

                      SO ORDERED

                     /s/Steven I. Locke
                    STEVEN I. LOCKE
                    United States Magistrate Judge