# EXHIBIT 2

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK

------------------------------X Docket#
SITEONE LANDSCAPE SUPPLY, LLC, : 23-cv-02084-GRB-SIL
                              :
              Plaintiff,      :
                              :
      - versus -             : U.S. Courthouse
                              : Central Islip, NY
NICHOLAS GIORDANO et al.,     :
                              : March 26, 2025
              Defendants      : 2:37 p.m.
------------------------------X
```

           TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
             BEFORE THE HONORABLE STEVEN I. LOCKE
                UNITED STATES MAGISTRATE JUDGE


**A  P  P  E  A  R  A  N  C  E  S:**


**For the Plaintiffs**:          **Kevin P. Mulry, Esq.**
                                 Farrell Fritz, PC
                                 400 RXR Plaza
                                 Uniondale, NY 11556

                                 **Matthew Adler, Esq.**
                                 Troutman Pepper Hamilton
                                  Sanders LLP
                                 3000 Two Logan Square
                                 18th And Arch Streets
                                 Philadelphia, PA 19103

                                 **John Sikes Gibbs, III, Esq.**
                                 Troutman Pepper Hamilton
                                  Sanders LLP
                                 600 Peachtree Street, N.E.
                                 Suite 3000
                                 Atlanta, GA 30308


               (Appearances continue on next page)


**Transcription Service**:       **Transcriptions Plus II, Inc.**
                                 61 Beatrice Avenue
                                 West Islip, New York 11795
                                 RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

50

Proceedings

1   surprise that the searches that are relevant to the case

2   to our defense will come up with documents.  Basically

3   we're entitled to a defense and we should be able to get

4   these documents.  They brought this lawsuit.

5           THE COURT:  I got all that.

6           MR. MULE:  It's been a one-way street so far,

7   your Honor.

8           THE COURT:  I got all that.  Okay.  Mr. Gibbs?

9           MR. GIBBS:  Thank you, your Honor.

10          THE COURT:  Let me just say before you get

11  started, the answer to this question is not you don't

12  have to do any more searches.  So gauge your response

13  accordingly, please.

14          MR. GIBBS:  Yes, your Honor.  So I think --

15          THE COURT:  And I think I said that before.

16          MR. GIBBS:  -- I think that it is very

17  important to start off with a -- I want to frame first

18  the basis for these additional requests.

19          So if you read their motion papers, they

20  specifically say they are seeking additional evidence

21  about this vendetta lawsuit.  That is the thrust of what

22  they're asking for.  They've really listed six different

23  types of things they're looking for.  Specifically,

24  purchase of the assets, the activities leading up to

25  Don's termination, the decision to terminate Don, the

Proceedings

1  investigation into Nick's activities, the decision to

2  terminate Nick, and the decision to commence this

3  lawsuit.

4          So it's a really narrow universe of topics that

5  they're seeking this additional discovery about.  So I

6  just want to frame that up first --

7          THE COURT:  Okay.

8          MR. GIBBS:  -- because that's the focus of this

9  vendetta lawsuit theory.

10          Now, I want to walk through -- because I'm

11  sorry, your Honor, but when we went through this process

12  last year, we met and conferred for hours.  I mean it was

13  something like 14 or 15 hours.  We met and conferred over

14  each other's discovery responses and what we were going

15  to do.

16          And the letters, I've attached them as exhibits

17  where I expressly tell them -- the August 2nd letter I

18  think is the most important one.

19          THE COURT:  Okay.

20          MR. GIBBS:  And that one specifically says hey,

21  here are our discussions, our joint discussions up to

22  this date.  You proposed, you defendants, you proposed to

23  us 15 additional search terms.  So at the end of July we

24  sent them our search terms.  And it's not just search

25  terms.  It was a chart that said here's the search terms,

52

Proceedings

1   here are the requests for production to which they are I

2   guess seeking materials for.  Here are the custodians

3   that are being search.  Here are the hit counts for these

4   particular search terms.  We initially sent them -- we

5   initially ran 12 separate sets of search terms, included

6   all that information, and we sent it to them I think it

7   was the last week of July.

8            We then had another meet and confer over that

9   where we discussed additional terms.  They sent us 15

10  additional search terms.  We ran all of those search

11  term's and we sent it back to them.  And we said, I mean

12  I can quote it from the letter, we said look, 12 of the

13  search terms that you sent us, that gives us an

14  additional 4,300 pages --

15            THE COURT:  This is the August 2 letter?

16            MR. GIBBS:  Correct, your Honor.

17            THE COURT:  Okay.  What page number?

18            MR. GIBBS:  Page 5.

19            THE COURT:  Okay.

20            MR. GIBBS:  Page 5.  And I said that gives us

21  an additional 4,300 pages of documents, 12 of your search

22  terms.  But the other three, those three alone because I

23  think it was, you know, one was for like just Don I think

24  was one of the search terms.

25            THE COURT:  When you say 12,000 you're

53

Proceedings

1  referring to the 11,904 number in the letter?

2           MR. GIBBS:  I'm sorry, say that one more time,

3  your Honor?

4           THE COURT:  When you say 12,000, you're

5  referring to this below the point B where it says 11,904?

6           MR. GIBBS:  No, your Honor.  So the 12 I'm

7  referring to, so they gave us 15 total search terms.

8           THE COURT:  Right.

9           MR. GIBBS:  And we ran those and we agreed to

10 review the documents that were responsive to 12 of those

11 search terms.

12          THE COURT:  Oh, I see.  Okay.  Sorry.

13          MR. GIBBS:  Yeah.  And that total number of

14 documents that was responsive to those 12 search terms

15 they gave us, it was 4,300 documents.  And we said okay,

16 we will review those additional 4,300 documents in

17 addition to the 20 something, 30 something thousand that

18 we're already respond -- that we were already reviewing.

19          And we said specifically hey, but these three

20 that you gave us, these other three, that's almost 58,000

21 additional documents.  That's not proportional or

22 reasonable, so we're not agreeing to review those.  They

23 took no issue with that.  We invited them.  Hey, if you

24 got other search terms you want us to run, if you've got

25 questions about this -- and we included with this, just

54

Proceedings

1  to be clear, we sent them the full hit count report that

2  had all 12 of ours, all 15 of the ones that they

3  proposed.  We sent that to them.  It's like as plain as

4  day.

5         And then we proceed, we go and review all those

6  documents.  It totals up to a little over 35,000

7  documents.  So we collected email data for 24 different

8  people and we ran these search terms across those 24

9  people in various iterations.  We reviewed those 35,000

10 and change documents.  We produced more than 1,000

11 documents from the emails.  We started producing in June.

12 We finished our last email production September 6 and we

13 finished our non-email production on October 18th.

14        So after that on November 27th, that's when

15 they come to us and say hey, you applied, and this is a

16 quote, "You applied limited search terms to a limited

17 number of custodians."  And that is attached as Exhibit 3

18 to our motion, docket 196.

19        And so they came to us and in that particular

20 email they demanded that we run 15 additional terms over

21 a period of more than two years and across 13 custodians.

22 Three of the folks who were included in that group are

23 new custodians for whom we had not collected data because

24 we did not identify them as relevant.  So they were also

25 asking not only run additional search terms but collect

55

Proceedings

1  email data from three additional people.

2          So we responded in the two separate letters,

3  Exhibits 4 and 5 to our motion and we explained in really

4  great detail why the requested searches were not

5  reasonable, why we were not willing to do this.  It was

6  going to cost -- we ran the hit counts, sent them the hit

7  counts, and it was going to be a total of almost 18,000

8  documents.  And we said hey, that'll take, you know, 250

9  hours of attorney time to review, that'll be more than

10  $100,000.  Considering everything that we've already done

11  including running all the search terms that you asked us

12  to do which we reviewed the documents for, we don't think

13  it's unreasonable for us to have to do this.  There are

14  18,000 more.  When it's really untethered from, you know,

15  any specific relevance.

16          And so that was -- so we explained that in

17  January.  We went back and said hey, look, if there's

18  some way to narrow it or something like that, please let

19  us know.  They did not respond.  Instead, the night

20  before the February 10th hearing they filed their motion

21  to compel.  Attached to that motion, those search terms,

22  your Honor, that is the first time we ever saw them.  And

23  that chart, I will say Exhibit H, your Honor, that is 25

24  pages, 39 separate search terms or search parameters that

25  they've asked us to run.  It's only increased.  Every

56

Proceedings

1  time they ask us to run more searches, the number gets

2  bigger.

3          THE COURT:  Well, but now the number is getting

4  smaller because they've come down to seven custodians.

5          MR. GIBBS:  No, your Honor.  No, your Honor.

6  So I'm only talking right now about email.  This is only

7  email.  Everything I've just said to you --

8          THE COURT:  Okay.

9          MR. GIBBS:  Everything I've said so far is only

10 email.

11         THE COURT:  Okay.  We were talking about texts

12 though.

13         MR. GIBBS:  We --

14         THE COURT:  I asked Mr. Mule about texts, start

15 with texts.

16         MR. GIBBS:  Well, I think we've gotten in -- so

17 the text messages sort of come a little later.  And I

18 think what Mr. Mule said, he addressed texts and emails.

19         THE COURT:  Well, then he sort of said the

20 email argument is the same, but you're drawing a

21 distinction between the two, which is okay.  I'm just

22 trying to understand it.

23         MR. GIBBS:  Yes, your Honor.  I think this

24 provides the context and the timeline with the text

25 messages.

57

Proceedings

1          THE COURT:  Okay.

2          MR. GIBBS:  So the demands again -- so February

3   7th we get this expanded set of search terms for the

4   email data which we've never seen.  So this expanded from

5   15 specific search terms that they sent us on November

6   27th now to 39.  So it almost tripled the number of

7   search parameters they wanted us to run with no

8   explanation.  Well, we had already sent hit counts for

9   the original 15 and said what more?  This is too much.

10  Explain why you need this and let's see if we can make it

11  something smaller.  And instead, they sent us something

12  that's almost three times as large.

13          So we get that.  We had the hearing on February

14  10th.  We adjourned.  We agreed that we would run the hit

15  counts, provide that data to them, which we did.  And so

16  again, this was just an email.  The number of documents,

17  the number of emails that hit on the search terms, so it

18  was almost 204,000 documents.  To promote it into the

19  database, host it, review it, produce it would be about

20  $400,000.  And that is for the 24 custodians for whom we

21  have already collected email data.

22          And so they're asking for three additional

23  custodians as well.  And to collect the data from those

24  three people, to run the search terms, the original

25  search terms and the new ones, that would be about

58

Proceedings

1    $76,000.  And so we're talking about just for the emails
2    we're talking about an additional half a million dollars
3    to do what they've asked.
4             THE COURT:  Okay.  My recollection of this
5    issue the first time we had the motion hearing was that I
6    certainly raised some concern about there being no
7    electronic ESI protocol.
8             MR. GIBBS:  Yes, your Honor.
9             THE COURT:  This has only confirmed my original
10   thought.  And there are two ways to go.  One was I was
11   hoping we could sort of Band-Aid something together to
12   give a response to this motion.
13            I'm looking at Exhibit H which is the cross-
14   referencing of custodians to particular requests and it's
15   not clear -- well, I understand the purpose of it and it
16   makes sense.  It still says well we want documents about
17   this allegation from this person.  That is not an ESI
18   protocol.  An ESI protocol would then have search terms
19   that could be run.  But I don't see that in Exhibit H.
20            MR. MULE:  Your Honor, it's in there.  It says
21   additional proposed search terms.  It has SiteOne's
22   terms --
23            THE COURT:  Slow down, slow down.  Oh, I see.
24   I see it.  Okay.
25            MR. MULE:  -- on the -- and then it has the

59

Proceedings

1  additional proposed search terms which are the terms that

2  we requested be run.

3          THE COURT:  Okay.  And that is (indiscernible)

4  text?

5          MR. MULE:  That's -- what I'm saying is it

6  could be applied to both because we --

7          THE COURT:  Are they both searched the same way

8  that --

9          MR. MULE:  Yeah, exactly.  Like they just add

10  to text and put these search terms, this could be a way

11  it could be done.  You know, for us, they put the burden

12  on us manually reviewing the texts because they said you

13  can't, you know, it's hard to get searches.  But you

14  know, they didn't even come back to us with any type of

15  proposed edits on this or even saying that any of these

16  were not relevant.  They're relevant.  They're geared --

17          THE COURT:  Okay.  Well, I'm not going to talk

18  about relevance for a moment.

19          MR. MULE:  No?  Sorry.

20          THE COURT:  But okay.  Understanding that now,

21  with respect to the seven custodians, I want to focus on

22  those.  Did you run the counts for those seven custodians

23  using the terms from the additional proposed terms

24  column?

25          MR. GIBBS:  Well, so your Honor, so do you mean

60

                              Proceedings

1    for emails?

2              THE COURT:  Emails, well emails and texts.  But

3    if there's two separate answers, one for each, that's

4    fine.

5              MR. GIBBS:  It's separate, it's separate.

6              THE COURT:  Okay.  So tell me what's the answer

7    to both?

8              MR. GIBBS:  So the answer for emails is yes, we

9    have run all of their proposed search parameters exactly

10   as they asked us to do.

11             THE COURT:  Okay.

12             MR. GIBBS:  Exactly what's in their chart,

13   Exhibit H --

14             THE COURT:  And so for emails, the number --

15   what was the total?  You said it but tell me again.

16             MR. GIBBS:  204,000 documents.

17             THE COURT:  Okay.  And then did you do it for

18   texts?

19             MR. GIBBS:  No, your Honor.  We did not do it

20   for text messages.

21             THE COURT:  Okay.  And text hasn't been done.

22             MR. GIBBS:  I did not understand that that

23   would be an appropriate way.  So I'll tell you that for

24   text messages, for the three that we searched -- and now,

25   you know, I'll move on to the text message piece.  So for

61

Proceedings

1    the text messages, we told them last year hey look, we're

2    agreeable to searching text for a reasonable number of

3    people and started with the 24.  And we said there's no

4    way.  So the conversation was what do you really want?

5    Like who are you really after here?  And the list stayed

6    at 24 until late last year and then it was culled down to

7    the 13.

8             And we continued to say look, 13 is still --

9    that's a lot.  And we've already done all these other

10   things.  What's your real list?  And they wouldn't tell

11   us who the real people are.

12            So we selected the three people, the management

13   people --

14            THE COURT:  No, I remember that.

15            MR. GIBBS:  Okay.  So we made what we thought

16   was an informed selection of who would be most likely to

17   have the data relevant to this vendetta lawsuit.  The

18   people who investigated Don and Vic and Nick and actually

19   terminated them, made the decision to terminate them.

20            THE COURT:  And you look at their texts as

21   well, most of them.

22            MR. GIBBS:  So what we did, let me tell you

23   what we did for them, your Honor.  So we got their -- we

24   collected their text messages, and we got our list of the

25   26 people.  So I guess 27 people.  It's all of the

62

Proceedings

1   original custodians for whom we collected email data plus

2   the three other new custodians they proposed.

3          THE COURT:  Right.

4          MR. GIBBS:  And we got those, those

5   individuals, and we pulled every single text message

6   between these three custodians and any of those 27

7   people.  And then we pulled all of those messages and we

8   manually reviewed every single one of those.  I can't

9   remember the exact number that we reviewed.  It was a few

10  or several hundred.  And then we produced the messages,

11  the relevant responsive messages.  We produced those on

12  March 18th and there were I think we'll just say

13  approximately 100 text messages.  And so that's the

14  process that we went through with the text messages.

15         THE COURT:  Okay.  Let me ask you --

16         MR. GIBBS:  So we did not run search terms in

17  the text messages.  We reviewed them manually just like

18  they did.

19         THE COURT:  Okay.  Let me ask you a question,

20  Mr. Mule.  A lot of the time frames in your Exhibit H,

21  the date range, it seems to me as a matter of logic that

22  there was probably a certain number of months window that

23  would be the hot time, for lack of a better phrase, where

24  things were going on.  It seems to me that one way to

25  manage it might be to limit the time frame.

63

Proceedings

1         For example, I'm making up dates now, but if
2    the hot four months was January 1 to April 1, I guess
3    that's three months, if they did the search and there
4    were no texts responsive from that window collected in a
5    subsequent text being responsive would approach zero, it
6    would certainly go down.  Right?
7         So perhaps the one way to make this more
8    manageable is to (A), limit the time frame because I'm
9    inclined to grant searches for these seven individuals
10   having looked at Exhibit G and reviewing Mr. Mule's
11   rationale.  I think it is a reasonable rationale.  It
12   just may be too cumbersome for the amount of data we're
13   talking about.
14        So I'm also concerned that perhaps the search
15   terms may generate too many responses.  For example, the
16   one that just says Don or Vic or Nick.  That it may need
17   additional search terms to limit it.  But if you were to
18   create a hot window, what would that be, Mr. Mule, in
19   your opinion?
20        MR. MULE:  Yeah.  So your Honor, I guess it
21   would depend on the particular search.  And you know,
22   even in SiteOne's date ranges, they had different dates
23   with respect to different searches.  So we could
24   certainly do that exercise.
25        THE COURT:  Well, it seems to me the time

64

Proceedings

1  period you would be interested in, Mr. Gibbs, would be

2  from your perspective is several months before.  Right?

3  Leading up to what happened.

4              MR. GIBBS:  October.  Starting October.  To our

5  view, the hot period is October of 2022 through late

6  March, or April 1, 2023.

7              THE COURT:  Right.  And your hot period though,

8  Mr. Mule, would probably postdate that because you want

9  evidence of some kind of, you call it vengeance, I don't

10 know, whatever you want to call it.  Right?  They're

11 trying to get back at you guys because the deal went

12 south.

13             MR. MULE:  Yeah.  Well, we would go back to

14 October 2022 as well because in our view, they were

15 planning to basically number one, get rid of Don.  And

16 then they were negotiating with him.  And at the same

17 time they're negotiating with him, they are plotting this

18 lawsuit against him.  So --

19             THE COURT:  But what would that window -- from

20 when to when is the window?

21             MR. MULE:  So this would be like, you know, at

22 least from sometime -- we have like -- because most of

23 this, October 1, 2022 --

24             THE COURT:  So okay, then to -- if your theory

25 is going to bear fruit, right, it seems like you don't

65

Proceedings

1  need two years of texts.  I mean it could be -- unless

2  the first -- if the first three months of texts let's

3  say, I'm just picking a number, reveal exactly what you

4  suspected and this whole thing was just a conspiracy,

5  then it might makes sense to go through another three

6  months to see how this conspiracy played out.

7          But on the other hand, if the first few months

8  reveal absolutely nothing but what you'd expect in your

9  normal asset purchase situation, it seems unlikely that a

10 conspiracy would develop after the fact.  You see what

11 I'm saying?

12         MR. MULE:  So I have one idea.  Maybe if Mr.

13 Milman can jump in?  But as far as the -- I think there

14 is a distinction between the texts and the emails so --

15         THE COURT:  Meaning there'd be two different

16 windows?

17         MR. MULE:  Right.

18         THE COURT:  Okay, okay.

19         MR. MULE:  Exactly.  So you know, to the extent

20 we're talking about, you know, to try to cull down the

21 universe and we talked about texts between the seven

22 additional to have a total of ten for the texts --

23         THE COURT:  But they already did the three,

24 the --

25         MR. MULE:  They did three, so seven more,