# EXHIBIT B

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA01F890

EXECUTION COPY

## CONFIDENTIAL SEPARATION AGREEMENT

This Confidential Separation Agreement ("Agreement") is made and entered into by SiteOne Landscape Supply, LLC ("Company"), Dominick Caroleo ("Caroleo"), and Laura Shartle ("Shartle") (with all three being collectively referred to herein as the "Parties"). This Agreement shall become effective on the date it is signed by Caroleo ("Effective Date").

WHEREAS Caroleo, who was previously the sole shareholder of The Garden Dept. Corporation and entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") with the Company effective January 14, 2020 (a copy of which being attached as Exhibit A hereto) under which the Company purchased all assets of The Garden Department Corporation and under which Caroleo was entitled to certain annual earnout payments;

WHEREAS Caroleo, who entered into an Employment Agreement ("Employment Agreement") with the Company effective January 14, 2020 (a copy of which being attached as Exhibit B hereto) in conjunction with the Asset Purchase Agreement;

WHEREAS Caroleo was terminated for Cause (as defined in the Employment Agreement) from his employment with the Company effective October 19, 2022 (the "Separation Date");

WHEREAS Caroleo disputes whether Cause (as defined in the Employment Agreement) existed with regard to his termination and has threatened certain litigation ("Action"); and

WHEREAS in the interest of time and expense, the Parties desire to compromise, settle, and resolve their disputes and to set forth their mutual understandings and agreements herein.

NOW, THEREFORE, in consideration of the payment of monies and in further consideration of the promises, covenants, and releases hereinafter set forth, the receipt, adequacy and sufficiency of which are acknowledged, the Parties agree as follows:

1.    **Settlement Amount**

   (a)    Settlement of Claims. The claims in this Action are settled in accordance with the terms of this Agreement.

   (b)    Settlement. The Company will pay the lump sum of Two Million Dollars ($2,000,000.00) (the "Settlement Amount") in full settlement of this matter.  The Company and Caroleo agree that $1,236,615 of the Settlement Amount constitutes the 2022 earnout payment as contemplated by the Asset Purchase Agreement, which will be paid via IRS Form 1099 with no withholdings; that $601,008 of the Settlement Amount constitutes consideration in lieu of litigation for damages claimed via Caroleo's threatened defamation claim which Caroleo alleges include but are not limited to physical pain and sickness, which will be paid via IRS Form 1099 with no withholdings; and that $162,377 of the Settlement Amount constitutes

1

EXECUTION COPY

consideration for a 2022 bonus and unvested RSU grant, which will be paid as W-2 wages with all applicable withholdings. Each of these portions of the Settlement Amount will be paid in separate lump-sum payments with separate appropriate tax forms being issued for each payment. Caroleo will provide the Company with a completed IRS Form W-9 within three business days of executing this Agreement.

(c)      The Company makes no representations or warranties with respect to the tax consequences of the payments and any other consideration provided to Caroleo or made on his behalf under the terms of this Agreement. Caroleo agrees and understands that he is responsible for payment, if any, of local, state, and/or federal taxes on the payments and any other consideration provided hereunder by the Company and any penalties or assessments thereon. Caroleo further agrees to indemnify and hold the Company harmless from any claims, demands, deficiencies, penalties, interest, assessments, executions, judgments, or recoveries by any government agency against the Company for any amounts claimed due on account of (a) Employee's failure to pay or delayed payment of federal or state taxes if any are due, or (b) damages sustained by the Company by reason of any such claims.

(d)      Payment of Settlement Amount. The Parties agree that the Settlement Amount shall be made payable to Milman Labuda Law Group/Attorney Trust Account/IOLA and delivered to Milman Labuda Law Group, PLLC, Attention: Robert Milman 3000 Marcus Avenue, Suite 3W8, Lake Success, New York 11042 to be held in Caroleo's counsel's, Milman Labuda Law Group, PLLC ("MLLG"), escrow account on or before close of business on the 5th business day following Caroleo's execution of this Agreement. The Settlement Amount will be wired in accordance with the instructions below:

Milman Labuda Law Group PLLC TO:
First National Bank of Long Island
3000 Marcus Avenue Lake Success, NY 11042
ABA Number: 021411335
For Credit to 08 7007159 Milman Labuda Law Group

(e)      The Company agrees that Caroleo was terminated "without cause."

## 2.      Ongoing Obligations

(a)      Caroleo's obligations under the Asset Purchase Agreement (expressly including, but not limited to, the terms set forth in Sections 4.01, 4.02, and 7.07); those obligations set forth in Sections 7, 8, 9, 11, 13, and 19 of the Employment Agreement; and those obligations set forth in the Employee Restricted Stock Unit Agreement dated March 1, 2021 shall all continue in full force and effect (along with any necessary definitional components set forth elsewhere in those

2

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA01F890

EXECUTION COPY

Agreements), and the Company expressly hereby reserves all rights to enforce those obligations consistent with their terms.

(b)     The Parties acknowledge and agree that for purposes of interpreting the terms of the Employment Agreement Caroleo's Termination Date is October 19, 2022.

### 3.     Release, Waiver, and Covenant Not to Sue

(a)     <u>Claims Released</u>. Caroleo does hereby voluntarily and irrevocably waive, release, dismiss with prejudice, and withdraw all claims, complaints, suits or demands of any kind whatsoever (whether known or unknown) which he ever had, now has or may have against Laura Shartle, the Company, and any current or former subsidiaries, parents, or affiliates of the Company and their past, present, and future officers, directors, employees, agents, insurers, attorneys, plan administrators, and their respective benefit plans (collectively, the "Releasees"), arising from or relating to (directly or indirectly) Caroleo's employment, the termination of his employment, the Employment Agreement, the Asset Purchase Agreement, or other events that have occurred as of the date of execution of the Agreement, including but not limited to:

(i)     claims for violations of Title VII of the Civil Rights Act of 1964, the Fair Labor Standards Act, the Civil Rights Act of 1991, the Americans with Disabilities Act, the Equal Pay Act, the Civil Rights Act of 1966, the Family and Medical Leave Act, 42 U.S.C. § 1981, the National Labor Relations Act, the Labor Management Relations Act, or the Employee Retirement Income Security Act of 1974, the New York Human Rights Law, and the New York City Human Rights Law;

(ii)     claims for violations of any other federal or state statute or regulation or local ordinance;

(iii)     claims for conversion, lost or unpaid wages, compensation or benefits, defamation, intentional or negligent infliction of emotional distress, assault, battery, wrongful or constructive discharge, negligent hiring, retention or supervision, fraud, misrepresentation, conversion, tortious interference, breach of contract or breach of fiduciary duty;

(iv)     claims to benefits under any bonus, severance, workforce reduction, early retirement, outplacement or any other similar type plan sponsored by Company; and

EXECUTION COPY

(v)     any other claims under state law arising in tort or contract (specifically including those arising under the Employment Agreement and/or the Asset Purchase Agreement).

By referencing the laws above, the Company does not admit to coverage of the Releasees under any of these laws.

(b)     <u>Settlement, Accord, Satisfaction and Covenant Not to Sue</u>. Caroleo and the Company acknowledge that this Agreement constitutes a full SETTLEMENT, ACCORD AND SATISFACTION of all claims covered by the release provisions of Sections 3(a). Caroleo covenants not to sue or file any complaint or claim against the other or any of the Releasees with any court based on any act or omission arising or occurring prior to the date he executes this Agreement, whether known or unknown at the time he signs the Agreement. Caroleo also waives the right to receive any future monetary recovery directly from Company or any of the Releasees, including payments that result from any complaints or charges that Caroleo files with any governmental agency or that are filed on Caroleo's behalf.

(c)     <u>Claims Not Released</u>. In signing this Agreement, Caroleo is not releasing any claims which may arise under the terms of this Agreement, or which may arise otherwise out of events occurring after the date they execute the Agreement, or which may not be released as a matter of law. Caroleo is not waiving any claims or defenses he may have in his personal or corporate capacity as a landlord in any properties in which the Company is a tenant. Caroleo understands and acknowledges that nothing herein is intended to or shall be construed to require the Company to institute or continue in effect any particular plan or benefit sponsored by Company and Company hereby reserves the right to amend or terminate any of its compensation or benefit programs at any time in accordance with the procedures set forth in such plans or programs.

(d)     <u>Company Release</u>:  The Company, on behalf of itself and its subsidiaries, affiliates, divisions, successors, assigns, officers, directors, agents, partners and current and former employees (collectively, the "Company Releasors") agrees to and does hereby irrevocably and unconditionally release, acquit and forever discharge Caroleo and his heirs, executors, administrators, representatives, successors and assigns (collectively, the "Caroleo Releasees") with respect to and from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, remedies, causes of action, suits, rights, demands, costs, losses, debts, and expenses (including attorneys' fees and costs) whether in law or equity and whether arising under federal, state or local law, which the Company Releasors had, now have, or may have against each or any of the Caroleo Releasees by reason of Caroleo's employment with the Company since January 14, 2020, including alleged harassment of Laura Shartle; however, nothing herein shall

4

EXECUTION COPY

constitute a release by the Company Releasors of Caroleo or the Caroleo Releasees from any claims, liabilities, or obligations arising under the Asset Purchase Agreement. For clarity, and by way of example only, the Company Releasors are not releasing any claims based upon Caroleo's ongoing obligations set forth in Section 2 herein (and Company's corresponding rights with respect thereto) or based upon representations, warranties, and/or indemnification rights provided in the Asset Purchase Agreement.

(e)     <u>Shartle Release</u>. Shartle does hereby voluntarily and irrevocably waive, release, dismiss with prejudice, and withdraw all claims, complaints, suits or demands of any kind whatsoever (whether known or unknown) which she ever had, or now has against or may have against Caroleo arising out of the events that occurred as of the date of execution of the Agreement.

**4.     <u>Confidentiality, Non-Disparagement, and No Retaliation</u>**

(a)     The terms of this Agreement and the amount of the Separation Amount are to be maintained by the Parties as strictly confidential except as may be required by law. Provided, however, that the Parties may disclose the amount of the Separation Amount to their attorneys, accountants, or other professional advisors but only as necessary to secure professional advice and only under such circumstances as will preserve the privileged nature of those communications and/or the confidentiality of the amount of the Separation Amount.

(b)     The Company agrees that it will instruct Briley Brisendine, Joe Ketter, Doug Black, Jerry Justice, Anna Valentine and Sean Kramer to not at any time make any comment, statement, posting or expression, directly or indirectly, through any media, oral or written, which is or is intended to be derogatory, disparaging, misleading, untrue, or threatening about or relating to Caroleo. Caroleo agrees that he will not at any time make any comment, statement, posting or expression, through any media, oral or written, which is or is intended to be derogatory, disparaging, misleading, untrue, or threatening about or relating to the Company, its parent companies, affiliates, subsidiaries subsequently purchased by the Company, and/or the Company's officers, directors, or employees, including Shartle. Shartle agrees that she will not at any time make any comment, statement, posting or expression, through any media, oral or written, which is or is intended to be derogatory, disparaging, misleading, untrue, or threatening about or relating to Caroleo.

(c)     Except as may be required by court order or subpoena, Caroleo represents and warrants that he will not encourage, volunteer testimony, to or otherwise cooperate with any other individual or entity with respect to actual or potential claims against the Company, and he will not, directly or indirectly, encourage any individual or entity to assert any claim against the Company.

EXECUTION COPY

(d)      Caroleo and Shartle further agree and covenant that they shall have no future direct or indirect contact with one another, whether verbal or written via any electronic or other media, and that they shall in no way retaliate or otherwise take any action with respect to one another, whether directly or indirectly.

(e)      Nothing in this Agreement will prevent Caroleo or Shartle from providing truthful testimony under oath in a judicial or administrative proceeding or prevent Caroleo or Shartle from providing information to a federal, state or local agency in connection with the lawful exercise of such agency's functions or to an attorney retained by Caroleo or Shartle.

(f)      Caroleo acknowledges that the facts underlying this Agreement do not involve discrimination within the meaning of New York General Obligations Law Section 5-336, and thus 5-336 is not applicable to this Agreement.

**5.**      <u>**No Future Employment**</u>

Caroleo agrees that because of circumstances unique to Caroleo and because of irreconcilable differences between Caroleo and the Company, Caroleo agrees not to seek reinstatement with, or apply for reemployment with, the Company or any other affiliated entity (whether as an employee, independent contractor, or otherwise) following the Effective Date.

**6.**      <u>**Denial of Liability or Wrongdoing**</u>

It is understood and acknowledged by all Parties that this is a settlement and compromise of potential disputed claims and is not and cannot be considered as an admission of liability of wrongdoing by any Party. To the contrary, it is understood and acknowledged that the Parties expressly deny any liability and deny the validity of all claims of the other Party.

**7.**      <u>**No Assignment of Claims**</u>

Caroleo represents and warrants that he alone is entitled to assert any claim against the Company of any kind or character arising out of, or as a consequence of, or relating to his employment with Company and by virtue of his status as the Shareholder and Agent as defined and set forth in the APA. Caroleo represents and warrants that at no time did he assign or transfer, to any person or entity, any claim or any portion thereof, or interest therein.

**8.**      <u>**Arbitration**</u>

Except as provided in Section 10 herein below, any dispute, controversy, or claim arising out of or related to this Agreement, or any breach of this Agreement, shall be submitted to and

decided by binding arbitration. Arbitration shall be administered exclusively by JAMS and shall be conducted consistent with the JAMS Employment Arbitration Rules and Procedures. Each party shall pay its own costs of arbitration. Any arbitral award determination shall be final and binding upon the Parties. The location of any arbitration commenced shall be New York, New York.

9.    **Remedies**

In the event of a breach or threatened breach by Caroleo of any of the provisions of this Agreement, Caroleo hereby consents and agrees that money damages may not afford an adequate remedy and that the Company shall be entitled to seek a temporary, preliminary, and/or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. Any equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available relief. Additionally, if Caroleo breaches this Agreement, the Company shall be entitled to, in addition to its other rights and remedies at law or in equity, liquidated damages in an amount at least equal to the Separation Amount.

10.    **Miscellaneous**

(a)    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same instrument.

(b)    <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of Caroleo and his heirs, administrators, representatives, and executors. This Agreement shall be binding upon and inure to the benefit of Company and Company and their officers, directors, employees, agents, shareholders, subsidiaries, and affiliates, and their respective predecessors, successors, assigns, heirs, executors and administrators, and to their heirs, administrators, representatives, executors, successors and assigns.

(c)    <u>Applicable Law</u>. This Agreement shall be construed and interpreted in accordance with the laws of the State of New York (without giving effect to principles of conflicts of laws) to the extent such laws are not otherwise superseded by the laws of the United States.

(d)    <u>Entire Agreement</u>. Recognizing Caroleo's ongoing obligations set forth herein above in Section 2 (and Company's corresponding rights with respect thereto), this Agreement contains the entire agreement and understanding as to Caroleo's employment and the termination thereof, his rights and claims under the Employment Agreement, Employee Restricted Stock Unit Agreement, and his rights and claims under the Asset Purchase Agreement, superseding and replacing

EXECUTION COPY

all prior negotiations, understandings, representations and agreements, written or oral as to these specific topics.

(e)    <u>Modification and Waiver</u>. No modification, amendment, waiver, termination or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon any of the Parties unless confirmed by a written instrument signed by all Parties. No waiver by any party of any term or provision of this Agreement or of any default hereunder shall affect such Party's rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar.

(g)    <u>Severability</u>. The unenforceability or invalidity of any particular provision of this Agreement shall not affect its other provisions, and to the extent necessary to give such other provisions effect, they shall be deemed severable. If any of the provisions of this Agreement are determined by any court of law or equity with jurisdiction over this matter to be unreasonable or unenforceable, in whole or in part, as written, the Parties hereby consent to and affirmatively request that said court reform the provision so as to be reasonable and enforceable and that said court enforce the provision as reformed.

IN WITNESS WHEREOF, the Parties have signed and executed this Agreement on the dates set forth below as an expression of their intent to be bound by the foregoing terms of this Agreement.

**SITEONE LANDSCAPE SUPPLY, LLC**

By: _Briley Brisendine_

Name: Briley Brisendine

Title: EVP and General Counsel

Date: 2/18/2023

**LAURA SHARTLE**

_Laura Shartle_

Date: 2/18/2023

**DOMINICK CAROLEO**

Date: 2/21/2023

8

# EXHIBIT A

**Execution Draft**

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "***Agreement***"), is dated as of January 14, 2020, by and among **SITEONE LANDSCAPE SUPPLY, LLC**, a Delaware limited liability company ("***Buyer***"), **THE GARDEN DEPT. CORP.**, a New York corporation ("***Company***"), and the shareholder of Company set forth on the signature pages hereto (the "***Shareholder***"), and **Dominick Caroleo**, as agent for Company and the Shareholder pursuant to Section 7.13 ("***Agent***").

**WHEREAS**, Company is engaged in the Business at and from locations in Coram, Dix Hills and Speonk, New York;

**WHEREAS**, Buyer wishes to purchase and acquire, and Company desires to sell, substantially all assets related to the Business, on and subject to the terms and conditions of this Agreement;

**WHEREAS**, the Shareholder owns all of the issued and outstanding shares of Company; and

**WHEREAS**, capitalized terms used but not otherwise defined herein have the respective meanings set forth on Exhibit 1 to this Agreement.

**NOW, THEREFORE**, in consideration of the premises, and the mutual representations, warranties, covenants and agreements hereinafter set forth, the parties hereto agree as follows:

# ARTICLE I
# PURCHASE AND SALE

**1.01**    **Purchase of Purchased Assets from Company.**

(a)    Purchased Assets. Except as otherwise specifically provided in Section 1.01(b), at the Closing, Company shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and acquire from Company, free and clear of all Encumbrances, all right, title and interest in and to all of the assets, properties and rights of Company, wherever located, and whether or not reflected on the books of Company (each a "***Purchased Asset***", and collectively, the "***Purchased Assets***"), including the following:

(i)    all Equipment, including the specific assets listed on Schedule 1.01(a)(i);

(ii)    all accounts receivable, trade receivables, notes receivable, and other receivables (other than notes or receivables from the Shareholder), and the right to bill customers for products sold or services provided prior to the Closing (collectively, the "***Receivables***");

(iii)    all Inventory;

(iv)     all Contracts listed on Schedule 1.01(a)(iv), and all bona fide purchase orders issued to and accepted by Company in the ordinary course of the Business, and the benefit of any confidentiality or non-compete agreements in favor of Company with respect to the Business;

(v)     all rights to receive vendor rebates accruing in respect of the Business;

(vi)     all prepaid expenses and deposits, deferred charges, advance payments, security deposits and prepaid items relating to the Business or other Purchased Assets, excluding any such items exclusively relating to Excluded Assets;

(vii)     all Permits, to the extent transferable or assignable;

(viii)     all Records and Confidential Information;

(ix)     all rights to receive any insurance proceeds payable in respect of any Purchased Asset;

(x)     all claims, warranties, choses in action, causes of action (including for past infringement or misappropriation), rights of recovery and rights of set-off of any kind against third parties (including any warranties from contractors, subcontractors, vendors or suppliers regarding their performance, quality of workmanship or quality of materials) or the Assumed Obligations, and the right to receive and retain mail and other communications relating to the Business, the Purchased Assets or the Assumed Obligations;

(xi)     all Intellectual Property used in connection with the Business (including the right to use the name of "Garden Department" or any derivatives thereof as a corporate or trade name); and

(xii)     all goodwill and going concern rights associated with the Business or the Purchased Assets.

(b)     Excluded Assets. The Purchased Assets shall not include, and Buyer shall not be deemed to purchase or acquire pursuant to this Agreement, any of the following assets (collectively, the "***Excluded Assets***"):

(i)     cash on hand, cash equivalents and bank and other financial accounts;

(ii)     any Contracts other than those specifically referenced in Schedule 1.01(a)(iv);

(iii)     the corporate seal, minute books, stock books, blank share certificates, Tax Returns, tax and employer identification numbers, and working papers and other records relating to the Taxes (including sales and use tax records, in any medium) or corporate formation, maintenance and existence of Company;

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA81F890

(iv)    any insurance policies (including life insurance policies on the lives of the Shareholder and any rights thereto);

(v)    the rights of Company or the Shareholder under this Agreement or any Transaction Agreement;

(vi)    any Employee Benefit Plan or assets of, or specifically relating to, any Employee Benefit Plan;

(vii)    the vehicles listed on Schedule 1.01(b)(vii); and

(viii)    any goodwill reflected for accounting purposes on the books and records of Company relating to an acquisition of another business in 2010 by Company; it being understood that such business is otherwise part of the Business and all intangible assets associated with such acquired business, including customer and vendor relationships and related business goodwill, are Purchased Assets.

**1.02    Assumed Obligations**. At the Closing, Buyer shall assume and agree to perform and discharge: (a) all executory obligations due to be performed after the Closing (other than accounts payable) under any Contracts included in the Purchased Assets and duly assigned to Buyer, except to the extent arising from any breach or default by the respective Company at or prior to Closing, and (b) all accounts payable and accrued expenses of Company, but only to the extent taken into account in the final determination of the Net Working Capital at Closing ((a) and (b) collectively, the "*Assumed Obligations*").

**1.03    Excluded Liabilities**. Other than as expressly provided in <u>Section 1.02</u> above, Buyer shall assume no Liability whatsoever of Company or the Shareholder, whether or not arising from or related to the Business or the Purchased Assets (the "*Excluded Liabilities*"), and Company and the Shareholder shall pay, perform and discharge, as and when due, each such Excluded Liability. Without limiting the generality of the foregoing, the Excluded Liabilities shall include any Liability (other than the Assumed Obligations), regardless of when accruing, arising out of or relating to:

(a)    all Debt;

(b)    any actual or alleged (i) violation of Applicable Law, (ii) breach of contract or warranty, (iii) tortious conduct or (iv) claims predicated on strict liability or any similar legal theory, including any product liability claim arising out of any product sold or service rendered prior to the Closing Date;

(c)    any acts, omissions, events or circumstances prior to the Effective Time;

(d)    Taxes of any kind or character, except as provided in <u>Section 4.06</u>;

(e)    the ownership, operation, use or disposal of any Excluded Asset or any business activity other than the Business;

DocuSign Envelope ID: 38A463F4-31DD-4845-A7B9-BE16DA81F890

(f)     any employee compensation or employee benefits, including any liability for severance pay, overtime pay, unemployment compensation, vacation, sick leave, termination pay or relating to any Employee Benefit Plan, change of control, retention, sale of business or similar transaction-related bonus arrangement, whether or not pursuant to a written agreement, up to the Closing Date;

(g)     any pre-Closing Environmental Condition in, at, under or emanating from the Real Property; or

(h)     any claims, choses in action, causes of action, rights of recovery, rights of set-off of any kind by any third party arising out of the conduct of the Business or the ownership of the Purchased Assets prior to Closing.

**1.04     Purchase Price**. The "***Purchase Price***" for the Purchased Assets shall be equal to the sum of:

(a)     Twenty-Eight Million Dollars ($28,000,000) (the "***Initial Purchase Price***");

(b)     <u>plus</u> the amount by which the Net Working Capital at Closing exceeds the Target Net Working Capital, if any;

(c)     <u>minus</u> the amount by which the Target Net Working Capital exceeds the Net Working Capital at Closing, if any;

(d)     <u>plus</u> any Acquisition Earnout, if, as and when earned pursuant to <u>Exhibit 2</u>; and

(e)     <u>plus</u> any EBITDA Earnout Payment, if, as and when earned pursuant to <u>Exhibit 3</u>.

**1.05     Closing.**

(a)     The closing ("***Closing***") of the purchase and sale of the Purchased Assets shall take place on the later of January 13, 2019 or the second (2nd) Business Day following the satisfaction (or waiver by the party entitled to the benefit thereof) of all of the closing conditions set forth in <u>Article VI</u> (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver thereof), or at such other date and time as the parties may determine, at the offices of Kilpatrick Townsend & Stockton LLP, 1100 Peachtree Street, N.E., Suite 2800, Atlanta, Georgia 30309-4530, provided that the parties may exchange all Closing documents by email or facsimile, with original Closing documents to be promptly exchanged by overnight courier or personal delivery. The date on which the Closing occurs is herein referred to as the "***Closing Date***". The Closing shall be deemed effective for all purposes as of the close of business on the Closing Date (the "***Effective Time***").

(b)     At least two Business Days prior to the anticipated Closing, Company shall deliver to Buyer a letter (a "***Pay-off Letter***") from each holder of any Debt encumbering or relating to any of the Purchased Assets of Company (each a "***Debt Holder***") addressed to Buyer. Each Pay-

DocuSign Envelope ID: 38A463F4-31DD-4845-A7B9-BE16DA01F890

off Letter shall contain (i) the name of each Debt Holder to whom such Debt is owed, (ii) the aggregate payments necessary to be made at Closing in order to satisfy in full all amounts outstanding, including all principal, interest, fees, prepayment penalties or other amounts due or owing with respect thereto, (iii) an agreement by such Debt Holder to release any Encumbrances on any of the Purchased Assets of Company securing such Debt upon payment of such stated amount and authorizing Buyer or its designee to file termination statements with respect to any financing statements or other security instruments in respect of such Encumbrances, and (iv) wiring instructions or other payment instructions specified for each such Debt Holder.

(c)     At Closing, Company and the Shareholder shall deliver or cause to be delivered to Buyer the following:

(i)      a certificate from the Secretary of Company, dated as of the Closing Date, in form and substance reasonably acceptable to Buyer attesting to the (A) resolutions of the Board of Directors of Company and the Shareholder authorizing the execution, delivery and performance of the Transaction Agreements, (B) incumbency of the officers executing any Transaction Agreement on behalf of Company, and (C) copies of all other Organizational Documents of Company, as in effect on the Closing Date;

(ii)     such bills of sale, endorsed certificates of title, conveyance documents, tax clearances and other documents, instruments, and certificates in connection with the transactions contemplated by this Agreement, as Buyer may reasonably request, in form and substance reasonably acceptable to Buyer and its counsel;

(iii)    written evidence, to the satisfaction of Buyer, of all approvals, consents and waivers listed on Schedule 2.03;

(iv)     a counterpart to each of the lease agreements, in the forms previously agreed, duly executed by the applicable Related Party Landlord with respect to each parcel of the Real Property (the "***Related Party Lease Agreements***");

(v)      a certificate from Company and each of the Related Party Landlords, in form and substance reasonably satisfactory to Buyer, certifying that such Person is not a foreign person within the meaning of Section 1445 of the Code;

(vi)     a counterpart to the transition services agreement between Company, 777 Leasing and Buyer, in the form previously agreed, duly executed by Company and 777 Leasing (the "***TSA***");

(vii)    a counterpart to the Escrow Agreement, in the form previously agreed, duly executed by Agent;

(viii)   a reasonably current good standing certificate (or its equivalent) for Company from the New York Secretary of State and the corresponding authority of any other state where Company is licensed or qualified to conduct business;

DocuSign Envelope ID: 38A463F4-31DD-4845-A7B9-BE16DA81F890

(ix)    a counterpart to the employment agreement, in the form previously agreed, between Dominick Caroleo and Buyer (the "***Employment Agreement***"), duly executed by Dominick Caroleo; and

(x)    evidence reasonably satisfactory to Buyer and its counsel that all Encumbrances on the Purchased Assets have been released (or will be released promptly upon each Debt Holder's receipt of the amount stated in its Pay-Off Letter).

(d)    At Closing, Buyer shall,

(i)    in accordance with a settlement statement (the "***Settlement Statement***") executed by Buyer and Agent, on behalf of Company and the Shareholder:

(A)    pay, on behalf of Company, by wire transfer of immediately available funds, all of the Debt of Company as set forth in the applicable Pay-off Letters delivered to Buyer pursuant to <u>Section 1.05(b)</u> to the Person(s) designated for payment therein;

(B)    deposit with the Escrow Agent, the sum of the NWC Escrow, the SUT Escrow and the Indemnity Escrow (collectively, the "***Escrow Amount***"), to be held and disbursed pursuant to <u>Section 1.07</u> and the Escrow Agreement; and

(C)    pay to Agent, on behalf and for the benefit of Company, the Initial Purchase Price, *plus* the Estimated NWC Adjustment, *minus* the amounts paid pursuant to (A) and (B) above, by wire transfer of immediately available funds to a bank account designated by Agent;

(ii)    deliver or cause to be delivered to Company a counterpart to the Escrow Agreement, duly executed by Buyer;

(iii)    deliver or cause to be delivered to Company a counterpart to the TSA, duly executed by Buyer;

(iv)    deliver or cause to be delivered to Dominick Caroleo, a counterpart to the Employment Agreement, duly executed by Buyer; and

(v)    deliver or cause to be delivered to the Related Party Landlords, as applicable, a counterpart to each Related Party Lease Agreement, duly executed by Buyer.

(e)    All deliveries made or to be made at Closing shall be deemed to be made simultaneously, and no such delivery shall be deemed made or effective unless all required deliveries have been made or waived in writing by the party entitled thereto.

**1.06    Purchase Price Adjustment**.

(a)    <u>Estimated Closing Statement</u>. Agent (on behalf of Company) has prepared and delivered, or caused to be prepared and delivered, to Buyer a statement (the "***Estimated Closing Statement***") setting forth the Agent's good faith estimate of: (i) the Net Working Capital

as of the close of business on the Closing Date, based on Company's books and records and calculated in accordance with the Accounting Principles (the "***Estimated Net Working Capital***"); and (ii) the estimated NWC Adjustment resulting therefrom (the "***Estimated NWC Adjustment***").

(b)     Within sixty (60) days, subject to extension not to exceed fifteen (15) days with the consent of Agent (not to be unreasonably withheld or conditioned), after the Closing Date, Buyer will cause to be prepared and delivered to Agent a statement setting forth Buyer's good faith calculation of the Net Working Capital as of the Effective Time (the "***Proposed Final Net Working Capital***"). The Proposed Final Net Working Capital shall be binding and conclusive upon the parties unless Agent gives written notice of disagreement to Buyer within thirty (30) days after receipt of the Proposed Final Net Working Capital, specifying in reasonable detail the nature and extent of such disagreement. If Buyer and Agent mutually agree upon the Net Working Capital within twenty (20) days after Buyer's receipt of such notice of disagreement, such agreement shall be binding upon the parties. If Buyer and Agent are unable to resolve any such disagreement(s) within the aforementioned twenty (20) day period, Buyer or Agent may refer the accounting matters remaining in dispute for final determination to such reputable, national independent accounting firm as Buyer and Agent may designate by mutual agreement, or failing such agreement, as may be designated by an arbitral panel convened pursuant to <u>Section 7.11</u> upon demand of Buyer or Agent (the firm so designated, the "***Chosen Firm***"). The Chosen Firm shall only have authority to resolve those accounting matters specifically referred to it for resolution. The Chosen Firm shall apply the other provisions of <u>Section 1.04</u> and this <u>Section 1.06</u> in resolving any dispute pursuant hereto. The parties shall use their reasonable commercial efforts to cause the Chosen Firm to resolve any such disputed accounting matters within thirty (30) days after such referral. The decision of the Chosen Firm as to any accounting matters in dispute shall be in writing and shall be final and binding upon all parties hereto for all purposes. Any disagreements among the parties with respect to any matters of law or the interpretation of this Agreement remain subject to the dispute resolution provisions set forth in <u>Section 7.11</u>, and the Chosen Firm shall have no authority to decide such matters unless specifically agreed by Buyer and Agent at the time, and any dispute as to whether a matter is an accounting matter or a matter of law or interpretation of this Agreement will, unless otherwise agreed by Buyer and Agent at the time, be resolved pursuant to the dispute resolution procedures set forth in <u>Section 7.11</u>. The fees and disbursements of the Chosen Firm shall be shared equally by Buyer, on the one hand, and Company and the Shareholder, on the other.

(c)     For purposes of determining Company's inventories for the calculation of Net Working Capital, as soon as possible following the Closing, Buyer shall conduct or cause to be conducted a physical count of the inventory of Company, which shall be adjusted to reflect transactions intervening after the Effective Time and prior to the time of such physical count, and which shall be net of a 100% reserve against any such inventory that is obsolete, damaged or otherwise not saleable as First Quality Goods in the ordinary course of business in accordance with the standards of the respective manufacturers. Agent shall be entitled to be present during and to observe such physical count.

(d)     If the Net Working Capital, as finally determined pursuant to this <u>Section 1.06</u> exceeds the Estimated Net Working Capital used at Closing, then Buyer shall pay the amount of such excess to Company, and Buyer and Agent shall instruct the Escrow Agent to release the NWC Escrow to Company. If the Net Working Capital, as finally determined pursuant

to this Section 1.06 is less than the Estimated Net Working Capital used at Closing, then Company and the Shareholder shall refund to Buyer an aggregate amount equal to such shortfall, which shall be paid from the NWC Escrow to the extent thereof (and Buyer and Agent shall instruct the Escrow Agent to release such amount to Buyer), with any remaining shortfall to be reimbursed by Company and the Shareholder. To the extent the amount of the NWC Escrow exceeds any shortfall payable to Buyer pursuant to the preceding sentence, Buyer and Agent shall instruct the Escrow Agent to release such excess amount to Company.

(e)    Notwithstanding any other provision hereof, if, pursuant to Section 1.06(a) there is a dispute as to the Net Working Capital, Company and the Shareholder, on the one hand, or Buyer, on the other, shall promptly pay to Buyer or Company, as appropriate, such overall net amounts as are not in dispute, pending final determination of any disputed matters pursuant to Section 1.06(a).

(f)    Any amount payable pursuant to Section 1.06(d) shall be due and payable no later than ten (10) Business Days after the final determination of the corresponding amount by wire transfer of immediately available funds to such account(s) as may be directed by Buyer or the Agent, as the case may, together with an amount calculated like interest thereon from and after the Closing Date to and including the date of payment, at a rate per annum equal to five percent (5%), and calculated daily on the basis of a 365-day year and the actual number of days elapsed, without compounding.

**1.07    Establishment of Escrow**.

(a)    The Escrow Amount will be held by Wells Fargo Bank, National Association (the "***Escrow Agent***") and disbursed pursuant to this Section 1.07 and an escrow agreement in mutually agreeable form to be entered into as of the Closing Date (the "***Escrow Agreement***"). On the Closing Date, Buyer shall deposit with the Escrow Agent the Escrow Amount, which shall be held by Escrow Agent in three (3) segregated accounts in the following initial amounts: (i) Two Million Dollars ($2,000,000) to partially secure Company's and the Shareholder's indemnification obligations pursuant to Article V (the "***Indemnity Escrow***"), (ii) One Million Five Hundred Thousand Dollars ($1,500,000) to partially secure certain Company's and the Shareholder's indemnification obligations pursuant to Article V in respect of certain potential sales and use tax liabilities of Company (the "***SUT Escrow***"), and (iii) Three Hundred Twenty-Five Thousand Dollars ($325,000) to partially secure any eventual adjustment to the Purchase Price pursuant to Section 1.06 (the "***NWC Escrow***"). All fees and expenses of the Escrow Agent will be borne by Buyer (except for any such fees and expenses resulting from a breach of this Agreement or the Escrow Agreement, which such fees and expenses will be borne by the breaching party).

(b)    In accordance with the Escrow Agreement, the Indemnity Escrow shall be held for twelve (12) months, with sixty percent (60%) of the then-remaining balance (net of any then-reserved amounts) to be disbursed to Agent, on behalf and for the benefit of Company, within two (2) Business Days following the six (6) month anniversary of the Closing Date and the remaining balance (net of any then-reserved amounts) to be disbursed to Agent, on behalf and for the benefit of Company, within two (2) Business Days of the first anniversary of the Closing Date. If that certain case styled Julio Avelar, David Gomez and Jose Maldonado v. The Garden Dept.

Corp., and Victor Caroleo (Eastern District of New York; Case No. 2:19-cv-06742) (together with any appeal or derivative proceeding involving any or all of the same parties, or any subsequent case alleging substantially the same facts and involving any or all of the same parties, in each case whether or not including other parties plaintiff) has not been definitively resolved (whether by settlement or a final, non-appealable judgment), and any liability of Company satisfied in full (an "**Avelar Resolution**"), on or before the first anniversary of the Closing Date, then notwithstanding the foregoing, the sum of $175,000 shall be retained in the Indemnity Escrow until the Avelar Resolution.

(c)     One Million Dollars ($1,000,000) of the SUT Escrow, and accrued interest, will be held pursuant to the Escrow Agreement until final resolution of the Notice of Determination of New York Sales and Use Tax for the sales and use tax periods March 1, 2013 through February 28, 2018, which was issued by the New York State Department of Taxation and Finance, and which is currently under appeal (Audit Case ID X566996419) (collectively, the "**Sales and Use Tax Appeal**"). Once a resolution of the Sales and Use Tax Appeal has been reached, the SUT Escrow shall be disbursed to the New York State Department of Taxation and Finance in satisfaction of the amount payable by Company with any remainder being paid to Agent, on behalf and for the benefit of Company.

(d)     Additionally, Five Hundred Thousand Dollars ($500,000) of the SUT Escrow, and accrued interest, will be held pursuant to the Escrow Agreement until the earliest of the following three things happens: (i) there is an agreement between Company and the New York State Department of Taxation and Finance to resolve any audit of New York Sales and Use Tax for the sales and use tax periods March 1, 2018 to December 31, 2019 (the "**Gap Period**"); (ii) the statute of limitations for assessing New York Sales and Use Tax for the Gap Period lapses, plus an additional thirty days passes without any audit activity for the Gap Period by the New York State Department of Taxation and Finance; or (iii) one year passes after the Sales and Use Tax Appeal is resolved, without the New York State Department of Taxation and Finance initiating any audit activity for the Gap Period. In the case of subclause (i) above, the balance of the SUT Escrow will be disbursed to the New York State Department of Taxation and Finance in satisfaction of any amount payable by Company with any remainder being paid to Agent, on behalf and for the benefit of Company. In the case of subclause (ii) above, $250,000 will be released to the Company thirty (30) days after the statute of limitations lapses for the sales and use tax period March 1, 2018 to February 28, 2019, without the New York State Department of Taxation and Finance initiating any audit activity for such period, and the remaining $250,000 will be released to Agent, on behalf and for the benefit of Company, thirty (30) days after the statute of limitations lapses for the sales and use tax period March 1, 2019 to December 31, 2019, without the New York State Department of Taxation and Finance initiating any audit activity for such period. In the case of subclause (iii) above, the balance of the SUT Escrow will be released to Agent, on behalf and for the benefit of Company, in full.

(e)     Neither the establishment of the Indemnity Escrow or the SUT Escrow, nor the disbursement of funds therein shall be construed to limit any rights or remedies of Buyer under this Agreement.

(f)     Buyer and Agent shall issue joint written instructions to disburse the Escrow Amount as and when provided in Section 1.07 or the Escrow Agreement. In all instances, the terms

of the Escrow Agreement will govern the conduct of the Escrow Agent and the treatment of the Escrow Amount.

**ARTICLE II**
**REPRESENTATIONS AND WARRANTIES**
**OF COMPANY AND SHAREHOLDER**

Unless otherwise provided herein, Company and the Shareholder, jointly and severally, represent and warrant to Buyer as follows, as of the date hereof and as of the Closing Date:

**2.01    Organization**. Company is a corporation duly organized, validly existing and in good standing under the laws of New York, and has all requisite power and authority to carry on its business as now conducted by it and to own and operate its assets as now owned and operated by it. Company is only qualified to conduct business in the State of New York and is not required to be qualified to conduct business in any other state. Company has delivered to Buyer true and correct copies of the charter, bylaws, and shareholders' agreement (if any) of Company, as amended to date (the "*Organizational Documents*"), each as currently in effect. The Shareholder identified on the signature pages hereto is the record and beneficial owner of all of the issued and outstanding shares of Company. Company does not have any subsidiaries or otherwise owns any shares, equity or debt securities or other proprietary or ownership interests, directly or indirectly, in any other Person, nor does Company have any Contract to acquire any such shares, securities or proprietary or ownership interests.

**2.02    Authority; Enforceability**. Company has the full right, corporate power and authority, and the Shareholder have the full right, power and legal capacity, in each case to execute and deliver the Transaction Agreements to which they are a party, and to perform each of their respective obligations thereunder. The Shareholder is a resident of the State of New York. The Transaction Agreements constitute the legally binding obligations of Company and the Shareholder, enforceable in accordance with their respective terms, subject to (a) the future effect of any bankruptcy, insolvency or other similar Applicable Law or (b) the discretion of a court in awarding an injunction, specific performance or other equitable remedy.

**2.03    No Conflicts; Consents**. The execution, delivery and performance of the Transaction Agreements by Company and the Shareholder, and the consummation of the transactions contemplated thereby have been duly and validly authorized by all requisite action of Company and the Shareholder, and do not and will not: (a) require the consent, waiver, approval, license or other authorization of or notice to any other Person (including any spousal consent); (b) violate any provision of Applicable Law applicable to Company or the Shareholder; (c) contravene, conflict with, or result in a violation of: (i) any provision of Company's Organizational Documents, (ii) with respect to the Shareholder that is not a natural person, any provision of any governing or constitutive documents of the Shareholder, or (iii) any resolution adopted by the Board of Directors of Company or the Shareholder; or (d) except as set forth on Schedule 2.03, conflict with, result in the termination of any provisions of, constitute a default under, accelerate any obligations arising under, trigger any payment under, result in the creation of any Encumbrance pursuant to, or otherwise adversely affect in any material respect, any Contract to which Company or the Shareholder is a party or by which any of their respective assets are bound, in each such case whether with or without the giving of notice, the passage of time or

10

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA81E890

both. No consent, approval, Permit, Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Company in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

**2.04    Financial Reports; Rebate Provisions, Books & Records**.

(a)    Company has delivered to Buyer the financial statements or models identified on <u>Schedule 2.04(a)</u> (the "***Financial Reports***"). Except as set forth on <u>Schedule 2.04(a)</u>, the Financial Reports (a) are true and correct, (b) have been prepared in accordance with the Accounting Principles, (c) present fairly the financial position and results of operations and cash flows of Company as of the respective dates thereof and for the periods indicated therein, and (d) are consistent with the books and records of Company prepared in the ordinary course of business. Except as set forth on <u>Schedule 2.04(a)</u>, there have been no changes in Company's accounting practices since the Reference Date.

(b)    Except as set forth on <u>Schedule 2.04(b)</u>, Company has no Liabilities other than: (i) as reflected in the Reference Date Balance Sheet, if any; and (ii) Liabilities incurred since the Reference Date in the ordinary course of the Business consistent with past practice.

(c)    <u>Schedule 2.04(c)</u> lists all vendor rebate programs in which Company currently participates and describes the material terms and conditions of each such program, as well as all unpaid amounts accrued in respect of Company's purchases during the current program period through the Closing Date.

(d)    <u>Schedule 2.04(d)</u> lists all customer rebate programs which Company currently offers and describes the material terms and conditions of each such program, as well as all unpaid amounts accrued in respect of each such customer's purchases during the current program period through the Closing Date.

(e)    The books and other accounting records of Company, all of which have been made available to Buyer, are maintained in a manner sufficient to produce financial statements in accordance with the Accounting Principles, and fairly and accurately provide the basis for the financial position and results of operation set forth in the Financial Reports. All of such books and records are in possession of Company at the Real Property and will be put into Buyer's possession at the Closing.

(f)    Company maintains a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with the Accounting Principles and to maintain accountability for assets, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded assets are compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(g)    The documents provided by Company or their representatives to Buyer or its representatives in connection with Buyer's due diligence, are true, correct, and complete copies of the documents they purport to be in all material respects.

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA81F890

**2.05    Legal Actions**.

(a)    Except as set forth in Schedule 2.05(a), there is no (and has not been, at any time in the preceding twelve (12) months, any) Proceeding pending against or filed by, threatened by, or to Company's Knowledge, threatened against, Company or any of its properties or assets or involving any Employee Benefit Plan (or by or against the Shareholder or any Affiliate thereof and relating to Company or any of the Purchased Assets).

(b)    There are no outstanding Orders and no unsatisfied judgments, penalties or awards against or affecting Company or any of the Purchased Assets.

**2.06    Compliance with Applicable Law**.

(a)    Except as set forth in Schedule 2.06(a), Company is, and has at all times been, in all material respects in compliance with all Applicable Laws, Orders, and Permits applicable to it or its Business or the ownership or operation of the Purchased Assets.

(b)    Company has duly obtained all Permits required for Company to conduct its Business or necessary for the ownership, lease, operation or use of its assets, all of which are valid and in full force and effect and are listed on Schedule 2.06(b). Company has delivered copies of all Permits to Buyer.

(c)    Except as set forth in Schedule 2.06(c), within the past three (3) years, Company has not received written notice of any alleged violation, breach or default of any Applicable Laws, Orders or Permits.

(d)    No loss, non-renewal or expiration of, nor any noncompliance with, any Permit necessary to conduct the Business is pending, or to Company's Knowledge, threatened (including as a result of the transactions contemplated hereby), other than the expiration of such Permits in accordance with their terms.

**2.07    Inventory, Personal Property and Title and Condition of Assets**.

(a)    All Inventory included in the Purchased Assets was produced by Company or acquired in bona fide, arms-length transactions entered into in the ordinary course of business. No Inventory is held by Company on consignment, or is otherwise subject to any ownership interest of any third party. Company does not depends on any single vendor for any material portion of the Inventory, nor has Company had any unreasonable difficulty in obtaining any Inventory that is material to ongoing operations of the Business. All Inventories of finished goods included in the Purchased Assets are of a quality and quantity that are merchantable or useable in the ordinary course of the Business. The values at which such Inventory is reflected on the most recent balance sheet contained in the Financial Reports or, in the case of Inventory acquired following the date thereof, on the books and records of Company, reflect the normal inventory valuation policies of Company, which policies are consistently applied by Company and include the writing down of obsolete Inventories and stating Inventories at the lower of cost or market. The Inventories reflected in the Financial Reports fairly reflect the levels of such Inventory maintained during the period indicated therein.

DocuSign Envelope ID: 38A463F4-31DD-4845-A7B9-BE16DA81F890

(b)     Company owns, and at the Closing Buyer shall acquire, all right, title and interest in and to all of the Purchased Assets, free and clear of any and all Encumbrances. Company holds a valid leasehold interest in and to all equipment and other tangible assets of third parties held by Company for, or used by Company in, the Business. Except as set forth in Schedule 2.07(b), all of the tangible Purchased Assets are located at the Real Property.

(c)     Except as otherwise set forth in Schedule 2.07(c), all tangible assets included in the Purchased Assets are in good working order and condition, except for ordinary wear and tear, and are suitable for continued use in the Business as presently conducted or planned to be conducted. No such assets are in need of replacement or material maintenance or repair, except for routine replacement, maintenance and repair, and no such routine replacement, maintenance and repair has been deferred within the past twelve (12) months. Schedule 2.07(c) lists all rolling stock included in the Purchased Assets, including, for titled vehicles, the VIN, year, make and mileage of each such item, and for forklifts, the make and model, and year of manufacture,. All such rolling stock has been maintained in all material respects in accordance with the manufacturer's recommended maintenance schedules.

(d)     Except for employees and other personnel, and as otherwise set forth on Schedule 2.07(d), the Purchased Assets together with the Real Property are all of the properties and assets (tangible and intangible) necessary to conduct the Business as heretofore conducted by Company, and are sufficient for the uninterrupted continuation of the Business (as historically conducted) after the Closing.

**2.08    Real Property**.

(a)     Company neither owns nor has ever owned any real property.

(b)     Each Related Party Landlord has good and marketable fee simple title to the Real Property set forth next to its name on Schedule 2.08(b) (collectively, the "***Real Property***"), to be leased to Buyer pursuant to the Related Party Lease Agreements, free and clear of all Encumbrances, other than Permitted Encumbrances. At the Closing, Buyer will acquire a valid leasehold interest in the Real Property on and pursuant to the terms of the Related Party Lease Agreements. The Real Property constitutes all of the real property used or occupied by Company in the Business.

(c)     Except for the Related Party Lease Agreements and as set forth on Schedule 2.08(c), there are no leases, subleases or agreements for the use, occupancy or possession of all or any portion of the Real Property.

(d)     Neither any Related Party Landlord nor Company has received notice of any material non-recurring Taxes or assessments with respect to the Real Property, nor to the applicable Related Party Landlord's Knowledge or Company's Knowledge, is any thereof threatened by any Governmental Authority. None of the Real Property is or has been during Company's use or occupancy thereof subject to any exemption from ad valorem or property taxes or any reduction thereof based on the nature of the operations conducted thereat.

(e)     (i) No buildings, structures or other improvements have been erected and no structural additions to existing buildings, structures or other improvements have been made on

13

any Real Property since the Reference Date; and (ii) there has been no fire, flood or other casualty to any of the buildings, structural additions or other improvements on any Real Property requiring any repair or restoration that changed the footprint or the height of such buildings, structural additions or other improvements.

(f)      Except as otherwise set forth in <u>Schedule 2.08(f)</u>, none of the operations conducted at or improvements on any Real Property encroach on any adjacent real property or an area subject to any easement held by any other Person, in any respect that may require changes in the conduct of the Business or result in Liability to Company or Buyer as a result of such encroachment, nor do the operations or improvements of any other Person encroach on any Real Property. To the applicable Related Party Landlord's Knowledge or Company's Knowledge, there is no basis for any dispute regarding the location of any boundary line of any Real Property. Company has not breached in any material respect the terms of any easement related to any Real Property, and Company has not received any notice: (i) alleging encroachment or disputing the location of any boundary line of the Real Property; or (ii) from the holder of any easement alleging any encroachment or any other breach of the terms of the easement.

(g)      None of the Real Property is subject to any pending, or to the applicable Related Party Landlord's Knowledge or Company's Knowledge, threatened, condemnation, eminent domain, expropriation or rezoning proceeding. The Real Property and the current use thereof complies in all material respects with all Applicable Laws, including subdivision, municipal, zoning or building codes or ordinances, or applicable restrictive covenants, without reliance on any "grandfather" exception, and neither any Related Party Landlord nor Company has received written notice of any allegation of any such non-compliance, nor to any Related Party Landlord's Knowledge or Company's Knowledge, is any thereof threatened by any Person.

(h)      Company is not indebted to any contractor, laborer, mechanic, materialman, architect, engineer or any other Person for work, labor or services performed or rendered, or for materials supplied or furnished, in connection with any Real Property for which any such Person could claim a Encumbrance against any Real Property or Purchased Assets.

(i)      No portion of the Real Property is located within any Special Flood Hazard Area designated by the U.S. Federal Emergency Management Agency or in any area designated as a flood plain or in a similar designation by any Governmental Authority; nor does any portion of the Real Property meet the definition of "*wetlands*" codified at 40 C.F.R. part 230.3(t), or been similarly designated by any Governmental Authority; and no portion of any Real Property constitutes "*wetlands*" that have been filled, whether or not pursuant to appropriate Permits.

(j)      Except as set forth on <u>Schedule 2.08(j)</u>: (A) the improvements located on or annexed to the Real Property are in good order and repair and are in good and safe condition free from material defects; and (B) all electrical, plumbing, heating and air conditioning (if any) and exterior drainage systems and equipment, in or on the Real Property are in good condition and working order. No such improvements or systems and equipment are in need of replacement or material maintenance or repair, except for routine replacement, maintenance and repair, and no such routine replacement, maintenance and repair has been deferred within the past twelve (12) months.

(k)     None of the Real Property is subject to any use, development or occupancy restrictions (except those imposed by applicable zoning and subdivision laws and regulations), Taxes or utility "*tap-in*" fees (except those generally applicable throughout the tax district in which such Real Property is located), or unrecorded charges or restrictions other than (A) current city, state, municipal and/or county ad valorem taxes and/or assessments not yet due and payable; and (B) easements for the installation or maintenance of public utilities serving only the Real Property, provided that none thereof adversely affects in any material respect the use of the Real Property in the Business.

**2.09    Contracts**.

(a)     Schedule 2.09(a) lists each uncompleted Contract relating to the Business or the Purchased Assets, other than bona fide customer purchase orders issued to and accepted by Company in the ordinary course of the Business for amounts not in excess of $5,000 each. Company has delivered true and correct copies of all such written Contracts (and accurate summaries of the material terms of any unwritten Contracts) as currently in effect.

(b)     All Contracts included in the Purchased Assets: (i) were entered into in the ordinary course of business on commercially reasonable terms, with bona fide third parties in arms-length transactions; (ii) are valid and enforceable in accordance with their terms against Company and to Company's Knowledge against any counterparty; (iii) are in full force and effect; and (iv) except as set forth in Schedule 2.09(b), will continue to be valid and enforceable and in full force and effect on identical terms following the Closing Date. All such Contracts have been fulfilled or performed by Company in accordance with their respective terms in the ordinary course of the Business. Neither Company nor, to the Knowledge of Company, any other party to any such Contract has materially breached, violated or defaulted under or received notice of a material breach, violation or default under, any such Contract, and no circumstances exist, which, with the giving of notice, the passage of time or both, would constitute a material breach, violation or default under any such Contract.

**2.10    Tax Matters**. Company has duly and timely filed all Tax Returns required to be filed under Applicable Law. All Taxes due and payable by Company (whether or not shown on any Tax Return) have been timely paid. No claim has been made in the last six (6) years by a Governmental Authority in a jurisdiction where Company does not file Tax Returns that Company is or may be subject to taxation by that jurisdiction. Except as set forth in Schedule 2.10, all Taxes that Company is or was required by Applicable Law to withhold or collect in the last six (6) years have been duly withheld or collected and, have been or will be paid to the proper Person or, if not yet due, have been appropriately reserved. Company has not entered into any agreements with any federal, state or municipal taxing authority, including any tax abatement or tax credit agreements.

**2.11    Intellectual Property**.

(a)     Schedule 2.11 lists all patents, patent applications, registered trademarks, trade names, service marks, registered copyrights, domain names, URLs, websites and other registered Intellectual Property (or applications to register any Intellectual Property) held by Company. The operation of the Business by Company does not conflict with, infringe upon, misappropriate or otherwise violate any United States Intellectual Property rights of any Person.

DocuSign Envelope ID: 38A463F4-31DD-4845-A7B9-BE16DA81F890

Except as set forth on <u>Schedule 2.11</u>, there are, to the Knowledge of Company, no facts which indicate a likelihood of any infringement or misappropriation by, or conflict with, any Person with respect to any Intellectual Property, including any written demand or request that Company license rights from, or make royalty payments to, any Person. Except as set forth on <u>Schedule 2.11</u>, Company owns the entire right, title and interest in, to and under, or has acquired an express or implied license to use, the Intellectual Property used by it in the Business without payment of any further royalty or similar amount to any third party, except for amounts consistent with those reflected in the Financial Reports. The Intellectual Property included in the Purchased Assets is sufficient for the continued operation of the Business by Buyer as heretofore conducted by Company.

(b)     Company and its Affiliates and representatives and the services they provide (including the software, systems, servers, computers and related equipment used to provide the services) are in compliance with the requirements of any agreement between Company and processors of Payment Card Data and the Payment Card Industry Data Security Standards (including the payment application data security standards) as amended, updated, superseded or replaced from time to time by the PCI Security Standards Counsel (the "***PCI Standards***"), including with respect to the collection, storage, retention, processing, usage, transmission and destruction of Payment Card Data. For purposes of this <u>Section 2.11(b)</u>, "***Payment Card Data***" means any data associated with a payment card or otherwise protected under the PCI Standards, including: (a) "card holder data" which includes (i) primary account number; (ii) cardholder name; (iii) service code; and (iv) expiration date; (b) "sensitive authentication data" which includes (i) magnetic strip data; (ii) CVC2, CVV2, CID; (iii) PIN and PIN Block information; and (iv) any security-related information; and (c) other information used to authenticate cardholders and/or authorize payment card transactions. Company uses, and causes its Affiliates and representatives to use, Payment Card Data only for assisting in completing a card transaction, for fraud control services, or as otherwise specifically permitted in writing by a duly authorized representative of the owner of such Payment Card Data. To the Knowledge of Company, there has been no unauthorized access to, disclosure of or use of Payment Card Data or other personally identifiable information collected, stored, retained, processed, used, transmitted or destroyed by Company or its Affiliates or representatives. Company maintains appropriate business continuity procedures and systems to protect the security of Payment Card Data in the event of a disruption, disaster or failure of Company's primary data systems that involve a risk to Payment Card Data.

(c)     In the last five (5) years, to Company's Knowledge, there have been no unauthorized intrusions or breaches of Company's data or security or any data collected by Company, including Personal Information, nor has there been a written complaint alleging or otherwise relating to an improper use, disclosure or breach of Company's data or security or any data collected by Company, including Personal Information.

(d)     Except as set forth in <u>Schedule 2.11(d)</u>, Company neither uses nor has used any Software for the conduct of the Business, except for such off-the-shelf, third party Software that may be readily obtained by license from third party vendors of such Software on reasonable commercial terms at costs similar to those reflected in the Financial Reports.

**2.12    Employment Matters**.

(a)      Schedule 2.12(a) lists (i) each current employee (including any temporary or leased employee) of Company and 777 Leasing ("**_Employees_**"); (ii) each Employee's statutory employer; (iii) each Employee's title or function and current rate of compensation (including bonus and commission plans); and (iv) each Employee's accrued vacation, sick leave or personal leave if applicable. Schedule 2.12(a) also lists all Employees who are currently absent from work due to a work-related injury, who are receiving workers' compensation, who are receiving disability compensation, or who have been involuntarily separated from employment within the past ninety (90) days.

(b)      Except as set forth in Schedule 2.12(b), there are no unpaid wages, bonuses, commissions or other compensation (other than those not yet due and which have been accrued in the financial books and records of Company) owed to any Employee.

(c)      Schedule 2.12(c) lists the names of each current consultant or independent contractor to Company or 777 Leasing and the capacity in which such Person is currently engaged. There are no disputes currently pending, or to Company's Knowledge threatened, between Company and its consultants or independent contractors.

(d)      All Persons classified by Company and 777 Leasing as independent contractors satisfy the requirements of all Applicable Laws to be so classified, and Company and 777 Leasing have fully and accurately reported their compensation on IRS Forms 1099 when required to do so. Except as set forth in Schedule 2.12(d), neither Company nor 777 has any obligation to provide benefits with respect to any such Persons under any Employee Benefit Plan or otherwise.

(e)      Except as set forth in Schedule 2.12(e), during the last five (5) years, no allegation of sexual harassment or misconduct has been made against any employee, officer or director of Company or 777 Leasing, and neither Company nor 777 Leasing has entered into any settlement agreements related to any allegation of sexual harassment or misconduct by an employee, officer or director of Company or 777 Leasing.

(f)      Except as set forth in Schedule 2.12(f), (i) all Employees are employees at-will, terminable on one-month notice or less without penalty; and (ii) there are no outstanding agreements or arrangements with respect to severance payments to current Employees or former employees of Company or 777 Leasing.

(g)      The records of Company and 777 Leasing for the last three (3) years accurately reflect the employment or service histories of its employees, individual independent contractors, and leased employees, including their hours of service.

(h)      Neither Company nor 777 Leasing (i) is or ever has been a party to, or bound by, any collective bargaining or other similar agreement with a labor organization representing any of its employees, and (ii) is obligated under any agreement or otherwise to recognize or bargain with any labor organization or union on behalf of any employees. Since January 1, 2016, there has not been, nor, to the Knowledge of Company, has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor activity or dispute affecting Company or 777 Leasing.

(i)       Except at set forth in <u>Schedule 2.12(i)</u>, neither Company nor 777 Leasing is a party to any individual employment or retention agreement.

(j)       Each of Company and 777 Leasing is, and has at all times been, in compliance in all material respects with all Applicable Laws pertaining to employment and employment practices, including applicable wage and hour laws, workers' compensation laws, occupational safety laws, worker eligibility laws, unemployment laws and social security laws. Except as set forth in <u>Schedule 2.12(j)</u>, there are no Proceedings against Company or 777 Leasing pending, or to Company's Knowledge, threatened by, with or before any Governmental Authority in connection with the employment of any current or former employee, or the engagement of any consultant, of Company or 777 Leasing, including, without limitation, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay or any other employment related matter arising under Applicable Laws.

**2.13    Employee Benefit Plans**.

(a)       <u>Schedule 2.13(a)</u> lists each Employee Benefit Plan that is currently in effect or was maintained, sponsored or contributed to by Company or 777 Leasing or any ERISA Affiliate at any time within the last six (6) calendar years. None of the Employee Benefit Plans is an employee pension benefit plan that is a "*multiemployer plan*" (within the meaning of Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***")), or that is subject to the provisions of Title IV of ERISA. Each of Company and 777 Leasing has delivered true, correct and complete copies of the following documents with respect to each of the current Employee Benefit Plans maintained, sponsored or contributed to by Company or 777 Leasing: (i) any Employee Benefit Plan and related trust documents, and amendments thereto, and (ii) the most recent Form 5500. Each Employee Benefit Plan has been maintained in compliance in all material respects with the documents and instruments governing such plan.

(b)       Except as otherwise disclosed on <u>Schedule 2.13(b)</u>, each current Employee Benefit Plan that is intended to be tax qualified under Section 401(a) of the Code is so qualified and any trust maintained pursuant thereto is exempt from federal income taxation under Section 501 of the Code, and nothing has occurred or, to the Knowledge of Company, is expected to occur that caused or would reasonably be expected to cause the loss of such qualification or exemption or the imposition of any penalty or Tax Liability.

(c)       The consummation of the transactions contemplated by this Agreement will not give rise to any Liability arising through Company or 777 Leasing for which Buyer or its Affiliates will or may become liable for any employee benefits, including liability for severance pay, unemployment compensation, termination pay or withdrawal liability, or accelerate the time of payment or vesting or increase the amount of compensation or benefits due to any employee of Company or 777 Leasing.

(d)       Neither Company nor any of its Affiliates (including 777 Leasing) has any commitment to any employee or any former employee to provide any post-retirement health or life insurance benefit, other than liability for continued group health plan coverage required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or applicable state law.

### 2.14    Environmental Matters.

(a)    Neither Company nor any Related Party Landlord has: (i) received any written request for information, notice, demand letter, administrative inquiry, or formal or informal complaint or claim with respect to any Environmental Condition (including under the citizen suit provision of any Environmental Law) in the last three (3) years; or (ii) been the subject of or, to the Knowledge of Company, threatened with, any governmental enforcement action or third party claim under any Environmental Law in the last three (3) years, and to the Knowledge of Company, there is no reason to believe that any of the above is reasonably likely to be forthcoming.

(b)    Company has complied and is presently in compliance, in all material respects, with all applicable Environmental Laws pertaining to the Real Property, the Business and any other activities conducted by Company at or from the Real Property or any prior location at which Company has conducted any operations in the last three (3) years.

(c)    Company has not generated, manufactured, refined, transported, treated, stored, handled, disposed, transferred, produced, recycled, or processed any Hazardous Substances at or from any Real Property, except in compliance, in all material respects, with all applicable Environmental Laws, and there has not been any Release or, to the Knowledge of Company, any Threat of Release, of any Hazardous Substances at or in the immediate vicinity of any Real Property in the last three (3) years, except as it may relate to the publicly-known Speonk Solvent Plume affecting property in the vicinity of the Real Property, and for which Company has no Liability.

(d)    Company has not received notice of, nor otherwise has any Knowledge concerning, any Environmental Condition at any off-site location or locations to which Company transported or arranged for the transportation of Hazardous Substances in the last three (3) years.

(e)    Except as set forth on Schedule 2.14(e), there are no, and during the period of time during which Company has used any of the Real Property for the Business, there have never been any, underground storage tanks present at such Real Property.

(f)    To Company's Knowledge, there are no events, conditions, circumstances, activities, practices, incidents, actions, omissions or plans in the past three (3) years or present that (x) could interfere with or prevent continued material compliance with any Environmental Law with respect to the operation of the Business, or (y) may reasonably give rise to any Environmental Liability relating to the Business or that otherwise may form the reasonable basis of any Proceeding relating to the Business or the Real Property: (i) under any Environmental Laws; (ii) based on or related to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling, or the emission, discharge, Release or threatened Release, of any Hazardous Substance; or (iii) resulting from exposure to workplace hazards.

(g)    Except as set forth in Schedule 2.14(g), Company has no reports or tests with respect to compliance of the Real Property with the Environmental Laws or the presence of Hazardous Substances that were: (A) prepared for Company or an Affiliate (including the Related Party Landlords); or (B) are in the possession, custody or control of Company or an Affiliate.

(h)    Company has not at any time produced, manufactured, sold or otherwise placed in commerce any product containing asbestos or asbestos-containing material, and there are no, and there never has been any, asbestos or asbestos-containing materials present on the Real Property.

**2.15    Significant Customers and Vendors**. <u>Schedule 2.15</u> lists the ten (10) largest customers and vendors (measured by dollar amount of revenue or purchases, respectively) of Company and the dollar amount of the revenues and purchases, respectively, attributable to each such customer and vendor for the year ended December 31, 2018 and the ten-month period ended October 31, 2019 (collectively, the "***Material Customers***" and "***Material Vendors***"). Except as set forth on <u>Schedule 2.15</u>: (i) all Material Customers and Material Vendors continue to be customers and vendors of Company, and none of them has materially adversely reduced, modified or changed the terms of, its business with Company from the levels achieved during the year ended December 31, 2018, and to Company's Knowledge, no such reduction, modification or change is expected to occur, (ii) Company is not involved in any material claim, dispute or controversy with any Material Customer or Material Vendor and (iii) Company is not involved in any claim, dispute or controversy with any of its other customers or vendors that, individually or in the aggregate could reasonably be expected to have a Material Adverse Effect on Company or its Business.

**2.16    Certain Changes**. Except as set forth in <u>Schedule 2.16</u>, since the Reference Date, Company have operated the Business solely in the ordinary course consistent with past practices, and has used reasonable commercial efforts to preserve the Business and the Purchased Assets. Without limiting the foregoing, since the Reference Date, there has not been any:

(a)    event or circumstance that, individually or in the aggregate, has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    revaluation or write-down of any of the Purchased Assets other than in the ordinary course of the Business;

(c)    amendment or termination of any Contract included in the Purchased Assets, other than in the ordinary course of business;

(d)    material change in the accounting principles, methods or practices of Company, in the manner Company keeps its books or records, or in its current practices with respect to sales, receivables, inventories, payables or accruals;

(e)    sale or other disposition by Company of any of the assets shown or reflected on the Reference Date Balance Sheet for Company, if any, or that would otherwise have been Purchased Assets hereunder if not previously sold or disposed of, except for sales of inventory and the disposal of obsolete assets in the ordinary course of the Business;

(f)    with respect to any employee, director or agent of Company or 777 Leasing: (i) grant of any severance, continuation or termination pay; (ii) entering into of any employment, deferred compensation or other similar agreement (or any amendment to any such existing agreement); (iii) increase in benefits payable or potentially payable under any severance, continuation or termination pay policies or employment agreements; (iv) increase in compensation, bonus or other benefits outside of the ordinary course of the Business and consistent

with past practices; (v) material change in the terms of any Employee Benefit Plan; or (vi) representation by or on behalf of Company or 777 Leasing to any employee that Company, 777 Leasing or Buyer would continue to maintain or implement any benefit plan or would continue to employ such employee after the Closing Date;

(g)     damage, destruction or loss (whether or not covered by insurance) with respect to any Purchased Asset that resulted in or could reasonably be expected to result in losses, in the aggregate, of more than $25,000.00;

(h)     acquisition by merger or consolidation with, or by purchase of a substantial portion of the assets or stock of, or by any other manner, any business of any Person or any division thereof;

(i)     adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consent to the filing of any bankruptcy petition against Company under any similar Applicable Law;

(j)     except as set forth in Schedule 2.16(j), capital expenditures exceeding (i) $15,000.00 or more individually, or (ii) $50,000.00 or more in aggregate;

(k)     except as set forth in Schedule 2.16(k), commencement or settlement of any Proceeding involving Company or any of its assets; or

(l)     any agreement or commitment to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**2.17     Insurance**. Schedule 2.17 lists all insurance policies of any kind currently in force with respect to Company, the Business or the Purchased Assets (the "***Insurance Policies***"). Such Insurance Policies satisfy in all material respects the requirements of any Contracts to which Company is a party. Company has delivered true, correct and complete copies of any insurance "loss runs" for the past three (3) years. None of the insurers under any such Insurance Policies has rejected the defense or coverage of any claim purported to be covered by such insurer or has reserved the right to reject the defense or coverage of any claim purported to be covered by such insurer, and timely notice has been duly given to all relevant issues by Company of all matters that may reasonably be subject to coverage under such policies. Company has no liability for retrospective premium adjustments under any insurance policy.

**2.18     Warranties**. Each product sold and service provided by Company meets, and at all times has met, in all material respects all standards for quality and workmanship prescribed by Applicable Law, industry standards and any express or implied warranties under which Company may have any Liability. To Company's Knowledge, there is no design, manufacturing or other defect in any product sold by Company. Since the Reference Date, there have not been any product recalls with respect to any products sold by Company and, to Company's Knowledge, there is no fact relating to any products sold by Company (including any installation services performed by Company) that may impose a duty to recall any such products or to warn customers of a defect in any such products.

**2.19    Brokers and Finders**. Except for Protegrity Advisors, no finder or any agent, broker or other Person acting pursuant to authority of Company or the Shareholder is entitled to any commission or finder's fee in connection with the transactions contemplated by this Agreement.

**2.20    Certain Payments**. Neither Company nor any of its shareholders, directors, officers, agents or employees, nor any other Person acting for or on behalf of Company, has directly or indirectly: (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property or services (i) to obtain favorable treatment in securing business, (ii) to pay for favorable treatment for business secured, (iii) to obtain special concessions or for special concessions already obtained, and (iv) in violation of any Applicable Law; or (b) established or maintained any fund or asset that has not been recorded in the books and records of Company maintained in the ordinary course of the Business.  The Company does not transact any business outside the United States of America.

**2.21    Related Party Transactions**.

(a)    Schedule 2.21(a) contains a list or description of all Contracts, transfers of assets or Liabilities or other commitments or transactions since January 1, 2018, to which Company, on the one hand, and the Shareholder or any Related Party of the Shareholder, on the other hand, are parties, except for any Related Party Lease Agreements. Each such Contract, commitment or transaction is on terms and conditions at least as favorable, taken as a whole, to Company, as would have been obtained at the time of execution in a comparable arm's-length transaction with a Person other than a Related Party. Except for the Transaction Agreements, all such Contracts, commitments or transactions shall be, at Buyer's election, terminated without Liability to Buyer at or prior to the Effective Time.

(b)    Except for the Related Party Landlords with respect to the Real Property or as otherwise set forth in Schedule 2.21(b), neither the Shareholder nor any Related Party of the Shareholder, (i) owns, directly or indirectly, any interest in (A) any property or asset used in or held for use by Company, (B) any Person having business dealings with Company, except for business dealings expressly contemplated by the Transaction Agreements to survive the Closing, or (C) any Person that is a supplier, customer or competitor of Company, or (ii) serves as an officer, director or employee of any Person that is a supplier, customer or competitor of Company.

**2.22    Disclosure**. No representation or warranty by Company or the Shareholder in this Agreement or in any Schedule hereto contains any untrue statement of a material fact or omits to state a fact necessary to make such representation or warranty not materially misleading. There are no facts or circumstances known to Company or the Shareholder that have had or could reasonably be expected to have a Material Adverse Effect that have not been disclosed in this Agreement, including the Schedules hereto, except for any such facts or circumstances that a Person participating in the Business would reasonably also know.

**2.23    Disclaimer. EXCEPT AS SET FORTH IN THIS ARTICLE II, NEITHER COMPANY NOR THE SHAREHOLDER MAKES ANY EXPRESS OR IMPLIED WARRANTY OR REPRESENTATION TO BUYER OR ANY THIRD PARTY WITH**

RESPECT TO THIS AGREEMENT, THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, THE BUSINESS OR OTHERWISE.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Company and the Shareholder as follows, as of the date hereof and as of the Closing Date:

**3.01    Organization**. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

**3.02    Authority; Enforceability**. Buyer has the full right, limited liability company power and authority to execute and deliver the Transaction Agreements, and to perform its obligations thereunder. The Transaction Agreements constitute the legally binding obligations of Buyer, enforceable in accordance with their respective terms, subject to (a) the future effect of any bankruptcy, insolvency or other similar Applicable Law or (b) the discretion of a court in awarding an injunction, specific performance or other equitable remedy. All requisite limited liability company action has been taken by Buyer to authorize and approve the execution and delivery of the Transaction Agreements, the performance by Buyer of its duties and obligations thereunder and of all other acts necessary or appropriate for the consummation of the transactions contemplated by the Transaction Agreements.

**3.03    Validity of Contemplated Transactions, Restrictions**. The execution, delivery and performance of this Agreement and the Transaction Agreements by Buyer and the consummation of the transactions contemplated hereby or thereby, will not (i) violate, result in a breach of or conflict with any provision of the certificate of formation or limited liability company agreement of Buyer, or any Applicable Law or Order relating to Buyer, or (ii) violate or result in a default under or require the consent or approval of any party to any material contract, agreement, instrument, lease, license or understanding to which Buyer is a party, or to which any of its properties or assets are subject, which, in any such case could adversely affect Buyer's ability timely to perform its obligations hereunder.

**3.04    Brokers and Finders**. No finder or any agent, broker or other Person acting pursuant to authority of Buyer is entitled to any commission or finder's fee in connection with the transactions contemplated by this Agreement.

**3.05    Litigation**. No action, suit, claim, arbitration, proceeding or investigation is pending or, to the knowledge of Buyer, threatened which questions or challenges the validity of any Transaction Agreement or the transactions contemplated hereby or thereby.

**3.06    No Conflicts**. No consent, authorization, approval, order, license, certificate, or permit of, or declaration or filing with, any federal, state, local, or other governmental authority, any court or other tribunal or any other Person is required by Buyer for the execution, delivery, or performance of any Transaction Agreement or any transaction contemplated hereby or thereby, except for any thereof as has been duly obtained.

**3.07    Disclosure**. No representation or warranty by Buyer in this Agreement or in any Schedule hereto contains any untrue statement of a material fact or omits to state a fact necessary to make such representation or warranty not materially misleading.

## ARTICLE IV
## OTHER AGREEMENTS

**4.01    Confidentiality**.

(a)    From and after Closing, Company and the Shareholder will, and will cause their respective Affiliates to, treat any Confidential Information in confidence and will not use for any purpose or disclose any such Confidential Information to any Person other than Buyer (or a Person designated by Buyer); *provided, however,* that the foregoing shall not apply to information in the public domain as of the Closing Date or that thereafter enters the public domain other than by act or omission of Company or the Shareholder or any of their Affiliates. If Company or the Shareholder is required to disclose any Confidential Information pursuant to Applicable Law, Company or Shareholder shall promptly give Buyer notice of any request or demand for disclosure of such Confidential Information upon receipt along with a copy of any written correspondence, pleading or other communication received by Company or the Shareholder concerning the request or demand, so that Buyer can seek an appropriate protective order and shall provide reasonable cooperation to Buyer in seeking such order. The restrictions in this <u>Section 4.01</u> shall survive Closing and shall continue indefinitely; *provided, however*, that such restrictions shall terminate on the fifth (5th) anniversary of Closing with respect to any Confidential Information that does not constitute a trade secret under Applicable Law.

(b)    For purposes of this Agreement, "***Confidential Information***" shall mean any and all technical, business and other information of or relating to the Business or the Purchased Assets that derives value, actual, potential, economic or otherwise, from not being generally known to other Persons, whether or not constituting a trade secret, including technical or non-technical data, compositions, devices, methods, techniques, drawings, inventions, know-how, processes, financial data, financial plans, audit plans, lists of actual potential customers or suppliers, information regarding acquisition and investment plans and strategies, business plans or operations. Confidential Information includes any such information of third parties that Company is obligated to or does keep or treat as confidential.

(c)    From and after Closing, Buyer will, and will cause its Affiliates to, hold pre-Closing information related to customers of the Business in confidence and will use and disclose such information solely as reasonably necessary in connection with Buyer's conduct of the Business.  If Buyer is required to disclose any such information pursuant to Applicable Law, Buyer shall promptly give the Agent notice of any request or demand for disclosure of such information upon receipt along with a copy of any written correspondence, pleading or other communication received by Buyer concerning the request or demand, so that the Agent can seek an appropriate protective order and shall provide reasonable cooperation to the Agent in seeking such order. The restrictions in this <u>Section 4.01</u> shall survive Closing and shall continue indefinitely; *provided, however*, that such restrictions shall terminate on the fifth (5th) anniversary of Closing with respect to such information that does not constitute a trade secret under Applicable Law.

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA01F890

(d)     Promptly after Closing, Buyer will destroy or return to Shareholder the specific financial model spreadsheet prepared by Shareholder and Protegrity and posted to the virtual data room; nothing here shall be construed to require Buyer to delete any automatic backup or archival copies created by Buyer's information technology systems in the ordinary course of business, provided that such backup files are accessible only by Buyer's information technology personnel and will be maintained in strict confidence and not used for any purpose or disclosed to any third party except as required by Applicable Law and otherwise in compliance with the second sentence of Section 4.01(c) above.  Upon the request of Shareholder, Buyer will promptly certify in writing that it has complied with its obligations pursuant to this Agreement.

**4.02    Covenant Not to Compete**.

(a)     Except as provided in Section 4.02(b), Company and the Shareholder agree that, from Closing and through the fifth (5th) anniversary of the Closing Date, none of them will, directly or indirectly, for any reason, for its or their own account or on behalf of or together with any Person, other than Buyer or its Affiliates:

(i)     engage in, own, control, manage, or participate in the ownership, control or management of, or render services or advice to, or lend its or his name to, any business engaged, or undertaking to become engaged, in whole or in part, in the sale or distribution of nursery or landscape products, including annuals, perennials, bulbs, gloves, rain gear, shoes, aquatic supplies, chemicals, fertilizers, mulch, sand, soil, stone, snow shovels, hoses, hose reels, anchor kits, rakes, trowels, wheelbarrows, spreaders or ball carts (each a "***Product***"), within or into a 75-mile radius of Company's existing locations in Coram, Speonk and Dix Hills, New York (the "***Territory***");

(ii)     solicit or assist in the solicitation of, any Person to which Company sold or provided or solicited to sell or provide any Product during the two-year period ending on the Closing Date, for the purpose of soliciting or selling any Product that is identical to or a reasonable substitute for any Product sold by the Business during the two-year period ending on the Closing Date;

(iii)     solicit or assist in the solicitation of, any Person employed or engaged by Buyer in the Business in any capacity (as an employee, independent contractor or otherwise) during the two year period ending on the Closing Date to terminate his or her employment or other engagement, whether or not such employment or engagement is pursuant to a Contract and whether or not such employment or engagement is at will; or

(iv)     knowingly or intentionally damage or destroy in any material respect the goodwill of the Business with suppliers, employees, patrons, and customers of the Business.

(b)     Notwithstanding anything herein to the contrary, it shall not be a breach of Section 4.02(a)(i) for Company and the Shareholder to own, in the aggregate, directly or indirectly, not more than two percent (2%) of any class of publicly traded securities of any Person engaged in any of the activities described in Section 4.02(a)(i), so long as such securities are held as a passive investment.

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA81E890

(c)     Although the parties have, in good faith, used their best efforts to make the provisions of Sections 4.01 and 4.02 reasonable in terms of geographic area, duration and scope of restricted activities in light of the nature of the Business, and it is not anticipated, nor is it intended, by any party hereto that a court of competent jurisdiction or arbitral tribunal would find it necessary to reform the provisions hereof to make them reasonable in terms of geographic area, duration or otherwise, the parties understand and agree that if a court of competent jurisdiction or related tribunal determines it necessary to reform the scope of Sections 4.01 and 4.02 or any part thereof in order to make it binding and enforceable, such provision shall be considered divisible in all respects and such lesser scope as any such court shall determine to be reasonable shall be effective, binding and enforceable.

(d)     The parties recognize and agree that in the event of a breach or threatened breach of Section 4.01(a) or 4.02(a) money damages would not be an adequate remedy to Buyer and its Affiliates for such breach and, even if money damages were adequate, it would be difficult to ascertain or measure with any degree of accuracy the damages sustained by Buyer or any of its Affiliates therefrom. Accordingly, if there should be a breach or threatened breach of the provisions of Section 4.01(a) or 4.02(a) Buyer and its Affiliates shall be entitled to an injunction enjoining any such breach, without any requirement to post a bond or other security. Nothing in the preceding sentence shall limit or otherwise affect any remedies that Buyer or its Affiliates may otherwise have under Applicable Law.

(e)     All of the covenants in Sections 4.01(a) and 4.02(a) are intended by each party hereto to be, and shall be construed as, agreements independent of any other provision in this Agreement, and the existence of any claim or cause of action of Company or the Shareholder against Buyer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Buyer of any covenant in Section 4.01(a) or 4.02(a).

**4.03    Employment Matters**. Company shall, and the Shareholder shall cause Company and 777 Leasing to, pay or cause to be paid to all employees of Company and 777 Leasing in full in respect of any periods through and including the Closing Date, including all wages or salary, commissions, bonuses, vacation or paid time off, sick leave or other paid time off and other benefits (including employer 401(k) contributions for active employees of Company or 777 Leasing for such employees through the Closing Date, including discretionary contributions consistent with past practices) (collectively, "***Employee Expenses***") in each case, that are accrued or attributable to periods prior to and through the Closing Date, whether or not then due and payable. For purposes of the foregoing, bonuses will be based on the target bonus amount for the fiscal year ending December 31, 2019, as set forth on Schedule 4.03, and employer 401(k) contributions will be calculated on a basis consistent with contributions during the twelve months prior to Closing, in each case, prorated on a daily basis to reflect the portion of such fiscal year ending on and including the Closing Date.

**4.04    Allocation of Purchase Price**. The parties agree that the purchase price and the Assumed Obligations of Company (plus any other relevant items) will be allocated among the Purchased Assets for tax purposes in a manner consistent with Section 1060 of the Code and the regulations promulgated thereunder, based upon the fair market values of such assets. Within 30 days following the final determination of the Net Working Capital, Buyer will prepare (or cause to be prepared) and deliver to the Agent a schedule allocating the Purchase Price (and all other

amounts treated as consideration for federal income Tax purposes) among the Purchased Assets (the "**_Allocation Schedule_**") in form and substance consistent with Exhibit 4 hereto. The Allocation Schedule shall be deemed to be accepted by, and shall be conclusive and binding on, the Agent except to the extent that the Agent shall deliver within thirty (30) days a written notice to Buyer setting forth in reasonable detail any objections and the basis therefor. Buyer and the Agent shall use commercially reasonable efforts to resolve any items in dispute within fifteen (15) days following the Agent's delivery of its objections. For the avoidance of doubt, if any such objection remains disputed after such period, then the parties shall each be entitled to adopt their own positions regarding the allocation of the Purchase Price (and all other amounts treated as consideration for federal income Tax purposes) among the Purchased Assets for applicable Tax purposes, provided such positions are consistent in substance with Exhibit 4 hereto. If the Agent and Buyer agree on the Allocation Schedule (or such is deemed accepted), the parties shall cause IRS Form 8594 and all Tax Returns to be prepared and filed in accordance with the Allocation Schedule, and shall not take any position in any Tax Return or Proceeding that is inconsistent with the Allocation Schedule unless otherwise required to do so by applicable law or a "determination" within the meaning of Section 1313(a)(1) of the Code.

**4.05    Access to Records**.

(a)    After the Closing Date, Company and Shareholder will provide Buyer and its employees, agents, consultants and other advisors and representatives reasonable access to any records constituting Excluded Assets and remaining in Company's or Shareholder's possession that are or that relate to the Purchased Assets, during normal business hours, for any reasonable business purpose specified by Buyer in such notice. For a period of seven (7) years after Closing, Company and Shareholder agree to give Buyer reasonable notice prior to transferring, discarding or destroying any such records. After the Closing Date, Company may, in its discretion, store such records at a place of business of Buyer located in Coram, Dix Hills or Speonk, New York for so long as Shareholder remains an employee of Buyer and Buyer remains a tenant at such location(s), provided that Buyer shall not have any liability arising out of any destruction or damage to such records cause by casualty, acts of God or similar events.

(b)    After the Closing Date, Buyer will provide Company and its employees, agents, consultants and other advisors and representatives reasonable access to any records constituting Purchased Assets and in Buyer's possession that are or that relate to the Excluded Assets, during normal business hours, for any reasonable business purpose specified by Company in such notice. Buyer agrees to maintain any such records in accordance with its records retention policy, as may be amended from time to time.

**4.06    Proration**. Notwithstanding anything herein to the contrary and without duplication of amounts reflected in the Net Working Capital at Closing, any ad valorem Taxes imposed on the Purchased Assets and other periodic expense items such as utilities and similar expenses with respect to the Business or Purchased Assets that relate to a period beginning before the Closing Date and ending after the Closing Date shall be apportioned as of Closing such that Company shall be liable for (and shall reimburse Buyer to the extent that Buyer shall pay) that portion of such ad valorem Taxes and other expense items relating to, or arising in respect of, periods through the Closing Date and Buyer shall be liable for (and shall reimburse Company to the extent Company shall have paid) that portion of such ad valorem Taxes and other expense

items relating to, or arising in respect to, periods after the Closing Date. All amounts to be prorated will, to the extent reasonably feasible, be taken into account on the Settlement Statement. To the extent the amounts of any such proratable items are not finally known at the Closing, appropriate settlement will be made within thirty (30) days after the amount of any such item is finally known.

**4.07     Accounts Receivable**. Upon demand, Company and the Shareholder will jointly and severally reimburse Buyer for the amount of any Receivables taken into account in the calculation of the final Net Working Capital pursuant to <u>Section 1.06</u> to the extent not collected by Buyer within one hundred eighty (180) days after the Closing Date, so long as Buyer exercises reasonable commercial efforts to collect such Receivables consistent with Buyer's efforts to collect its own accounts receivable in the ordinary course; provided, however, that upon receiving any such reimbursement, Buyer shall promptly (a) reassign to Company (or as otherwise designated by Company) all Receivables to which such reimbursement relates on a quitclaim basis and (b) upon the request of Company, execute and deliver such further documents as may be reasonably necessary to effect such reassignment. Company hereby grants to Buyer the power, right and authority, coupled with an interest, to receive, endorse, cash, deposit, and otherwise deal with, in the name of Company, any checks, drafts, documents and instruments evidencing payment of any notes, accounts receivable or other payment rights included in the Purchased Assets and that are payable to, payable to the order of, or endorsed in favor of Company or any agent thereof. Each of Company and Buyer agrees promptly to endorse and pay over or cause to be endorsed and paid over to the other, without deduction or offset, the full amount of any payment received by it after the Closing in respect of Receivables belonging to the other pursuant to this Section or, in the case of Company, other payment rights included in the Purchased Assets, and shall hold any such amount in trust for the other pending such payment.

**4.08     Further Assurances**. From time to time after Closing, each party will execute and deliver such other documents, certificates, agreements and other writings and take such other actions as may reasonably be necessary or requested by any other party in order to consummate, evidence or implement expeditiously the transactions contemplated by this Agreement.

**4.09     Public Announcements**. The parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except as may be required by Applicable Law or securities exchange rules, will not issue any such public statement without the prior written consent of the other parties; *provided that*, for the avoidance of doubt, following Closing, routine notifications by Buyer to third parties having dealings with the Business will not constitute public statements for purposes of this <u>Section 4.09</u>.

**4.10     Transition Cooperation; Mail Received After Closing**.

(a)     Company and Shareholder agree to cooperate with Buyer to facilitate the transfer of all utilities servicing the Business at any Real Property into Buyer's name, including the transfer of any telephone numbers, electrical service, water and sewage.

(b)     Following the Closing, Buyer may receive and open all mail received at the Real Property (unless clearly labeled as personal) and, to the extent that such mail and the contents thereof relate to the Business, the Purchased Assets or the Assumed Obligations, deal with the

contents thereof at its discretion. Company and the Shareholder shall promptly forward or cause to be forwarded to Buyer any mail received by any of them that relates to the Business, the Purchased Assets or the Assumed Obligations. Buyer shall promptly forward or cause to be forwarded to the Shareholder any mail received by Buyer that is clearly personal in nature. Buyer shall not have any liability hereunder for any inadvertent opening of personal mail received at the Real Property.

(c)        Within ten (10) Business Days following the expiration of the TSA, each of Company and the Shareholder will take all action reasonably necessary to change the company or other business name of Company and The Garden Dept. West Corp., a New York corporation, to delete the words "Garden Dept.", or any derivative thereof, as applicable, and to facilitate the transfer to Buyer and/or withdrawal of Company's corporate, assumed or fictitious names. As promptly as reasonably practicable following the Closing, and in any event not later than thirty (30) days following the expiration of the TSA, Company and the Shareholder will take all action reasonably necessary to change Company's registered office addresses and principal place of business to a location other than the Real Property, and to file appropriate notices of such changes with any applicable Governmental Authorities.

(d)        Promptly following the Closing, Company and Agent will take all action reasonably requested by Buyer or any registrar to transfer ownership and full control of the domain names included in the Purchased Assets (including www.gardendept.com) to Buyer. Company and Agent will from time to time, and without cost to Buyer, cooperate promptly in facilitating the transfer to Buyer of the domain names with such registrar(s) and will follow the rules designated by such registrar(s) to effect such transfer, including promptly responding to any communications from such registrar(s) confirming the transfer of the domain names to Buyer's ownership and administrative control.  Notwithstanding the transfer of the aforementioned domain, Buyer agrees to leave Shareholder's existing email account (doncaroleo@gardendept.com) active following the Closing for the lesser of three years or Shareholder's separation from employment with Buyer or any of its Affiliates.  Shareholder's use of such email account will be subject to Buyer's generally applicable, published policies on email and IT systems usage, as in effect from time to time.  For the avoidance of doubt, consistent with Section 4.10(b), the content of any emails received at such address and relating to the Business, the Purchased Assets or the Assumed Obligations, will be deemed to be the property of Buyer, and will be subject to any confidentiality obligations owed by Shareholder (in any capacity) to Buyer, whereas the content of any emails that are clearly personal in nature will be deemed to be the property of Shareholder.  Shareholder will use his reasonable efforts to transition all non-personal emails to his new "siteone.com" email address as soon as reasonably practicable.

(e)        Notwithstanding anything to the contrary contained in this Agreement, the parties agree that prior to delivery of an endorsed certificate of title by Company to Buyer and re-registration of the corresponding motor vehicle in Buyer's name, that the vehicles shall be deemed leased (without additional consideration) by Buyer from Company without recourse against Company and at Buyer's sole risk, and that the Buyer will indemnify Company against any claims made or damages incurred (other than damages to the vehicles themselves) (including reasonable attorney fees and costs) relating to the operation or use of said vehicles by Buyer, and that Buyer will insure said vehicles and their operation for reasonable amounts consistent with insurance covering other vehicles operated by Buyer. In furtherance of the foregoing Buyer and

Company shall enter into transitional motor vehicle lease agreements in respect of such motor vehicles, pending delivery of an endorsed certificate of title by Company to Buyer and re-registration in Buyer's name. Nothing in the motor vehicle lease agreements shall be construed to alter, amend, modify, invalidate, impair, or supersede the terms and conditions of this Agreement, which shall in all events control as between Buyer and Company. In any event, Buyer will remove and turn in Company's plates from such motor vehicles on or before the earlier of (i) the scheduled expiration date or (ii) the date required by any Applicable Law, and Buyer shall promptly take all steps necessary to obtain endorsed certificates of title by Company to Buyer and the re-registrations in Buyer's name of such motor vehicles, with all Taxes and other costs and expenses incurred in connection with transferring such motor vehicles to Buyer to be paid by Buyer. Notwithstanding the foregoing, Company shall, promptly after Closing, renew the registration for each motor vehicle for which (a) the certificate of title is subject to an Encumbrance as of the date hereof and (b) the registration expires on or before April 1, 2020; provided that, the costs of such renewals shall be prorated, as between Company and Buyer pursuant to Section 4.06.

    **4.11**    **Consents; Failure to Obtain Consents**. Notwithstanding anything to the contrary set forth herein, this Agreement shall not constitute an assignment or attempt to assign or transfer any interest in any Contract or Permit otherwise included in the Purchased Assets, or any claim, right or benefit arising thereunder or resulting therefrom, if such assignment or transfer is without the consent of a third party and would constitute a breach or violation thereof or adversely affect the rights of Buyer, the Purchased Assets or the Business. Following the Closing, until all such consents are obtained, Company and the Shareholder shall cooperate in any arrangement reasonably satisfactory to Buyer designed to fulfill Company's obligations thereunder and to afford Buyer the continued full benefits thereof. In the event any equipment lease shall be subject to this provision, Company shall maintain any required insurance in respect of the covered equipment and shall timely make any payments under the applicable lease, provided that Buyer shall, so long as Buyer continues to have access to the relevant equipment for use in the Business, reimburse Company for any scheduled lease payments or insurance payments in respect of such equipment. Upon the expiration of any such lease, at Buyer's election, Company agrees to exercise any available purchase option for the benefit of Buyer (and at Buyer's expense). If Buyer notifies Company that it does not intend to exercise any such purchase option, than Company may exercise such option for its own account or may surrender the relevant equipment in accordance with the terms of the applicable lease.

    **4.12**    **[Intentionally Omitted]**.

    **4.13**    **Operation of the Company's Business**. Except as otherwise permitted or required by this Agreement, between the date of this Agreement and the Closing Date, without the express written consent of Buyer, Company and Shareholder shall conduct the business and operations of Company only in the usual and ordinary course of business in accordance with past custom and practice. Without limiting the generality of the foregoing, except as otherwise permitted or required by this Agreement, between the date of this Agreement and the Closing, without the express written consent (which may be by email) of Buyer, Company shall not, and Shareholder shall not permit Company to, take any action which would constitute a breach of Section 2.16 if taken between the Reference Date and the date of this Agreement.

**4.14    Access and Investigation**. Between the date of this Agreement and the Closing Date, and upon reasonable advance notice received from Buyer, Company and Shareholder shall (a) afford Buyer and its representatives reasonable access, during regular business hours, to Company's properties, contracts, books and records and other documents and data in the possession of Company, such rights of access to be exercised in a manner that does not unreasonably interfere with the operations of the Business; (b) furnish Buyer with copies of all such documents and data as Buyer may reasonably request in the data room established by the parties for the purpose of enabling Buyer to conduct due diligence; (c) furnish Buyer in the same manner with such additional financial, operating and other relevant data and information in the possession of Company as Buyer may reasonably request; and (d) to the extent reasonably requested by Buyer, cause its directors and officers (not including employees) to discuss with Buyer the affairs, finances and accounts of the Company.

**ARTICLE V**
**INDEMNIFICATION**

**5.01    Agreement to Indemnify**.

(a)    Subject to the limitations set forth in this <u>Article V</u>, Company and the Shareholder (collectively "***Seller Indemnitors***"; each, a "***Seller Indemnitor***") shall, jointly and severally, indemnify, defend and hold harmless Buyer and its Affiliates and their respective officers, directors, employees, representatives and agents (collectively "***Buyer Indemnitees***"; each, a "***Buyer Indemnitee***") in respect of any and all Losses incurred by any Buyer Indemnitee arising out of or as a result of any: (i) inaccuracy or misrepresentation in or breach of any representation or warranty made by Company or the Shareholder in this Agreement; (ii) breach of any covenant or agreement made by Company or the Shareholder in this Agreement; (iii) Excluded Liabilities; and (iv) costs and expenses of any Buyer Indemnitees (including reasonable attorneys' fees and amounts paid in settlement) reasonably incurred in connection with any Proceedings arising out of any of the foregoing or incurred in enforcing this indemnification.

(b)    Subject to the limitations set forth in this <u>Article V</u>, Buyer shall indemnify, defend and hold harmless Company and the Shareholder, jointly and severally, and their respective Affiliates and respective officers, directors, employees, representatives and agents (collectively "***Seller Indemnitees***"; each, a "***Seller Indemnitee***") in respect of any and all Losses incurred by any Seller Indemnitee arising out of or as a result of any: (i) inaccuracy or misrepresentation in or breach of any representation or warranty made by Buyer in this Agreement; (ii) breach of any covenant or agreement made by Buyer in this Agreement; (iii) Assumed Obligations; and (iv) costs and expenses of any Seller Indemnitee (including reasonable attorneys' fees and amounts paid in settlement) reasonably incurred in connection with any Proceedings arising out of any of the foregoing or incurred in enforcing this indemnification.

(c)    Upon learning that any third party may assert a claim against a Buyer Indemnitee or a Seller Indemnitee, as applicable, (an "***Indemnitee***") with respect to any matter for which an Indemnitee intends to seek indemnification against any Seller Indemnitor or Buyer, as applicable, ("***Indemnitor***") under this <u>Article V</u>, then such Indemnitee will immediately notify Agent, on behalf of the Seller Indemnitors, or Buyer, as applicable, within thirty (30) days thereafter, such notice to state the nature and basis of any claim made by the third party; *provided*

*that,* no delay on the part of an Indemnitee in notifying Agent or Buyer, as applicable, will relieve any Indemnitor from any obligation hereunder unless, and then solely to the extent that, such Indemnitor is actually prejudiced thereby. In the event Agent or Buyer, as applicable, notifies the Indemnitee within thirty (30) days after the date such Indemnitee has given notice of the matter that the Indemnitor will indemnify such Indemnitee in respect of such matter, then Agent or Buyer, as applicable, may, by notice to the Indemnitee within such 30-day period, assume the defense of such matter on behalf of such Indemnitee at Indemnitor's sole risk and expense. If Agent, on behalf of the Seller Indemnitors, or Buyer, as applicable assumes the defense of such matter, (i) Buyer or Agent, as applicable, will defend such Indemnitee against the matter with counsel of its choice reasonably satisfactory to the Indemnitee, (ii) the Indemnitee may retain separate counsel at its sole cost and expense, and (iii) no Indemnitor will consent to the entry of a judgment or consent order with respect to the matter, or enter into any settlement, in each case which either (A) grants the plaintiff or claimant any form of relief other than monetary damages which will be satisfied in full by the Indemnitor or (B) fails to include a provision whereby the plaintiff or claimant in the matter releases each Indemnitee from all liability with respect thereto, in either such case without the written consent of Agent, on behalf of the Seller Indemnitees, or Buyer, as applicable. If Agent, on behalf of the Seller Indemnitors, or Buyer does not assume the defense of such matter, (i) the Indemnitee may defend against and settle the matter in any manner it reasonably may deem appropriate, and with counsel of its choice, and without prejudice to its indemnification rights hereunder, and (ii) such Indemnitor may retain separate counsel at its sole cost and expense. Notwithstanding anything to the contrary in the foregoing, if defendants in any action include any Indemnitee and any Indemnitor, and any Indemnitee shall have been advised by its counsel that there may be material legal defenses available to such Indemnitee inconsistent with those available to any Indemnitor, or if a conflict of interest exists between any Indemnitee and any Indemnitor with respect to such claim or the defense thereof, then in any such case, the Indemnitee shall have the right to re-assume such defense through its own counsel, and in such event (or in the event that Agent or Buyer, as applicable, does not timely assume or diligently pursue the defense of such matter as provided above) the reasonable fees and expenses of such Indemnitee's counsel shall be borne by the Indemnitors and shall be paid by them from time to time within thirty (30) days of receipt of appropriate invoices therefor.

(d)     In the event that an Indemnitee notifies Agent, on behalf of the Seller Indemnitors, or Buyer, as applicable, of any claim for indemnification hereunder that does not involve a third party claim, an Indemnitor shall, within thirty (30) days after the date of such notice, pay to each Indemnitee the amount of Losses payable pursuant to this Section 5.01 and shall thereafter pay any other Losses payable pursuant to this Section 5.01 and arising out of the same matter on demand, unless an Indemnitor disputes in writing Indemnitor's liability for, or the amount of, any such Losses within such 30-day period, in which case such payment shall be made as provided above in respect of any matters or amounts not so disputed and any Losses in respect of the matters so disputed shall be paid within five (5) Business Days after any determination (by agreement of Indemnitee and Indemnitor, or pursuant to arbitration in accordance with Section 7.11), that an Indemnitor is liable therefor pursuant to this Section 5.01.

(e)     In connection with any payment of Losses pursuant to this Section 5.01, an Indemnitor shall pay to each Indemnitee an amount calculated like interest on the amount of such Losses at the Reference Rate from the date of the Loss until each Indemnitee shall have been indemnified in respect thereof.

(f)       Any provision of this Agreement to the contrary notwithstanding, neither Company nor the Shareholder, on the one hand, nor Buyer, on the other hand, shall have any obligation to indemnify the other party (or parties, in the case of Company and the Shareholder) pursuant to this Agreement for (i) any punitive or other similar damages incurred by such other party or (ii) in respect of any breach of any representation or warranty pursuant to Section 5.01(a)(i) or Section 5.01(b)(i), respectively, any amount, in the aggregate, in excess of $10,000,000; *provided* that this subclause (ii) will not apply to claims for fraud or for breach of a representation or warranty listed in Section 5.02(b).

(g)       All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the purchase price of Company for Tax purposes, unless otherwise required by Applicable Law.

**5.02      Survival of Representations, Warranties and Covenants**.

(a)       Except as otherwise provided in this Section 5.02, all representations and warranties contained herein and the right to assert claims in respect of any breach thereof (whether by way of indemnification or otherwise) shall survive the Closing and any investigation heretofore or hereafter conducted by or on behalf of the party entitled to benefit thereof, and shall expire on the date eighteen (18) months after the Closing Date.

(b)       Notwithstanding Section 5.02(a) above, the representations and warranties made in Section 2.14 (Environmental Matters) and the right to assert claims in respect of any breach thereof (whether by way of indemnification or otherwise) shall survive the Closing and shall expire on the sixth (6th) anniversary of the Closing Date; and the representations and warranties made in Sections 2.01 (Organization), 2.02 (Authority; Enforceability), 2.07(b) (Title to Assets), 2.08(b) (Title to Real Property), 2.10 (Tax Matters) or otherwise relating to Tax matters, 2.12(j) (Employment Law Compliance), and 2.13 (Employee Benefit Plans), and any claims for intentional misrepresentation or fraud, and the right to assert claims in respect thereof (whether by way of indemnification or otherwise), shall survive the Closing for the longest period allowed by law.

(c)       Notwithstanding anything to the contrary herein, the survival period in respect of any alleged or actual inaccuracy or misrepresentation in or breach of representation or warranty, or any related claim, shall be extended automatically to include any time period necessary to resolve a claim for indemnification that was made by the giving of notice as provided in Section 7.02 but not resolved before expiration of such survival period. Liability for any such item shall continue (including as to any Losses incurred or accruing after such survival period would otherwise have expired) until such claim shall have been finally settled, decided or adjudicated, and the parties waive any defense based on any statute of limitations or repose with respect to any such matter.  Under no circumstances shall the fact that Losses are still being or may in the future be incurred be a basis for postponing or delaying satisfaction of any Indemnitee's right to be indemnified in respect of indemnifiable Losses that have already been incurred. Notwithstanding anything to the contrary herein, all covenants, agreements and obligations contained herein that by their terms are to be performed after Closing shall survive Closing and not expire unless otherwise specifically provided in this Agreement. Each Indemnitor agrees that its liability under Section 5.01 is direct and primary, and shall be absolute, unconditional and

33

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA81F890

irrevocable irrespective of any failure, omission, delay or lack on the part of any Indemnitee to exercise any right or remedy against any other Indemnitor(s) under this Agreement, or any release or discharge by operation of law, agreement or otherwise, of any other Indemnitor(s) with which or with whom such Indemnitor is jointly and severally liable from any obligations under this Agreement.

**5.03    Limits on Indemnification**. No claim related to a breach of a representation or warranty shall be made by an Indemnitee for indemnity pursuant to Section 5.01(a) unless and until the aggregate amount of Losses suffered or incurred by the Indemnitees, in the aggregate, in connection with all such breaches of representations and warranties exceed $225,000 in the aggregate (the "*Basket Amount*"), at which point the Indemnitees shall be entitled to indemnification for the full amount of Losses so incurred, not including the Basket Amount, provided that the Basket Amount shall not apply to breaches of the representations and warranties identified in Section 5.02(b) or to claims for intentional misrepresentation or fraud.

**ARTICLE VI**
**CONDITIONS TO CLOSING; TERMINATION**

**6.01    Conditions to Buyer's Obligations**. The obligation of Buyer to consummate the transactions contemplated hereby is subject to the satisfaction or written waiver of the following conditions on or before the Closing Date:

(a)    Each of the representations and warranties set forth in Article II hereof shall be true and correct in all material respects as of the Closing as though such representations and warranties were made on and as of the Closing, except for those representations and warranties that address matters only as of a particular date, which representations and warranties shall be true and correct only as of such date.

(b)    Each of Company and Shareholder shall have performed and complied with, in all material respects, all the covenants and obligations required to be performed or to be complied with pursuant to this Agreement at or prior to the Closing.

(c)    No Proceeding before any Governmental Authority shall be pending or threatened wherein an unfavorable Order would prevent the carrying out of this Agreement or the transactions contemplated herein (and no such Order shall be in effect).

(d)    On or prior to the Closing Date, Company and Shareholder shall have delivered to the Buyer each of the items set forth in Section 1.05(c).

**6.02    Conditions to Company's Obligations**. The obligation of Company and Shareholder to consummate the transactions contemplated hereby is subject to the satisfaction or written waiver by Agent of the following conditions on or before the Closing Date:

(a)    Each of the representations and warranties set forth in Article III hereof shall be true and correct in all material respects as of the Closing as though such representations and warranties were made on and as of the Closing, except for those representations and warranties that address matters only as of a particular date, which representations and warranties shall be true and correct only as of such date.

34

(b)     Buyer shall have performed and complied with, in all respects, all the covenants and obligations required to be performed or to be complied with pursuant to this Agreement at or prior to the Closing.

(c)     No Proceeding before any Governmental Authority shall be pending or threatened wherein an unfavorable Order would prevent the carrying out of this Agreement or the transactions contemplated hereby (and no such Order shall be in effect).

(d)     On or prior to the Closing Date, Buyer shall have delivered to Company each of the items set forth in Section 1.05(d).

**6.03     Termination Events**. By notice given prior to or at the Closing, subject to Section 6.04, this Agreement may be terminated as follows:

(a)     by Buyer, if any condition in Section 6.01 has not been satisfied as of thirty (30) days after the date of this Agreement (the "***Closing Deadline***") or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of the Buyer to comply with its obligations under this Agreement), and Buyer has not waived in writing such condition on or before such date;

(b)     by Agent, if any condition in Section 6.02 has not been satisfied as of the Closing Deadline or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of Company or Shareholder to comply with their obligations under this Agreement), and Agent has not waived in writing such condition on or before such date; or

(c)     by the mutual written consent of Buyer and Agent.

**6.04     Effect of Termination**. In the event of termination by any party pursuant to Section 6.03, written notice thereof shall promptly be given to the other parties and this Agreement and the transactions contemplated herein shall be terminated, without further action by any party. If this Agreement is terminated pursuant to Section 6.03, all obligations of the parties under this Agreement will terminate, except that the obligations of the parties in this Section 6.04, and the provisions of Article VII will survive; *provided*, *however*, that, if this Agreement is terminated in violation of Section 6.03 or as a result of a breach of this Agreement or because one or more of the conditions to any party's obligations under this Agreement is not satisfied as a result of another party's failure to comply with its obligations under this Agreement, each party's right to pursue all legal remedies will survive such termination unimpaired.

## ARTICLE VII
## MISCELLANEOUS

**7.01     Expenses**. Subject to Section 4.06 and Article V, all costs and expenses incurred in connection with the Transaction Agreements and in closing and carrying out the transactions contemplated thereby, including, without limitation, any brokerage fees, agent's commissions or finder's fees, shall be paid by the party incurring such cost or expense.  Buyer shall be responsible for  all transfer, documentary, sales, use, stamp, registration, recording and other such Taxes and fees, if any, incurred in connection with the sale of the Purchased Assets.

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA81F890

**7.02    Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing, and shall be deemed duly given on the earliest of the following: (i) upon actual receipt; (ii) five (5) Business Days after mailing by first class, certified or registered U.S. mail, postage prepaid and addressed as indicated below, return receipt requested; (iii) if given by facsimile, once such notice or other communication is transmitted to the facsimile number specified below, *provided that* the sending facsimile generates a transmission report showing successful completion of such transaction, and *provided*, *further*, that if such telecopy is sent after 5:00 p.m. local time at the location of the receiving facsimile, or is sent on a day other than a Business Day, such notice or communication shall be deemed given as of 9:00 a.m. local time at such location on the next succeeding Business Day; or (iv) if sent through a nationally-recognized overnight delivery service that guarantees next day delivery and addressed as indicated below, the Business Day following its delivery to such service in time for next day delivery:

|  |  |
|---|---|
| If to Buyer: | SiteOne Landscape Supply LLC<br>300 Colonial Center Parkway, Suite 600<br>Roswell, GA 30076<br>Attention: Scott Salmon, Executive Vice President of Strategy and Development<br>Facsimile: (770) 740-8541 |
| with copies to: | SiteOne Landscape Supply LLC<br>300 Colonial Center Parkway, Suite 600<br>Roswell, Georgia 30076<br>Attention: Briley Brisendine<br>          EVP & General Counsel<br>Facsimile: (470) 277-7478 |
|  | Kilpatrick Townsend & Stockton LLP<br>1100 Peachtree Street NE, Suite 2800<br>Atlanta, Georgia 30309<br>Attention: Richard Cicchillo, Jr.<br>Facsimile:(404) 815-6555 |
| If to Company, in care of Agent: | Dominick Caroleo<br>13 Hunting Hollow Court<br>Dix Hills, New York 11746 |
| with a copy to: | Hodgson Russ LLP<br>605 Third Avenue, Suite 2300<br>New York, New York 10158<br>Attn: Gary M. Schober<br>Facsimile: (716) 819-4605 |

Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered under this <u>Section 7.02</u> by giving the other parties notice in the manner herein set forth.

36

**7.03    Amendments; No Waivers**. Any amendment to this Agreement must be in writing and signed by all parties to this Agreement. Any waiver of this Agreement must be in writing and signed by the party against whom it is to be effective. Except as provided in any such writing, no failure or delay in exercising any right, power or privilege hereunder shall constitute a waiver thereof, nor shall any single or partial exercise or waiver thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law.

**7.04    Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither Buyer, Company nor the Shareholder may assign this Agreement or any of its respective rights, interests or obligations hereunder without the prior written approval of the other party or parties, and any purported assignment in violation of this Section 7.04 shall be null and void. Notwithstanding the foregoing, Buyer may, without consent, assign its rights hereunder to an Affiliate, to any acquirer of all or any material portion of the Purchased Assets, or collaterally to any lender in connection with any bona fide financing transaction.

**7.05    Counterparts; Effectiveness**. This Agreement may be signed in any number of counterparts, and any signatures delivered by telecopy or portable document format (.pdf), each of which shall be an original, shall have the same effect as if the signatures were upon the same instrument and delivered in person.

**7.06    Entire Agreement**. This Agreement (including the Schedules and Exhibits hereto) constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings and negotiations, both written and oral, between the parties with respect to the subject matter of this Agreement.

**7.07    Severability**. If any provision of this Agreement, or the application thereof to any Person, place or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable or void, the remainder of this Agreement and such provisions as applied to other Persons, places and circumstances shall remain in full force and effect.

**7.08    Construction**. If any party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty or covenant. All representations, warranties and covenants of the parties contained herein and the right to assert claims in respect of any breach thereof shall survive the Closing, and any investigation heretofore or hereafter conducted or knowledge obtained by or on behalf of the party entitled to benefit thereof, and shall remain in full force and effect thereafter, except as otherwise expressly provided in Section 5.02. A disclosure on one Schedule relates only to the Sections of the Agreement that reference such Schedule, and not to any other Schedule or Section of the Agreement, unless expressly so stated or obvious from the context, or a cross-reference is made from one Schedule to another Schedule. Each party having participated in the negotiation and preparation of this Agreement and having been represented by counsel of its choosing, there shall be no presumption that any ambiguities herein be construed against any

37

particular party. The relationship of the parties hereunder shall be that of independent contractors, and not of fiduciaries, joint venturers, partners or agents. The rights and remedies herein provided shall be cumulative and not exclusive of any right or remedies provided by law, except as provided in this Agreement. The headings contained in this Agreement or any Exhibit or Schedule hereto are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement or any Exhibit or Schedule. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The phrase "*to the extent*" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if". Any reference in this Agreement to gender shall include all genders including the neuter, and words imparting the singular number only shall include the plural and vice versa.

7.09    **No Third-Party Beneficiaries**. Except as provided in <u>Article V</u>, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

7.10    **Governing Law**. This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware (without reference to its principles of choice or conflict of laws that would result in the application of the laws of another jurisdiction).

7.11    **Arbitration**.

(a)    Any controversy or claim arising out of, under or relating to any Transaction Agreement or any Schedule, Exhibit or other agreement executed and delivered in connection with any Transaction Agreement or the transactions contemplated thereby, any breach thereof, or relating to the intent, interpretation, performance, enforcement or arbitrability of any provision thereof, shall, except as provided in <u>Section 1.06(a)</u> or <u>Section 7.11(e)</u>, be settled by binding arbitration in New York, New York, by a panel of three arbitrators in accordance with the rules for commercial arbitration of the American Arbitration Association then in effect. Judgment upon the award rendered by the foregoing arbitrators shall be final and may be entered in any court having jurisdiction thereof.

(b)    One arbitrator shall be chosen by Agent, on behalf of Company or the Shareholder party to such dispute, and one by Buyer within ten (10) days after notice in writing from either party to the other and the two (2) so chosen shall select a third arbitrator within fifteen (15) days after their selection. The award(s) of the arbitrators shall be in writing, shall state the reasons therefor and be submitted to the parties to such dispute, shall require the concurrence of at least two (2) members of the panel.

(c)    Subject to <u>Article V</u> hereof and except as may otherwise be determined by the arbitrators, each party shall be solely responsible for any expenses (including attorneys' fees and disbursements, court costs and expert witness fees) incurred by it or on its behalf in investigating and enforcing any rights under this Agreement, and Company and the Shareholder party to such dispute, on the one hand, and Buyer, on the other, shall bear one-half of the fees and expenses of the arbitrators in connection with any such Proceeding.

(d)    The parties shall facilitate the arbitration by: (i) making available to one another and to the arbitrators for examination and inspection all documents, books, records and personnel under their control and reasonably available to them if determined by the arbitrators to be relevant to and required to resolve the dispute (except to the extent privileged); (ii) conducting arbitration hearings to the extent reasonably practicable on successive days; and (iii) using their commercially reasonable efforts to observe the time periods established by the arbitrators for submission of evidence or briefs.

(e)    Nothing herein shall be deemed to restrict or prohibit any party from applying to any court of competent jurisdiction for specific performance or other injunctive relief.

**7.12    Specific Performance**. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**7.13    Agent**. Dominick Caroleo is hereby appointed as agent and attorney-in-fact for the Shareholder and Company under each Transaction Agreement, to give and receive notices and communications, to waive or amend any provision of any Transaction Agreement, to agree to, negotiate, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to claims for indemnification, to authorize delivery to any Indemnitee of any payment hereunder, and to take all actions necessary or appropriate in the judgment of Agent for the accomplishment of the foregoing in accordance with the terms and provisions of any Transaction Agreement. Notices or communications to or from Agent hereunder shall constitute notice to or from the Shareholder and Company. Shareholder and Company hereby agree that the appointment of Agent pursuant to this Section 7.13 shall be irrevocable except as otherwise provided herein or by non-waivable provisions of Applicable Law. Any decision, act, consent or instruction of Agent relating to any Transaction Agreement shall constitute a decision of the Shareholder and Company, and shall be final, binding and conclusive upon the Shareholder and Company, and Buyer may rely upon any such written decision, consent or instruction of Agent as being the decision, consent or instruction of each and every Shareholder and Company. Buyer and the other Indemnitees are hereby relieved from any liability to any Person for any acts done by them in accordance with such decision, consent or instruction of Agent.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER:**

**SITEONE LANDSCAPE SUPPLY, LLC**

By: _____

Name: Briley Brisendine
Title: Executive Vice President and General Counsel

[*Signatures Continue on Next Page*]

[*Signature Page to Asset Purchase Agreement*]

**COMPANY:**

**THE GARDEN DEPT. CORP.**

By: _____
Name: Dominick Caroleo
Title: President


**AGENT:**

_____
Dominick Caroleo


**SHAREHOLDER:**

_____
Dominick Caroleo

# Exhibit 1

## Definitions

"***777 Leasing***" means 777-Leasing Corporation, a New York corporation.

"***Accounting Principles***" means GAAP, as historically applied by Company.

"***Affiliate***" (including the term "affiliated"), whether or not capitalized, means, with respect to any Person, any Person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with such other Person.

"***Applicable Law***" means any applicable domestic or foreign, federal, state or local statute, law, ordinance, common law, policy, guidance, rule, administrative interpretation, regulation, order, writ, injunction, directive, judgment, decree or other legal requirement, of any Governmental Authority.

"***Business***" means (x) sale or distribution of nursery or landscape products, including annuals, perennials, bulbs, gloves, rain gear, shoes, aquatic supplies, chemicals, fertilizers, mulch, sand, soil, stone, snow shovels, hoses, hose reels, anchor kits, rakes, trowels, wheelbarrows, spreaders or ball carts, and (y) the provision of related services.

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks in Atlanta, Georgia or Coram, New York are authorized or required by law to close.

"***Company's Knowledge***", "***Knowledge of Company***" or any similar phrase means the actual knowledge of any of Shareholder or Vic Caroleo, in each case after reasonable due inquiry.

"***Contracts***" means all contracts, agreements, options, understandings, leases, licenses, sales and accepted purchase orders, commitments, warranties and other instruments of any kind, whether written or oral, to which any Person is a party or by which any of its assets are bound.

"***Control***", "***Controlled***" or "***Controlling***" means, with respect to any specified Person, and whether or not capitalized, the power, directly or indirectly, to direct or cause the direction of the management or policies of such Person, whether by ownership of securities, by contract or otherwise.

"***Debt***" means any indebtedness of a Person, whether or not contingent, in respect of borrowed money or evidenced by bonds, notes, debentures, promissory notes, trust indentures or other similar instruments or letters of credit (or reimbursement agreements in respect thereof) or banker's acceptances or interest swap agreements or representing capitalized or synthetic lease obligations or the unpaid balance of the purchase price of any property or assets, overdrafts, as well as the amount of all indebtedness of others secured by a Encumbrance on any asset of such Person (whether or not such indebtedness is assumed by such Person) including, but not limited to, any amounts owed to any financial institution or any Related Party, and, to the extent not otherwise included, the amount of any indebtedness of any other Person guaranteed by such Person; provided, however, that "Debt" does not include accounts payable or accrued expenses

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA81F890

that are current liabilities of Company arising in the ordinary course of business to the extent that such amounts are taken into account in the calculation of the Net Working Capital.

"*Employee Benefit Plan*" means any "employee benefit plan" (as defined by Section 3(3) of ERISA) and any other bonus, profit sharing, pension, compensation, deferred compensation, stock option, stock purchase, fringe benefit, severance, post-retirement, scholarship, disability, sick leave, vacation, individual employment, commission, bonus, payroll practice, retention, or other plan, agreement, policy, trust fund or arrangement, in each case now or at any time in the past maintained by, sponsored by, contributed to or participated in by Company or any ERISA Affiliate.

"*Encumbrance*" means any security agreement, title defect, restriction, lien, pledge, mortgage, deed of trust, deed to secure debt, easement, encroachment, security interest, hypothecation, right of first refusal, adverse claim, conditional sales contract, encumbrance, or any other claim or charge of any kind or nature whatsoever

"*Environmental Condition*" means any condition with respect to the environment (including the air, water, groundwater, surface water and land), whether or not yet discovered, which could or does result in any damage, loss, cost, expense, claim, demand, order or liability to or against any Person by any third party or Governmental Authority, including, without limitation, any condition resulting from the ownership of any Purchased Assets, or operation of the Business.

"*Environmental Laws*" means any Applicable Law relating to the protection of human health, safety or the environment including: (A) all requirements pertaining to reporting, licensing, permitting, controlling, investigating or remediating emissions, discharges, releases or threatened releases of Hazardous Substances, whether solid, liquid or gaseous in nature, into the air, surface water, groundwater or land, or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances, whether solid, liquid or gaseous in nature; and (B) all requirements pertaining to the protection of the health and safety of employees or the public from exposure to Hazardous Substances.

"*Environmental Liabilities*" means all Liabilities of a Person, whether such Liabilities are owed by such Person to Governmental Authorities, private third parties or otherwise, arising under or relating to any Environmental Law or Environmental Condition.

"*Equipment*" means all vehicles, machinery, office equipment, furniture, fixtures, trade fixtures, fixed assets, and all related parts, tools, supplies and any available manufacturer warranties.

"*ERISA Affiliate*" means any entity that would be considered a single employer with Company or 777 Leasing under Section 414(b), (c), (m) and (o) of the Internal Revenue Code of 1986, as amended (the "*Code*").

"*First Quality Goods*" means goods that are free from any defect materially affecting saleability at standard, undiscounted pricing for goods of like type.

"*GAAP*" means generally accepted accounting principles in the United States, consistently applied.

DocuSign Envelope ID: 38A463F4-31DD-4845-A7B9-BE16DA81F890

"*Governmental Authority*" means any foreign, domestic, federal, territorial, state or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, arbitral tribunal, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"*Hazardous Substance*" means any substance: (A) the presence of which requires investigation or remediation under any Environmental Laws; (B) which is defined as a "*pollutant,*" "*hazardous waste*" or "*hazardous substance*" under any Environmental Laws; (C) that is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic or mutagenic or otherwise hazardous and is regulated under Environmental Laws; or (D) that is gasoline, diesel fuel or other petroleum hydrocarbons, polychlorinated biphenyls (PCBs) or asbestos and that is regulated under any Environmental Laws.

"*Intellectual Property*" means all patents, patent applications, docketed inventions, trademarks, trade names, service marks, copyrights, computer programs and other software, domain names, URLs, websites, trade secrets, confidential and proprietary business information, processes, know how, engineering, drawings, plans and product specifications, all other intellectual property, including all promotional displays and materials, price lists, bid and quote information, literature, catalogs, brochures, advertising material and the like, all telephone numbers, telephone and advertising listings, customer, supplier and distributor lists and all other information and data relating to the customers or suppliers, all product development, packaging development, and any licenses, license agreements and applications related to any of the foregoing.

"*Inventory*" means all inventories of raw materials and finished goods.

"*Liability*" means any liability or obligation of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise.

"*Losses*" means all demands, claims, assessments, losses, damages, diminution in value, Taxes, costs, expenses, liabilities, judgments, awards, fines, interest, sanctions, penalties, charges (including any amounts paid in settlement), whether or not arising out of a third party claim, including reasonable costs, fees and expenses of attorneys, accountants and other representatives of a Person incurring or suffering such Losses or seeking to mitigate same, and interest thereon from the date incurred to the date repaid.

"*Material Adverse Effect*" means a material adverse effect on, or a material adverse change in, the operations, affairs, prospects, condition (financial or otherwise), results of operations, assets, Liabilities, reserves or any other material aspect of the Business.

"*Net Working Capital*" means, as of any relevant time, (x) the sum of (i) gross trade receivables of Company, <u>plus</u> (ii) net book value of Inventory of Company, <u>plus</u> (iii) prepaid expenses and deposits (to the extent Buyer will obtain the effective benefit thereof following the Closing), <u>minus</u> (y) the sum of (i) accounts payable and (ii) accrued expenses of Company (excluding Employee Expenses attributable to the period prior to the Effective Time), all

determined in accordance with generally accepted accounting principles, *provided that* only Purchased Assets and Assumed Obligations of Company shall be included in such calculation. Notwithstanding anything to the contrary herein, none of the following will be taken into account for purposes of calculating Net Working Capital: (1) assets or liabilities related to Taxes, (2) amounts payable to or by the Shareholder, (3) obsolete or excessive Inventories of finished goods not saleable in the ordinary course of Business at customary margins, or (4) the age of any Receivables. For the avoidance of doubt, Net Working Capital can be a positive or negative number.

"***NWC Adjustment***" means (i) the amount by which the Estimated Net Working Capital exceeds the Target Net Working Capital, if any, or (ii) the amount by which the Target Net Working Capital exceeds the Estimated Net Working Capital, if any.

"***Order***" means any order, writ, injunction, directive, judgment, decree, consent decree, compliance order, administrative order or other legal requirement applicable to Company, the Business or any Purchased Assets.

"***Permit***" means any permit, license, franchise, approval, authorization, qualification, certificate, exemption, registration or consent of any Governmental Authority.

"***Permitted Encumbrances***" means (i) liens for Taxes not yet due and payable and (ii) mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business and relating to amounts not yet due and payable, but which in each case have been fully accrued on the books of Company.

"***Person***" means an individual, corporation, partnership, limited liability company, association, trust, bank, estate or other entity or organization, including a Governmental Authority.

"***Personal Information***" means any information that can identify a person, which may include, but not be limited to, (i) name, address, telephone number, health information, driver's license number, government-issued identification number, or any other data that can be used to precisely identify, contact or locate an individual, (ii) any nonpublic, personally identifiable financial information, such as information relating to a relationship between an individual person and a financial institution, and/or related to a financial transaction by such individual person with a financial institution or (iii) Internet Protocol addresses or other persistent device identifiers.

"***Proceeding***" means any demand, action, suit, claim, proceeding, audit, complaint, grievance, charge, inquiry, hearing, arbitration or governmental investigation of any nature, public or private.

"***Records***" means all records, files, books and operating data, maintenance records, books of account, correspondence, financial, sales, market and credit information and reports, drawings, patterns, slogans, market research and other research materials, license documents, customer lists and Confidential Information, in each case whether in print, electronic or other media.

"***Reference Date***" means October 31, 2019.

"***Reference Date Balance Sheet***" means the balance sheet of Company included in the Financial Reports at the Reference Date.

"***Reference Rate***" means the per annum rate of interest announced from time to time by Bank of America, National Association (or any successor) as its prime rate (or reference rate).

"***Related Party***" means, with respect to any Person, any trustee, trustor, shareholder, beneficiary, partner, member, manager, interest holder, director, officer or executive employee of such Person, any family member of any trustee, trustor, shareholder, beneficiary, partner, member, manager, interest holder, director, officer or executive employee of such Person, or any other Person that, directly or indirectly, alone or together with others, is an Affiliate of such Person or of any trustee, trustor, shareholder, beneficiary, partner, member, manager, interest holder, director, officer or executive employee of such Person.

"***Related Party Landlord***" means, (i) in respect of the Coram facility, Narrow Way Realty, LTD, Group 5 Associates, Ltd., 9 4th St. LLC, and 3670 Route 112 LLC (ii) in respect of the Dix Hills Facility, Don Caroleo Ventures LLC, and (iii) in respect of the Speonk facility, 3 Girls and 1 Boy, LLC.

"***Related Party Landlord's Knowledge***", "***Knowledge of Related Party Landlord***" or any similar phrase means the actual knowledge of the Shareholder after reasonable due inquiry.

"***Release***" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping into the environment.

"***Software***" means any software, computer instructions, assembly language, object code, source code, routines, configuration files, compilers, development environments, and application programming interfaces, or to which access to the functionality thereof (for example with "Software as a Service" or similar arrangements) whether proprietary, "open source," "copy-left" or any other designations, used in the conduct of the Business or operations of Company.

"***Target Net Working Capital***" means Seven Hundred Twenty Thousand Dollars ($720,000).

"***Tax***" or "***Taxes***" means all taxes, assessments or impositions imposed by or on behalf of a Governmental Authority of any nature including: (i) federal, state, local or foreign net income tax, alternative or add-on minimum tax, profits or excess profits tax, franchise tax, gross income, adjusted gross income or gross receipts tax, employment related tax (including employee withholding or employer payroll tax, FICA or FUTA), real or personal property tax or ad valorem tax, amounts due under any abandoned property law, sales or use tax, excise tax, stamp tax or duty, any withholding or back up withholding tax, estimated taxes, value added tax, severance tax, prohibited transaction tax, premiums tax, occupation tax, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign) responsible for the imposition of any such tax; and (ii) any liability with respect to the foregoing as a result of being or formerly having been a member of any affiliated, consolidated, combined, unitary, or similar group, as a result of any transferee liability in respect of the foregoing, whether arising as a result of any agreement or otherwise by operation of law.

"***Tax Return***" means all returns, reports, forms or other information required to be filed with respect to any Tax (including estimated Tax payments), and any claims for refunds of Taxes and any amendments or supplements of any of the foregoing.

"***Threat of Release***" means a substantial likelihood of a Release that requires action to prevent or mitigate damage to the environment that may result from such Release.

"***Transaction Agreements***" means, collectively, this Agreement, the Escrow Agreement, the TSA, the Related Party Lease Agreements and the other agreements, documents, instruments, and certificates executed or to be executed by any of the parties hereto in connection with the transaction contemplated by this Agreement.

In addition to the terms defined above, the following terms shall have the respective meanings given thereto in the Sections of the Agreement indicated below:

| Defined Term | Section | Defined Term | Section |
|---|---|---|---|
| 2013-2018 Resolution | 1.07(c) | Excluded Liabilities | 1.03 |
| Agent | 7.13 | Financial Reports | 2.04(a) |
| Agreement | Preamble | Indemnitee | 5.01(c) |
| Allocation Schedule | 4.04 | Indemnitor | 5.01(c) |
| Assumed Obligations | 1.02 | Indemnity Escrow | 1.07(a) |
| Avelar Resolution | 1.07(b) | Initial Purchase Price | 1.04(a) |
| Basket Amount | 5.03 | Insurance Policies | 2.17 |
| Buyer | Preamble | Material Customers | 2.15 |
| Buyer Indemnitee(s) | 5.01(a) | Material Vendors | 2.15 |
| Chosen Firm | 1.06(a) | NWC Escrow | 1.07(a) |
| Closing | 1.05(a) | Organizational Documents | 2.01 |
| Closing Date | 1.05(a) | Payment Card Data | 2.11(b) |
| Closing Deadline | 6.03(a) | Pay-off Letter | 1.05(b) |
| Company | Preamble | PCI Standards | 2.11(b) |
| Confidential Information | 4.01(b) | Product | 4.02(a)(i) |
| Debt Holder | 1.05(b) | Proposed Final Net Working Capital | 1.06(b) |
| Effective Time | 1.05(a) | Purchase Price | 1.04 |
| Employee Expenses | 4.03 | Purchased Assets | 1.01(a) |
| Employees | 2.12(a) | Real Property | 2.08(a) |
| Employment Agreement | 1.05(c)(ix) | Receivables | 1.01(a)(ii) |
| ERISA | 2.13(a) | Related Party Lease Agreements | 1.05(c)(iv) |
| Escrow Agent | 1.07(a) | Seller Indemnitee(s) | 5.01(b) |
| Escrow Agreement | 1.07(a) | Seller Indemnitor(s) | 5.01(a) |
| Escrow Amount | 1.05(d)(i)(B) | Settlement Statement | 1.05(d)(i) |
| Estimated Closing Statement | 1.06(a) | Shareholder | Preamble |
| Estimated Net Working Capital | 1.06(a) | SUT Escrow | 1.07(a) |
| Estimated NWC Adjustment | 1.06(a) | Territory | 4.02(a)(i) |
| Excluded Assets | 1.01(b) | TSA | 1.05(c)(vi) |

## Exhibit 2

## Acquisition Earnouts

1.      If, on or before December 31, 2022, Buyer consummates an Acquisition of any of the Target Entities listed below, then, within thirty (30) days after each such Acquisition, Buyer will pay to Company, as additional Purchase Price, a one-time earnout payment based on the Target Revenues of the Target Entity Acquired based on the following chart (each, an "*Acquisition Earnout*"):

| Target Revenues of Target Entity | Earnout as Percentage of Incremental Target Revenues |
|---|---|
| Up to $1,000,000 | 5% |
| $1,000,001 to $2,000,000 | 4% |
| $2,000,001 to $3,000,000 | 3% |
| $3,000,001 to $4,000,000 | 2% |
| >$4,000,001 | 1% |

By way of example only, if a Target Entity is Acquired that has Target Revenues of $2.5 million, the Acquisition Earnout would be: (5% on $1 Million) plus (4% on $1 Million) plus (3% on $500,000) or $50,000 plus $40,000 plus $15,000 = $105,000. By way of further example, if a second Target Entity is Acquired having Target Revenues of $1.5 Million, the Acquisition Earnout would be (5% on $1,000,000) plus (4% on $500,000) or $50,000 + $20,000 = $70,000.

Notwithstanding any other provision hereof, (i) the maximum Acquisition Earnout with respect to any single Acquisition is $250,000, regardless of the Target Revenues, and (ii) the cumulative maximum Acquisition Earnouts payable hereunder with respect to all Acquisitions is $500,000.

2.      As used in this Exhibit 2, the following terms have the respective meanings set forth below:

"*Acquisition*" means, with respect to any Target Entity, (i) the acquisition (whether by share purchase, merger, share exchange or otherwise) of a majority of the outstanding voting and equity securities of such Target Entity or any Affiliate, or (ii) the acquisition of all or substantially all of the operating assets of a Target Entity, an Affiliate or an operating division of a Target Entity or an Affiliate of a Target Entity, or one or more discrete facilities operated by a Target Entity or an Affiliate. Any derivative terms, such as "*Acquired*" and "*Acquire*" shall have correlative meanings.

"*Target Revenues*" means, in respect of any Target Entity Acquired on or before December 31, 2022, the pre-acquisition annualized revenues of such Target Entity, as determined from the quality of earnings report or other financial due diligence report used by Buyer for purposes of obtaining Buyer's internal approvals for the Acquisition.

"**Target Entity**" means each of the following entities: K&K Mason Stone Supply, *provided that* if Buyer Acquires less than all of the operations of such Target Entity, the Target Revenues for such Target Entity will be based solely on the operations actually Acquired.

## Exhibit 3

## EBITDA Earnout Payments

      1.     As used in this <u>Exhibit 3</u> the following terms have the respective definitions set forth below:

"***Baseline***" means $5,700,000.

"***Bissett Facilities***" means the legacy "Bissett Nursery" yards at Holtsville, NY and Dix Hills, NY (not including the operations of Bissett Equipment Corp.), in each case without regard to whether such operations are conducted by Buyer or an Affiliate.

"***EBITDA***" means, as to any specified facilities, the sum of (x) the net income (or loss) of such facilities, determined as if such facilities were operated by a separate, stand-alone entity (i.e. without the allocation of any general overhead or administrative fees of Buyer (other than amounts for goods or services rendered on an arms' length basis on terms not less favorable than generally available from third parties)), plus (y) all amounts deducted (or <u>minus</u> any amounts added) in the computation of such net income on account of (1) interest expense or interest income, (2) taxes imposed on or measured by income or excess profits, (3) non-cash employee compensation, (4) depreciation and amortization, (5) any reorganization expense and (6) Non-Recurring Items, all determined in accordance with GAAP from the Buyer's financial books and records prepared in the ordinary course.

"***GD Facilities***" means the Coram facility, Dix Hills facility and Speonk facility historically operated by GD prior to the Closing.

"***Non-Recurring Items***" means the following: (1) material charges or credits (other than ordinary adjustments of a recurring nature) specifically related to operations of prior years, such as the elimination of unused reserves provided in prior years, (2) material charges or credits resulting from unusual or extraordinary transactions in assets held for use or held for sale, (3) the write-off of a material amount of intangibles, (4) the write-off of material amounts related to the retirement or refunding of any debt before maturity, (5) the gain or loss on the sale of property, plant and equipment not acquired for resale, (6) the effects of purchase accounting on inventory values, (7) restructuring charges, and (8) any other revenues or gains and expenses or losses considered to be non-recurring or extraordinary under GAAP.

      2.     Subject to the other provisions of the Agreement and this <u>Exhibit 3</u>, Buyer will pay to Agent (on behalf of Company) as additional consideration in respect of the Purchased Assets (each, an "***EBITDA Earnout Payment***"):

    a)  $1,475,000, if, (but only if) the EBITDA of the GD Facilities for calendar year 2020 equals or exceeds $3,750,000;

    b)  $1,475,000, if, (but only if) the EBITDA of the GD Facilities for calendar year 2021 equals or exceeds $3,900,000;

c) For each of calendar years 2020, 2021 and 2022, thirty-five percent (35%) of the amount by which the EBITDA for the GD Facilities *and* the Bissett Facilities exceeds the Baseline; *provided, however*, that if EBITDA for the Bissett Facilities in 2020 is less than $0, it shall be deemed to be $0 and no negative EBITDA for the Bissett Facilities in 2020 shall reduce EBITDA for the GD Facilities.

Buyer shall pay any EBITDA Earnout Payment to Company within five (5) Business Days after it is definitively determined that Company is entitled to such EBITDA Earnout Payment pursuant to the terms of this <u>Exhibit 3</u>, such payment to be made by wire transfer of immediately available funds to the account(s) designated by the Agent in writing in advance. If the parties agree to make any material changes to the business activities of the GD Facilities or the Bissett Facilities (such as adding or changing lines of business, making material new investments to support growth opportunities, consolidating facilities, etc.), during any period relevant to the calculation of any potential EBITDA Earnout Payment, they will simultaneously agree in writing to make any appropriate changes to the thresholds for determining eligibility for or the calculation of any potentially affected EBITDA Earnout Payment.

3.      For purposes of determining Company's entitlement to any EBITDA Earnout Payment pursuant to this <u>Exhibit 3</u>, (i) not later than sixty (60) days after the end of calendar years 2020, 2021 and 2022, Buyer will prepare and deliver to the Agent a good faith written calculation of the EBITDA of the GD Facilities and the Bissett Facilities for the calendar year then-ended, and (ii) not later than sixty (60) days after the end of calendar years 2020 and 2021, Buyer will prepare and deliver to the Agent a good faith written calculation of the EBITDA of the GD Facilities for the calendar year then-ended, together with reasonable supporting detail. Buyer's determination of the EBITDA of the GD Facilities or of the GD Facilities and Bissett Facilities and the amount of any corresponding EBITDA Earnout Payment shall be binding and conclusive upon the parties unless the Agent gives written notice of disagreement to Buyer within thirty (30) days after receipt thereof (and during which thirty (30) day period Buyer shall make available to the Agent reasonable access to the books, records and work papers used to calculate EBITDA for the relevant facilities), such notice to specify in reasonable detail the nature and extent of such disagreement(s). If Buyer and the Agent are unable to resolve any such disagreement(s) as to Company's entitlement to any EBITDA Earnout Payment or the amount thereof within thirty (30) days after Buyer's receipt of the Agent's notice of disagreement, and the amounts remaining in dispute would, if determined in favor of the Agent, result in a higher cumulative EBITDA Earnout Payment for the applicable calendar year than proposed by Buyer, then Buyer and the Agent will refer the accounting matters remaining in dispute for final determination to such reputable, national independent accounting firm as Buyer and the Agent may designate by mutual agreement, or failing such agreement, as may be designated by an arbitral panel convened pursuant to <u>Section 7.11</u> upon demand of Buyer or the Agent (the firm so designated, the "***Chosen Earnout Firm***"). The Chosen Earnout Firm shall only have authority to resolve those accounting matters relating to the calculation of EBITDA for the GD Facilities or the GD Facilities and Bissett Facilities, as applicable, that are still in dispute and are specifically referred to it for resolution. The Chosen Earnout Firm shall apply the provisions of this <u>Exhibit 3</u> in resolving any dispute pursuant hereto. The parties shall use their reasonable commercial efforts to cause the Chosen Earnout Firm to resolve any such disputed accounting matters within thirty (30) days after such referral. The decision of the Chosen Earnout Firm as to any accounting matters in dispute shall be in writing and shall be final and binding upon all parties hereto for all purposes. Any disagreements

among the parties with respect to any matters of law or the interpretation of this Exhibit 3 remain subject to the dispute resolution provisions set forth in Section 7.11, and the Chosen Earnout Firm shall have no authority to decide such matters unless specifically agreed by Buyer and the Agent at the time, and any dispute as to whether a matter is an accounting matter or a matter of law or interpretation of this Agreement will, unless otherwise agreed by Buyer and the Agent at the time, be resolved pursuant to the dispute resolution procedures set forth in Section 7.11. If the cumulative EBITDA Earnout Payment in respect of any calendar year, as finally determined hereunder, is greater than that proposed by Buyer, then the fees and disbursements of the Chosen Earnout Firm shall be borne by Buyer, but in all other circumstances, such fees and disbursements shall be borne by Company and the Shareholder, jointly.

4.      The parties agree that any EBITDA Earnout Payment shall be treated for Tax purposes as additional Purchase Price in respect of the Purchased Assets, and will be allocated as additional goodwill.

5.      To the extent the Indemnity Escrow has been fully released or reserved for pending claims, then upon notice to Agent, Buyer shall have the right, but shall not be obligated, to setoff any amount of Losses to which any Indemnitee is entitled under Section 5.01(a) against any EBITDA Earnout Payment due hereunder.  The exercise of such right of setoff by Buyer in good faith, whether or not ultimately determined to be justified, will not constitute a breach of Buyer's obligation to pay such EBITDA Earnout Payment when due so long as (a) Buyer makes such EBITDA Earnout Payment promptly after it realizes such setoff was not justified and (b) pays interest on the amount of such EBITDA Earnout Payment from the day it should have been paid to the day on which such EBITDA Earnout Payment is actually made at the rate of 6%.  Neither the exercise of nor the failure to exercise such right of setoff will constitute an election of remedies or limit any Indemnitee in any manner in the enforcement of any other remedies that may be available to it, including the right to recover any indemnifiable Losses in excess of the total EBITDA Earnout Payment(s).  Company and the Shareholder acknowledge that it will be to their benefit (by avoiding the need to immediately satisfy an indemnity claim in cash) if Buyer elects to setoff any indemnifiable Losses against a future EBITDA Earnout Payment as provided herein.

6.      The EBITDA Earnout Payments are subject to reduction by fifty percent (50%) of the gross amount of any retention bonuses (including employer-side taxes) paid by Buyer to Nicholas A. Giordano or Gerard L. Passaro in respect of calendar year 2021, not to exceed a maximum reduction of $77,500 pursuant to this paragraph 6.

**Exhibit 4**

**Allocation Schedule**

| **Asset Class** | **Example of Includible Assets[1]** | **Purchase Price to be Allocated[2]** |
|---|---|---|
| Class I Assets | Includes cash and certain deposit accounts. | The fair market value of Class I Assets, if any. |
| Class II Assets | Includes certain actively traded property, certificates of deposit and foreign currency. | The fair market value of Class II Assets, if any. |
| Class III Assets | Includes accounts receivable and certain assets regularly marked-to-market by Company. | An amount equal to the value of the Class III Assets included in the Net Working Capital as finally determined. |
| Class IV Assets | Includes inventory and other stock in trade. | An amount equal to the value of the Class IV Assets included in the Net Working Capital as finally determined. |
| Class V Assets | All assets not included in Class I, II, III, IV, VI, or VII. | $1,000,000. |
| Class VI Assets and Class VII Assets | Goodwill and other intangibles described in Code Section 197. | The remainder of the purchase price, as determined for federal income Tax purposes. |

---

[1] The specific assets to be included in each designated "class" will be determined in accordance with Treasury Regulation §1.338-6(b).

[2] Purchase price to be allocated includes liabilities assumed or deemed for federal income Tax purposes to be assumed by Buyer, and all other amounts includible in "purchase price" for federal income Tax purposes. It will be allocated in accordance with the "residual method" under Section 1060 of the Code. Accordingly, the purchase price (as adjusted) will be allocated first to the Class I Assets up to the value of such assets as set forth above. Any excess purchase price (as adjusted) will next be allocated to Class II Assets up to the value assigned to such assets set forth above. For purposes of clarity, after the purchase price (as adjusted) is allocated to each class of assets, any remaining purchase price will be allocated to the next sequential class of assets until each class of assets is allocated the value set forth above.

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA01F890

# EXHIBIT B

*Execution Version*

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "*Agreement*") is made and entered into on the 14th day of January, 2020, by and between **SITEONE LANDSCAPE SUPPLY, LLC**, a Delaware limited liability company (including its successors and assigns, "*Company*"), and **DOMINICK CAROLEO**, a resident of the State of New York (the "*Employee*").

**WHEREAS**, Company is engaged in the business of selling and distributing irrigation products, landscape lighting, water features, drainage products and supplies, trenchers, blowers, mowers, golf course maintenance supplies, bulk aggregates, hardscapes, soils, mulch, sod, landscape products, bulk or bagged landscaping material (including compost, soil mixes, top soil, mulch, landscaping rocks or sand), natural stone products (including patio stone, pebbles, cobblestones, boulders, thin select stone, slabs or chopped or cut stone), landscape supplies (including edging, fertilizers, sealers, binders, tools, pailed asphalt, polymeric sand, stone cleaners, rust and mold removers or rock binding agents), and bagged or bulk cementitious mixes, to landscape contractors, general contractors, home builders, and masons, and providing related services and supplies (collectively, the "*Business*"; all such products, collectively, "*Products*");

**WHEREAS**, Company intends to purchase and acquire, among other things, substantially all of the assets of The Garden Dept. Corp., a New York corporation, ("*Garden Dept.*") engaged in the Business from three (3) locations in Suffolk County, New York (the "*Purchase*");

**WHEREAS**, Employee is currently employed by Garden Dept. as its Vice President, and possesses significant knowledge and information with respect to the conduct of the Business on Long Island, which knowledge and information includes trade secrets and which will be increased, developed and enhanced through Employee's employment by Company following the Closing; and

**WHEREAS**, in connection with the Purchase, the parties hereto desire to enter into an agreement for Company's employment of Employee on the terms and conditions contained in this Agreement.

**NOW, THEREFORE**, in consideration of the promises, agreements and conditions contained in this Agreement, the parties hereto agree as follows:

1. **Duties.** Subject to the terms and conditions of this Agreement, and subject to the consummation of the Purchase (the "*Closing*"), Company hereby employs Employee and Employee hereby accepts employment with Company as and from the Effective Date. Employee shall serve as President/CEO of all Garden Dept. locations listed on **Exhibit A** and General Manager of the other Long Island nursery operations of the Company listed on **Exhibit A** (collectively the "*Area*"), reporting to Brian Kersnowski or his successor as Regional Vice President of Company or equivalent (Employee's "*Supervisor*"). Employee shall directly report to, and have a direct line of communication with, Employee's Supervisor. In such capacity, Employee shall be responsible for managing the Area as set forth in **Exhibit B**. During the Employment Period (defined below), Employee shall devote Employee's full time, attention and

skill to Employee's duties hereunder, shall faithfully and diligently perform such duties in compliance with the lawful directions of Company, and shall use his best efforts to promote the interests of Company and its affiliated entities. Employee shall at all times carry out the duties assigned to Employee in a loyal, trustworthy, and businesslike manner. Employee will not, without the prior written consent of Company's Board of Managers (the "***Board***"), at any time during the Employment Period engage in any venture or activity which materially interferes with the performance of Employee's duties under this Agreement or otherwise has or is reasonably likely to have an adverse effect on the reputation, goodwill, public image or business interests of Company or its subsidiaries and affiliated entities (collectively, the "***Company Entities***"); provided, however, this sentence shall not apply on occasions when Employee is subpoenaed or ordered by a court or other governmental authority to testify or give evidence and must, of course, respond truthfully, or to conduct protected by Sarbanes-Oxley or any other applicable law; and provided however, that the foregoing shall not prevent the Employee from (i) serving as an officer and/or on the board of directors of non-profit organizations, or (ii) participating in charitable, civic, educational, professional, community or industry affairs, so long as, in the good faith judgment of the Employee's Supervisor, such activities in the aggregate do not interfere or conflict with the performance of his duties hereunder, create a potential business conflict or adversely affect Company's business reputation in the Area.

      **2.**   **Term.** Unless earlier terminated as provided in this Agreement, the term of Employee's employment under this Agreement shall commence on the expiration or termination of the Employee's Secondment Period pursuant to that certain Transition Services Agreement between Garden Dept. and the Company (the "***Effective Date***"), and shall continue until three (3) years after the date thereof (the "***Initial Period***"). Thereafter, Employee's employment hereunder shall continue on an at-will basis until one (1) month after either party gives the other written notice of termination (which notice may be given prior to the expiration of such Initial Period) (such Initial Period together with any at-will period thereafter, the "***Employment Period***"). The last day on which Employee is employed by Company, whether separation is voluntary or involuntary, with or without Cause (as defined below), is referred to as the "***Termination Date***."

      **3.**   <u>**Salary and Benefits**</u>.

      (a)   <u>Salary</u>. During the Initial Period, Company shall pay to Employee a salary at the rate of One Hundred Fifty-Seven Thousand Eight Hundred Dollars ($157,800) per annum, prorated for any partial year (the "***Salary***"), to be earned and payable in substantially equal installments in accordance with Company's normal payroll practices for the payment of base salary to similarly-situated employees as in effect from time to time. After one year, the Salary will be reviewed by Company not less frequently than annually and may be adjusted in the discretion of Company, but not reduced below the initial Salary without Employee's agreement.

      (b)   <u>Short Term Incentive Plan</u>. Employee will be entitled to participate in Company's Short Term Incentive Plan, established annually, under which Employee shall be eligible to earn a discretionary target bonus of up to 22% of Employee's Salary (prorated in respect of any partial fiscal year) upon satisfaction of the performance goals and criteria established by Company. Such goals and criteria may include both objective and subjective considerations relating to Employee's performance, Company's economic performance, then current prevailing industry compensation scales, safety and other relevant business factors. Any

DocuSign Envelope ID: 38A463F4-31DD-4845-A7B9-BE16DA81F890

incentive payment shall be payable in accordance with Company's bonus policies as in effect from time to time, and in order to be eligible for the bonus, Employee must be employed by Company on the date of the payment. For calendar year 2020, Employee's short-term incentive plan payout will be guaranteed at 22%, provided that Employee is in compliance with his obligations hereunder.

(c)    <u>Benefits</u>. To the extent that Employee is qualified under the requirements of the applicable health, welfare or retirement benefit plans, including employee stock option plans, and subject to the terms and conditions thereof, Employee will be entitled during the Employment Period to participate in any employee benefit plans (other than incentive compensation plans) generally provided by Company to its similarly-situated employees (other than any mileage reimbursement program), for so long as Company provides such benefit plans, subject to the terms and conditions thereof.

(d)    <u>Expenses</u>. Company will reimburse Employee for, or pay directly, all reasonable business expenses incurred by Employee at the request of, or on behalf of, Company, in the performance of Employee's duties under this Agreement; provided that Employee incurs and accounts for such expenses in accordance with Company's policies and directives as in effect from time to time. Any provision of this paragraph to the contrary notwithstanding, Employee may, at his option, fly first class (or other similar premium class) on all business trips undertaken at Company's request involving flights, in the aggregate on any one trip, greater than three hours in scheduled duration.

(e)    <u>Paid Time Off</u>. Employee will be entitled to paid time off each year, subject to and in accordance with Company's policies regarding paid time off for employees in the state where Employee's primary place of business is located. The timing of any paid time off to be taken by Employee shall be determined in consultation with Employee's Supervisor. Employee will also be entitled to other paid leave set forth in Company's policies as in effect from time to time.

4.    <u>**Termination**</u>.

(a)    <u>By Company For Cause</u>. Company may terminate Employee's employment at any time, with immediate effect, for Cause. "***Cause***" shall be determined in good faith by the Board and shall mean one or more of the following: (i) Employee's commission of any act that constitutes fraud, embezzlement or intentional misconduct; (ii) Employee's breach of any fiduciary duty to Company or any Company Entity; (iii) Employee being formally charged with a crime, the pending nature of which, in the good faith opinion of the Board, materially conflicts with or compromises the business interests, goodwill or reputation of Company or any Company Entity; (iv) Employee's material breach of any provision of this Agreement or any other agreement with Company, any of Company's written policies of general application from time to time in effect, or any other substantial lawful obligation of Employee's employment, provided in each case that, if reasonably capable of cure, such breach has not been cured within ten (10) days after written notice from Company to Employee; (v) Employee's material or habitual neglect of Employee's duties under this Agreement; or (vi) Employee's conviction of, or plea of guilty or nolo contendere to, a felony.

(b)    <u>Disability</u>. This Agreement and the Employee's employment shall terminate immediately upon delivery of written notice of termination by Company after Employee has become unable to perform his duties under this Agreement, with reasonable accommodation, by reason of illness or incapacity, which illness or incapacity results in Employee's failure to discharge Employee's duties under this Agreement for an aggregate total of ninety (90) days (whether consecutive or nonconsecutive) during any one hundred eighty (180) day period ("***Disability***"). In the event the Employee's employment is terminated due to Disability, the Company shall pay or provide the Employee in the ordinary course (i) any unpaid Salary through the date of termination paid in accordance with the Company's normal payroll policies as if the Employee were an employee; (ii) reimbursement for any unreimbursed expenses through the date of termination incurred and paid in accordance with the Company's normal reimbursement procedures; and (iii) any other amounts and benefits the Employee is entitled to receive under any employee benefit plan in accordance with the terms of the applicable plan (collectively items (i) through (iv) shall be hereafter referred to as the "***Accrued Amounts***").

(c)    <u>Death</u>. This Agreement and the Employee's employment shall terminate immediately upon the death of the Employee. In the event the Employee's employment is terminated due to the Employee's death, the Company shall pay or provide to the Employee's estate the Accrued Amounts.

(d)    <u>By Company Without Cause</u>. Company may terminate Employee's employment at any time without Cause upon one (1) month's written notice to Employee. Company may terminate Employee with immediate effect and pay Employee his Salary pursuant to **Section 3(a)** for such notice period in lieu of waiting for passage of the notice period.

(e)    <u>By Employee for Good Reason</u>. Employee will have the right to terminate Employee's employment under this Agreement for Good Reason. As used herein, "***Good Reason***" means any of the following events; provided that Employee has given Company written notice within thirty (30) days of the occurrence of the event or condition alleged to constitute Good Reason describing such event or condition in reasonable detail and asserting that Employee is taking the position that such event or condition constitutes Good Reason, and Company has not cured such event or condition within ten (10) days after receiving such notice from Employee: (i) a material reduction in Employee's responsibilities, powers and authority as an employee of Company relative to similarly-situated employees; (ii) a material breach of this Agreement by Company; or (iii) relocation of Employee's principal place of business to a location not within fifty (50) miles of 3672 New York-112, Coram, NY 11727, without Employee's consent. For a termination to constitute Good Reason, Employee must actually terminate his employment with Company within thirty (30) days after Employee's notice and expiration of Company's cure period as described above.

(f)    <u>Severance</u>. Except as provided in this **Section 4(f)**, upon any termination of Employee's employment, Company shall have no further obligations under this Agreement, other than to pay Employee Salary through the Termination Date, the Accrued Amounts (if applicable) and other amounts accruing prior to the Termination Date or as otherwise provided herein. Without limiting the foregoing, except as provided below or as required by law, Company

4

will have no obligation to pay any severance pay, unpaid bonus, accrued benefit or any other amount.

(i)     Notwithstanding the foregoing, if Company terminates Employee without Cause (excluding a termination resulting from death or disability pursuant to **Section 4(b) or Section 4(c)**) or Employee terminates his employment for Good Reason, and the Termination Date is during the Initial Period, then Company shall continue to pay Employee as severance (collectively, the "***Severance Benefits***"): Employee's then current annual Salary for a period of the lesser of: (x) six (6) months commencing as of the Termination Date, or (y) the greater of (i) the remaining portion of the Initial Period or (ii) the amount payable under any written severance salary of Company then in effect, with such Salary continuation amount to be payable in accordance with Company's normal payroll practices for the payment of base salary to similarly-situated employees, except that the first installment of such payments shall be paid on the 30th day following the Termination Date, and shall include all installments that would have been paid if the release of claims referred to in **Section 5** had been effective at the Termination Date. Payments pursuant to this **Section 4(f)(i)** shall be in lieu of any severance payments under any applicable policy of Company in effect from time to time.

(ii)     If Employee's employment terminates for any reason (other than a termination by Company for Cause), and the Termination Date is after the Initial Period, then Employee shall be entitled to severance as provided under any applicable written policy of Company as in effect from time to time (subject to **Section 5**). Employee's service with Garden Dept. prior to the date hereof will be recognized to the same extent previously recognized by Garden Dept. under its severance policy in effect immediately prior to the date hereof.

(iii)     Payment of any benefits pursuant to this **Section 4(f)** (other than Salary in respect of periods prior to the Termination Date), is conditioned on and subject to (x) Employee timely signing and not revoking a Release as described below, and (y) Employee being and remaining in compliance with the provisions of this Agreement and any other agreement between Employee and Company.

5.     **Release.** Other than the payment of Salary for periods prior to the Termination Date, no payment under **Section 4(f)** above shall be due to Employee unless Employee shall have executed and delivered to Company (within the applicable time frame set forth therein), a release of any and all claims against Company, Company Entities and their respective present and former officers, directors, employees and agents (collectively the "***Released Parties***") and a covenant not to sue the Released Parties, substantially in the form attached hereto as **Exhibit C** (the "***Release***"), and such Release shall have become effective according to its terms. In the event Employee shall decline or fail for any reason to timely execute and deliver such Release or it otherwise does not become effective, Employee shall not be entitled to any amounts after employment terminates, except as required by law.

6.     **Return of Property.** Upon Employee's termination of employment or at any time when requested by Company, Employee agrees to return to Company all of the property of

Company, any Company Entity, or any property of their respective suppliers or customers in Employee's possession (including, without limitation, all keys, business cards, computers, smart phones, credit cards, personal items or equipment provided to Employee for Employee's use, together with all lists, books, manuals, documents, plans, notes, forms and records of or pertaining to Company or Company Entities or their respective businesses, management or operations, whether in paper or electronic form).

       **7.**   **Confidential Information.** Employee acknowledges and agrees that during the course of Employee's employment with Garden Dept. and during the Employment Period, Employee has learned and will continue to learn important confidential information related to the Business, Company and Company Entities. Employee also acknowledges that such confidential information is not generally available to the public and includes, but is not limited to, information about Company or Company Entities' clients, operations, finances and businesses. "***Confidential Information***" consists of information, without regard to form, relating to Company or Company Entities and their businesses that derives value, actual or potential, from not being generally known to others and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality, including, but not limited to, business and marketing plans, technology, computer programs and software, methods of operation, selling and pricing information, specifications of any new products under development, names and information about customers and suppliers (whether or not in writing), sales records, personnel data, and profit and performance reports. Confidential Information includes information that does not rise to the level of a trade secret under applicable law, and includes information of third parties which Company or any Company Entity has an obligation to keep or does in fact keep confidential. Confidential Information does not include any such information which Employee can establish (a) was publicly known or made generally available prior to the time of disclosure by the Company to Employee; (b) becomes publicly known or made generally available after disclosure by the Company to Employee through no wrongful action or omission by Employee; or (c) is in Employee's rightful possession, without confidentiality obligations, at the time of disclosure by the Company as shown by Employee's then-contemporaneous written records.

Employee agrees not to, directly or indirectly, use or disclose for any purpose any Confidential Information except in the good faith performance of his duties on behalf of Company. The restrictions in this **Section 7** shall continue indefinitely; provided, however, that such restrictions shall terminate on the fifth (5th) anniversary of the Termination Date with respect to any Confidential Information that does not then constitute a trade secret under applicable law. Employee agrees that during his employment with Company, Employee will not improperly use, disclose, or induce Company or any Company Entity to use any proprietary information or trade secrets of any former employer or other Person, which Employee has an obligation to keep in confidence.

Nothing in this **Section 7** shall be construed to prohibit disclosures that are required or authorized by applicable law.

Nothing in this **Section 7** shall be construed to limit or supersede the common law of torts or statutory or other protection of trade secrets where such law provides Company or Company Entities with greater or longer protection than provided in this **Section 7**. Nothing in this **Section 7** shall be construed to prevent disclosure of Confidential Information as may be

required or permitted by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Nothing herein prohibits Employee from reporting possible violations of federal law or regulation to any governmental agency or entity including, but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, or any Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. Pursuant to 18 U.S.C. § 1833(b), an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of confidential information or a trade secret that is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of the law; or (2) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Employee does not need the prior authorization of the Company to make any such reports or disclosures and Employee is not required to notify the Company that he or she has made such reports or disclosures. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the attorney and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

8.    **Covenants of Employee.**

(a)    <u>Non-Competition</u>. During the Restricted Period (as defined below), Employee agrees not to directly or indirectly, whether alone or with any other Person, provide any Services, to or on behalf of any Person engaged in the Business (other than Company or Company Entities), within a 75 mile radius of any distribution site identified on **Exhibit A**, provided that after the Employment Period this sentence shall apply only to distribution sites operated by Company as of the Termination Date. Notwithstanding anything herein to the contrary, it shall not be a breach of the covenant contained in this **Section 8(a)** for Employee to own up to two percent (2%) of any class of publicly traded securities of any Person engaged in any of the activities described in this **Section 8(a)**, so long as Employee holds such securities as a passive investment. As used herein, "***Person***" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, unincorporated society or association, trust or other legal entity, or government (including any political subdivision or agency thereof). In the event of a violation by Employee of this **Section 8(A)**, Company shall be entitled to an injunction restraining Employee from continued participation in the prohibited activity. Nothing herein shall be construed as prohibiting Company from pursuing any other remedies available to Company for said violation, including the recovery of damages from Employee. As used herein, "***Restricted Period***" means the Employment Period together with the one year one (1) year commencing as of the Termination Date.

(b)    <u>Non-Solicitation of Customers</u>. During the Restricted Period, Employee will not (i) directly or indirectly, on behalf of himself or any other Person, solicit or divert or attempt to solicit or divert the business of any Customer with whom Employee has had material contact during the Employment Period or during Employee's previous employment with Garden Dept. or about which Employee has had access to Confidential Information, in each case for the purpose of selling or attempting to sell to any such Customer any Products or related services; or

7

(ii) induce or attempt to induce any vendor, supplier, licensor or other Person to cease doing business with Company or any Company Entity or materially and adversely modify the terms of such relationship, or in any other way interfere with the relationship between any such vendor, supplier, licensor or other Person and Company or any Company Entity; or (iii) induce or attempt to induce any vendor, supplier, licensor or other Person to cease doing business with Company or any Company Entity or materially and adversely modify the terms of such relationship, or in any other way interfere with the relationship between any such vendor, supplier, licensor or other Person and Company or any Company Entity. As used in this **Section 8(b)**, "*Customer*" means any Person who has purchased or entered into an agreement to purchase, Products or services from Garden Dept., Company or a Company Entity, within the preceding two (2) years, or any Person that Garden Dept., Company or a Company Entity has solicited (other than advertisements of general circulation such as newspapers) for the sale of Products or services (including by submission of any response to a request for quote or proposal, or similar call for submission of proposals), during the two (2) prior years.

      (c)    <u>Non-Solicitation of Employees and Independent Contractors</u>. During the Restricted Period, Employee will not (i) induce or solicit any employee or independent contractor of Company or any Company Entity, to leave the employ of, or terminate a relationship with, Company or any Company Entity regardless of whether such employment or relationship is pursuant to a written agreement or at-will or (ii) in any way interfere with the relationship between Company or any Company Entity and any such employee or independent contractor.

      (d)    <u>Non-Disparagement</u>. Except for reporting to Employee's Supervisor or the Board or its designee in connection with Employee's performance of his job duties on behalf of Company, during the Restricted Period, Employee agrees not to do or say anything that criticizes or disparages Company or any Company Entity, including their management or practices, or that disrupts or impairs their normal, ongoing business operations, or that harms their reputation with employees or the public. This provision shall not apply on occasions when Employee is subpoenaed or ordered by a court or other governmental authority to testify or give evidence and must, of course, respond truthfully, or to conduct protected by Sarbanes-Oxley or any other applicable law. This provision also does not apply on occasions when Employee provides truthful information in good faith in any administrative charge or complaint Employee may file with a federal, state, or local antidiscrimination or other employment-related agency or when Employee provides truthful information in good faith to any federal, state, or local governmental body, agency, or official investigating an alleged violation of any antidiscrimination or other employment-related law or otherwise gathering information or evidence pursuant to any official investigation, hearing, trial, or proceeding. Nothing in this provision is intended in any way to intimidate, coerce, deter, persuade, or compensate Employee with respect to providing, withholding, or restricting any communication whatsoever to the extent prohibited under 18 U.S.C. §§ 201, 1503, or 1512 or under any similar or related provision of state or federal law. In addition, nothing in this provision is intended to require Employee to provide notice to the Company or its attorneys before reporting any possible violations of federal law or regulation to any governmental agency or entity ("***Whistleblower Disclosures***"), and Employee is not required to notify the Company or its attorneys that he or she has made any such Whistleblower Disclosures.

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA81F890

(e)    <u>Notice to Future Employers</u>. Employee will, during the Restricted Period, inform any prospective employers or partners, coventurers or other business associates of Employee of any outstanding obligations of Employee under the provisions of this **Section 8** and, if requested, provide a copy of this **Section 8** to such prospective employers or partners, coventurers or other business associates, and Company may, at any time, notify any future employers or partners, coventurers or other business associates of Employee of any outstanding obligations of Employee under the provisions of this **Section 8**.

### 9.    <u>Inventions, Copyrights, Etc.</u>

(a)    <u>Inventions</u>. Employee will disclose promptly to Company, and only to Company, any invention or idea of Employee (developed alone or with others) relating to the Business, whether or not patentable, conceived or made during Employee's employment by Company, or prior employment with Garden Dept., and Company will receive the same in confidence. Employee agrees to assign and does hereby assign to Company or its designee any such invention or idea in any way connected with Employee's employment or related to the Business, and all associated intellectual property rights. Employee will cooperate with Company and sign all documents deemed necessary by Company or its designee to enable it to obtain, maintain, protect and defend patents covering such inventions and ideas and to confirm Company's or its designee's exclusive ownership of all rights in such inventions, ideas and patents, without any rights or remuneration in connection with such inventions.

(b)    <u>Work for Hire Acknowledgment; Assignment</u>. Employee acknowledges that Employee's work on and contributions to documents and other expressions in tangible media, including magnetic media and other forms of computer storage, during Employee's employment by Company (and prior employment by Garden Dept.) and in any way connected with Employee's employment or related to the Business, (collectively, "***Works***"), are within the scope of Employee's employment and part of Employee's duties and responsibilities for Company or any Company Entity, and are, and at all times will be regarded as, "work made for hire" as that term is used in the United States Copyright Laws. Without limiting this acknowledgment, Employee assigns, grants, and delivers exclusively to Company or its designee all rights, title, and interests in and to any such Works, and all copies and versions thereof, including all associated intellectual property rights, copyrights and renewals. Employee will execute and deliver to Company or its designee, and their respective successors and assigns, any assignments and documents they may reasonably request for the purpose of establishing, evidencing, and enforcing or defending its complete, exclusive, perpetual (subject to any applicable law on the lifespan of a copyright), and worldwide ownership of all rights, title, and interest of every kind and nature, including all copyrights, in and to the Works.

(c)    Employee irrevocably appoints Company, with full power of substitution, as Employee's agent to execute and deliver any assignments or documents contemplated by **Section 9(a)** or **9(b)** above that Employee fails or refuses to execute and deliver promptly, this power and agency being coupled with an interest and being irrevocable. Employee represents and warrants that Employee is not and will not become a party to any agreement or subject to any other obligation that (i) would require Employee to assign to any person other than Company or its designee any right, title or interest in any invention, idea or Work that Employee is or will be required to assign to Company or its designee under this Agreement or (ii) would be breached

9

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA81F890

or violated by, or is otherwise inconsistent with Employee's entering into and performing under, the provisions of this **Section 9**.

(d)    The foregoing assignment provisions do not apply to an invention for which no equipment, supplies, facility, or trade secret information of Company or any Company Entity was used and which was developed entirely on Employee's own time, unless (i) the invention relates to the Business or (ii) the invention results from any work performed by Employee for Company or a Company Entity.

10.    <u>Notices</u>. All notices, requests, demands, claims and other communications hereunder shall be in writing, and shall be deemed duly given on the earliest of the following: (i) upon actual receipt; (ii) five (5) Business Days after mailing by first class, certified or registered U.S. mail, postage prepaid and addressed as indicated below, return receipt requested; or (iii) if sent through a nationally-recognized overnight delivery service that guarantees next day delivery and addressed as indicated below, the Business Day following its delivery to such service in time for next day delivery:

| | |
|---|---|
| If to Company: | SiteOne Landscape Supply LLC<br>300 Colonial Center Parkway, Suite 600<br>Roswell, Georgia 30076<br>Attention: Scott Salmon |
| and to: | SiteOne Landscape Supply LLC<br>300 Colonial Center Parkway, Suite 600<br>Roswell, Georgia 30076<br>Attention: Briley Brisendine<br>　　　　　EVP & General Counsel |
| | Kilpatrick Townsend & Stockton LLP<br>1100 Peachtree Street NE, Suite 2800<br>Atlanta, Georgia 30309<br>Attention: Richard Cicchillo, Jr. |
| If to Employee: | Dominick Caroleo<br>13 Hunting Hollow Court<br>Dix Hills, New York 11746 |
| with a copy to: | Hodgson Russ LLP<br>605 Third Avenue, Suite 2300<br>New York, New York 10158<br>Attention: Gary M. Schober |

As used herein, "***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks in Atlanta, Georgia or Coram, New York are authorized or required by law to close. Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered under this **Section 10** by giving the other parties notice in the manner set forth herein.

11.    **Remedies.** Employee acknowledges that any breach of the restrictive covenants and agreements in this Agreement would result in irreparable harm and damage to Company and Company Entities which could not be adequately compensated in monetary damages. Employee therefore agrees that Company, in addition to any other rights and remedies available to it, shall be entitled to obtain an immediate injunction from any arbitral tribunal or court of competent jurisdiction if any such breach, or a threat thereof, occurs which Company in good faith believes will or is likely to result in irreparable harm to Company or any Company Entity. In the event the enforceability of any of the terms or provisions of this Agreement shall be challenged and Employee is not at that time enjoined from breaching any of the restrictive covenants, then if the challenged restricted covenant is found to be enforceable, the time periods during which Employee is restricted shall be deemed tolled upon the filing of the proceeding or other document or pleading challenging the enforceability of this Agreement until the dispute is finally resolved and all periods of appeal have expired.

12.    **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither Company nor Employee may assign this Agreement or any of its respective rights, interests or obligations hereunder without the prior written approval of the other party (as applicable, being the party of opposing interest), and any purported assignment in violation of this Section shall be null and void. Notwithstanding the foregoing, Company may, without consent, assign its rights hereunder to an affiliate, to any acquirer of all or any material portion of Company's business, or collaterally to any lender in connection with any bona fide financing transaction.

13.    **Covenants Independent; Survival.** The covenants, agreements, representations, and warranties of Employee contained in this Agreement are in addition to the covenants, agreements, representations and warranties of Employee contained in any other agreement or document in favor of Company, and this Agreement will in no way affect or be affected by the scope or continuing validity of any such covenant, agreement, representation or warranty of Employee. Employee's obligations pursuant to **Sections 7, 8** and **9** will survive the Termination Date and any termination of Employee's employment or this Agreement.

14.    **Counterparts; Effectiveness.** This Agreement may be signed in any number of counterparts, and any signatures delivered by telecopy or portable document format (.pdf), each of which shall be an original, shall have the same effect as if the signatures were upon the same instrument and delivered in person.

15.    **Section 409A Compliance.**

(a)    To the extent that any reimbursement, fringe benefit or other, similar plan or arrangement in which the Employee participates during the term of the Employee's employment under this Agreement or thereafter provides for a "deferral of compensation" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended ("*Section 409A*") (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, (ii) the amount eligible for reimbursement or payment under such plan or arrangement in one calendar year may not affect the amount eligible for reimbursement or payment in any other calendar year (except that a plan providing medical or health benefits may impose a generally applicable limit on the amount that may be reimbursed

11

or paid), (iii) subject to any shorter time periods provided in any expense reimbursement policy of Company, any reimbursement or payment of an expense under such plan or arrangement must be made on or before the last day of the calendar year following the calendar year in which the expense was incurred and (iv) the reimbursements shall be made pursuant to objectively determinable and nondiscretionary Company policies and procedures regarding such reimbursement of expenses. In addition, with respect to any payments or benefits subject to Section 409A, reference to the Employee's "termination of employment" (and corollary terms) with Company shall be construed to refer to the Employee's "separation from service" (as determined under Treas. Reg. Section 1.409A-1(h), as uniformly applied by Company) with Company. Whenever a provision under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of Company. The Employee's right to receive any installment payments hereunder shall, for purposes of Section 409A, be treated as a right to receive a series of separate and distinct payments. If the timing of the Employee's execution of a general release of claims pursuant to **Section 5** could impact the calendar year in which any payment under this Agreement that is subject to Section 409A will be made, such payment will be made in the later calendar year.

(b)    Notwithstanding anything to the contrary in this Agreement, if the Employee is a "specified employee" within the meaning of Section 409A at the time of the Employee's separation from service (other than due to death), then any payment under this Agreement that is subject to Section 409A and that is payable by reason of the Employee's separation from service within the first six (6) months following the Employee's separation from service will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of the Employee's separation from service. All subsequent related payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if the Employee dies following the Employee's separation from service, but prior to the six (6) month anniversary of the separation from service, then any payments delayed in accordance with this paragraph will be payable in a lump sum as soon as administratively practicable after the date of the Employee's death and all other related payments will be payable in accordance with the payment schedule applicable to each payment or benefit.

(c)    This Agreement (including any of the Severance Benefits) is intended to comply with the requirements of Section 409A so that none of the payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and, if any ambiguity is found herein with respect to such payments or benefits, any such ambiguities will be interpreted to so comply. If any payment or benefits subject to Section 409A could be construed not to comply with Section 409A, Company and the Employee agree to work together in good faith to amend this Agreement and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition under Section 409A.

16.    **Entire Agreement.** This Agreement (including the Exhibits hereto) constitutes the entire agreement of the parties to this Agreement with respect to the subject matter hereof and supersedes all prior agreements, understandings and negotiations, both written and oral, between the parties with respect to the subject matter of this Agreement; provided, however, that nothing

contained herein shall be deemed to modify, amend or supersede that certain Asset Purchase Agreement (the "**Purchase Agreement**"), dated as of the date hereof, by and among the Company, Garden Dept., and the shareholders of Garden Dept., which shall remain in full force and effect in accordance with its terms. Any prior employment agreement or relationship of Employee with Garden Dept. is terminated effective as of the Effective Date, and Employee agrees that Company does not assume any prior employment agreement or relationship, and is not liable for any liabilities or obligations under or in respect of any prior employment agreement or relationship of Employee. Employee shall look solely to Garden Dept. for performance under any such prior employment agreements.

17.    **Amendments; No Waivers.** Any waiver of this Agreement must be in writing and signed by the party against whom it is to be effective, and any amendment to this Agreement must be in a writing signed by both parties. No failure or delay in exercising any right, power or privilege hereunder shall constitute a waiver thereof, nor shall any single or partial exercise or waiver thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by applicable law.

18.    **Governing Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of New York (without reference to its principles of choice or conflict of laws that would result in the application of the laws of a different jurisdiction).

19.    **Severability.**    If any provision of this Agreement is deemed or held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, this Agreement shall be considered divisible and inoperative as to such provision to the extent it is deemed to be illegal, invalid or unenforceable, and in all other respects this Agreement shall remain in full force and effect; provided, however, that if any provision of this Agreement is deemed or held to be illegal, invalid or unenforceable, there shall be added hereto automatically a provision as similar as possible to such illegal, invalid or unenforceable provision as shall be legal, valid or enforceable. Further, should any provision contained in this Agreement ever be reformed or rewritten by any court or arbitrator, such provision as so reformed or rewritten shall be binding upon Employee and Company. In the event the restrictions contained in **Sections 7, 8** or **9** are held overbroad or unenforceable because of the duration, area, or matter of such provision, the parties intend that such provision be modified by the court or arbitrator by reducing the duration, area, or matter of such provision and, in its reduced form, enforcing the provision to the maximum extent permissible.

20.    **Arbitration.** All disputes arising directly or indirectly out of this Agreement, including the performance or non-performance of a party or the meaning or construction of any provisions ("**Disputes**"), shall be fully resolved in confidential arbitration proceedings as set forth in this **Section 20**. All Disputes shall be submitted to binding arbitration conducted and governed by the American Arbitration Association, Rules of Commercial Arbitration ("**AAA Rules**"); provided that (1) any arbitrator selected or otherwise assigned to decide the matter shall be an attorney licensed in the United States who has at least ten years of legal experience in transacting or litigating commercial claims, (2) any arbitration hearings shall take place in Suffolk County, New York, and the parties shall use good-faith efforts to schedule such hearings on successive days, (3) the arbitrator(s) shall be required to hear, and rule on, dispositive motions

13

(such as a motion for summary judgment) addressing any issues of law or undisputed facts as provided by Fed. R. Civ. Proc. 56, (4) the parties are entitled to depose such witnesses whose anticipated testimony is found by the arbitrator(s) to be relevant to determine the matter, (5) the parties are required to complete discovery during a period of time that shall not exceed six months, (6) no postponements are allowed in the absence of the parties' agreement or good cause shown, (7) the parties are permitted, without limitation, to submit closing briefs, which must be considered in the arbitration decision if submitted to the arbitrator(s) within a reasonable time to be determined by the arbitrator(s), and (8) the arbitration decision must follow applicable law and consist of a reasoned opinion. Such arbitration shall be conducted at a time and place mutually agreed upon by the parties; but, in the event of such failure to agree on either the place or the time for arbitration, such decision shall be made by the American Arbitration Association. In all cases, one arbitrator shall be selected in accordance with the AAA Rules (the "***Original Arbitrator***"). The Original Arbitrator shall decide the matter, unless the amount in controversy (as determined by the Original Arbitrator) exceeds $1 million and either party elects to have a panel. In such event, there shall be a panel of three arbitrators, consisting of the Original Arbitrator and one arbitrator selected by each party. Any award or decision in arbitration shall be binding upon both parties and shall be enforced by any court of competent jurisdiction. Any damages recoverable by either party pursuant to this **Section 20** and this Agreement shall bear interest at an annual rate equal to the prime rate published in ***The Wall Street Journal*** on the day such damages are awarded hereunder (or, if for any reason, ***The Wall Street Journal*** is not published on such day, on the immediately following day on which ***The Wall Street Journal*** is published). Such interest shall accrue from the day such damages are awarded until the day before such damages are irrevocably paid by the party responsible for the payment of such damages and shall be paid on a demand therefor by the other party. The parties further agree that any arbitral proceeding hereunder may, for the sake of efficiency, be combined with any related proceeding arising out of or relating to the Purchase Agreement. Nothing contained herein shall be deemed to restrict or prohibit any party from applying to any court of competent jurisdiction for specific performance or other injunctive relief.

21.    **No Conflicting Agreement.** Employee represents and warrants that Employee is not party to any agreement, contract or understanding that would prohibit Employee from entering into this Agreement or performing fully his obligations hereunder.

22.    **Tax Matters**. All payments made by Company under this Agreement will be subject to the withholding of such amounts relating to taxes or other charges or payroll deductions as Company reasonably determines are required to be withheld pursuant to applicable law, regulation or any benefit plan in which Employee participates. Employee and his beneficiaries are solely responsible for any income or other taxes payable by an employee or his beneficiaries in connection any payment made or to be made or other benefits provided pursuant to this Agreement.

[Signature page follows]

**IN WITNESS WHEREOF**, Company and Employee have executed this Agreement as of the date first written above.

**COMPANY**:

**SITEONE LANDSCAPE SUPPLY, LLC**

By: _____

Name: Briley Brisendine

Title: Executive Vice President and General Counsel

**EMPLOYEE**:

_____

Dominick Caroleo

*[Signature Page to Employment Agreement]*

DocuSign Envelope ID: 38A463F4-31DD-4845-A7B9-BE16DA91F890

**IN WITNESS WHEREOF**, Company and Employee have executed this Agreement as of the date first written above.

<u>**COMPANY:**</u>

**SITEONE LANDSCAPE SUPPLY, LLC**

By: _____

Name: Briley Brisendine

Title: Executive Vice President and General Counsel

<u>**EMPLOYEE:**</u>

_____

Dominick Caroleo

*[Signature Page to Employment Agreement]*

## **Exhibit A**

## **Distribution Sites**

The facilities operated by Garden Dept. as of the date hereof located at (or any replacement location reasonably designated by Company from time-to-time):

- 3672 New York-112, Coram, NY 11727
- 650 Deer Park Avenue, Dix Hills, NY 11746
- 166 Old Country Road, Speonk, NY 11972

The legacy Bissett Nursery facilities listed below (not including the operations of Bissett Equipment Corp.) or any replacement location reasonably designated by Company from time-to-time:

- Bissett Nursery Dix Hills Yard, 470 Deer Park Road, Dix Hills, NY
- Bissett Nursery Main Yard, 323 Long Island Avenue, Holtsville, NY

Employee and Supervisor will mutually establish a phase-in plan for Employee to assume managerial responsibility for the Bissett Nursery Yards over the 30-60 days following the closing of the Purchase.

DocuSign Envelope ID: 38A463F4-21DD-4845-A7B9-BE16DA01E890

## Exhibit B

## Employee's Responsibilities

Employee shall be responsible for the following, subject in all cases to Company's generally applicable policies and procedures, reasonable consultation with and supervision by Employee's Supervisor, and compliance with operating and capital budgets established by the Company from time to time with input from Employee (collectively, the "*Services*"):

1. Setting (after consultation with Employee's Supervisor) and attaining sales goals for the Area;

2. Strategic and all other business planning, including scheduling and running meetings with respect to such planning;

3. Managing, supervising, overseeing, motivating, training, coaching, advising and developing employees of the Area (including, but not limited to, evaluating compensation and promotions in line with Company's guidelines);

4. Managing assets of Company relating to the Area, including equipment, inventory and accounts receivable;

5. Selecting and replacing vendors and sub-contractors, and exercising managerial authority over procurement, within the Area;

6. Establishing and maintaining positive relationships with customers, vendors, sub-contractors and employees of the Area;

7. Identifying additional markets or areas of opportunity to meet the growth objectives of Company within the greater New York City metropolitan area;

8. Consultation, as requested, with respect to potential acquisitions in the greater New York City area.

9. So long as the Area is performing in line with established budgets, if Company acquires a nursery or hardscape business in Nassau or Suffolk County, New York, Company will offer Employee the option to add the acquired branches into the Area, subject to the parties agreeing on appropriate adjustment of the Baseline and calculation mechanics for the EBITDA Earnout Payments (as defined in the Purchase Agreement).

10. Maintaining knowledge and awareness of the competition and market intelligence impacting the Business within the Area;

11. Exercising managerial authority over the NSLGA trade show on Long Island to network with existing and potential customers (including, but not limited to, determining Company's booth, employee attendance and other relevant issues);

12. Managerial authority over hiring employees for, and terminating the employment of employees in the Area;

13. Preparation of budgets for the Area;

14. Succession planning of personnel within the Area;

15. Resource planning and management;

16. Spending funds for repairs to, and maintenance or replacement of, equipment as appropriate for the Area;

17. All other day-to-day operations of the Area (including, but not limited to, oversight of employee scheduling, merchandise, pricing and trade-show and in-store displays);

18. Integrating the distribution locations acquired by Company from Garden Dept. into the Business and facilitating a smooth transition to Company's ownership thereof;

19. On-site presence at the Company's legacy business locations in the Area, as reasonably necessary in performing the Services, and during the period beginning upon Closing and ending 60 days after Closing, after consultation with Employee's Supervisor, provided that if the Closing does not occur before January 1, 2020, such period may need to be accelerated (i.e. less than 60 days) as determined by Employee and Employee's Supervisor; and

20. Assisting in, and undertaking other projects for, the benefit of Company and its affiliated entities as may be reasonably requested from time to time by Company, provided that Employee shall only be required to travel for matters reasonably related to the Services and shall not be required to travel out of the greater New York City metropolitan area more than 10% of a full-time employment schedule, unless it is mutually agreed upon by the parties.

In performing the Services, Employee shall have reasonable access to all appropriate books and records of the Company relating to the Area and support resources from Company consistent with its generally applicable practices (including, but not limited to, centralized procurement, data analytics, new product lines and synergistic programs from existing product lines).

**Exhibit C**

**Form of Release**

In consideration of the benefits provided by SiteOne Landscape Supply, LLC ("**Company**") to the undersigned ("**Employee**") under the Employment Agreement, dated January 14, 2020, between Employee and Company (the "**Employment Agreement**"), which are described below, Employee hereby agrees as follows:

1.    Release of Claims. To the full extent allowed by law, Employee does hereby release and forever discharge Company and its subsidiaries, affiliates, predecessors, successors, and assigns, and all of their present and former officers, directors, benefit plans and programs, agents, representatives, shareholders, attorneys, trustees, and employees (hereinafter collectively referred to as the "**Releasees**") from any and all claims, actions, causes of action, suits, entitlements, liabilities, agreements, damages, losses, or expenses (including attorney's fees and costs actually incurred) of any nature whatsoever, whether known or unknown (hereinafter "**Claim**" or "**Claims**"), that Employee has, may have had, or may later claim to have had against any of them for personal injuries, losses or damage to personal property, breach of contract (express or implied), breach of any covenant of good faith (express or implied), or any other losses or expenses of any kind (whether arising in tort or contract or by statute) resulting from anything that has occurred prior to the date Employee executes this Release. This release includes, but is not limited to, any Claims for back pay, liquidated damages, compensatory damages, or any other losses or other damages to Employee or his property resulting from any claimed violation of local, state, or federal law, including, for example (but not limited to), claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (prohibiting discrimination on account of race, color, religion, sex, or national origin); 42 U.S.C. § 1981; the Age Discrimination in Employment Act (the "**ADEA**"), 29 U.S.C. § 621 et seq. (prohibiting discrimination on account of age); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (prohibiting discrimination on account of disabilities); the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 et seq.; the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.; the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq.; Title II of the Genetic Information Nondiscrimination Act of 2008, 42 U.S.C. § 2000ff et seq.; the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.; the New York Civil Rights Law, N.Y. Civ. Rights Law §§ 40-c & 40-d; the New York Equal Pay Law, N.Y. Lab. Law § 194; the New York Whistleblower Protection Law, N.Y. Lab. Law §§ 740 & 215; the New York Discrimination Because of Disability Law, N.Y. Civ. Rights Law §§ 47 to 47-c; the New York Paid Family Leave Benefits Law, N.Y. W. Comp. Law § 201 et seq.; the City of New York Human Rights Law, N.Y.C., N.Y., Admin. Code § 8-101 et seq.; the New York City Earned Sick Time Act, N.Y.C., N.Y., Admin. Code § 20-911 et seq.; or any other Claims under federal, state, or local statutory or common law. The foregoing release of Claims expressly includes a waiver of any right to recovery for the Claims released herein in any and all private causes of action and/or charges and/or in any and all complaints filed with, or by, any governmental agency and/or other person or tribunal. This Release does not, however, waive rights or claims (i) to receive the severance payments (including, without limitation, the Severance Benefits) as provided in the Employment Agreement, or (ii) that may arise after the date Employee signs it below.

Employee expressly acknowledges that this Release is intended to include in its effect, without limitation, all Claims which Employee does not know or suspect to exist in Employee's favor at the time Employee signs this Release, and that this Release contemplates the extinguishment of any such Claim or Claims. Thus, in order to effectuate a full and complete release and discharge of the Releasees, Employee expressly waives and relinquishes all rights and benefits which Employee may have under any state or federal statute or common law principle that would otherwise limit the effect of this Release to Claims known or suspected prior to the date Employee signs this Release, and does so understanding and acknowledging the significance and consequences of such specific waiver.

2.      Covenant Not to Sue. Employee agrees that, except to the extent such right may not be waived by law, Employee will not commence any legal action or lawsuit or otherwise assert any legal claim seeking relief for any Claim released or waived under the Release of Claims provision above. This "covenant not to sue" does not, however, prevent or prohibit Employee from seeking a judicial determination of the validity of his Release of Claims under the ADEA. In addition, this "covenant not to sue" does not prevent or prohibit Employee from filing any administrative complaint or charge against the Releasees (or any of them) with any federal, state, or local agency, including, for instance, the U.S. Equal Employment Opportunity Commission or the U.S. Department of Labor, but Employee understands that by signing this Release, Employee will have no right to recover monetary damages or obtain individual relief of any kind in such proceeding with respect to Claims released or waived by this Release.

3.      Consideration Period. Because the arrangements discussed in this Release affect important rights and obligations, Company advises Employee to consult with an attorney before Employee agrees to the terms set forth herein. Employee has [twenty-one (21)][forty-five (45)][1] days from the date Employee receives this Release within which to consider it, and Employee may take as much of that time as Employee wishes before signing. If Employee decides to accept the benefits offered herein, Employee must sign this Release on or before the expiration of the [twenty-one (21)-day][forty-five (45)-day] period and return it promptly to _____.

4.      Revocation Rights. For a period of up to and including seven (7) days after the date Employee signs this Release, Employee may revoke it entirely. No rights or obligations contained in this Release shall become enforceable before the end of the seven-day revocation period. If Employee decides to revoke the Release, Employee he must deliver to _____ at the contact address described in the preceding paragraph a signed notice of revocation on or before the last day of this seven-day period. Upon delivery of a notice of revocation to Company, this Release shall be canceled and void, and neither Employee nor Company shall have any rights or obligations arising under it. This Release shall become effective (the "**Effective Date**") eight (8) days after the date Employee executes it below, unless it is earlier revoked by Employee.

*[Signature Page Follows]*

---

[1] To be 21 days unless Employee's termination is part of a group termination, in which case Employee shall have 45 days.

DocuSign Envelope ID: 38A463F4-31DD-4845-A7B9-BE16DA01F890

I have carefully read the above Release, understand the meaning and intent thereof, and voluntarily agree to its terms this _____ day of _____, 20____.


_____

Dominick Caroleo


**SITEONE LANDSCAPE SUPPLY, LLC**


By: _____

Name: _____

Title: _____