# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____x
SITEONE LANDSCAPE SUPPLY, LLC,

                              Plaintiff,

                         Case No.:
     -against-       2:23-CV-02084(GRB)(SIL)

NICHOLAS GIORDANO, DOMINICK CAROLEO,
VICTOR CAROLEO, NARROW WAY REALTY, LTD.,
NARROW WAY 2 LLC, THE GARDEN DEPT.
CORP., GROUP 5 ASSOCIATES, LTD., 3670
ROUTE 112 LLC, and 9 4TH ST.LLC, SCAPES
SUPPLY, LLC, NEWAY MANAGEMENT, LLC, and
NEWAY TRUCKING,

                              Defendants.
_____x

                         April 16, 2026
                         9:00 a.m.


     VIRTUAL DEPOSITION OF DOUGLAS COFFEY BLACK,

a witness on behalf of the  Plaintiff, taken

by Defendant, pursuant to order, held via

Zoom videoconference before Susan Fabbricante,

a Stenographer and Notary Public within and

for the State of New York.



             LH Reporting Services, Inc.
             Computer-Aided Transcription
             50 Glen Street, Suite 316
             Glen Cove, New York 11542

224

DOUG BLACK

Generally what you or what SiteOne is doing here is at least disclosing to its investors, in a public forum, that there are, you know, the abilities to compete with SiteOne, and that could adversely affect SiteOne's financials and other things, operations and other things at SiteOne; is that fair?

A.    Yes.  Correct.

(Whereupon, the document is no longer being displayed on the screen.)

Q.    Do you recall testifying in this case on October 15, 2025?

A.    I recall the event, yes.

Q.    Do you recall the sum and substance of your testimony that day?

A.    Not all of it.  A lot of it was around my phone.

Q.    Yes.  Do you recall testifying at your deposition that day that, quote, I am not concerned that there's any relevant data that's missing, end quote?

Do you remember that testimony?

DOUG BLACK

A.   Yes, vaguely.

Q.   That's in reference to the phone, as least the October deposition, the android phone that was lost; is that right?

A.   Yes.

Q.   Do you stand by that statement today?

A.   Yes.

Q.   Are you aware that -- we'll get into this in a minute.

Are you aware that your counsel acknowledges you produced multiple text messages from that very phone recently?

A.   He showed me some of it, yes. There was three I think.

Q.   I think it was four actually.

In any event, how can it be that your testimony six months ago, that there's no relevant data on that phone, is still true when you produced relevant data from that phone?

A.   Well, when I testified, it was relevant to the case, you know, and I stand by that.

DOUG BLACK

I have read those texts.  They had no -- I mean, obviously, I'm communicating with Jerry about the case, but I'm not putting content in those messages, except that Nick's, you know, award was approved.

Q.    We will get into the specific texts.

Mr. Black, I'm very confused.  I don't see the word "content" in the answer I just quoted you from your deposition.

What you said and I'll repeat it, I'm not concerned there's any relevant data that is missing.

The only thing you're testifying that you just confirmed today, a minute ago, you're still not concerned that there's no relevant data on that phone.

One second.  Let me finish.

Relevant data was just produced by your counsel.  So I don't understand how you can stand by that testimony today.

MR. GIBBS:  Objection.

It calls for a legal

DOUG BLACK

conclusion.

You can answer.

A.   I guess my definition of relevant is meaningful to any -- any -- any side of the case, and I made that statement, because I don't put detail in texts.

I tend to send, You call me. I'll call you back, et cetera, and that has proven to be the case here.

Q.   Got it.  I think I understand now.

When you testified at your deposition in October of 2025, when you used the word "relevant," and we're talking about relevant data, in your mind that those answers in and that testimony was concerning meaningful information to either side of the case?

A.   Yes.

MR. CYRULNIK:  That's new information which pose a host of problems, but we can -- let me think about that and come back to it.

DOUG BLACK

litigation is whether it's meaningful to either side.

You said, Yes.

Now you seem to be saying, unless I'm misunderstanding, that is the standard. That is in your head what you deem to be reasonable or whatever, but the standard you understand is relevance.

Can you just give me a clear answer on that?

A.    I believe the standard is relevance.

Q.    Not meaningful?

A.    Not meaningful.

Q.    So when Mr. Bizzaro asked you back in October, whether you believe, as a custodian in this litigation with respect to your missing device, preservation and the like, I'm not concerned there's any relevant data that's missing, you didn't mean relevant.  You're saying you meant meaningful?

A.    Correct.

MR. CYRULNIK:  With that, we

DOUG BLACK

him.

Q.   Would you be surprised to learn that Nevel had multiple conversations with the IT folks at SiteOne, during the course of trying to obtain the text messages on the transfer, and was told repeatedly over and over again that the enterprise applications could not be removed, because it would wipe the device?  Are you aware of that?

A.   No.

Q.   It goes on, "What is now unclear is whether Ranglin returned the phone to Doug Black on or after February 1, or if Ranglin accidentally kept the phone, eventually mixing it in with other old devices collected from other SiteOne employees for the purpose of being wiped and disposed."

Do you see that?

A.   Yes.

Q.   You have no idea, as of this day, meaning July of '25, you have no idea, after that February 1st date, what happened to that phone.  You never saw it again?

282

DOUG BLACK

A.   Well, obviously, I found it in my desk drawer at home.  So he must have given it back to me, and I took it home and put it in the desk.

At the time I didn't know where it was.  I couldn't find it.

I couldn't remember whether he gave it back to me or not.  Just, you know, it wasn't a prime focus of mine.  It was an old phone that I wanted to keep.  So...

Q.   It was not a prime focus of yours despite the litigation hold.

In your public filings with the SEC, and in your private handbooks and rules, SiteOne makes very clear that consequences for destruction or loss of any such information can subject SiteOne to serious liability.

That wasn't a focus of yours?

MR. GIBBS:  Objection.

It mischaracterizes his testimony.

A.   I'm running a large company.  A lot of things I need to focus on.

283

DOUG BLACK

I trust Nevel, and I trust Lynn, and I trust when I gave him the phone that he was going to give it back, and if he gave it back, I was going to keep it.

So I was not, at that point in time, worried about losing the phone.

Obviously, when we went to look for the phone, it was lost.  You know, he was concerned about that.

Our intention -- my intention was to keep the phone.

Q.    Where did you find the phone you said?

A.    I found -- well, I actually didn't find it.  My son Luke, who's 13, found it.

He was going through my drawers in my desk.

Q.    In your desk at home?

A.    My desk at home, yes.  In my study.

Q.    Your study, is that the home office or a different room?

A.    That's my home office.

284

DOUG BLACK

Q.   Top drawer?

A.   No, it was a middle drawer.

Q.   Didn't you testify that you searched your home office?

A.   I did.

Q.   Did you search the drawers?

A.   I did search the drawers, yeah. It was hidden under a couple of old passports, and somehow I missed it.

Q.   When you searched the drawers, you didn't move things around to see if it was under stuff on top?

A.   Yeah, of course I moved stuff around.  Obviously, I didn't move that.

It was tucked in the corner and, you know, there's a lot of things in my drawers, and I believed I searched it thoroughly.  Obviously I missed it.

Q.   How many times did you search your home office?

A.   Several times.

Q.   How many?

MR. GIBBS:  Objection.

Asked and answered.

DOUG BLACK

A.   I can't tell you how many, but I know it was at least three times.  I was highly motivated to get that phone, because --

Q.   I didn't ask highly motivated.

MR. GIBBS:  Let him finish the answer.

MR. CYRULNIK:  He is not answering my question.  So I'm going to stop him before he starts.

MR. CARDELLO:  Hold on.

The witness is going to finish his answer.

If you want to strike his answer as not being responsive, you can, but you can't cut him off.

MR. CYRULNIK:  Okay.  Let me put on the record that if the witness continues to go down these paths and give long answers that are not responsive to my questions, that's fine.

286

DOUG BLACK

Mr. Cardello made his ruling and will allow it.

I move to strike.

We will seek more than seven hours, because I will not be finished on time.

MR. CARDELLO:  You will make that application to me, and I'll make the decision.

If you don't like the decision, you can bring it up to Judge Locke.

MR. CYRULNIK:  Have you already pre-decided that, Mr. Cardello?

MR. CARDELLO:  I have not.

MR. CYRULNIK:  Thank you.

MR. CARDELLO:  Why would you ask me that question?

MR. CYRULNIK:  I thought that was what you were implying.

MR. CARDELLO:  No, I wasn't implying at all.

What I said to you is your

287

DOUG BLACK

avenue to address your concerns, which is what I do.

I'm giving you what you are seeking relief.  I'm giving you the avenue to which you could seek the relief based upon what I'm hearing right here.  That's all I'm saying.

MR. CYRULNIK:  I understand.  Thank you.

MR. CARDELLO:  Please do not mischaracterize what I said.

MR. CYRULNIK:  Mr. Cardello, I phrased it as a question, because that is how I understood it.

You told me I was wrong.  That's great to hear.

MR. CARDELLO:  Thank you.  Let's move on.

BY MR. CYRULNIK:

Q.   Mr. Black, were you finished with your testimony?  If you weren't, go ahead.

A.   No, I'm finished.

DOUG BLACK

Q. The several, quote, unquote, times you searched your home office for your missing phone, were those in a narrow time frame?

In other words, when you realized the phone was missing within two days, three days, that's when you searched it several times or over the course of time?

A. I would say, over the course of time.

Q. Okay. Do you know why your son was searching in your home office desk drawers?

A. Yeah, he was looking for a hole puncher, a three -- three hole puncher for his homework, and he found my phone instead.

Q. What did he do if you know? Were you there when he found it? What did he do immediately after?

A. Yeah, I was -- I was in our room, in our master bathroom, and he came in, and said, Here's what I found.

He knew. You know, my wife and he knew I was looking for the phone, and it

289

DOUG BLACK

was a good -- it was a good day.  He found it.

Q.    In other words, he said, Here's the phone you've been looking for?

A.    Yeah.

(Whereupon, the document is no longer being displayed on the screen.)

Q.    What was your immediate reaction?

A.    I was ecstatic.

Q.    Did you turn it on right away?

A.    I did turn it on to see if it was, you know, operating.  I checked to see if it had texts.  It did.

And so I notified Travis, Lynn and Nevel that, Hey, I found the phone.

Nevel said, Turn it off, because if you leave it on, and it connects to the Internet, it might delete the texts.  So I turned it off immediately.

I brought it in, gave it to Lynn, and Lynn gave it to Nevel.

Q.    Let's break that down.

Did all of that, meaning, turning

290

DOUG BLACK

it on, seeing the texts messages, emailing Nevel and others, did all that happen while you were still in the -- did you say master bathroom?

A.   No.  No, I -- it was probably 30 minutes later.  You know, I finished whatever I was doing.  Sent the email out.

I can't remember how fast it took him to respond, but when he responded, I immediately turned it off, you know, turned it off per his instruction.

Then this was over the weekend. So I think it was Monday, or whenever I came into the office, and Lynn was in.  So it happened over, you know, a course of a couple of days.

Q.   The email you sent to Nevel, that was about 30 minutes after your son brought you the phone?

A.   I would say, yes.

Q.   The turning it on, the first step of turning it on and seeing there are text messages, did that happen immediately?

A.   Yes, I did that immediately, and

DOUG BLACK

then I think I plugged it in to charge it, because, you know, I wanted -- I believe I had to plug it in to get it charged to turn it on.

Q.   You said you couldn't turn it on immediately?

A.   Look, I'm going by memory here, but I don't -- I don't -- I don't remember whether I had to plug in to a charger first, but we found the phone.

I got the phone, and I went, and turned it on.  Either I charged it first and then turned it on, or it had juice in it already.

Q.   Mr. Black, what date was this?

A.   I don't remember the exact date, but I think it was March.

Q.   Can you try to remember the exact date?  Was it the end of March, the beginning of March, the middle of March?

A.   I don't know the exact date.

Q.   You don't know if it was in the beginning, middle or the end of March?

MR. GIBBS:  Objection.

DOUG BLACK

Asked and answered twice.

MR. CYRULNIK:  Evan, it hasn't been answered.

He said he doesn't remember. I'm trying to pin him down whether it was the beginning -- hold on.

Mr. Cardello, I think we need your assistance here.

I asked for an attorney proffer on very, very basic and fundamental details like this by letter, I think on April 1st, and Evan refused.

We reserve our right on that.

What he responded in the letter is that we can explore all of this at Mr. Black's deposition.

That is what I'm doing.

I would like him not to interrupt and saying the witness answered when he doesn't remember

DOUG BLACK

something.

I can try and rejog his memory.

MR. CARDELLO:  Well, I am going to allow you to do that.

You can ask the question, and you can ask it again.

The witness will answer the question to the best of his ability.

If he doesn't know, he doesn't know, but you can ask the question.

BY MR. CYRULNIK:

Q.  Mr. Black?

A.  If I recall, it was mid March.

Q.  So about a month ago, and you do not remember -- strike that.

You have been searching for this phone for a long time.  It had been an issue.  There were multiple letters from counsel.  There were motion practice.  A lot has been going on concerning this phone.

You said you were eager to

294

DOUG BLACK

retrieve the phone. You searched several times over the course of time.

You retrieved that phone roughly 30 days ago, and your testimony today is that you do not remember whether you had to charge the phone when you turned it on, or it had juice in it; is that accurate?

A. That is accurate.

Q. Where did you get the charger?

A. It's -- you know, I found a [sic] android charger. I guess we still had it.

Q. Was it in that same drawer?

A. I don't know. No, it wasn't in the same drawer, because -- well, I don't know where I got the charger.

Q. Does your wife use an iPhone or an android?

A. She uses an iPhone.

Q. Does your son use an iPhone or an android?

A. He doesn't have a phone.

Q. Okay. I like that.

Why would you have an android charger lying around the house?

295

DOUG BLACK

A.    Because I use to have an android phone.

Q.    Two and a half years prior?

A.    Yeah.  I don't even know the difference between an android phone charger and an -- and an iPhone to tell you the truth.  It might be the same thing.

Q.    You don't remember if you used the phone charger that you use for your regular iPhone to charge it?

A.    I just told you, my son brought me the phone.  I was ectatic.

I went and either charged it, and turned it on, or I turned it on, and checked it, and was excited, and then I sent out the email.

I do not remember whether I charged it first, or turned it on first, and I don't remember where I got the charger.

Q.    Okay.  If that's your testimony, that's your testimony.

Did you inform Mr. Gibbs that you found your phone?

A.    I informed Nevel, Travis and Lynn

DOUG BLACK

as I mentioned.

Q. What was the next step with your phone after you sent the email to them informing them? What did you do?

A. Nevel responded. Told me to turn it off. I went in and turned it off.

Came in. Again, this would be either Monday or Tuesday. I'm not sure when I was in the office next, but Lynn and I were both in the office.

I gave it to Lynn, and from then -- from there on, I left it up to Lynn and Nevel to get the text and give it to you all.

MR. CYRULNIK: Susan, I'm sorry.

Can you read back the answer please?

(Whereupon, the requested material was read back.)

Q. You haven't seen the phone since?

A. No.

Q. In between the time that your son discovered the phone and brought it to you,

DOUG BLACK

and the following Monday, where you gave it to Lynn, this was on a Saturday you said?

A.   I'm not sure if it was Saturday or Sunday.  It was during the weekend.

Q.   So in between the 24, 48 hour period from when your son, he's 13 years old you said?  He's 13 years old?

A.   Yes.

Q.   Your 13 year old found the phone, and brought it to, and you gave it to Lynn.

Did you check any personal texts or photos on it?

A.   I did.  I checked the text to see if they were there, and they were there.

Q.   I'm sorry.  Aside from checking to see if they were there, did you read any texts or look at any pictures?

A.   Not specifically.  I was really just concerned with the texts there.  So...

Q.   So sitting here today, a month later, you still have not looked at any specific texts or pictures on that phone?

A.   No.  No.

Q.   You did testify, at your prior

DOUG BLACK

deposition, that the primary reason you wanted to keep the phone, and why you were upset that it was lost, was that you had personal texts and photos on there; do you remember that?

A.   Yes.

Q.   It's been 30 days and now that you have it, you haven't asked to see those?

A.   Well, it's been years.  So I wanted to keep the phone in case I wanted to access information or pictures, and it's just -- you know, it's been years.

So -- and I haven't needed to -- you know, I haven't felt like I'm missing anything.

So -- so, yeah, I guess I'm comfortable that there's nothing on there that I'm going to need.

Q.   From the time that you gave the phone to Lynn on that Monday, after discovering it on Saturday or Sunday, in mid March, do you have any understanding as to what happened to that phone since then?

A.   No.  I mean, I assume it was --

DOUG BLACK

they downloaded.

I was given an update by either Lynn or Nevel that, Hey, we were able to get the texts off the phone.

I said, That's great.

That's -- that's -- you know, that's the only reason -- at this point in time, I don't -- I don't need the phone any more.

If we can get the texts off of it, I assume that's -- that's what we needed it for.

Q.   You can't give us any other details beyond what happened, what protocols were put in place, who did what?

A.   No.

MR. CYRULNIK:  I don't want to spend time on the record, but Mr. Cardello, as soon as we're done, I will break a couple of minutes before four.  We need to discuss what we're going to do.

MR. CARDELLO:  We'll talk about that after we conclude.

300

                    DOUG BLACK

                    We need to do that before four o'clock, because we have a hard deadline at four o'clock.

                    Clearly we are not getting through the seven hours.  So we'll talk about that as well, or we'll talk about that tomorrow.

                    I understand your concern.

                    We'll talk.

                    MR. CYRULNIK:  Okay.

BY MR. CYRULNIK:

        Q.    Now Mr. Black, did you have -- who are the three people that you emailed? I apologize.  It was Nevel, Lynn and who else?

        A.    Travis Jackson.

        Q.    Did you ever inform the board that the phone was recovered?

        A.    No.

        Q.    Do you know if anyone informed the board that the phone was recovered?

        A.    No.

        Q.    No, you do not know, or no, it was not informed?

DOUG BLACK

A.    I don't believe the board was informed that I found the phone.

Q.    Was the board informed that you lost the phone?

A.    I might have been -- I doubt it.

Q.    Do you think that is not something important that the board should know?

A.    No, it's not important that the board should know.

Q.    Because it's not important or it doesn't rise to the level of importance that the board needs to know?

A.    Because it doesn't rise to the level of importance that the board needs to know.

Q.    Do you know why your counsel, and I'm not asking for any discussion you had on this.

I'm asking you if you know why your counsel waited approximately two plus weeks to let us know that the phone they swore had been missing and quote, in every sense of the word, and would immediately let

DOUG BLACK

us know if it was located was located?

A.  No, I don't know.

Q.  Do you know when your counsel -- strike that.  I guess you can deduce that from my question.

Were you made aware that there were any text messages recovered from that phone that were relevant to this litigation?

A.  I was made aware yesterday, yes, when -- when Mr. Gibbs and I discussed the deposition for today.

Q.  So prior to that, you had no idea whether there were any messages on that phone that were in any way relevant?

A.  No.

MR. CYRULNIK:  I'm going to take a quick five minute break.

MR. CARDELLO:  Everyone come back at 3:30.

(Whereupon, a recess was taken.)

MR. CARDELLO:  Back on the record.

CONTINUED EXAMINATION BY

DOUG BLACK

MR. CYRULNIK:

Q.    Mr. Black, are you aware that in that letter, a couple of weeks after you found your cell phone, your counsel represented that they extracted roughly 17 thousand text messages including attachments?

A.    No, I wasn't aware of that.

Q.    Does that number surprise you at all?

A.    No.

Q.    Do you know of those 17 thousand text messages, do you know how many were produced to me?

A.    No.

Q.    Did you ever text Don Caroleo?

A.    I don't know.

Q.    Sitting here today, you don't recall a single instance where you texted with Don Caroleo?

A.    I mean, I really don't know.  I may have texted him.

Q.    In October 2025, this is page 87 of your deposition transcript.  I have a

304

DOUG BLACK

question from Mr. Bizzaro.

QUESTION:  Do you recall, sitting here today, ever sending a text message directly to Don Caroleo?

"ANSWER:  Directly to Don, I'm sure.  Yeah, I'm sure I did.

Q.    What changed between October and today, April 16th, to make you say you don't know?

A.    Well, I think I just said that I may have.  So it's the same.  I may have sent him a text.

Q.    It is a little different, Mr. Black, and nuances is how lawyers deal with this world.

You said you're sure you did, and now you may have.

Those are two different things.

MR. GIBBS:  Is there a question pending?

MR. CYRULNIK:  Yes.

Q.    Can you explain to me what changed between October and April?

305

DOUG BLACK

A.    Nothing's changed.

Q.    I guess I'll ask it this way: Are you sure you texted Don Caroleo or is it possible that you did?

A.    It's possible that I did.

Q.    You're not sure?

A.    I'm not sure.

Q.    Let's go into the text messages. Your counsel produced the four text messages total out of 17 thousand.

Not a single one with Don Caroleo by the way.  So we'll deal with that with your counsel.

For now, let's go to the paltry number off text messages they did produce.

We'll start with, in no particular order, this one.

(Whereupon, the document is being displayed on the screen.)

MR. CARDELLO:   What exhibit number is it?

MR. CYRULNIK:   This is going to be Exhibit Number 9, Doug Black 9.

306

DOUG BLACK

(Whereupon, Doug Black Exhibit 9, Text Messages, Bates stamp SiteOne 757662 through Bates stamp SiteOne 757663, Two-Page Document, was hereby marked for identification.)

MR. CYRULNIK:  Doug Black 9 is a text message between Doug Black, Briley Brisendine, Bates stamp SiteOne 757662 through 663.

Q.   Mr. Black, I direct your attention, the first page is a report on the message.

It says, "Total Messages:  2; Date Range:  January 13, 2023; Participant, Briley Brisendine," in all caps, and Doug Black in lower case.

Do you see that?

A.   Yes.

Q.   The actual message is, and I'll read them out loud.  There's only two.

At 11:15 a.m, on January 13th, Briley Brisendine texts you, "Sorry I missed you.  I am free when you are."

307

DOUG BLACK

Then Briley Brisendine sends another message at 3:28, saying, "Do you have a minute for a short call this afternoon on the Caroleo negotiations?"

Do you see that?

A.   Yes.

Q.   I have a few questions here.

First is, do you recall receiving these messages from Mr. Brisendine?

A.   Not specifically.

Q.   Do you have an understanding of what Mr. Brisendine was referring to when he asked for a call to ask you to discuss the, quote, Caroleo negotiations?

A.   No.

Q.   You have no idea what that's referring to?

A.   I have no idea.  I mean, obviously, it has to do with Caroleo negotiations, but...

Q.   I'm saying, do you know which negotiation he's talking about?

A.   No, I don't.

Q.   I don't see any response from you

308

DOUG BLACK

either between Mr. Brisendine's first message, or second message, or even a response saying, Yeah, sure.  I have time for a call this afternoon.

Do you know why?

A.   I don't know why.

Q.   Do you know why Briley Brisendine is listed first in the recipient, and at the top these messages?

A.   No.

Q.   Do you know why Briley Brisendine is in all caps and Doug Black is not?

A.   Briley's name is all caps.  It was entered in the system that way.

Q.   What system are you taking about?

A.   Well, in my contacts.  That's -- that's how his name looks, and most of my contacts aren't like that.  So I don't know. Whoever put it in there.

Q.   In your personal contacts, you're saying Briley Brisendine appears like that?

A.   Yes.  Yes.

Q.   Understood.

(Whereupon, the document is

DOUG BLACK

no longer being displayed on the screen.)

MR. CYRULNIK:  Let me table this one for a second, and we'll come right back to it.

Let's go to a different one. I am marking this one as Doug Black Exhibit 10.

(Whereupon, Doug Black Exhibit 10, Text Messages, Bates stamp SiteOne 757660 through Bates Stamp SiteOne 757661, Two-Page Document, was hereby marked for identification.)

(Whereupon, the document is being displayed on the screen.)

MR. CYRULNIK:  This one is similar to the last one, two pages with a cover of a message report and a message, SiteOne 757660 through 661.

Q.   You will see here that again, "Participants:  2; Date Range:  10/25/2022; Total Messages:  3."

310

                    DOUG BLACK

          Do you see that?

     A.   Yes.

     Q.   As you correctly noted, this one references to Jerry Justice, not Briley Brisendine.

          I should say, Jerry Justice that is in the normal alphabetical world, and not caps.  Do you see that?

     A.   Yes.

     Q.   Do you see here that your name appears first, not Justice?

     A.   Uh-hum.

     Q.   In Exhibit 9, we saw Brisendine appear first and not you?  Do you see that?

     A.   Uh-hum.

     Q.   Does that indicate to you one of these sets of messages did not actually come from your phone?

     A.   I don't know what that means at all.

          MR. CYRULNIK:  Counsel, do you want to shed any light on that?

          MR. GIBBS:  It's not my

311

DOUG BLACK

deposition.  I'm not answering

questions.

MR. CYRULNIK:  In your

letter, you said we could explore

this to the full extent of the

deposition, and your witness

doesn't know the answer.

I'm asking you.

MR. CARDELLO:  We're not

going to do that during the

deposition.

We can do it subsequent to

the deposition.

MR. CYRULNIK:  Okay.  Fair

enough, Mr. Cardello.  Thank you.

Q.   So these are messages --

MR. CYRULNIK:  Sorry?

Q.   From Jerry Justice back in

October of 2022.

At 1:40, Justice says, "Give me a

couple of minutes."

At 3:20 you respond, you say,

"Nick's award is approved."

A minute later, at 3:21, Justice

312

                         DOUG BLACK

responds with a thumbs up, and "thank you."

          Do you see that?

     A.   Yes.

     Q.   Do you remember receiving these messages?

     A.   Not specifically.

     Q.   What did you mean by, "Nick's award is approved"?

     A.   It would have been his equity award approved by the HRCC committee.

     Q.   What was the amount of that equity award at that time?

     A.   I believe it was 300 thousand dollars.

               (Whereupon, the document is no longer being displayed on the screen.)

     Q.   Do you remember the discussions with Justice -- presumably there were discussions, I should say -- between you and Justice concerning Nick's equity award prior to this text; is that right?

     A.   Yes, of course we would have discussed it.

CERTIFICATION
STATE OF NEW YORK )

COUNTY OF NASSAU   )


I, SUSAN FABBRICANTE, a Stenotype Reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose deposition is herein before set forth, was duly sworn by me, and that such examination is a true and accurate record of the testimony given by such witness to the best of my ability.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of April 2026.


SUSAN FABBRICANTE