

**Michael Cardello**
Managing Partner
Direct Dial: (516) 880-7290
Email:  mcardello@moritthock.com

August 10, 2026

**Via ECF**

Magistrate Judge Steven I. Locke
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

> Re:    ***Siteone Landscape Supply, LLC v. Nicholas Giordano, et al.***
> **Case Number 2:23-cv-02084-GRB-SIL**

Dear Magistrate Judge Locke:

Pursuant to the Minute Order dated May 18, 2026, Your Honor authorized me, as Special Master, to "retain an appropriate expert to examine a Samsung Galaxy cell phone for the purpose of determining whether any type of text messages have been deleted between January 1, 2024 through March 31, 2026, and whether the phone had been turned on and where, during that same period."

Pursuant to the August 3, 2026 Electronic Status Report Order, the parties were instructed to submit a status report to the Court by August 10, 2026, today.  Attached hereto are each parties' respective updates.

In addition, after reviewing Plaintiff's and Defendants' individual status updates, I note for the Court that I disagree, in part, with the parties' characterizations of facts with regard to the IT Forensic review process that I will discuss at the Court Conference on August 12, 2026.

If the Court has any questions, please do not hesitate to contact me.  Thank you.

> Respectfully submitted,
>
> *Michael Cardello III*
>
> Michael Cardello III
> Special Master

MCIII:kla
Attachments

cc:    All counsel via ECF

_____

400 Garden City Plaza, 2nd Floor, Garden City, NY 11530 | P: 516.873.2000 | F: 516.873.2010 | www.moritthock.com

4413850v1

*SiteOne Landscape Supply, LLC v. Giordano et al.*
Case No.: 23-CV-02084-GRB-SIL
Joint Status Report of the Parties – SiteOne Insert

## JOINT STATUS REPORT- PLAINTIFF'S POSITION

This Court's May 18, 2026 Order [ECF 287] (the "Order") required the parties to file a joint status letter on June 19, 2026. Because the forensic examination required by the Order was delayed, as further detailed below, the Court adjourned the parties' deadline to submit a joint status letter to August 10, 2026. This letter now provides that report.

### I.    BACKGROUND

a.   Case Status.

First and foremost, fact depositions concluded on June 22, 2026.

The more recent developments in this case, and the below described dispute between the parties on how to proceed, arise from the subjects of SiteOne's CEO Douglas Black's cell phone and from the withdrawal last week of one of Defendants' counsel. Defendants are attempting to use both developments as a basis for further delay in the progress in the case. SiteOne opposes any delay. We address these issues in turn.

Mr. Black's cell phone: SiteOne originally reported to Defendants on May 27, 2025 that Mr. Black had lost his Samsung device. On March 30, 2026, SiteOne counsel reported that Mr. Black had since found the phone. Arguing sarcastically that it is "miraculous[]" that Mr. Black located his device, Defendants moved to compel a forensic examination of the device. [ECF 285].

b.   The May 18 Order (and associated colloquy) Granting Forensic Review of Mr. Black's Found Phone.

On May 18, 2026, the Court granted Defendants' request for a forensic examination of Mr. Black's device for a very limited purpose: to determine whether from January 1, 2024 to March 31, 2026, (1) any text messages were deleted, and (2) whether (and if so, where) the phone had been turned on in that time period. [ECF 287] (the "Order").

Three points from that Order and the colloquy with the Court now stand out in retrospect. *First,* for the reasons elaborated on below, the Court was prescient in stating that "I suspect that there's going to be a whole lot of nothing" to be gained in the process. May 18, 2026 Hearing Tr. 14:4-5. *Second,* the Court shut down Defendants' attempt at "what aboutism", in which Defendants' counsel stated "a similar situation, albeit I think not as grave, happened with respect to my clients. Both Don and Vic Caroleo –" and the Court immediately interrupted to remind counsel that "Your client admitted deleting information from their phones." May 18, 2026 Hearing Tr. 5:13-18. *Third,* SiteOne counsel made clear at the time Plaintiff's strong position that this exercise should not delay further progress towards dispositive motions and trial: "[T]he substance of the review is fine if we can do it expeditiously and move things along, get other deadlines set and keep the case moving. That is our primary concern." May 18, 2026 Hearing Tr. 14:7-10.

That was almost three months ago. Unfortunately, the Black cell phone forensic process indeed caused this case substantial delay (the postponement of the originally scheduled status

1

*SiteOne Landscape Supply, LLC v. Giordano et al.*
Case No.: 23-CV-02084-GRB-SIL
Joint Status Report of the Parties – SiteOne Insert

conference and the 100% attention this issue has received in that time to the exclusion of any other forward progress). Defendants are now pushing for still more delay, as evidenced by the filing of Mr. Kevin Cyrulnik's motion to withdraw and adjourn the August 12 conference [ECF 294], as well as Mr. Bizzaro's email to Special Master Cardello of Saturday morning, August 8, arguing that "the status letters to the Court [i.e., this very letter] are premature since the forensic exam is not complete." Thus, Defendants not only want to avoid the upcoming conference – they want to avoid even *reporting* about the case.

c.  The Forensic Examination is Concluded.

There is no reason for further delay. The expert work will soon be completed – after repeated extensions which themselves delayed the progress of this action. Specifically: in accordance with the Order, on May 20, 2026, Special Master Michael Cardello retained the forensic expert company, Lexpath Technologies Holdings, Inc. (the "Expert" or "Lexpath"), to conduct the examination. The Order required that the Expert provide Special Master Cardello with its findings "no later than May 29, 2026."

Shortly after the Expert's retention, Special Master Cardello advised the Court that Lexpath required additional time to complete the forensic examination and requested that the Expert be given two additional weeks, until June 23, 2026, to report its findings to the Special Master. [ECF 289]. The Court granted this request. On June 18, 2026, Special Master Cardello requested a second extension, until July 17, 2026, for the expert to report its findings. [ECF 290]. The Court granted this request as well. Finally, on July 31, 2026, Special Master Cardello requested a third extension, until August 5, 2026, for the expert to issue its final report. [ECF 292]. The Court granted this request.

Since Lexpath's retention, the Parties, with Special Master Cardello, have had numerous live conversations, on May 21, June 1, June 5, June 22, and July 21, with Mr. Generosa, a Partner at Lexpath, to discuss Lexpath's processes given the security features of Mr. Black's device. One such conversation, on June 5, 2026, included SiteOne's Telecom Team Leader, so that she could directly advise the forensic expert about the security features on Mr. Black's device. The parties' contact with Mr. Generosa has not been limited to these live discussions – they have also directly corresponded with Mr. Generosa directly throughout this process.

The Expert issued an interim report on July 28, 2026 which, responding to the questions posed by this Court in the May 18 Order, did not find evidence regarding the destruction of text messages or that the device was turned on or off during the relevant time period. The interim report discussed at length the security features on Mr. Black's phone, which are "industry-standard enterprise security tools" designed to "prevent unauthorized access to the data on the device," and the steps taken by the Expert to bypass those security features. The interim report noted that there were additional measures to be taken to potentially circumvent the phone's security features.

Special Master Cardello on July 31 allowed the Expert to proceed to take those additional measures (hence his grant of the third and most recent extension).

*SiteOne Landscape Supply, LLC v. Giordano et al.*
Case No.: 23-CV-02084-GRB-SIL
Joint Status Report of the Parties – SiteOne Insert

As of the date of the August 12 conference, the final report is not completed. Based on comments from the expert, we do not expect this report to yield any further material information – but even if it does, this should not serve as a block on further case progress in other areas. The issues can proceed simultaneously.

> ### d. Defendant Counsel Mr. Cyrulnik's Withdrawal.

Toward the very end of this process, and indeed not until August 3, one of Defendants' several lawyers on this case, Mr. Cyrulnik, announced that he was withdrawing from the case as he had joined another firm.

Claiming that he was "lead counsel" on this matter, Mr. Cyrulnik asked for a postponement of the August 12 conference until Defendants could obtain "new" counsel. The Court denied the request for postponement.

## II.    CASE SCHEDULE

The parties disagree about next steps. Defendants claim that they have "serious questions" about the Lexpath methodology and the lack of a conclusive examination by the Expert. If Defendants are permitted to continue to pursue this issue, it will delay all and any further progress in this longstanding litigation.

By sharp contrast, SiteOne believes that this process is now complete, the Expert review was appropriate, Defendants are not entitled to any further "expert" reviews of the phone, and the case should move forward expeditiously. It is not remarkable that a publicly traded company puts security features on its CEO's phone. This shows responsibility, not spoliation. This issue has derailed the case's progress more than enough. Accordingly, SiteOne's position is that the case should move forward to the expert and then summary judgment phases, with specific deadlines to be ordered at the August 12, 2026 status conference pursuant to the dates Plaintiff respectfully lays out in Schedule A hereto.

This is the case for several reasons. First, Defendants have not articulated, and cannot, how *anything* on Mr. Black's cell phone could possibly be relevant to this action. The Court has already resolved the question of SiteOne's motives: they are irrelevant. Dec. 1, 2025 Hearing Tr. 27:4-12. This case turns on Defendants' own conduct – specifically, Defendants' decision to open and operate a competing business in violation of their obligations to SiteOne.

Second, apparently recognizing that they are precluded by the law of this case and nothing found to have been deleted would be relevant or admissible, Defendants are now apparently pursuing a theory that destruction is per se relevant whether or not tied to evidence in the case. This has led them to make colorful accusations in a June 8, 2026 email to Special Master Cardello – again, without a shred of proof of actual destruction – that SiteOne and potentially its counsel have engaged in "spoliation, potential evidence tampering, and likely perjury." These accusations are just that – accusations – they are entirely unfounded, based on nothing more than Defendants' speculation.

*SiteOne Landscape Supply, LLC v. Giordano et al.*
Case No.: 23-CV-02084-GRB-SIL
Joint Status Report of the Parties – SiteOne Insert

Third, the forensic examination ordered by this Court is now complete, with the exception of a single process proposed by Mr. Generosa that is unlikely to yield any results. The outcome of a court-ordered process that Defendants themselves sought cannot serve as a justification for prolonging this litigation and Defendants are not entitled to a do-over simply because the forensic examination did not yield the results they anticipated. The case should not be delayed any further simply because Defendants are unhappy with the results.

Fourth, the forensic examination has gone on long enough. To the extent Defendants have remaining questions for the Expert and believe they have some valid basis upon which to argue that *anything* on Mr. Black's phone could possibly be relevant to this Action, Defendants' remaining questions should not interfere with the remaining case schedule.

Fifth and related to the above, none of this should be affected, and the case should not further be delayed, by Mr. Cyrulnik's departure. Mr. Bizzaro, who has been counsel on this matter since March 26, 2025, remains as counsel and has been involved throughout this process, including on calls with Mr. Generosa. Mr. Cyrulnik has apparently known of his just-disclosed departure for some longer time (SiteOne received the conflict waiver request on or about July 29), and so there was ample time between whenever Mr. Cyrulnik knew he was leaving, and today, for Mr. Cyrulnik to have familiarized the experienced Mr. Bizzaro with this very narrow issue.

## III.    CONCLUSION

For the reasons stated above, Plaintiffs request that the Court at the August 12 status conference order that the proceedings follow the schedule respectfully presented below as Schedule A.

*/s/ Daniel E. Gorman*
Counsel for Plaintiff SiteOne Landscape Supply, LLC

4

*SiteOne Landscape Supply, LLC v. Giordano et al.*
Case No.: 23-CV-02084-GRB-SIL
Joint Status Report of the Parties – SiteOne Insert

## SCHEDULE A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SITEONE LANDSCAPE SUPPLY, LLC,

      Plaintiff,

v.

NICHOLAS GIORDANO; DOMINICK CAROLEO; VICTOR CAROLEO; NARROW WAY REALTY, LTD.; NARROW WAY 2 LLC; THE GARDEN DEPT. CORP.; GROUP 5 ASSOCIATES, LTD.; 3670 ROUTE 112 LLC; 9 4TH ST. LLC; SCAPES SUPPLY, LLC; NEWAY MANAGEMENT, LLC; AND NEWAY TRUCKING,

      Defendants.

Civil Action No.: 23-CV-02084

**SCHEDULING ORDER WORKSHEET
DEADLINES AND APPEARANCES**

| | |
|---|---|
| August 25, 2026 | Deadline to produce documents in response to post-deposition document demands. |
| September 8, 2026 | Deadline for Filing Discovery-Related Motions (including those related to spoliation). |
| September 22, 2026 | Identification of case-in-chief experts and service of Rule 26 disclosures. |
| October 22, 2026 | Identification of rebuttal experts and service of Rule 26 disclosures. |
| November 20, 2026 | Completion of expert depositions and expert discovery.[1] |
| January 8, 2027 | Deadline to file pre-motion for summary judgment conference letters. |

---

[1] SiteOne respectfully requests that Michael Cardello III have his appointment expanded to encompass supervision of all expert witness depositions.

**Defendants' Status Position**:

**Case Schedule**

All fact depositions are complete. Defendants' position is that, unfortunately, the case cannot yet proceed because the forensic examination ordered by the Court on May 18, 2026 (ECF 287, the "Order") remains incomplete and, consistent with the Court's statements at the last conference, the remaining case dates cannot be set until that forensic examination is complete. This is particularly so where SiteOne now seeks to advance the case on the strength of a device production whose full security posture it never disclosed -- even while its own personnel participated in calls convened for the express purpose of identifying those very protections (as discussed below).  In sum, SiteOne's attempt to effectively neutralize the Court Order by simply moving forward despite not actually yet obtaining the vital information in the Order is baseless and obviously a self-motivated attempt to preclude Defendants from ever obtaining the information critical to its case.

**Court-Ordered Forensic Examination**

At the outset, the Court should note that its Order for the forensic examination of SiteOne's CEO Doug Black's Samsung device arose because on May 27, 2025 -- over two years after SiteOne brought this action against the Defendants -- Defendants and this Court learned for the first time that CEO Black's cell phone had allegedly been lost in January of 2024 -- despite the issuance of multiple litigation hold letters issued by SiteOne's in house legal department. Thereafter, in March of 2026, approximately one week before Black's deposition and almost one year after declaring the phone lost, the missing Samsung device was purportedly (and miraculously) found in the desk draw of CEO Black's home office notwithstanding that, at his IT-retention deposition, CEO Black testified that he (and his wife) searched their entire home -- including the desk and drawer in question -- multiple times, but could not locate the phone.

The parties' scheduling differences arise from differing constructions of where the recent forensic report ordered by the Court leave the parties.  More specifically, the Order required the forensic examination of the Samsung device belonging to Mr. Black -- the CEO of SiteOne Landscape Supply, LLC, a publicly traded company on NASDAQ (Ticker: SITE) -- to determine three things:  (i) whether any text messages were deleted; (ii) whether the phone had been turned on from January 1, 2024 to March 31, 2026 (the "Relevant Time Period"); and (iii) where the phone was if/when it was turned on during the Relevant Time Period.  The answers to these questions are critical to Defendants' case, especially in light of the incredible set of events surrounding this phone and Mr. Black's sworn testimony concerning same.  The Order permitted Special Master Michael Cardello III to retain an expert in order to conduct the forensic examination, and the forensic expert was required to provide Special Master Cardello with his findings "no later than May 29, 2026."

On May 20, 2026, Special Master Cardello retained a forensic expert, Daniel Generosa from LexPath Technologies Holdings, Inc. ("LexPath"), to conduct the forensic examination in accordance with the Order.  LexPath in turn assigned the examination to its forensic specialists, Veronica Perez, a Senior Computer Forensic Specialist, and Joseph Caruso, a CISSP and Certified

Forensic Examiner, who together authored the report described below. Shortly thereafter, Special Master Cardello advised the Court that LexPath required additional time to complete the forensic examination and requested that the forensic expert be given two additional weeks, until June 23, 2026, to report his findings to the Special Master. [ECF 289]. The Court granted this request. On June 18, 2026, Special Master Cardello requested that the expert be given until July 17, 2026 to report his findings. [ECF 290]. The Court granted this request as well.

Since Mr. Generosa's retention, the Parties have had several conversations with him – on May 21, June 1, June 5, June 22, and July 21 – to discuss LexPath's processes given the security features of Mr. Black's device. One such conversation, on June 5, 2026, included SiteOne's Telecom Team Leader, at Mr. Generosa's request, so that she could directly advise the forensic expert about the security features on Mr. Black's device to facilitate the Ordered extraction. More specifically, and again at Mr. Generosa's request, counsel for all parties spoke with SiteOne's Telecom Team Leader so that LexPath could determine the nature of the AirWatch encryption on Mr. Black's device and guard against any loss of data while LexPath attempted to decrypt it. At no point during that call -- or at any other time -- did SiteOne or its Telecom Team Leader disclose that Mr. Black's device was protected by three separate enterprise security platforms. While the Parties were aware that AirWatch was installed on the device, as confirmed by SiteOne on June 5, 2026, SiteOne never disclosed the existence of the CrowdStrike Falcon endpoint security layer or the full extent of the Knox-enforced encryption configuration. Rather, those additional controls were revealed for the first time in LexPath's July 28, 2026 interim report.

SiteOne's silence is difficult to reconcile with its obligations of good faith and cooperative discovery. *See* Fed. R. Civ. P. 26(e)(1)(A), 26(g). Its own personnel participated directly in calls convened for the specific purpose of identifying the device's security features so that data would not be lost during the examination and to enable Mr. Generosa and his team to successfully extract and decrypt the data Ordered by the Court, yet SiteOne withheld the very information -- the existence of multiple, independently configured enterprise security layers, each administered by SiteOne itself -- that has proven to be the central impediment to compliance with the Order. Having concealed the full scope of the protections it placed on its CEO's device, SiteOne cannot now be heard to treat the resulting delay as a reason to press this case forward and simply ignore the mandate of the Order.

It was not until July 28, 2026 that the Parties received an interim report from LexPath, attached hereto as Exhibit A. The report reveals, for the first time, that Mr. Black's device is protected by multiple, independently configured layers of enterprise security that SiteOne never previously disclosed, including an AirWatch Mobile Device Management platform with a non-removable Intelligent Hub, CrowdStrike Falcon endpoint detection and response, and the hardware-backed Samsung Knox platform enforcing file-based encryption with device-bound keys. LexPath reports that, as a direct consequence of this layered configuration, its many attempts to obtain the information required by the Order -- including attempts using the law-enforcement editions of Cellebrite -- have to date been unsuccessful.

**The severity of these undisclosed protections cannot be overstated**. During the July 31, 2026 conference, Special Master Cardello advised the Parties that, in a conversation with the forensic expert just minutes earlier, Mr. Generosa reported that CEO Black's device carries the

equivalent of "**Department of Defense protections**," that he and his team had "**never seen anything like it**," and that these protections are what caused both the delay and the continued inability to decrypt the encrypted data. This statement from Mr. Generosa is critical -- the team he retained to perform this forensic analysis pursuant to the Court's Order has over forty years of experience doing this type of work; that they can attest they have "never seen anything like [this protection]" is mind-boggling and begs the question of what exactly is Mr. Black hiding, and whether his sworn testimony about the purported loss and sudden finding of the phone is truthful.

Critically, LexPath is currently conducting an Emergency Download Mode extraction, which it hopes will allow it to recover the encrypted user data directly from the handset (Mr. Generosa stated his team's opinion that they believe they have a 50/50 probability of successful extraction using this method). The Parties were advised by Mr. Cardello that LexPath would provide the results of this portion of the analysis by Wednesday, August 5. But that day came and went without any such report, which the Parties still do not have as the time of this submission.

It is abundantly clear that the forensic examination ordered by the Court remains incomplete and that the case cannot proceed unless and until the Order by this Court comes to finality. Defendants are entitled to the full benefit of the examination they sought and which this Court Ordered, and the case should await its completion before moving forward.

Relatedly, the Court's Order appears to have been frustrated due to SiteOne's perplexing conduct in failing to disclose these additional layers of security protection of Black's device. In fact, despite the concerns raised by LexPath – neither SiteOne nor its attorneys have offered to assist in the decryption process (i.e. relaxing or disabling the protections of Black's device).

Finally, the interim report issued by LexPath raises a host of questions, the answers to which could prove critical to advancing this examination and finally complying with the Court's Order. Accordingly, Defendants' respectfully ask the Court to order the following in connection with its existing Order.

As a threshold matter, Defendants respectfully request that LexPath be permitted to finish the Emergency Download Mode extraction and provide the results (whether successful or not) to Mr. Cardello, and then to the Parties. In addition, Defendants make the following five requests.

*First*, Defendants respectfully request that the Court require SiteOne to (a) preserve all enterprise console logs, audit trails, and configuration records relating to Mr. Black's device, and to certify such preservation by sworn declaration; and (b) assist affirmatively in the decryption process by relaxing (or entirely removing) the enterprise security platforms on the Samsung device and by providing any and all information and cooperation to LexPath -- or to another forensic team -- so that Mr. Black's device can be accessed without data loss and the Court's Order can be complied with.

*Second*, Defendants respectfully request that the following questions be answered by SiteOne in a sworn declaration: (1) when CrowdStrike Falcon, the AirWatch Intelligent Hub, and the other security platforms were installed on Mr. Black's device (with documented proof of same); (2) whether these "DOD-level" enterprise security platforms that LexPath "has never seen"

are deployed on all SiteOne officer devices or only on Mr. Black's device; and (3) when SiteOne purchased or licensed AirWatch, the Intelligent Hub, CrowdStrike Falcon, and Samsung Knox.

*Third*, Defendants respectfully request that SiteOne be ordered to comply with the steps set forth in Paragraph 31 of the interim report and recommended by the expert to get the necessary data in compliance with the Court's Order, including obtaining the enterprise consoles from AirWatch/Workspace ONE and CrowdStrike Falcon and obtaining the network-connection records directly from Verizon (whether through a subpoena or otherwise):

> "The remaining avenues most likely to bear on the questions presented do not require further extraction from the handset. Historical device telemetry and management records, to the extent they have been retained, may reside in the enterprise consoles that govern the device — the AirWatch/Workspace ONE console and/or the CrowdStrike Falcon console. In addition, Verizon may maintain network-connection records relevant to whether and/or when the device was powered on and used. Lexpath recommends that the availability of these sources be determined and, where they exist, that they be pursued.")

*See* Paragraph 31 of the interim report.

*Fourth*, Defendants respectfully request the Court to order SiteOne to bear the costs of the forensic examination attributable to the delay and additional complexity caused by its failure to disclose the multi-layered encryption, including all fees incurred by LexPath after the original May 29, 2026 deadline, as well as Defendants' reasonable attorneys' fees and expenses incurred in connection with the extended forensic process, given that SiteOne's non-disclosure is the direct cause of the delay and expense incurred to date. *See* Fed. R. Civ. P. 26(g); Fed. R. Civ. P. 37(b)(2)(C).

*Fifth*, to the extent LexPath's remaining efforts are unsuccessful, Defendants respectfully request the Court to authorize the retention of an additional expert, within ten days of the issuance of LexPath's final report, to at least investigate the device, the forthcoming final report and whatever other information is obtained pursuant to Defendants' requests above to determine whether that expert believes it has the expertise to extract and decrypt the necessary information to comply with the Court's Order, and it that expert believes it can, to proceed with that exercise[1] at SiteOne's cost and expense.[2]

---

[1] On July 9, 2026, LexPath stated in an email to Mr. Cardello, which was then forwarded to the parties, that LexPath was able to decrypt the data on the phone in question. Defendants have pressed Mr. Cardello for an explanation from LexPath as to why it issued that statement since it now appears that was inaccurate given that the data is still encrypted through today. Mr. Cardello stated that he asked LexPath to address this issue in its interim report, but Defendants do not see any reasonable explanation (or any explanation for that matter), all of which lends to the conclusion that another expert should at least be given the opportunity to analyze the phone and data collected to date to determine whether it has the requisite expertise to extract and decrypt the Court-Ordered information.

[2] Given SiteOne's failure to disclose the layered security controls on its CEO's device and its exclusive ability to lift them, Defendants respectfully reserve their right to seek appropriate relief under Federal Rule of Civil Procedure

We look forward to the upcoming conference with the Court.

---

37(e), including an adverse-inference instruction or other sanctions authorized by Rule 37(e)(2), as well as under the Court's inherent authority, should SiteOne decline to cooperate in enabling a complete extraction, should the court-ordered data ultimately prove to have been lost or spoliated, or should the examination reveal that data was altered or destroyed.

# Exhibit "A"



# Interim Report of Findings

Forensic Imaging of:

Model: Samsung Galaxy S9

Phone No.: 678-495-8293

IMEI: 353305095389447

OS Version: Android 10 (API 29), One UI 2.5; Build G960USQU9FVB2 (February 2022); Kernel 4.9.186

Samsung Account: DBlack@siteone.com

July 28, 2026

**Prepared For:**
Michael Cardello III, Esq.
Special Master

**Prepared by:**
Joe Caruso, CISSP
Forensic Examiner



## DETAILED FINDINGS

**Scope of Work**

1.  Lexpath Technologies was retained by the Special Master, Michael Cardello III, Esq., to forensically image a Samsung Galaxy S9 mobile phone on the Verizon cellular network for the purpose of determining whether any messages of any type had been deleted from the device between January 1, 2024, and March 31, 2026.  Lexpath was also tasked with establishing if the device had been powered on between January 1, 2024, and March 31, 2026.

2.  Lexpath assigned this scope of work to its contracted forensic specialists, Veronica Perez and Joseph Caruso. Ms. Perez, a Senior Computer Forensic Specialist, holds mobile-device forensic certifications from Cellebrite, Teel Technologies, and the California Department of Justice, serves as a mobile forensics instructor for the California DOJ Advanced Training Center and Teel Technologies, brings more than a decade of law-enforcement experience, and has been designated an expert witness in digital forensics in multiple state and federal courts. Mr. Caruso is a CISSP and Certified Forensic Examiner with more than 40 years of experience in computer and device forensics, has served as a consulting expert in matters including Motorola Mobility v. Microsoft and Apple v. Samsung, and has advised national cybersecurity councils under two U.S. Presidents. Mr. Caruso is the author of this report. A copy of each examiner's curriculum vitae is annexed to this report as Exhibit A.

3.  Lexpath was aware that initial attempts at forensically imaging the device had failed and that a Smart Switch backup had been created. The logs of this backup were provided and reviewed by the examiners.  Lexpath also created a Smart Switch backup of the text messages.



**Las Vegas Imaging Attempts**

4.   Lexpath instructed SiteOne's counsel to have the device sent to Ms. Perez's forensics lab in Las Vegas, Nevada. Initial imaging attempts were led by Ms. Perez.

5.   The phone was received at the Las Vegas Lab set to Airplane Mode (all network connectivity was blocked) and in a Faraday Bag, completely isolating the device from any network connectivity and preserving the state of the device.  Physically, the device was in fair condition showing wear and tear consistent with regular use of a mobile device by an end user.

6.   The device posed multiple obstacles which prevented the creation of a standard forensic image. These obstacles included the presence of the AirWatch MDM[1] and its Intelligent Hub. The AirWatch Mobile Device Management (MDM) platform is configured to prevent USB data transfer from the device and to block the mobile device from entering developer mode. Developer Mode is essential for creating a forensic image of a mobile device. AirWatch was designed to protect the data on the device and is difficult, if not impossible, to uninstall from the device itself. The forensics team was able to circumvent the uninstall restrictions of the AirWatch MDM; however, the Intelligent Hub that controls access could not be uninstalled and continues to prevent Developer Mode USB connectivity.

7.   In addition to AirWatch and its Intelligent Hub, the device has Knox Security Protection enabled. This is confirmed by the device's own logs: during the Smart Switch backup session, the device reported its Knox enterprise restriction policy as active.[2] Samsung Knox

---

[1] MDM (Mobile Device Management) refers to enterprise software that allows an organization's IT department to remotely administer, secure, and restrict mobile devices used for company business. An MDM agent installed on a device can enforce corporate policies such as blocking USB data transfer, disabling Developer Mode, and remotely locking or wiping the device. AirWatch, the MDM platform installed on this device, was acquired by VMware in 2014 and folded into its Workspace ONE product line; following Broadcom's 2023 acquisition of VMware, the business was divested to KKR in July 2024 and now operates as Omnissa, which continues to develop Workspace ONE UEM.

[2] SmartSwitchLog_SMG960U_20260320_10_17_0.log, at 10:17:14.363: "MSDG[SmartSwitch]SystemInfoUtil: getEnterprisePolicyEnabled, edmUri : content://com.sec.knox.provider/RestrictionPolicy2 result is 1" — a Smart Switch query to the Samsung Knox enterprise policy provider returning a result of 1 (enabled), confirming an active Knox-enforced enterprise restriction policy. The same log also records Knox Sensitive Data Protection activity, e.g., at 10:13:12.773: "KnoxStateMonitor: lockSdp :: Device Owner has been locked."



secures a device from the physical chip up to the software layer with multi-layered protection. Samsung Knox is a defense-grade security platform embedded in Samsung devices' hardware which isolates and protects sensitive corporate data from the rest of the operating system. When integrated with AirWatch, AirWatch cannot manipulate a device's hardware on its own. It relies on the Knox Standard and Premium APIs[3] to execute corporate commands on the Samsung device's hardware. Therefore, forcibly uninstalling AirWatch as the team accomplished does not unlock USB File Transfer Access or Android ADB Access[4].

**CrowdStrike Falcon EDR**

8.    In addition, during Ms. Perez's analysis in Las Vegas, Lexpath discovered the CrowdStrike Falcon Endpoint Protection application installed and configured on the device.  CrowdStrike Falcon for Mobile on Android is a lightweight, cloud-native Endpoint Detection and Response (EDR) and Mobile Threat Defense (MTD) solution designed to protect corporate data from sophisticated mobile attacks. It extends standard enterprise EDR visibility that is typically used on servers and laptops to Android phones and tablets via a single, unified security console. Falcon for Mobile does not perform local file scans. Instead, it continuously monitors behavioral telemetry and device posture to detect threats in real time.   Falcon's presence on the device did not interfere with Lexpath's extraction efforts; it is noted here because the telemetry it reports to the CrowdStrike Falcon console —

---

[3] The Knox Standard and Knox Premium APIs were the two tiers of management interfaces Samsung licensed to MDM vendors during the Galaxy S9's deployment era (circa 2018). The Standard API provided device-level policy controls beyond stock Android — such as disabling USB data transfer, blocking Developer Mode, and restricting device features — while the licensed Premium tier added deeper, hardware-backed controls, including secure-container (Knox Workspace) management and device attestation enforced at the TrustZone level. An MDM such as AirWatch issues its commands through these APIs; the restrictions are then enforced by Knox in the device's hardware, which is why removing the MDM application does not lift them. Samsung has since consolidated these tiers into the Knox Platform for Enterprise, but the Standard/Premium designations were current for devices of this generation.

[4] ADB (Android Debug Bridge) is a command-line developer interface that allows a computer to communicate directly with an Android device over a USB (or network) connection. When enabled through the device's Developer Mode, ADB permits file transfer, application installation, and low-level system commands, and is a standard channel through which forensic tools extract data from Android devices. Blocking ADB access therefore prevents most software-based forensic acquisition methods.

behavioral events and device posture over time — could serve as an additional data point regarding the device's activity and power state. Whether that console and historical telemetry for this device remain available is not known to Lexpath and would need to be confirmed, as discussed in the recommendations below.

9. Initially, Ms. Perez attempted using Cellebrite Premium/Inseyets to perform an extraction. Cellebrite Premium/Inseyets are the high-tier law enforcement editions of Cellebrite that do not rely on standard user-facing operating system features.  Because tools like Cellebrite Premium utilize low-level system exploits, they operate underneath the application and profile layer where MDM restrictions live.  The analysts in the Las Vegas Lab used Cellebrite Premium/Inseyets and attempted to bypass the MDM.  The analysts worked directly with Cellebrite support for assistance and ultimately concluded that Cellebrite did not support this Samsung Model as it presented with AirWatch MDM/Intelligent Hub.  After 6 failed attempts to bypass the MDM and security software using a variety of methods, including AFU full file system dumps, BFU using Cellebrite zero-day exploits, and MDM Restriction Subversion with Cellebrite, the device was shipped in its Faraday bag to Mr. Caruso's lab in Tampa, Florida to take advantage of that facility's advanced capabilities beyond Cellebrite, Teel, and Axiom.

**The Device's Encryption Background: A Combined Hardware and Software Scheme**

10. The Samsung Galaxy S9 protects user data using Android File-Based Encryption (FBE), reinforced by the Samsung Knox platform. Under this scheme, the data is not protected by a single password but by an encryption key derived from two independent factors that must be combined: a software factor — the user's lock-screen credential (PIN, password, or pattern), processed through a deliberately slow key-derivation function; and a hardware factor — a device-unique secret embedded in the phone's processor (the TrustZone/Keymaster secure environment, governed on this device by Samsung Knox), which never leaves the chip and cannot be read or copied out of it.

11. Neither factor is sufficient on its own to decrypt the data. The user credential cannot derive the key without the hardware secret, and the hardware secret cannot derive it without the


credential. By design, the key is available only on the device, within its secure hardware, and only once the correct credential is entered; a copy of the encrypted storage obtained by conventional means therefore yields only ciphertext, which is why standard forensic tools cannot read it. The device's secure hardware additionally rate-limits credential attempts made against the running device,[5] frustrating rapid on-device guessing. Defeating this scheme requires a low-level method that reaches the key material through the device's own processor rather than around it; the extent to which that was possible on this device is addressed in the sections that follow.

12.   Android further divides protected storage into two tiers: Device-Encrypted (DE) storage, which the system can reach after start-up in order to boot and run, and Credential-Encrypted (CE) storage, which becomes accessible only after the user's credential is entered. The messaging databases and the historical system logs at issue reside in CE storage. The device also employs Knox Sensitive Data Protection (SDP), an additional Knox-managed encryption layer, as confirmed by the device's own logs. The practical consequence is central to the findings and methods that follow: any technique that obtains the raw contents of the flash memory without also obtaining the hardware-held key — or without operating through the device's own secure hardware with the credential — recovers only encrypted data.

## Bootloader Extraction and the Limits of Recoverable Data

13.   To attempt recovery of the device's power-event history and messaging artifacts, Mr. Caruso loaded a custom bootloader into the device's memory and used it to start the device. This approach operates beneath the Android operating system, and therefore beneath the application- and profile-level restrictions imposed by the AirWatch MDM. It

---

[5] This rate-limiting is enforced by Android's Gatekeeper subsystem, which runs inside the processor's TrustZone secure environment. After successive failed credential attempts, Gatekeeper refuses to process further attempts until a mandatory, escalating lockout timer expires — roughly 30 seconds after the first several failures, with progressively longer lockouts thereafter. Because this throttling is enforced in secure hardware, beneath the operating system, it cannot be disabled or bypassed by automated guessing tools. It operates in tandem with the deliberately slow key-derivation function described in the preceding paragraph, which imposes a substantial computational cost on every guess.

does not, however, operate beneath the Samsung Knox platform, which is implemented in the device's hardware (TrustZone) and governs access to the keys that encrypt data at rest. As a result, the bootloader method could read data present in the device's running memory (RAM) during the active session, but could not compel the Knox secure environment to release the keys required to decrypt the persistent user-data partition — where the historical power logs and the SMS/MMS databases reside.

14. Two bootloader extractions were performed. The first returned an unencrypted data set consisting of power events associated with the then-ongoing forensic imaging session. Analysis using ALEAPP (Android Logs Events and Protobuf Parser) confirmed that the recovered events were limited to recent, session-generated activity. It appears that this data originated from the device's volatile memory and had not been read from the encrypted persistent storage.

15. Following modification of the extraction process, the second extraction returned a data set in encrypted form. The encrypted artifact was a wrapped image of a memory region: its container structure and metadata were visible, but its contents could not be read without the corresponding decryption key — analogous to an encrypted archive in which the listing of contents is visible while the contents themselves cannot be opened without the password. To render the artifact readable, Mr. Caruso performed an offline brute-force decryption using Passware, distributed across GPUs on the lab's servers and requiring 196.4 GPU-hours of aggregate compute.

16. Upon decryption, the second extraction yielded substantively the same result as the first: transient, session-related power events. It appears that this data, like the first extraction, was drawn from volatile memory rather than from the protected persistent store.

17. Accordingly, both bootloader extractions recovered only volatile session data. At no point did the bootloader process decrypt or access the persistent, Knox-protected user-data partition. The historical power-on/off history and the messaging databases — including any artifacts of deleted messages — remain within that encrypted persistent storage and were

not retrieved by this method. The absence of historical events in the recovered data reflects the limits of what a volatile-memory extraction can capture.

18.     One possible reason for the lack of data in the logs is outlined in the Android Developer Documents which provide the following guidelines for logs. DUMP OF SERVICE batterystats is maintained for 2 to 4 days. DUMP OF SERVICE usagestats has a 14-day retention policy[6] as the default; however, the retention policy is configurable up to 50 months. Because we do not have access to the configuration of the device, we cannot determine the status of the dumpsys retention policy[7].

19.     The volatile data recovered through the bootloader extractions was also examined for the log sources that can reflect historical device activity — power_off_History, and the DropBox crash logs (including the data_app_crash and system_app_crash logs, among others). None of these contained historical entries in the recovered data; consistent with the findings above, the recovered data reflected only the current session. The persistent copies of these logs reside in the encrypted user-data partition, which was not decrypted or accessed by this method.

**Physical Acquisition Considered — JTAG**

20.     JTAG (Joint Test Action Group) extraction uses a device's hardware test-access ports to command its storage controller to read the raw contents of flash memory, bypassing the operating system and the lock screen. It was historically effective on older devices that used eMMC storage and exposed accessible test points. To evaluate JTAG and chip-off without placing the evidence device at risk, the team sourced an identical sacrificial Samsung Galaxy S9 and performed evaluations on the test unit; the conclusions in this section and the chip-off section that follows are informed by that hands-on testing rather than by literature review alone.

---

[6] https://developer.android.com/tools/dumpsys

[7] https://support.google.com/analytics/answer/7667196?hl=en

21. The potential success of extracting an image (encrypted or otherwise) from the device via JTAG — which was communicated as a "coin-toss" — was originally evaluated based on Mr. Caruso's experience with older Samsung devices which used eMMC storage and had the ability to access the JTAG interface's exposed test points. Upon examination of the sacrificial device and confirming the device specifications and documentation, it was eventually determined that JTAG could be a viable method for this device, but subject to two potential obstacles. First, the Galaxy S9 uses UFS (Universal Flash Storage) rather than eMMC, and devices of this generation do not expose test-access ports suitable for a full read of the flash memory without modification. The mechanism JTAG depends upon is effectively unavailable on this hardware as-is and would require potentially destructive modification of the device's printed circuit board. Second, even a successful JTAG read would return the user-data partition in encrypted form. Because the decryption key depends on the hardware-held secret described above, and JTAG reads the flash without operating through the device's secure hardware, the recovered data would not be readable without a decryption key.

**Physical Acquisition Considered — Chip-Off**

22. Chip-off extraction involves physically removing the flash memory chip from the circuit board and reading its contents in a specialized chip reader. Like JTAG, it bypasses the operating system and lock screen, and it was historically used to recover data from locked or damaged devices. The potential success of a chip-off image was evaluated on the test device.

23. Upon examination of the test device, it was determined that chip-off is technically possible on this device, though removing and reading a UFS chip is more difficult than the eMMC chips for which the technique was developed. The decisive limitation is again the encryption. A chip-off produces the raw contents of the flash — the encrypted user-data partition together with the wrapped key material stored on it. Critically, removing the chip permanently separates the flash memory from the processor that holds the hardware half of the encryption key. Once separated, the wrapped keys on the chip cannot be unwrapped,

because the hardware secret required to do so remains in the processor and cannot be extracted from it. This is not overcome by possession of the user's passcode: the passcode supplies only the software half of the key, and without the hardware half — inaccessible once the chip is removed — the data cannot be decrypted. A chip-off would therefore destroy the device while likely producing only unreadable ciphertext.

**Physical Acquisition Considered — Emergency Download Mode (EDL)**

24.  A further method — acquisition via Emergency Download Mode (EDL) — was identified, evaluated, and successful on the sacrificial test unit. EDL is a low-level service mode present on the Qualcomm Snapdragon processor used in this device's model (SM-G960U). It is invoked by momentarily shorting dedicated test points on the device's circuit board, which forces the processor into a firmware-transfer state that operates beneath the Android operating system — and therefore beneath the AirWatch MDM and Intelligent Hub restrictions that blocked the standard extraction methods described above. Because EDL is a hardware-level mode invoked directly on the processor, it does not require USB File Transfer or Developer Mode to be enabled on the device.

25.  On the sacrificial test unit, Ms. Perez opened the device and while it was powered on and unlocked, shorted the applicable test points to place the processor into EDL. Using this technique, a forensic image of the test device was captured and the image decrypted utilizing Passware forensic software.

26.  Ms. Perez then applied the same technique to the subject device and was able to extract a 52.75 GB image.  She then used the same Passware forensics tool to decrypt the data on the image, but the Passware tool returned an error that was not encountered on the test device. The Passware logs were exported and evaluated.  A copy of the logs was also provided to Passware support.

27.  Ms. Perez has been working with Passware support to resolve the error and has support ticket #124976 open with their technical support team.  We expect an update to our case within the next five business days.



**Interim Findings and Next Steps**

28.     These are interim findings and will be updated. To date, apart from the Emergency Download Mode extraction now in progress, no method attempted has decrypted or accessed the device's persistent, Knox-protected storage, where the historical power-on/off history and the SMS/MMS databases (including any artifacts of deleted messages) reside. This is a consequence of the device's combined hardware-and-software encryption: the extractions completed to date recovered only volatile session data, and the persistent data that was captured via EDL remains encrypted with keys that are bound to the device's encryption technologies.

29.     Physical acquisition by JTAG or chip-off was considered, evaluated hands-on using an identical sacrificial Samsung Galaxy S9 sourced for testing, and is not currently deemed necessary. We have essentially accomplished what a JTAG or chip-off extraction would have accomplished using a minimally invasive EDL technique.

30.     The Emergency Download Mode extraction now underway represents the most viable, and likely the last, avenue for attempting to recover the encrypted user data directly from the handset. Our testing validated that EDL acquisition and decryption work against consumer File-Based Encryption on this hardware. The test unit, however — while identical to the subject device in hardware and Android build — did not share the subject's enterprise security configuration, specifically the AirWatch Intelligent Hub and the Knox settings applied through AirWatch policy, including the Knox Sensitive Data Protection (SDP) layer confirmed in the subject device's own logs. The test case therefore could not replicate the subject's enterprise Knox-SDP configuration, and does not by itself predict decryption of the subject. If our work with Passware does not succeed, the options for extracting this data directly from the device will be effectively exhausted. In that event, and absent a future vulnerability or tool, recovery of the data from the device itself would be unlikely, and the only remaining avenues would be the off-device sources identified below.

31.     The remaining avenues most likely to bear on the questions presented do not require further extraction from the handset. Historical device telemetry and management records,


to the extent they have been retained, may reside in the enterprise consoles that govern the device — the AirWatch/Workspace ONE console and/or the CrowdStrike Falcon console. In addition, Verizon may maintain network-connection records relevant to whether and/or when the device was powered on and used. Lexpath recommends that the availability of these sources be determined and, where they exist, that they be pursued.

32.    As a final observation, the subject device was secured with multiple, independently configured enterprise security controls: an AirWatch MDM with a non-removable Intelligent Hub, CrowdStrike Falcon endpoint detection and response, and the hardware-backed Samsung Knox platform enforcing file-based encryption with device-bound keys. These are industry-standard enterprise security tools, configured in a standard manner to block USB data transfer, disable Developer Mode and ADB access, and bind the encryption keys to the device's secure hardware. This configuration is designed to prevent unauthorized access to the data on the device. In combination, these controls prevented standard forensic acquisition, including by the law-enforcement editions of Cellebrite. The difficulty of extraction described in this report is a direct consequence of this layered enterprise configuration.

Dated: July 28, 2026

_____
Joseph Caruso

Exhibit A

**LEXPATH**

Lexpath Technologies Holdings, Inc.
405 Lexington Ave - 9th Floor
New York, NY 10174

**Veronica Perez**
Senior Computer Forensic Specialist

Veronica Perez holds multiple cell phone specific certifications from various cell phone vendors, including Teel Technologies, Cellebrite and the Department of Justice State of California. Ms. Perez serves as a Mobile Forensic Instructor for the Department of Justice State of California Advance Training Center and Teel Technologies.  Ms. Perez currently assists some of the major Cell Phone vendors with R&D work and assists with beta testing of their software.

Ms. Perez also works with Deployed 360 and is a contractor for the DOD for deployed missions. Ms. Perez currently has an active Top Secret/Secret Clearance. Ms. Perez has assisted in reorganizing the current training curriculum for all Forensic Examiners that would be deployed along with providing assistance to the examiners that were deployed.  Ms. Perez has assisted on several cases when another examiner is deployed by being able to remotely guide them in acquiring the device and provide step by step instructions.  Ms. Perez provides one-on-one instruction when needed to co-workers in advance cell phone forensic techniques when struggles arrive with the commercial forensic tools.

As a member of the Los Angeles School Police Department from 2001 to 2007 and the West Covina Police Department from 2007 to 2016, Ms. Perez brings over 10 years of Law Enforcement training, experience, and involvement in the proper methods of evidence custody, documentation, and forensic analysis in a manner that will withstand close scrutiny.

Ms. Perez is extensively experienced in the collection, examination, and analysis of digital forensics-related information, including both field and laboratory examinations surrounding the identification, preservation, retrieval, and analysis of electronic information in support of forensic investigations and ongoing litigations.

Ms. Perez has acted as a digital forensic investigator for private attorneys, law enforcement agencies, corporations, insurance companies, and private individuals. Ms. Perez's involvement
in diverse investigations and litigations has spanned numerous areas, including:

- Fraud
- Theft of Intellectual Property
- Trade Secret Misappropriation
- Email & Internet Abuse

- Employee Disputes
- Patent Infringement
- Copyright Infringement
- Divorce & Family Law

- Disputed Dismissals
- Asset Recovery
- Software Code Review
- Defamation
- Breach of Contract
- Industrial Espionage

Ms. Perez has been designated as an Expert Witness in Digital Forensics for the Superior Court of California, Superior Court of Oklahoma, Superior Court of South Carolina and Federal Court of Chicago.

**PROFESSIONAL EXPERIENCE**

- Leads and participates on forensic investigations and electronic discovery activities as a skilled high-tech investigator and project manager, regularly focusing on corporate computer fraud and cybercrime investigations.
- Leverages a variety of cell phone forensic platforms, including, but not limited to, Cellebrite Physical, Cellebrite Logical, XRY, Oxygen, Axiom, GreyKey, HandcomHD, Elcomsoft, Paraban and Mobiledit to recover text messages, pictures, videos, audio files, emails, contacts, call histories, calendars, Internet history, and application activity, as well as other record types.
- Performs specialized analysis efforts on GPS enabled devices, such as cell phones, to recover track logs, track points, waypoints, routes, stored location, recent addresses, and other location specific information.
- Performs specialized extractions and analysis on vehicle forensics techniques.
- Developed and programmed customized utilities for use in the processing of electronic data stored on cell phones and tablets, increasing the efficiency and effectiveness of forensic efforts.
- Provides litigation support advisory assistance to attorneys to advance forensic and electronic discovery efforts, satisfy discovery requests, and compel inspections.
- Acts as a forensic investigator for private attorneys, law enforcement agencies, corporations, insurance companies, and private individuals involved in diverse investigations and litigations spanning numerous areas, including, but not limited to: fraud, theft of intellectual property, trade secret misappropriation, email and internet abuse, employee disputes, sexual harassment, and breach of contract.
- Provides presentations on Digital Forensic collections, examinations and capabilities to many entities in the law enforcement, private sector and military environment.

## CERTIFICATIONS

- High Technology & Computer Crime Investigations

  *California Department of Justice Advanced Training Center*  2002
- Cell Phone Forensics Investigations

  *California Department of Justice Advanced Training Center*  2010
- Department of Justice Advance Training Center

  *Instructor on Cell Phone Forensics/Investigations*  2012
- EnCase Certified Examiner (EnCE)

  *Guidance Software*  2009
- Paraben Certified Mobile Phone Examiner (CME)

  *Paraben Forensic Corporation*  2008

## SELECTION OF TRAININGS & ACCREDIDATIONS

- High Technology & Computer Crime Investigations *California Department of Justice Advanced Training Center 2002*
- Investigation of Internet Crimes *California Department of Justice Advanced Training Center* 2003
- Computer Evidence Recovery & Analysis *California Department of Justice Advanced Training Center* 2003
- Advanced Computer Forensics for the Investigator *California Department of Justice Advanced Training Center* 2003
- Computer Forensic Tool-Specialized *California Department of Justice Advanced Training Center* 2004
- Protecting Victims of Child Prostitution *National Center for Missing & Exploited Children Jimmy Ryce Law Enforcement Training Center* 2004
- Crimes Against Children Conference Dallas Texas 2004

- Internet Investigations-Online *Federal Bureau of Investigations Innocent Images National Initiative-Calverton, Maryland* 2004

- Violent Crime Analysis *Federal Bureau of Investigations* 2004

- Digital Evidence Identification & Collection *Federal Bureau of Investigations* 2004

- Investigating Computer Crime Intrusions on Wireless Networks *Federal Bureau of Investigations* 2005

- Introduction to Cyber Crime *Federal Bureau of Investigations* 2005

- PC Forensics *California Department of Justice Advanced Training Center* 2007

- Computer Forensics Advanced Tools *California Department of Justice Advanced Training Center* 2006

- Handheld Forensics *Paraben* 2008

- EnCase Computer Forensics II *Guidance Software* 2008

- EnCase Advanced Computer Forensics *Guidance Software* 2008

- EnCase Advanced Internet Examinations *Guidance Software* 2008

- Cybercop 101 BDRA Computer Forensics *National White Collar Crime Center (NW3C)* 2009

- Cybercop 201 IDRA Computer Forensics *National White Collar Crime Center (NW3C)* 2009

- EnCase Network Intrusion Investigations G*uidance Software* 2009

- Computer Evidence Recovery & Analysis *California Department of Justice Advanced Training Center* 2009

- Advanced Computer Forensics for the Investigator *California Department of Justice Advanced Training Center* 2009

- Cell Phone Forensics Investigations *California Department of Justice Advanced Training Center* 2010

- iPhone Forensics *Jonathon Zdziarski* 2010

- Mobile Spyware *Cellular Forensics, LLC* 2011

- Andriod Forensics *viaForensics* 2011

- Advanced Mobile Forensics *viaForensics* 2011

- Department of Justice Advance Training Center Instructor on Cell Phone Forensics/Investigations 2012

- Secure View Certificate of Completion 2012

- Computer Forensics-Macintosh/Linux *California Department of Justice Advanced Training Center* 2012

- Mobile Device Repair and JTAG Forensics *Teel Technologies* 2012

- Chip Off Forensics *Teel Technologies* 2013

- Cellebrite CCLO/CCPA 2014

- In-System Programming (ISP) *Teel Technologies* 2015

- Wrote Flasherbox/Bootloader class materials for *Teel Technologies* 2016

- Vehicle Investigations *Department of Justice* 2019

- Oxygen Forensics Bootcamp 2023

- Advance Vehicle Forensics Investigations Teel Technologies 2024

- iPadRehab MicroSoldering Repair 2024

- Embedded Hardware Analysis Teel Technologies 2024

| Joseph Caruso – Founder/CEO/CTO Global Digital Forensics |
|---|

**Experience Highlights:** Joseph Caruso is a recognized industry leader in the fields of computer forensics, device forensics, eDiscovery, and cyber security. With over 40 years of active in-the-field experience in numerous technology areas, his diverse expert background is unrivaled, giving him the ability to explain a wide array of complex technologies in simple, easy to understand language, so the client, the opposition, and the court all fully understand the topic, methods, and results, while being able to withstand the highest levels of scrutiny.

Mr. Caruso has been in the computer technology business since 1980, has extensive experience with a wide variety of platforms and has developed databases and real-time systems for major companies, including transactional databases on IBM OS/390 and AS/400 mainframes, in both IMS and DB2. These systems are capable of processing millions of transactions a day and are the basis for reservation systems, financial systems, and insurance and retail companies around the world.

Early in his career, Mr. Caruso developed libraries that were designed to, among other things, convert photographs and documents so they are printable, convert and manipulate colors and create Bezier curves. These libraries were used in many image processing tools, including ImagePRO, and are still used by some high-end image processing software, including tools like Adobe.

Mr. Caruso has worked extensively on mobile networks and devices, including the architecting and implementation of carrier grade backhaul infrastructures and design of complex cellular networks. Mr. Caruso was a lead architect of the Egyptian food security network. A network of 5G microcells designed to monitor and secure food production, transportation, and storage across hundreds of location in the Nile River Valley, Giza, and through African trade routes. This groundbreaking project demonstrated the capabilities of 5G microcells and the ability of mobile devices to drive productivity. His knowledge of cellular networks and devices has led to his work as a consulting expert in cases such as Motorola Mobility V. Microsoft Corp., and the notorious Apple v. Samsung patent litigations.

Mr. Caruso has led incident response teams for Fortune 500 companies, which include Pfizer, ADCO, Harrah's, and institutions which include the World Bank, the International Monetary Fund, the US federal court system and L3, to name a few. He is experienced in data breaches of all sizes and has led teams that successfully secured networks after major intrusions and worked closely with clients to help ensure their reputation and assets remained intact.

Mr. Caruso has been featured as a technology expert regarding high profile cases on CNN Headline News, CBS Evening News with Katie Couric, FOX Business's Varney and Company, Boston 25 News, as well as WPIX News New York. His opinions and editorials have also been published on many national and local news sites. He has also served in an advisory capacity for national cyber security councils for two US Presidents. He is a seasoned Expert Witness in a wide range of technologies, ensuring a client's needs are met with a highly qualified, competent, and knowledgeable expert with real-world experience in the right field(s).

| **Clearance Level:** Expired Secret | **Labor Category:** Principal / Management |
|---|---|

**Education:** Dual Degree B.S./B.E in Mathematics and Engineering Physics - New York University, College of Arts and Sciences & Stevens Institute of Technology

**Knowledge of Systems and Applications:**
- Extensive Knowledge of Apple iOS and macOS, including reverse engineering of iPhone and iPad devices and software.
- Extensive knowledge of Android operating system and Android software development and forensics, including reverse engineering of Android devices and Chromebook devices.
- Extensive knowledge of MSDOS-MS Windows 11, including programming in C, C#, Python, Java, etc.
- Extensive background in Mainframe Operating Systems, including iSeries, AS/400 and OS/390.
- Programming Languages: COBOL, COBOL II, DB2, CICS, VSAM, TSO/ISPF, ROSCOE, MICRO FOCUS, Basic, Fortran, SQL, SQL/400, RPG, Pascal, C (all flavors), Assembler, ISPF, PL1 IMS/TSO/CLISTS/JCL/ JCLJes2/3,IMS, MVS, ACF2 Mainframe Security DFHSM, SPUFI,BMC LoadPlus, ACF2 Rumba, EDA, CLISTS FOCUS, TSO/MVS/ Focus, Oracle, ACF2 Security, CA-Spool, Boole & Babbage, Endeavor, BMC Computer Associates Tools, Compuware FILEAID, SAS, CHAMP, PANVALET - Tools VMSECURE, VM-CYPHER,
- Desktop and Server Operating Systems: Windows Server and Desktop Platforms, Unix/Linux Platforms, AS/400, OS/390, SUN, etc.
- Familiar with, and trained on, most major security platforms and devices, including Cisco, McAfee, Symantec, EMC, and others.
- Extensive knowledge of cellular networks and devices, including carrier grade infrastructure, billing systems and tower operations.

**Representative Cases**

- Rogers v. BNSF Railway (Biometric Information Privacy Act (BIPA))
- EMC Corporation v. Nexaweb, Inc., et al
- ClearOne Communications, Inc., v. Biamp Systems DSP
- Bose Corporation v. Silonsonic, Inc., et al
- Motorola Mobility V. Microsoft Corp.
- J.T. Shannon Lumber Company, Inc., v. Gilco Lumber, Inc., et al
- Calyon v. Mizuho Securities USA Inc., et al
- Holland v. Motown Record Corp., et al (Mainframe)
- Hoffman v. American Express Travel Related Services Co., et al (Mainframe)
- Baker, et al v. KMPG, LLP, et al
- Nisselson v. Lernout, et al (Mainframe)
- Frank K. Cooper Real Estate #1, Inc. v. Cendant Corporation, et al
- In Re Old Banc One Shareholders Securities Litigation
- Brainstorms Internet Marketing, Inc. v. USA Networks, Inc., et al
- Douse v. Quick & Reilly

**Technical Skills, Training, and Certifications**

- CISSP - Certified Information System Security Professional, ISC2
- Certified Forensic Examiner
- Trained in EnCase Enterprise, Access Data, and a Myriad of Open Source Tools
- Member of the College of Forensic Examiners
- IEEE Computer Society Professional Organizations
- CISSP
- Certified Computer Forensic Examiner
- Member of the College of Forensic Sciences
- Association of Forensic Examiners
- Association of Expert Witnesses, CA

**Published Articles and Works on Computer Forensics**

- Managing Complex Computer Forensic Examinations – Secure World Expo 2005, 2006 & 2007
- Comparing Computer and Network Forensics, Vol.2 – Winter 2003, Security Horizons
- Advanced Computer Forensics – Techniques for the Security Specialist (textbook published by BIA)
- Basic Computer Forensics (textbook published by BIA)
- Basic Computer Forensics, Class Materials (published by BIA)
- Advanced Computer Forensics, Class Materials (published by BIA)
- Numerous other miscellaneous cyber security and computer forensics related articles and opinions.

**Accomplishments, Highlights and Professional Experience**

- Advisor - White House Cyber Terrorism Infrastructure Security Council
- Advisor - Department of Defense and Department of Homeland Security regarding cyber threat identification and classification systems
- Instructor - Media exploitation, social engineering and zero-day exploits for the Department of Defense, Digital Warfare School (US Army) and the US Air Force OSI program
- Lecturer - Yale University, School of Law
- Lecturer - Leeds University (UK)
- Complex Litigation Summit, Am Law, San Francisco, CA (2004-2009 and 2012)
- Sedona Conference Board of Advisors (2005, 2007 and 2008)
- Lecturer - Inn of The Court, Nassau County, NY – "What is ESI and where is it hiding, an ESI primer for family law practitioners" (2008-2010)
- Conducted incident response, analysis and remediation for the IMF and the World Bank
- Analysis of data and computer systems related to an intrusion of several Sun Micro System servers. The investigation spanned three countries and involved the FBI, Scotland Yard, and the Argentinian National Police

- Consultant to the FDA and the Los Angeles County Sheriff's Office during the investigation of millions of dollars in diverted and counterfeit drugs being sold in the US
- Analysis of an intrusion involving an engineering and construction management firm that designs nuclear power plants, power grids and SCADA installations for US and worldwide municipalities and corporations. GDF was able to determine the root cause, identify the attackers and track the origins to a large nation state in Asia.
- Lead expert and consultant for consumer class action lawsuit against American Express. Fields of expertise for this action included analysis of airline reservation systems architecture, real-time transactions, and mainframe database systems, including source code analysis and system configuration.
- Consultant for shareholders class action lawsuit against Bank One Corporation. Fields of expertise included complex credit card transactions systems and drop box deposit systems
- Analysis of various database systems in a complex class action suit against multiple oil and gas companies
- Consultant and analyst for franchisee class action lawsuit against major real estate corporation Cendant, Inc. involving certain accounting systems
- Lead examiner for the Department of Securities and Insurance Regulation in the investigation of a large insurance company, which included onsite inspection of data systems, workflow process and electronic accounting control systems
- Lead examiner for the US Marshal Service in the investigation of counterfeit products in the commercial and retail brand name clothing markets.

## CHRONOLOGICAL EXPERIENCE

**2000- Present**                                                    **Global Digital Forensics**

*Founder-CEO/CTO*

Responsible for the overall operation of Global Digital Forensics. Global Digital Forensics, Inc. creates and implements solutions which help ease the way through complicated legal and technical issues, from the initial collection of digital evidence to the full analysis of that digital information. GDF offers a wide range of services, including digital forensics analysis, commercial fraud analysis, electronic evidence discovery, cyber security solutions, cyber emergency incident response, e-policy consulting and auditing, and certification services, for both private industry and the government.

**1996-2002**                                          **Business Intelligence Associates, Inc.**

*Director and President*

Founded BIA to fill a gap in the current security landscape. BIA had two lines of business computer forensics/incident response and litigation support.  Mr. Caruso led the incident response business, and when the litigation support practice and software was sold off, he continued to run the incent response business under the Global Digital Forensics name.

**1990–1996**                                                            **The Learning Curve, Inc.**

*CTO and CIO*

Founded The Learning Curve, Inc. in Clearwater, Florida to address the growing commercial demand for high-end data recovery and error correction code-based products for large scale data warehousing systems, technical education products and security related systems. The company was sold in 1996 and the technology and methodologies are still in use.

**1985–1990**                                               **Consolidated Software Products, Inc.**

*Founder & CTO*

Founded Consolidated Software Products, Inc. of New York in 1985, which developed software libraries that allowed applications to manage and co-ordinate massive amounts of data in real-time, the technology is still in use in the SAABER System developed for American Airlines. Developed the first PC-based data recovery utility with RAID capability for the National Geological Survey, which was successfully marketed in the private industry and is still in use today. Designed security enforcement protocols and systems for military-grade communications, including cryptographic recovery code.

**1983–1985**                                                    **Bell Labs R & D Engineer; Corporate Liaison**

*R & D Engineer; Corporate Liaison*

At Bell labs, performed file system design for embedded systems and Unix engineering duties in the research and development facility in New Jersey, and acted as a corporate liaison in Germany, troubleshooting for clients worldwide. He specialized in government contracts and technology transfers of high-end communications and military systems with a specialty in real-time systems, including design and development of Terrain Tracking Radar Systems for the joint Navy/Air force Tomahawk Missile Project with E-Systems. He was also responsible for security analysis of systems involved in the storage of classified information.

**1984 - 1987**                                                    **Magic Systems Development**

**Founder and Lead Developer**

Magic developed software libraries to convert documents and images into printable formats.  These libraries included tools to manipulate color palettes and create Bezier Curves. The libraries were used in many image processing programs, including ImagePro and others.  Some of Mr. Caruso's techniques and algorithms are still in use today.