# EXHIBIT 2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - -

SITEONE LANDSCAPE SUPPLY, LLC,

Plaintiff, Civil Action No.

v. 2:23-CV-2084(GRB)(SL)

NICHOLAS GIORDANO; DOMINICK CAROLEO; VICTOR CAROLEO; NARROW WAY REALTY, LTD.; NARROW WAY 2 LLC; THE GARDEN DEPARTMENT CORP.; GROUP 5 ASSOCIATES, LTD.; 3670 ROUTE 112 LLC; 9 4TH ST. LLC; SCAPES SUPPLY, LLC; NEWAY MANAGEMENT, LLC; AND NEWAY TRUCKING,

Defendants.

- - -

March 13, 2025

- - -

Videotaped deposition of VICTOR CAROLEO, conducted at Farrell Fritz, P.C., 400 RXR Plaza, Uniondale, New York, commencing at 10:00 a.m. EDT, on the above date.

Magna Legal Services

866-624-6221

www.MagnaLS.com

Marie Foley

RMR, CRR

MR. GIBBS: Good morning. This is Evan Gibbs on behalf of SiteOne Landscape Supply, LLC.

MR. MULRY: Kevin Mulry from Farrell Fritz also for plaintiff SiteOne.

MR. LABUDA: Good morning. Joe Labuda, Milman Labuda Law Group.

MR. MULE: Michael Mule, Milman Labuda Law Group.

And with us our client Don Caroleo.

THE VIDEOGRAPHER: Okay. Thank you.

Will the court reporter please swear in the witness.

THE STENOGRAPHER: If I could ask you to raise your right hand, please.

Do you swear or affirm the testimony you give will be the truth, the whole truth, and nothing but the truth today?

THE WITNESS: Yes, I do.

THE STENOGRAPHER: Thank you.
THE VIDEOGRAPHER: Thank you.
Counsel may proceed.

- - -

VICTOR CAROLEO, the Witness herein, having been first duly sworn by a Notary Public in and of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. GIBBS:

Q. Mr. Caroleo, if you would please, start by stating your full name for the record.
A. Victor Caroleo.
Q. And are you presently on any kind of medications that could affect your testimony today?
A. [redacted]
Q. But to the best of your

A. I'm good with ten years.
Q. Okay.
What -- what brand of phone do you have? What -- what make is the phone?
A. It's an Apple.
Q. iPhone?
A. Yes.
Q. Do you know the model of the phone, like iPhone 14?
A. No.
Q. Who is your wireless carrier for that phone?
A. Verizon.
Q. How long have you used that particular carrier?
A. Ten years.
Q. Other than this current cell phone, and begin focusing on the time period of October 1st, 2022 through today, have you had any other phones either issued to you or that -- that you've had that you've used personally? For example, a company-issued device, have you had anything like that?

A. I don't know if I understand your question, but I think I could answer it by saying this.

This phone broke somewhere along the line, I don't remember what year, and I got it replaced. Maybe that happened in the last two years.

Q. Was the phone replaced through Verizon?

A. Yes.

Q. Was the phone replaced after this lawsuit was filed, so after March 21st of 2023?

A. Yes.

Q. Did they transfer the data from your old phone to the new phone when you got the new one?

A. You know, I'm not too technical, but I gave it to the guy at Verizon, I says, you know, make sure this is the same phone as I have now. So he did whatever he had to do.

Q. When you turned on, if you recall, when you turned on the new phone

that you got, did you see your old
messages and contacts and things like that
on the new phone?
A. I never went and observed that.
I was just interested that I had my apps.
Q. What happened to your old phone
that caused it to break? Was it a drop?
A. You know, [redacted] so I can't remember
exactly. But if I took a guess, I think I
got water in it, as I remember.
Q. And the old phone, do you still
have that phone, or did you trade it in to
Verizon?
A. You know, [redacted] I'm going to say I traded it in,
but I don't recall.
Q. Do you have an iCloud account?
A. I've never used it, to my
recollection.
Q. Does your iPhone back up to your
iCloud account?
A. I have no idea.

Q. Other than the phone that you have currently, have you used any other electronic devices to communicate with others since October of 2022 through the present?

A. No.

Q. We talked earlier about your victorcaroleo@aol.com email address.

Do you also have an email address with Scapes Supply?

A. I never use it, but I do have one.

Q. And is that victor@scapessupply.com?

A. I believe so.

Q. Have you ever checked that email account?

A. Never.

Q. The victorcaroleo email account, how long have you had that particular account?

A. I've got to say it's over ten years.

Q. What do you use the personal

email account for? Is it personal and business or just one or the other?

A. The personal email account I use -- I don't do much business on my personal email. I do my personal stuff on my personal email, so not business.

Q. What about where do you do your business emails?

A. I really don't. You know, at my age, I just barely know how to work the email.

Q. On your AOL email account, are you the only one who has access to that account?

A. I can't answer that for sure.

Q. Have you ever used the AOL email account for any type of Scapes Supply business?

A. Not that I recall.

Q. Since the lawsuit has been filed in March of 2023, how many emails would you estimate that have been sent and received from the AOL account?

A. I wouldn't have a clue.

MR. MULE: Can we take a
five-minute break?
MR. LABUDA: Sure.
MR. GIBBS: Sure.
THE VIDEOGRAPHER: We are going
off the record.
The time is 10:40.
(Recess taken.)
THE VIDEOGRAPHER: We are going
back on the record.
The time is 10:53.
MR. LABUDA: All right.
The witness -- if we could, the
witness wanted to clarify a couple
answers that he gave to a few
questions.
MR. GIBBS: Certainly.
MR. LABUDA: Okay.
Mr. Caroleo, with respect to the
timing of the replacement, of the
timing of when your old phone broke,
do you have a -- do you have a
recollection of when that was?
THE WITNESS: I don't have a

recollection.
MR. LABUDA: Do you know whether or not it was before or after the litigation here began?
THE WITNESS: I don't have a recollection.
MR. LABUDA: Okay.
Second one, with respect to the -- you were asked questions about reviewing text messages, and I think your answer was that you reviewed text messages.
Do you know whether or not your lawyers reviewed your text messages in relation to this litigation?
THE WITNESS: My lawyers did review those text messages.
MR. LABUDA: Okay.
BY MR. GIBBS:
Q. Did not?
A. They did.
Q. Did review text messages.
And which attorneys are you referring to --

Before our break, we were talking about your personal email account which is the victorcaroleo@aol.com. I want to ask you a few more questions about that.

Have you communicated with Nick Giordano via that email account at any point?

A. No.

Q. Was that particular email account searched as part of the discovery process in this case?

A. I don't know.

Q. Do you recall turning over access of the account to any of your attorneys?

A. I don't recall.

Q. Since this case was filed, have you deleted any emails from that particular email account?

A. I'm sure I deleted stuff. It's my common practice.

Q. And talking just about emails, you mean it's a common practice for you to

delete emails --
A. Correct.
Q. -- in that account?
How often do you delete emails?
A. Basically every t[redacted]
something it gets deleted, [redacted]
and it -- I get overwhelmed when I have a lot of emails to go through. So I -- once I go through them, I delete them.
Q. Do you know if your email account retains deleted emails for any period of time?
A. You know, if the -- if it does, they get deleted too.
Q. So you double delete? You do a --
A. Correct.
Q. You delete the deleted?
A. And this is a practice I've been dealing with for years, [redacted]

[redacted]

Q. And on the AOL email account, do you check that email account from your phone?

A. Yes.

Q. And turning to the Scapes Supply email account, do you know what platform that account uses? Is it a Gmail or an Outlook type account?

A. I have no idea.

Like I said, I don't use it.

Q. Do you know if a litigation hold was turned on for that particular email account?

MR. MULE: I'm going to object.

BY MR. GIBBS:

Q. And the -- the question is just do you know, not did an attorney instruct you to do so. It's just do you know if a litigation hold was placed on that account?

MR. LABUDA: Yeah, I mean, I think we're objecting.

Q. Sure.
Since the lawsuit has been filed, have you ever emailed anyone about the Long Island Avenue property?
A. No.
Q. What about the Horseblock Road property?
A. No.
Q. And your attorneys represented in this case that you have a practice of regularly deleting text messages, and you talked about that earlier.
And with respect to deleting emails, have you stopped the practice of deleting emails?
A. Yes, in the last few weeks.
Q. Approximately when would you say you started that?
A. Maybe in the last four weeks.
Q. Do you communicate using text messages on a regular basis?
A. Well, I'd rather call people than use a text message.
Q. Do you use text messages

Q. Same question with respect to the Long Island Avenue property.
A. I don't recall.
Q. And same question with respect to the Horseblock Road property.
A. I don't recall.
Q. Do you send and receive text messages with your son Don?
A. I do.
Q. And just talking about from the beginning of the lawsuit to currently, just in general how frequently would you say that you text with your son Don?
A. Once a week, twice a week.
Q. And just generally speaking, I'm not trying to get into your personal private business, but generally what do you guys talk about in text messages?
A. You know, my grandson's becoming a baseball -- pretty good at it, and I'll ask him how he's doing. So let's call these things that we have on the phone family-related questions: when's the birthday party, what time.

Q. And any of those text messages, do you save those, or do you delete those as well?

A. I delete them.

Q. Since October of 2024, have you deleted any text messages from Don, to or from Don?

A. Yes, I'm sure 'cause that's my practice.

Q. And since the beginning of the lawsuit to the present, have you ever sent or received any texts from Nick Giordano?

A. I might have received some texts from Nick.

Q. How frequently would you say that you exchange text messages with Nick?

A. Three times a week.

Q. And what types of things do you typically discuss in text messages?

A. What was the years you said?

Q. From the beginning of the lawsuit to the present. So that would be March 21st, 2023 through today.

THE WITNESS: So I have a

question for you.
MR. LABUDA: Well, there's a question pending. You can answer the question and then we'd have to take a break unless -- unless your -- there's an issue about --
MR. MULE: Do you have a question about privilege?
MR. LABUDA: -- communication that we've had.
But you can -- I think the question was whether or not you've had conversations --
MR. GIBBS: Texts.
MR. LABUDA: What are the substance of the conversations.
BY MR. GIBBS:
Q. What are the substances of the text messages between you and Nick, generally?
MR. MULE: From March of '23, right?
MR. GIBBS: Correct.
THE WITNESS: My problem is the

dates that he's using.

MR. LABUDA: Well, he's saying March of, so it's for the last two years.

BY MR. GIBBS:

Q. Since Scapes Supply has been in operation. Maybe that makes it easier. Since Scapes Supply has been operating, what are the topics of the text messages between you and Nick?

A. It would be business related.

Q. Have you saved any of those text messages?

A. No.

Q. When was the last time that you exchanged text messages with Nick?

A. I'm sure yesterday.

Q. Have you retained those text messages?

A. I'm sure I did.

Q. Since October of 2024, have you deleted any text messages between you and Nick?

A. October what?

Q. 2024.

A. October '24.

Yes.

Q. Do you have an estimate of how many messages you deleted between you and Nick?

A. I don't.

Q. When was the last time that you deleted a text message to or from Nick?

A. I don't recall.

Q. Since this lawsuit was filed, or to make it easier, since Scapes Supply was opened for business in 2023, have you ever backed up your cell phone?

A. No.

Q. And a slightly different way of asking the question.

During that same time period, since Scapes Supply opened, have you ever had a third party back up your cell phone?

A. No.

Q. Have you personally made any efforts to recover any deleted text messages as part of this case?

A. No.
Q. And we discussed, we talked around this, I think, earlier, but just for a clear record, are you aware of any alternative sources for which your deleted text messages could be retrieved?
A. I'm not aware of any.
MR. GIBBS: I think Kevin and I will take a break and discuss, but I think except for the issue that we need to call the Court about, I think those would probably be most of the questions.
MR. LABUDA: Okay.
MR. GIBBS: So we'll take a break for just a few minutes and we'll come back.
MR. LABUDA: Sure, that's fine.
THE VIDEOGRAPHER: We are going off the record.
The time is 11:29.
(Recess taken.)
THE VIDEOGRAPHER: We are going back on the record.

when.

MR. GIBBS: No further questions.

MR. LABUDA: Okay. Let's just take a break for a second.

MR. GIBBS: Sure.

MR. LABUDA: Keep the record on.

THE WITNESS: I got one thing. It'll be good.

MR. GIBBS: Are you sure?

MR. LABUDA: Exactly.

THE VIDEOGRAPHER: We are going off the record.

The time is 11:59.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record.

The time is 12:09.

BY MR. GIBBS:

Q. And I've had further discussions off the record about questions surrounding the document marked as Exhibit 3, so I'm revisiting that document to ask a few particular questions.

Mr. Caroleo, do you have in front of you the document that I've marked as Exhibit 3?

A. Yes.

Q. And at the top of that document do you see where it says "From: Don Carloleo"?

A. Yes.

Q. Do you recall writing this particular email?

A. No, I don't.

Q. And do you recall sending this email from doncaroleo5484@gmail.com?

A. No, I don't.

Q. Do you recall receiving a copy of this email in your victorcaroleo@aol.com email address account?

A. No, I don't.

Q. Have you ever had access to the doncaroleo5484@gmail.com email account?

A. I never had access to it.

Q. Has Don ever had access to your victorcaroleo@aol.com email account?

A. Absolutely not.

Q. And looking at this particular email, referenced down at the bottom of the page in the next to last sentence there's a sentence that says: But for timing purpose we are -- purposes, we are willing to settle with Annette and the town.

Do you know who Annette is?

A. She's the town attorney.

Q. Have you ever exchanged emails with Annette?

A. No.

Q. Did you receive any responses to this particular email?

A. Never.

Q. And up at the top there's a line that says "To: Dominic S Thorne at Suffolk County New York.gov."

Are there any other -- have you ever communicated with Mr. Thorne via any other method?

A. No.

MR. MULE: I object, but go

ahead.
BY MR. GIBBS:
Q. Have you sent any other emails to Mr. Thorne?
A. No.
Q. Have you had any other email communications with Suffolk County or the Town of Brookhaven?
A. No.
Q. And did you retain a copy of this particular email in your victorcaroleo@aol.com email account?
A. No.
Q. Do you recall that you deleted this email?
A. I don't recall.
Q. Are you certain that you don't have a copy in the victorcaroleo@aol.com email account?
A. I'm certain I don't have a copy.
Q. Why are you certain that you don't have a copy?
A. 'Cause I would have deleted it, so I -- I don't remember.

C E R T I F I C A T E

I, MARIE FOLEY, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public for the State of New York, do hereby certify that prior to the commencement of the examination, VICTOR CAROLEO, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Marie Foley

COURT REPORTER
Registered Merit Reporter
Certified Realtime Reporter
Notary Public
Dated: March 18, 2025