# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -x

SITEONE LANDSCAPE SUPPLY, LLC,

Plaintiff,

-against-

Case No.: 2:23-CV-02084-GRB-SL

NICHOLAS GIORDANO, DOMINICK CAROLEO, VICTOR CAROLEO, NARROW WAY REALTY, LTD., NARROW WAY 2 LLC, THE GARDENDEPT. CORP., GROUP 5 ASSOCIATES,LTD., 3670 ROUTE 112 LLC, and 94TH ST. LLC,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -x

April 20, 2026
8:49 a.m.

EXAMINATION BEFORE TRIAL of VICTOR CAROLEO, the Defendant herein, held at 400 Garden City Plaza, Garden City, New York 11530, pursuant to Subpoena, taken before DANIELLE DEYOUNG, a Shorthand Reporter and Notary Public in and for the State of New York.

V. CAROLEO

LLC.

MR. GORMAN: Daniel Gorman, Troutman Pepper Locke, on behalf of the Plaintiff.

MR. CYRULNIK: Kevin Cyrulnik, Kazowitz LLP on behalf of Defendants and the witness.

MR. BIZZARO: Thomas Bizzaro for the Defendants and the witness.

MR. CARDELLO: Michael Cardello, Court-Appointed Special Master.

THE VIDEOGRAPHER: Thank you.

Will the court reporter please swear in the witness, and then counsel may proceed.

V I C T O R C A R O L E O, after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

MR. GIBBS: And I will just note for the record that Mr. Giordano is present for the deposition as well.

MR. CARDELLO: Before we get started, I just want to put on the

V. CAROLEO

deposition that [redacted]

Do you remember that?

MR. CYRULNIK: Object to the form.

THE WITNESS: Can you say that again?

MR. GIBBS: Sure.

Could you read back the question, please?

(Whereupon, the requested testimony was read back by the reporter.)

THE WITNESS: Yes.

BY MR. GIBBS:

Q Was that [redacted] that made that recommendation?

A I don't recall.

Q Other than whomever it was that you were referring to in your deposition, have any other physicians ever recommended [redacted]

A No, not that I recall.

V. CAROLEO

Q Do you still delete e-mails and text messages?

A Yes.

Q And with regard to the extent of your deletion, do you delete all texts and e-mails and if so, when do you delete them?

MR. CYRULNIK: Object to the form, compound.

A I delete all of them in a short period of time.

Q When you say "short period of time," would that be a week, an hour?

A Half an hour.

Q If you look in the records that we've marked as Vic Exhibit 1 --

THE WITNESS: In here (pointing)?

MR. GIBBS: Correct. If you go approximately halfway through, it looks like this --

THE WITNESS: Can you do that for me?

MR. GIBBS: Sure.

THE WITNESS: Thank you.

V. CAROLEO

Leading up to -- we'll say in 2019, in the one year leading up to the sale, what was your role with Garden Dept.?

A I was the face of the company.

Q Tell me what you mean by that.

A Good-looking guy, nice smile, nice teeth, "Hi, how are you, welcome, come in, what are you looking for." You know, people used to call me a nickname, the director, and I don't -- you know, jokingly, but that's what they thought.

Q At the -- again, we will focus on 2019, the year before the sale, how many -- this is just an estimate, but how many hours per week would you say you were working?

MR. CYRULNIK: Object to the form.

A I don't remember.

Q At that point, again 2019, was [redacted] to service customers or any other way with the business?

V. CAROLEO

MR. CYRULNIK: You're having issues with what?

MR. GORMAN: Hearing, with the side talking.

MR. CYRULNIK: You're having issues hearing?

MR. GORMAN: Yes, I'm having issues hearing.

MR. CARDELLO: Counsel, let's get moving.

MR. CYRULNIK: You can move closer if you want.

BY MR. GIBBS:

Q If you look on the first page, paragraph number two, it's a severance payment, it's titled, and it indicates that: "The company shall pay to employee 22,749.66."

Do you recall receiving that payment from SiteOne?

MR. CYRULNIK: Object to the form.

A I don't recall that.

Q This document, if you look at

V. CAROLEO

the paragraph above that, paragraph one, it says "Separation date." It says: "Employee agrees that October 21, 2022 is employee's last day of employment with the company."

Is that -- do you recall that being accurate as the last day that you worked for SiteOne?

MR. CYRULNIK: Object to the form.

A Now that I read that, that sounds right because it's my anniversary. This was my gift on my anniversary, you're fired.

Q Wonderful way to celebrate.

A After I put $5 million twice in their check, I'm a little steamed about that.

Q I get that sense.

A Thanks. I'll relax now.

Q That's okay. Depositions are high-emotional events.

A Exactly.

Q Do you recall if Mr. Giordano,

V. CAROLEO

if he worked at Garden Dept. continuously from the time that he was hired through whenever it was that he left the company?

A Can you say that again?

Q Sure.

Mr. Giordano, from the point whenever it was that he was hired, did he remain continuously employed with Garden Dept., as far as you can remember?

A Yes.

Q Did Mr. Giordano eventually come to be, sort of, Don's right-hand man, so to speak?

MR. CYRULNIK: Object to the form, vague.

A I'm not sure if you would call him a right-hand man, but he was in the company.

Q Let's focus on the time period of after SiteOne acquired Garden Dept. How would you describe Mr. Giordano's role with the company?

MR. CYRULNIK: Object to the form.

V. CAROLEO

A Yes.

Q How long had the $900,000 been in your checking account approximately?

MR. CYRULNIK: Object to the form.

A A year.

Q And how did it come into your account a year earlier?

MR. CYRULNIK: Object to the form.

A How did it come into my account? I have to think about this.

MR. CYRULNIK: I caution you not to speculate, Mr. Caroleo.

THE WITNESS: Yeah, I don't recall.

MR. CYRULNIK: If you know, you can answer.

BY MR. GIBBS:

Q Do you remember if you had to liquidate any assets for the $900,000 purchase price?

MR. CYRULNIK: Object to the form.

V. CAROLEO

A I don't recall.

Q Other than yourself, did anyone at all contribute to the purchase price for the Middle Island property?

MR. CYRULNIK: Object to the form.

A I believe my son did.

Q And how much did your son contribute to the purchase price?

MR. CYRULNIK: Object to the form and the use of the word "contribute."

But if you understand, you can answer.

A I don't recall.

Q What records --

Well, let me ask the question this way. Would it just be your checking account records that would reflect the source of the funds that were used for the purchase of this property?

MR. CYRULNIK: Object to the form.

A I'm not sure.

Q Do you know if anyone else

V. CAROLEO

submitted bids or offers for the property other than yourself?

A Somebody did.

Q Was that during the time period when you were negotiating the deal?

A Yes.

Q Tell me about that. Who was the other person who bid?

A I don't know any details of that, but I know they called me up and said you're going to pay a lot more.

Q You said "they" called you. Was it Ms. Huggins, Sandra Huggins, that called you?

A Or the broker of the company himself.

Q Did you submit multiple bids or offers for the property before you settled on a purchase price?

A I believe I did and then they raised the price. So I had to redo it again.

Q Do you know any of the other

V. CAROLEO

A In the winter, January, February.

Q How long have you been, we'll say spending January and February in Florida?

MR. CYRULNIK: Object to the form.

Go ahead.

A I would say 20 years it was just January at one time, then it went to February and a little bit of March later.

Q At the time --

And I will focus your time to the period where you were negotiating for the Middle Island property. Were you planning to open that business with anyone else?

A No.

Q Once you --

At some point after you purchased the property, Nick began assisting you or working with you. Is that right?

MR. CYRULNIK: Object to the

form.

A He assisted me.

Q So tell me about that. How did that come about and what was Nick's role?

MR. CYRULNIK: Object to the form.

A I asked him to help me out with some of the land clearing and stuff.

Q What did you --

When did you first approach Nick? Was it before or after you purchased the Middle Island property?

A I don't recall.

Q When you approached Nick, what did you tell him was the reason for -- that you needed his help?

A I said I'm building a nursery, can you just help me get things together. Because he's like my man, you know. Didn't disturb him while he was at SiteOne, come on the weekends and help me out.

Q When you first started talking

to Nick about this, did you indicate to him or did he indicate to you about you guys going into business together? Was he going to work at the business with you?

A No.

Q You approached Nick, you told him you were going to open a new nursery, asked him to help you, what was Nick's response?

A You know, he's like my son, whatever you need.

Q When was it that you first approached Nick about helping you?

MR. CYRULNIK: Object to the form.

A I don't recall.

Q What was the --

Did you tell Nick that you would pay him for helping you get the nursery started?

MR. CYRULNIK: Object to the form.

A I don't recall.

V. CAROLEO

funny, Dan? I don't know why you're laughing at the witness' answer. It's not appropriate.

MR. CARDELLO: Hold on, hold on. Now I'm going to direct this. There's been smiling, chuckling back and forth. I have let it go because it hasn't been disruptive. But I'm going to ask for that not to occur anymore.

BY MR. GIBBS:

Q You purchased the Horseblock Road property for 1.6 million. Do you remember how you found out about the property?

A I found out about the property through my son. He told me there was a piece of property for sale. He was thinking about it. Then he came to me later and said, This is something you should buy.

Q Did you purchase the property with your own money?

A No, I didn't purchase it with

V. CAROLEO

my own money.

Q What money did you purchase it with?

A I borrowed the money.

Q From whom?

A My son.

Q Did you borrow the full purchase price from your son?

A Yes.

Q Was borrowing the money from your son, was there any type of, like, a written agreement between the two of you for that loan?

A I imagine there was, I don't recall. It's my son.

Q Understood. You purchased the property with money that you borrowed from him. Did you promise to pay him back?

A Yes.

Q At any point since 2022 when you purchased the property, have you made any payments to your son towards this, the 1.6 million that you borrowed?

V. CAROLEO

A No.

Q Has he ever asked you for any payments on that?

A At times, you know, it was, you know: Figure out what you're going to do. I would like to get my money back.

Q And do you know where your son got the $1.6 million from?

A No, I have no idea.

Q At the time that you borrowed the money from Don, did you tell him what your plans were for the property, either apartments or a nursery?

MR. CYRULNIK: Object to the form.

A No, I didn't tell him.

Q Have you ever heard the name Neway Trucking?

A No.

Q Would it surprise you to learn that there are pictures of trucks at Scapes Supply with big stickers on the doors that say "Neway Trucking"?

V. CAROLEO

Q You have?

A Yes.

Q Tell me about this. What was or is this particular lawsuit about?

THE WITNESS: Tom? The rocks?

(Simultaneous speaking.)

MR. GIBBS: He can't answer for you --

MR. CYRULNIK: Hold on. Evan, I'll talk to my witness.

He can't answer questions and neither can I. So if you don't remember, you don't remember. If you do, you do.

THE WITNESS: Yeah, I don't remember.

BY MR. GIBBS:

Q Do you know if this lawsuit is still ongoing?

A It is still ongoing.

(Whereupon, Vic Exhibit 26 was marked for identification.)

BY MR. GIBBS:

V. CAROLEO

Q I've marked as Exhibit 26 the closing statement for the Horseblock Road property. This was dated -- or the closing date at least was July 8, 2022 at 10:00 a.m. Do you remember seeing this document before, Mr. Caroleo?

A Yes.

MR. CYRULNIK: Can I just ask you -- there's no Bates stamp on this. Do you know why?

MR. GIBBS: No, I'm not sure.

MR. CYRULNIK: Do you know if it was produced in this action?

MR. GIBBS: Well, I mean, it came from somewhere, presumably. You -- Oh, I do remember. This was produced at the depositions --

MR. CYRULNIK: -- deposition.

(Simultaneous speaking.)

MR. GIBBS: -- testified about. That's where it came from.

MR. CYRULNIK: Okay.

MR. GIBBS: This was produced at the Horseblock Road, LLC, deposition.

V. CAROLEO

BY MR. GIBBS:

Q My question for you is -- there is --

Down here at the bottom it indicates there was a 165,000-dollar down payment. My only question is: Did you borrow that -- the down payment from your son Don as well?

MR. CYRULNIK: Object to the form.

A I don't know if I borrowed a small amount from him.

Q Other than providing you with the purchase monies, was your son Don involved at all with the Horseblock Road property in 2022 or 2023?

MR. CYRULNIK: Object to the form and the use of the word "providing with."

BY MR. GIBBS:

Q You can answer.

A Well, he's the one who told me about the property, as I stated earlier.

Q Other than telling you about

V. CAROLEO

the property and providing at least the bulk of the purchase price, was he involved in any other way with the Horseblock Road property?

MR. CYRULNIK: Same objections.

A No, he wasn't.

Q Do you recall working with Suffolk County on a five-year plan for the Horseblock Road property?

MR. CYRULNIK: Object to the form.

A I don't recall.

Q When did you first --

Or let me ask it a different way. When did --

When you purchased the Horseblock Road property, tell me about the property. Was it like a wooded area? Was it cleared?

A Trees -- Trees from north to east, to the west to the south, loaded with trees.

Q Did you --

I'm assuming that for Scapes

V. CAROLEO

to operate there, trees had to be cleared off. When did the tree removal and grading the site prep work -- when did that begin?

A Within the last three months.

Q Of this year?

A December, January, February, March, April -- no, no. December, January, February.

Q So of -- December 2025 and the beginning of 2026 is when the work started at Horseblock Road?

A Correct.

Q Was there any site preparation work performed before December of 2025?

A Not that I recall.

Q Do you remember, or are you familiar with, a company called 777 Leasing Corp.?

A Yes.

Q Tell me about that company.

A We sold it to you guys.

Q Before you sold it, what did it do? What kind of company was it?

V. CAROLEO

A It was an asset holding company for trucks and equipment.

Q What trucks and equipment did it own? Was it for Garden Dept.?

A Yes.

Q Is 777 Leasing Corp. still an active company? Does it do business at all?

A I remember my son said he sold it to you guys. So I don't know if it's active anymore.

Q Was that a company --

Were you a shareholder of 777 Leasing Corp.?

A Yes.

Q Did you transfer your ownership shares to Don at some point?

A I don't recall what we did.

Q Do you remember using an e-mail account with the e-mail address, all one word, viccaroleo8@gmail.com?

A Yes.

Q Tell me about that e-mail account. What's it used for?

V. CAROLEO

A For the -- for the prophet's voice, the religious e-mails I use.

Q Okay. Has it ever been used in connection with Scapes Supply?

A Not that I recall, but let me explain to you, when you go on AOL, sometimes the name switches inadvertently. Sometimes I send an e-mail out that I didn't want.

Q Did you turn over the Gmail account to your attorneys for searching and production of documents in this case?

A I don't recall.

Q Do you recall if you disclosed the Gmail account in your interrogatories in this case?

A I don't recall.

Q Other than the AOL account that we've talked about earlier and the viccaroleo8@gmail, since January 2020 through the present, have you used any other e-mail addresses?

A I use victor@gmail -- victorcaroleo@gmail.

V. CAROLEO

Q And that's the full e-mail address, it's just victorcaroleo@gmail.com?

A Correct. And I use "victorsinfo," but all for ministry related things.

Q The other two --

The last two that you mentioned, victorcaroleo@gmail and victorsinfo@gmail.com, have you ever used either one of those for any business related to Scapes?

A First of all, I rarely use any of these three or four that we just mentioned, very rarely. And I never used it for Scapes, as far as I can remember.

Q What about vicdepot@aol.com?

A Yes.

Q What is that e-mail account?

A I originally started my own Garden Depot, right, 20 years I started. We didn't have Garden Depot at the end, and I just never closed it.

Q When you're referring to

V. CAROLEO

"Garden Depot," is that a separate company from Garden Dept.?

A That was the original name, "Garden Depot."

Q Oh, okay. When -- When was it called --

When was it called "Garden Depot"?

A For at least 25 years -- 23 years.

Q When did the name change to "Garden Dept."?

A Oh, man.

Q An approximation is fine.

A I don't know.

Q The vicdepot@aol.com, has that ever been used for any Scapes Supply business at all?

A To my recollection, no.

Q Can you identify any individuals that currently work for Scapes Supply that used to work for Garden Dept.?

A Can I identify them?

V. CAROLEO

C E R T I F I C A T E

I, DANIELLE DeYOUNG, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That the WITNESS whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by such WITNESS.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

Danielle DeYoung

DANIELLE DeYOUNG