# EXHIBIT 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - -

SITEONE LANDSCAPE SUPPLY, LLC, Civil Action No.
Plaintiff, 2:23-CV-2084(GRB)(SL)

v.

NICHOLAS GIORDANO; DOMINICK CAROLEO; VICTOR CAROLEO; NARROW WAY REALTY, LTD.; NARROW WAY 2 LLC; THE GARDEN DEPARTMENT CORP.; GROUP 5 ASSOCIATES, LTD.; 3670 ROUTE 112 LLC; 9 4TH ST. LLC; SCAPES SUPPLY, LLC; NEWAY MANAGEMENT, LLC; AND NEWAY TRUCKING,

Defendants.

- - -

March 14, 2025

- - -

Videotaped deposition of DOMINICK CAROLEO, conducted at 400 RXR Plaza, Uniondale, New York, commencing at 10:00 a.m. EDT, on the above date.

Magna Legal Services
866-624-6221
www.MagnaLS.com

Marie Foley

on behalf of SiteOne Landscape, LLC.

MR. MULRY: Kevin Mulry from Farrell Fritz, also on behalf of plaintiff SiteOne Landscape, LLC.

MR. LABUDA: Good morning. Joe Labuda for the defendants.

MR. MULE: Michael Mule for the defendants.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

THE STENOGRAPHER: If I could ask you to raise your right hand, please.

Do you swear or affirm the testimony you give will be the truth, the whole truth, and nothing but the truth today?

THE WITNESS: I do.

THE STENOGRAPHER: Thank you.

\- - -

DOMINICK CAROLEO, the Witness herein, having been first duly sworn by a Notary Public in and of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. GIBBS:

Q. Mr. Caroleo, if you would, let's start by you stating your full name for the record, please.

A. Dominick Caroleo.

Q. And are you presently taking any medications that could affect your testimony today?

A. No.

Q. I'll go over just a couple of ground rules.

The first and most important one is try to let me finish my question before you start to answer. It's easy to talk over each other, but to make sure we have a clear record, let's try to make sure we let each other start and stop fully.

Make sure to answer questions

anything to do with a conversation.
Exclude those.
THE WITNESS: Okay.
BY MR. GIBBS:
Q. Do you remember if you were -- if you understood that you had an obligation to preserve any other types of documents for purposes of the case?
A. I don't remember.
Q. Do you remember approximately when you became aware of your preservation obligations?
A. No, I don't.
Q. Have you ever discussed the preservation of communications or documents with Vic Caroleo?
A. I don't recall.
Q. And same question but with respect to Nick Giordano.
A. I don't believe so.
Q. Was your current cell phone searched for text messages and other relevant communications as part of discovery in this case?

MR. LABUDA: Objection just in terms of excluding any attorney/client privileged communications.

But you can answer the question.

A. Yes.

Q. And when was your phone searched, your current phone?

A. I don't recall the exact dates, but it was in the last four months maybe.

Q. Do you recall whether it was in 2025 or 2024?

A. 2024.

Q. Was that the first and only time that your current cell phone had been searched for purposes of this case?

A. Yes.

MR. MULE: I'm going to object, but...

BY MR. GIBBS:

Q. Do you recall the individual that did the searching on your cell phone?

A. No.

MR. MULE: I apologize, but I have to take a -- take a two-minute

break.
MR. LABUDA: Okay.
MR. MULE: If we can.
THE VIDEOGRAPHER: We are going off the record.
The time is 10:32.
(Recess taken.)
THE VIDEOGRAPHER: We are going back on the record.
The time is 10:35.
MR. MULE: The -- Evan, the witness would like to clarify an answer.
A. You asked me in one of the last couple questions if this phone, my current phone, has been searched or one of the words you used, and I want to just amend that. It has not.
Q. Has not been searched?
A. Sorry about that.
Q. Did someone make a copy of the data that's on your current phone?
A. No.
Q. Did you or anyone else manually

search your current phone for text messages or other communications or documents that might be on the phone relevant to the case?

A. I don't understand the question.

Q. Sure, I'll see if I can rephrase it.

A. Yeah.

Q. Has your current phone in any way been searched, either by you or by someone else, to determine whether it has relevant communications or documents on it?

A. I've looked at my texts. I don't -- I didn't have any intention but just looking at different texts.

I don't want to say I searched it.

Q. And that was just done by you personally?

A. Yeah.

Q. From October '22 to the present, how many cellphones have you had, including the current one?

MR. MULE: Just objection to the form. You said from October '22.
MR. GIBBS: Yeah.
MR. MULE: What year are you --
MR. GIBBS: October 2022.
A. What was the question again?
Q. Sure.
Since from October 2022 through the present, how many cellphones have you had?
A. Two.
Q. And are one of those the current one that you have here with you today, your current phone?
A. Yes.
Q. With respect to your current phone, what's the phone number for that device?
A. [redacted]3532.
Q. And how long have you personally had that -- that number?
A. I don't recall.
Q. Have you had it at all times relevant to this case, so going back to

October of 2022?
A. Yes.
Q. And what's the make and model of your current phone?
A. It's a Apple phone.
Q. So it's an iPhone?
A. An iPhone.
Q. Do you know is it like an iPhone 15?
A. I don't -- I don't know that without looking --
Q. That's fine.
A. -- in the settings.
Q. I couldn't answer that question either.
A. Yeah.
Q. Who is your mobile carrier?
A. Verizon.
Q. How long have you had Verizon?
A. I don't recall.
Q. Your current phone, when did you purchase that device?
A. You're asking me about the current phone, correct?

Q. Correct.
A. I don't recall exactly, but it was in the last four months.
Q. Would you say approximately December 2024?
A. Approximately.
Q. Where did you purchase the phone?
A. At a Verizon store.
Q. Was there any particular reason that you got a new phone?
A. My phone, my previous phone from this one was broken. The screen was broken; the glass was broken. I broke it at a Yankee game. And my finger was starting to become -- my thumb was starting to get cut from the glass, so I -- I got a new phone.
Q. Did you transfer the data from your old phone to your current phone?
A. I told the technician what I wanted done, and that was what I told him.
Q. To transfer all the data?
A. To transfer all the data I

didn't want.

Q. And as far as you know, that was done?

A. Yes, as far as I know.

Q. What did you do with your old phone when you got your new one?

A. I gave it to Verizon.

Q. At the time when you turned in your old phone, did you know at that time that you were -- you had an obligation in the case to preserve data and communications in connection with the data?

A. I don't recall what I remember at that point about the case.

Q. Do you have an iCloud account?

A. I'm not positive.

Q. On your current phone, how long is it set to store text messages?

A. I have no idea.

Q. And on your prior phone, do you know what that setting was on that device?

A. No, I don't.

I'm sorry, can -- I might need

hard time doing that.

It could be just, you know, checking on my kids or, you know, general family, you know, things or personal items between me and him.

Q. And similar question, since the beginning of the lawsuit through the present, have you sent or received any text messages with Nick Giordano?

A. Yes.

Q. How frequently on average would you say you communicate via text with Nick?

A. I don't recall, but in the last 60 days, probably, you know, a couple daily at this point now that we're working together.

Q. Before you were working together again, did you still exchange text messages?

A. I'm sure I've texted him. I haven't -- I haven't made a mental log about that, but it -- I didn't talk to him, there was times where we didn't talk

a lot, and there was times where we're in litigation together so we would discuss the litigation.

I'm not sure if that was overelaborating your question if you asked me about texts, but I think it was more on the phone at that point.

Q. And just to make sure we're clear, so your answer when you said that you would talk about the litigation and things of that, you meant those were phone conversations you mean?

A. I don't recall exactly how we communicated every time. All I know is that I've spoken to Nick in the last, you know, two years.

Q. Since the beginning of the lawsuit in March of 2023, have you deleted any text messages with Nick, either on your current phone or on your prior phone?

MR. LABUDA: Objection.

But you can answer.

A. It's come to my attention on my past phone that it had a setting that was

removing text messages every 30 days.
Q. I'll ask -- so, I appreciate that. I'll ask a slightly different question.
With respect to deleting messages from Mr. Nick Giordano, did you manually delete any messages? In other words, did you, you know, look at a specific message and delete that message or that conversation?
A. No.
Q. At what point did you become aware that your prior phone had an auto delete setting turned on?
A. I would say toward the end of 2024.
Q. And so you learned that before you turned that phone in?
MR. MULE: Objection. I -- I -- go ahead.
A. It -- just repeat that. I didn't follow.
Q. Sure.
You said you became aware that

there was an auto delete feature on your prior phone.
A. Yes.
Q. And so my question is did you figure that out before you turned that phone in to Verizon?
A. No.
Q. How did you learn, and again I'm not asking for any discussions that you had with your lawyers, but how had you come to find out that your prior phone had an auto delete feature turned on?
MR. MULE: I'm just going to --
MR. LABUDA: Yeah, instruct the witness not to answer the question if, you know, inasmuch as you're disclosing any attorney/client privileged communications.
If you can answer the question, you can answer the question. If you can't --
A. I can't answer the question 'cause the conversation was with my attorneys.

MR. LABUDA: We'll move to strike, but -- but -- and object, but, you know, okay.

BY MR. GIBBS:

Q. For your prior phone, did you provide your old phone to your attorneys at some point so that it could be searched for relevant documents or communications?

A. Repeat that again.

Q. Sure.

Did you provide your old phone to your attorneys at some point so that it could be searched for relevant communications or documents?

A. I did.

Q. Do you recall approximately when you provided the old phone to your lawyers?

A. Approximately a little bit before I got a new phone, and I would say, you know, some -- somewhere toward the end of 2024.

Q. Have you heard of a company called We Recover Data?

BY MR. GIBBS:

Q. Did you personally have contact with We Recover Data?

A. I don't recall.

Q. Did you provide your old phone to We Recover Data?

A. Yes.

Q. And do you recall what was done with your old phone?

A. I don't know the exact terminology, but they took a -- an image of, you know, the hard drive, if you will. I'm not sure if that's the -- the correct terminology for the phone.

Q. Did you personally get a copy of the hard drive from the phone?

A. I don't remember how I -- I don't remember if I got it or my attorneys got it.

Q. Was reaching out to We Recover Data, was that your idea to do that?

A. I don't recall whose idea.

Q. Did We Recover Data perform any other services for you?

MR. MULE: I'm just going to object only to the extent that it involves attorney/client communications.

If you can answer without that.

A. I cannot answer without that.

Q. Do you recall what We Recover Data's response was to any inquiries about the data not being usable?

MR. LABUDA: Same objection.

But you can answer in terms of just the instruction with attorney/client privileged communications, but, you know, you can answer, or -- or not.

THE WITNESS: I believe We Recover Data was --

MR. LABUDA: Well, you got to answer his question, so.

A. What was the question?

Q. Sure.

So, do you recall what we -- We Recover Data's response was when the issue was raised that the data was unusable?

A. I believe they said the data has been deleted from their servers at this point.

I don't remember the conversation word-for-word.

Q. Do you re -- I think -- let me ask it this way.

Do you recall if We Recover Data told you that they didn't have a backup of the data that they took back in 2023?

MR. LABUDA: And again I'm just going to instruct, I think that we're kind of deviating. I want to make sure that, like, we're sticking with conversations that you would have directly with We Recover Data.

MR. GIBBS: Correct.

MR. LABUDA: Not any conversations that you had through, you know, your counsel. Like, so if your counsel told you something, that should not be anything that you disclose, but if you had a conversation directly with We Recover

Data or with Vic or with Nick outside of the presence -- or anybody else outside of the presence of counsel, then you could answer the question.

A. What was the question again?

Q. Do you remember whether We Recover Data retained a backup copy of the data they collected from your cell phone originally?

A. I don't believe they did, and I don't hundred percent recall the conversation.

MR. LABUDA: And let's just take a quick second 'cause I want to just make sure we're on the same page in terms of attorney/client privileged communications.

MR. GIBBS: Sure.

THE VIDEOGRAPHER: We are going off the record.

The time is 11:21.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record.

The time is 11:25.
BY MR. GIBBS:
Q. Have you ever personally had any contact with a company called NextPoint?
A. I just want to go back to one of the previous questions regarding We Recover Data.
Q. And which question was that?
A. I don't -- I don't remember, but I want to make sure I get the -- I respond to this correctly 'cause I was getting confused before.
Q. Okay. You're -- you're free to make whatever clarification you'd like.
A. Yeah, I'm trying to remember a question that would help me answer this correctly.
But can you read me one of your last questions regarding We Recover Data?
Q. Was it with respect to backups of your phone? That was a line of questioning.
A. I don't remember that, but in the --

MR. LABUDA: What was -- what was on the -- what was recovered by We Recover Data?

A. Well, just a little bit -- I just want to explain a little bit more.

So, in the --

Q. Sure.

A. -- beginning of the lawsuit, if you will, there was mentioning about copies of our phone. So I took it upon myself, or -- or we've had conversations.

THE WITNESS: And I'm not sure if that's okay to say.

MR. LABUDA: Exclude attorney conversations.

A. So I just thought it would be a good idea to take a copy of the phone, God forbid the phone broke or was stolen or whatnot.

We Recover Data delivered the hard drive, I can't remember if it came to me or directly to my attorneys, but the hard drive was reviewed and there was nothing regarding the case on the hard

drive.

I don't -- I'm -- I'm a little cloudy on what the situation is at the moment why the data is unrecoverable or -- other than We Recover Data said that they don't have the data on their server at this point. I think it exceeded their retention, you know, policy at that point, so.

Q. I want to go back to one thing you just said.

A. Sure.

Q. It was at the very beginning.

A. Yeah.

Q. You said "I thought it would be a good idea."

So I want to go back to, I guess, the initial, you know, reach-out to We Recover Data.

Did you take it upon yourself to contact We Recover Data?

A. I'm -- I'm trying to -- this was a long time ago. I'm trying to remember.

I believe that I felt that this

would be a good idea. I don't want to talk about conversations with my attorney, but we might have, you know, discussed something, and I don't remember who engaged them or who reached out to them or who found them. I'm not sure who -- if that was me or my attorneys.

Does that answer that question?

Q. It does.

A. Okay.

You know, it was two -- it was two years ago maybe at this point, or maybe longer. I don't, you know, I don't remember exactly.

Q. But you recall the vendor was We Recover Data?

A. I don't -- I'm -- I'm remembering the name of it because you're mentioning it and that sounds correct. I don't remember if it was We Recover Data Corporation or Ltd. or anything like that, but that does sound like the name of the company.

Q. Do you recall having any

But you can answer.

MR. MULE: Yeah.

BY MR. GIBBS:

Q. And I can be -- I can be a little clearer with the time period.

At the time that you turned in your old phone to Verizon, did you understand at that point that it had information on it that could be relevant to the lawsuit?

MR. LABUDA: Same objection.

But you can answer the question.

A. I don't know.

Q. And why did you think you could exchange that phone so that it would be no longer available for the case?

A. I want to go back to the previous question 'cause I'm not sure I understood it correctly.

Q. I'll ask it again.

Did you understand that your old phone had information that could be relevant to the lawsuit at the time that you turned it in to Verizon?

MR. LABUDA: And just the same objection.

But you can answer the question.

A. Repeat the question again.

Q. Did you understand that your old phone had information on it that could be relevant to the lawsuit at the time you turned it in to Verizon?

MR. LABUDA: Same objection.

But you can answer.

A. I -- I can't remember what I was thinking at that point.

Q. And the follow-up question to that is why did you think you could exchange it so that it would be no longer available for purposes of this case?

MR. LABUDA: Objection.

But you can answer.

A. Repeat that slowly, or rephrase that if you can.

Q. Sure.

Did you think it was appropriate to exchange the phone even though it would be no longer available for purposes of

this case?

MR. LABUDA: Objection.

But you can answer.

A. I asked the Verizon technician to copy my information from my old phone onto the new phone. So I didn't see any harm in that.

I don't know if I necessarily had a litigation on my mind or just making sure that all of my information was properly on the phone.

MR. GIBBS: Okay.

I think we can take a break for a couple minutes.

MR. LABUDA: Okay.

MR. GIBBS: We're towards the and of our questioning, so.

MR. LABUDA: Okay.

THE VIDEOGRAPHER: We are going off the record.

The time is 11:35.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record.

The time is 11:56.

BY MR. GIBBS:

Q. After our break, Mr. Caroleo, I have just a few more questions to ask of you.

The first is we talked earlier about, you know, some backups that had been made by We Recover Data.

Other than the vendors that we've talked about today, are you aware of any other alternative source or sources from which any of your old text message data could be recovered?

MR. LABUDA: You can answer.

A. Repeat the question?

Q. Sure.

Other than the vendors that we've talked about today, We Recover Data and the others, are you aware of any other source from which your old text message data could be recovered?

A. No.

Q. Did you tell your attorneys that you were going to get a new phone?

C E R T I F I C A T E

I, MARIE FOLEY, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public for the State of New York, do hereby certify that prior to the commencement of the examination, DOMINICK CAROLEO, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

________________________________

COURT REPORTER
Registered Merit Reporter
Certified Realtime Reporter
Notary Public
Dated: March 19, 2025