# EXHIBIT 7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -x

SITEONE LANDSCAPE SUPPLY, LLC,

Plaintiff,

-against- Case No.: 2:23-CV-02084-GRB-SL

NICHOLAS GIORDANO, DOMINICK CAROLEO, VICTOR CAROLEO, NARROW WAY REALTY, LTD., NARROW WAY 2 LLC, THE GARDENDEPT. CORP., GROUP 5 ASSOCIATES,LTD., 3670 ROUTE 112 LLC, and 94TH ST. LLC,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -x

April 21, 2026
8:51 a.m.

EXAMINATION BEFORE TRIAL of DOMINICK CAROLEO, the Defendant, held at 400 Garden City Plaza, Garden City, New York 11530, pursuant to Order, taken before DANIELLE DEYOUNG, a Shorthand Reporter and Notary Public in and for the State of New York.

D. CAROLEO

LLC.

MR. GORMAN: Daniel Gorman, also Troutman Pepper Lock on behalf of SiteOne.

MR. CYRULNIK: Kevin Cyrulnik, Kasowitz LLP on behalf of all Defendants and the witness.

MR. BIZZARO: Thomas Bizzaro for the Defendants.

MR. CARDELLO: Michael Cardello, Court-Appointed Special Master.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

D O M I N I C K C A R O L E O, after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

MR. CARDELLO: So before we get started with the questioning, I just want to explain to the witness, Mr. Caroleo, my presence here.

So I was appointed by Judge Locke to oversee depositions in this case, which includes yours

D. CAROLEO

started to run that entire operation.

Q The Dix Hills operation?

A The Dix Hills.

Q Once he you came back, whenever that was, did you continue to run the main Coram location of Garden Dept.?

MR. CYRULNIK: Object to the form.

THE WITNESS: Repeat the question.

MR. GIBBS: Sure.

BY MR. GIBBS:

Q So after your dad returned to the business, whenever that was, did you continue to run the Coram location of Garden Dept.?

A Yeah. I mean, I oversaw the two stores. I don't -- you know, I was more of the overseer, Nick was running the Coram branch at that point and my dad was running the Dix Hills branch.

Q Let's talk about Nick for a second. When did -- again, long time

D. CAROLEO

ago, an approximation is fine, but approximately when did Nick start working for Garden Dept.?

A I can't answer that accurately, but I think it was somewhere around '04, '05, something like that.

Q Did you hire Mr. Giordano?

A I did.

Q What was his background when you hired him? Had he worked in the nursery business before?

A He worked at a competitor a couple miles away from the Garden Dept.'s coram branch. You know, he was a young guy like me at the time. We are actually -- I think I'm six months older than him. So he had some nursery knowledge but, you know, little experience at that point in managerial type things.

Q When Nick came --

And when he joined the business, what was his role with the company?

D. CAROLEO

A In the very beginning he was, kind of, just wearing a lot of different hats, like everyone was there. You know, the business wasn't very structured where everyone had like a certain piece of the business that they managed. We all, kind of, just -- we all were, you know, pushed where we were needed at that time.

Q It sounds like over time, you know, at least until -- or around 2011 or so, it sounded like Nick had, sort of, taken over more of a managerial type role within the business. Is that accurate?

A I think it was before 2011. I saw a lot of potential in Nick. You know, the first thing was his -- he just -- you know, he's like a machine, he just doesn't stop working. You know, he doesn't know anything else but work.

I saw that he was highly intelligent, you know, and motivated, and probably the biggest thing was he had desire. And, you know, I taught Nick everything that I learned from my dad

D. CAROLEO

because that was basically --

It was, sort of, like, you know, going back, what I just described in Nick is how I felt about myself and I learned from watching my dad over many years.

Q What was your --

So at the time -- and again, we will kind of focus on this time period around 2011. So you opened the -- or Garden Dept. opened the Dix Hills location, you had the Coram location. At that point in time, were there more defined roles among you, your dad and Nick within the company?

MR. CYRULNIK: Object to the form.

A At that time, you know, we had managers. We didn't have -- we didn't really have like other titles other than managers. Nick was a general manager, my dad was the general manager, but he was really the owner, but he was managing the Dix Hills branch.

D. CAROLEO

BY MR. GIBBS:

Q So over the course of time -- we will talk about again from 2011 until the acquisition by SiteOne -- how did your --

How did the roles within the company between you, Vic, and Nick, how did those change over time?

MR. CYRULNIK: Object to the form.

THE WITNESS: Repeat the question.

MR. GIBBS: Sure.

BY MR. GIBBS:

Q So from this time period around 2011, you mentioned when you acquired Dix Hills, from then until the company was sold to SiteOne, how did yours, Nick's, and Vic's roles within the company evolve over that time period?

MR. CYRULNIK: Same objection.

THE WITNESS: Sorry?

MR. CYRULNIK: I'm just objecting.

D. CAROLEO

THE WITNESS: I don't think they -- I think I explained that earlier. They didn't really change much. My dad was managing Dix Hills. My dad also was an overseer because he was an owner and he was in the business for a long time.

Nick's responsibility was Coram's branch, but he also was, you know, an intricate part of, you know, the other locations. You know, he had an opinion in those places. He had some strategy advice in those places. He did a lot of the procurement for all three of the locations. I mean, I would say he did 90 percent of it and he did a lot of selling.

We didn't treat it so much like three separate businesses. We treated it as one -- you know, we treated it as one business with like just registers on Long Island, if that makes any sense.

D. CAROLEO

BY MR. GIBBS:

Q It does. Were the same customers generally served out of all three locations?

A There was definitely some carryover.

Q So let's focus on the time period of specifically 2019 starting January 2019 through the end of that year. What was your role in the business?

A You know, I -- Nick and even my dad, but Nick and -- there was other managers. I mean, I don't want to forget -- you know, there was other intricate parts of the business. It wasn't just those two, but they were the two biggest players, you know, moving the needle, if you will.

You know, Nick and my dad really afforded me, you know, a lot of time to, you know, take my kid to a baseball game and that type of thing. So Nick really started to take over the

D. CAROLEO

operations and, you know, his involvement became really substantial by 2019.

Q What about your role, what would you -- what were your --

What did you do on a day-to-day basis? What was your role in the business?

A In 2019?

Q In 2019.

A I would say I would, you know, thought partner. You know, issues or any major decisions with Nick basically I would -- at that point the business was really like running on its own. I didn't have to really be so involved in the day-to-day at that point. We created a pretty good team and, you know, Nick was really leading the team.

Q How would you say, as between you and your dad -- and again, talking about 2019, how would you describe the interplay between the two of you in the business? Were you the, sort of, final decision maker or was he? How did that

D. CAROLEO

do Bissett for Doug because I was very fond of him. This was just an added little thing.

I do remember -- I think this came to like a Fidelity app that I had and you can electronically sign it. I didn't read the document. I -- if my memory serves me correct, I texted my -- not my boss, I don't think at the time, Brian Kurzynowski, and I said, hey, I got this stock agreement, I signed it. He says, hey, just so you know, there was a non-compete in that thing. I said, oh, really, I didn't know that.

I e-mailed it to my attorney and I was concerned because, you know, I had multiple non-competes. My longest non-compete was in the APA, the asset purchase agreement, it was for five years after the closing of the business. And I wasn't sure what I wanted to do with my life. It was possibly work for SiteOne until retirement or it was possible that I would, you know, complete, you know, my

D. CAROLEO

employment agreement or whatever I had with them and I was hoping to stay with them longer than five years, but I wanted that freedom that after five years if I decided to open up a business in this industry, I didn't want it to be extended out another 18 months.

Because this was an 18-month non-compete, if my memory serves me correct, that starts the minute your last day of the job was. So it didn't start when I signed it, it started when the job was over. And I had every intention to fulfill my obligations with the longest part of my non-compete, which was five years, I think. It was a very long time. My employment agreement only was for three years. So I was really --

I didn't even know how that all worked, but I was assuming that I was going to be let go after three years anyway. But I was -- that's why I was -- I don't know if the word panicking was right but, you know, I was perturbed, if

D. CAROLEO

you will, because I didn't want to essentially take a five-year non-compete and extend it to six and a half years.

Q I have a couple of follow-up questions based on what you just explained. The first is -- again, I'm not try to go mischaracterize what you said, but I believe --

I understood you to say that you received this in exchange for going over to Bissett. Did you mean that -- was your understanding that --

A It wasn't an exchange. It was -- they asked me to run Bissett, if I my memory serves me correct, I was not interested. I was enjoying just doing the Garden Dept. and I -- and Bissett was a diaster. This wasn't -- this was a tall task for anybody to do. They tried it with multiple people before I got there.

Doug was doing everything he can to get me to go over and manage that business, and I'm almost certain that

D. CAROLEO

APA.

MR. CYRULNIK: Object to the form, calls for a legal conclusion.

Sorry, go ahead.

BY MR. GIBBS:

Q If you go to section 4.02, that's the non-compete provision --

A What page number?

Q Let's see. It is 25.

A Okay.

Q My question is: Did you review this particular section -- the covenant not to compete, did you review this personally before you signed the asset purchase agreement?

MR. CYRULNIK: Object to the form.

A I'm sure I read it, you know, a long time ago. I don't -- I haven't read it recently. I don't remember.

Q Okay. I think you mentioned this earlier, but what was your -- you know, at the time that you signed this, what was your understanding of how long

D. CAROLEO

this covenant not to compete would be in effect?

A I had multiple non-competes, but I remember that the APA non-compete was five years or 60 months maybe after the -- you know, from the closing date, five years after that. Right? Makes sense?

MR. GIBBS: That makes sense, it does.

(Handing).

(Whereupon, Don Exhibit 9 was marked for identification.)

BY MR. GIBBS:

Q I've marked as Exhibit 9 a copy of a lease agreement between Narrow Way Realty Limited and SiteOne Supply LLC. Have you seen this particular document before, Mr. Caroleo?

A Yes.

Q Tell me what this is in your own words.

A It's a lease between SiteOne

D. CAROLEO

on an occasion or two. During a slow period, you know, instead of sending guys home and cutting salaries and getting people upset and finding new jobs, we tried to find them work.

Q Understood. There came a point when your employment with SiteOne ended. Was that in October of 2022?

A Sounds correct.

MR. CYRULNIK: Object to the form.

BY MR. GIBBS:

Q Do you remember the exact date that your employment ended?

A No, I don't.

MR. CYRULNIK: Object to the characterization of "ended." He was fired.

BY MR. GIBBS:

Q After you left SiteOne, what did you do for employment?

MR. CYRULNIK: Object to the form.

A I had absolutely no

sorry. Was he ever an employee of Garden Dept.?

MR. CYRULNIK: Object to the form.

A I don't know.

Q Do you know --

A Are you done with this?

Q Yeah, you can put that aside.

The Middle Island property that I referred to a minute ago, do you know whether your dad purchased that property in 2022?

MR. CYRULNIK: Object to the form.

A I come to find out he did, yeah.

Q Before he purchased that property, did he discuss it with you at all?

MR. CYRULNIK: Object to the form.

A I don't believe so.

Q When did you first learn that your father had purchased that property?

D. CAROLEO

MR. CYRULNIK: Object to the form.

A I don't know when I found out exactly, but I did come to find out that knowledge at some point. I can't tell you when.

Q Did your -- we will say in approximately December of 2022, did your dad borrow $900,000 from you?

MR. CYRULNIK: Object to the form, misstates --

THE WITNESS: Repeat the question one more time.

MR. GIBBS: Sure.

BY MR. GIBBS:

Q In December of 2022, did your dad borrow -- or November of 2022, did your dad borrow $900,000 from you to purchase a property?

MR. CYRULNIK: Object to the form, misstates the evidence.

A It sounds correct. I mean, I don't know if those are the exact specifics.

D. CAROLEO

Q Did he -- when he borrowed the money from you, did he tell you what the money was for?

MR. CYRULNIK: Object to the form.

A He asked me for a loan. He said that he was going to buy a property. He didn't get into where the property was or how he found it and that was really to the -- that was the extent of it.

Q When he asked for the loan, did he tell you anything about what he intended to do with the property?

MR. CYRULNIK: Object to the form, asked and answered.

A No.

Q The loan for -- the money that you gave him as a loan, what were the terms of that? What was the, you know, the repayment terms, so to speak?

A You know, I was just let go from SiteOne, maybe a day or two later my dad was let go from SiteOne. My dad needed a job. My dad needed to make

D. CAROLEO

money and my dad asked me for a loan. I didn't set up any type of payment terms or anything like that with him because I didn't want him to have that stress of that type of thing. I just felt like, you know, I wanted to help him and I didn't get into much of what he was doing or what was going on and that's really it. That's what I could recollect.

Q Since then, have you discussed with him -- do you have any repayment terms or anything like that?

A We've had conversations, but it's not something that's like on my mind 24/7 because I don't want to give my dad that type of pressure at the moment. I'm very -- you know, as you can see today, I'm very grateful for my dad. He's -- we wouldn't be here today if it wasn't, you know, for my -- I wouldn't be -- yeah.

Q Understood. I get it.

A Thanks.

Q Do you recall -- I think this would have been some years ago, but do

D. CAROLEO

forwarded it to one of my kids and said print this for grandpa.

Q Okay.

THE WITNESS: Good?

MR. GIBBS: We are good.

This is Exhibit 30 (handing).

(Whereupon, Don Exhibit 30 was marked for identification.)

MR. GIBBS: I've marked as Don Exhibit Number 30 an e-mail exchange between Don Caroleo and Dean Sadek. And if you would, just take a minute to review this and let me know once you've had a chance.

THE WITNESS: (Perusing).

I've reviewed it.

BY MR. GIBBS:

Q If you look down on the bottom, there's an e-mail from you to Mr. -- we will say Dean -- March 30th. It says: "I'm buying a property that I'm going to set up my business again at two

D. CAROLEO

and a half years from now. I made a $165,000 payment recently at contract using equity line."

Do you remember what property you're referring to in this particular e-mail?

MR. CYRULNIK: Object to the form.

A I don't.

Q Do you recall making a $165,000 down payment for a property?

MR. CYRULNIK: Object to the form.

A No, I don't.

MR. GIBBS: (Handing).

(Whereupon, Don Exhibit 31 was marked for identification.)

BY MR. GIBBS:

Q This is Don Exhibit 31. This is another e-mail exchange between Mr. Caroleo and Dean Sadek from April 1, 2022. The beginning Bates number is SiteOne_00016110.

D. CAROLEO

and just ask you a couple of questions to make sure I understand. So let's start with Exhibit 30.

Don, do you remember looking a few minutes ago at Exhibit 30?

A Yes.

Q Okay. I want to focus on the bottom e-mail that Mr. Gibbs focused on. It's an e-mail from you to a Dean Sadek, March 30, 2022. Do you see that one on the bottom?

A Yes.

Q Okay. I want to focus specifically on the second statement for now -- I will go back to the first one in a minute -- and it says, quote: "I have made a 165k payment recently at contract using liquidity line. We should make this a interest only for the next couple of years until I start making money there," period.

Do you see that?

A Yes.

Q Do you have an understanding

D. CAROLEO

of what payment was made and in connection with what, having seen the rest of the documents that were shown to you after this and that I think you said jogged your memory and whatnot. I don't know if this is related, but I just wanted to see if there's any understanding that you can give us about that.

A The 165 was a loan payment I made on, I believe, the Horseblock Road property to my dad.

Q Okay. So you testified that your father purchased the Horseblock Road property?

A Yes.

Q And you loaned him the money for that?

A Yes.

Q So this is a reference to the start of that loan, is essentially what you're saying?

A Yes.

Q Got it. Okay. And in order

D. CAROLEO

C E R T I F I C A T E

I, DANIELLE DeYOUNG, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That the WITNESS whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by such WITNESS.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

DANIELLE DeYOUNG

DANIELLE DeYOUNG