# EXHIBIT 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
SITEONE LANDSCAPE SUPPLY, LLC,
Plaintiff,

-against- Index No. 2:23-CV-02084-GRB-SL

NICHOLAS GIORDANO, DOMINICK CAROLEO, VICTOR CAROLEO,NARROW WAY REALTY, LTD.,NARROW WAY 2 LLC, THE GARDENDEPT. CORP., GROUP 5 ASSOCIATES,LTD., 3670 ROUTE 112 LLC, and 94TH ST. LLC,

Defendants.

----------------------------------------X

March 31, 2026

9:25 a.m.

A VIDEOTAPED IN PERSON DEPOSITION of, Nicholas Giordano, Defendant, herein, taken by the respective parties, pursuant to Order, before Larin Kaywood, a Notary Public for and within the State of New York.

Nicholas Giordano

MR. CARDELLO: He's not joining?

MR. BIZZARO: Yeah. I don't believe he's going to join. If he does I'll let you know, but as of now there's no -- he's not joining.

N I C H O L A S G I O R D A N O, having first been duly sworn by a Notary Public for and within the State of New York, upon being examined, testified as follows:

THE REPORTER: Can I have your first and last name for the record, please?

THE WITNESS: Nicholas Giordano, G-I-O-R-D-A-N-O.

THE REPORTER: And your address?

THE WITNESS: [redacted]

EXAMINATION BY

MR. GIBBS:

Q. Mr. Giordano, are you taking any medications, or do you take any

MR. BIZZARO: It's a tough one.

Yeah, right.

Q. When was the first time you heard about that property? And we'll call it today -- for this deposition, we'll call it the Yaphank property. When was the first time you heard about the Yaphank property?

A. In January of '23.

Q. Who did you learn about that property from?

A. Vic.

Q. And when did you first discuss it with him, was it early in January, late in January?

A. Early in January.

Q. Did Don tell you -- I'm sorry. Did Vic tell you how he found out about that property?

MR. BIZZARO: Objection.

A. No.

Q. Did Don find the property for him?

MR. BIZZARO: Objection.

Nicholas Giordano

purchased the property and then transferred the ownership to Narrow Way 2?

A. I don't know.

Q. In Paragraph 4, Vic also mentions that the deed was delivered to Narrow Way 2 on January 5th, 2023. Do you have any reason to believe that that's not true?

A. No, I don't -- no. I didn't know anything about it. And so I can't say it's true or not.

Q. What is Narrow Way 2?

A. It's a business.

Q. What's your relationship to Narrow Way 2?

MR. BIZZARO: Objection.

A. No relationship.

Q. Excuse me. Have you ever been a member or, you know, owned any shares of Narrow Way 2?

A. No.

Q. Have you ever been -- have you ever held any officer or director positions with Narrow Way 2?

Nicholas Giordano

A. No.

Q. When was the first time you heard about Narrow Way 2?

A. I never really heard about it until a while past when we purchased the property.

Q. When would you estimate that you first heard about Narrow Way 2, was it in 2023?

A. Yeah. Maybe the end of January 2023.

Q. Who was the first person to tell you about Narrow Way 2?

A. Vic.

Q. Do you know who owns Narrow Way 2?

A. No.

Q. When you discussed Narrow Way 2 with Vic, what did he tell you about the company?

A. He didn't tell me anything about it. He said, I bought this piece of property, we're going to open up a nursery.

Q. When he said -- when he

Nicholas Giordano

communicated to you, we were going to open up a nursery, who was he referring to?

A. Myself and him.

Q. Tell me about that conversation, how did that come about?

A. He said, I bought a piece of property, I want to open up a nursery, you know. I said, okay. That's pretty much the extent of the conversation.

Q. The first time this came up, did he -- was that a phone call, text message?

A. I don't recall.

Q. Did he -- excuse me.

Before he called you and said he'd purchased this property to open a nursery, had you discussed with him at any point prior to that the possibility of opening a nursery with him?

A. No, not really.

Q. And that conversation, if I understood correctly, was in early January of 2023?

A. From what I recall, yes.

Nicholas Giordano

Q. What -- was there any more to the conversation? Did you have any follow-up calls to talk about opening a nursery?

A. Not really, no.

Q. Did he -- during that initial call, did he give you the address or location of the Yaphank property?

A. I don't know if it was a call, if it was in person, if it was a text. So you keep referring to it as a call. So I don't know how I spoke to him about it. I don't know if he met me somewhere, I don't remember. This is three years ago.

Alls I know is we eventually met, whether it was in person, over the phone, or text message, and he said that he found a piece of property, he bought it, and he wants to open up a nursery.

Q. Did he -- how long -- after he told you about opening this nursery on this property, how long was it before you then visited that property?

A. Maybe a few days.

Nicholas Giordano

Q. When you had these early initial conversations with Vic about opening a nursery, did you discuss the ownership structure, the, you know, who would -- how much you were going to get paid, how much money you would have to contribute to the business, what were the further details?

A. Not at the time. It was more like, you know, we're going to see if we can make this work, more than anything. You know, those are details we could've worked out later.

Q. What was, I guess, what were the first steps that you took towards opening a nursery with Vic?

A. The first steps I took is the property was in disarray. It had to be cleaned up.

Q. Did Vic -- did he sort of ask you to do that, did he ask you to go clear the property and get it ready?

A. He asked me to help him, yes.

Q. What -- with regard to

Nicholas Giordano

preparing the property, what did you do versus what did Vic do?

A. Vic didn't really -- he wasn't around. He was kind of in Florida after that, so he didn't really help me with it. I did it by myself.

Q. Did you hire contractors to help clear the property?

A. Yes.

Q. Did you hire -- well, let's talk about that. What was the -- who was the first contractor -- I guess, what was the order of operations for getting the site ready? What was the first thing that you did to start getting it ready?

A. The place was, you know, like a dumping ground for the last 10, 15 years. So the first thing was to clean up all the debris and garbage around the property.

Q. Who -- did you hire somebody to do that?

A. No, I did it myself.

Q. When did you do the general clean up step? Like, what -- was it during

Nicholas Giordano

the week, on the weekends, when did you --
A. Weekends.
Q. Did you have to rent any kind of equipment or supplies to initially clean the property up?
A. No.
Q. After you got the property cleaned up, did you hire anyone to take out any trees on the property?
A. Yes.
Q. When was that done?
A. Pretty much simultaneously as I was cleaning up the garbage.
Q. Do you remember the contractor that you hired to do the tree removals?
A. Yeah, LaMay & Sons.
Q. Is that L-A-M-A-Y?
A. Yes.
Q. The -- excuse me. When you initially did the cleanup of the property yourself, did Vic pay you anything for that?
A. No.
Q. When you hired the LaMay to do

the tree clearing, did you pay for that?

A. I did, and I was reimbursed for it.

Q. How much was the tree removal services? And an estimate is fine.

A. 50 to 60,000.

Q. When did the tree removal take place, was that in January of 2023?

A. Yes.

Q. What other contractors did you hire to perform work at the Yaphank property?

A. A fence company.

Q. Do you remember the name of the fence company?

A. Victorian Fence.

Q. Did you hire anyone to do any grading or leveling at the property?

A. LaMay did that.

Q. Do you recall ordering any type of stone for the property?

A. Yes.

Q. I -- tell me about that. What kind of stone did you order?

Nicholas Giordano

A. I ordered boulders and RCA.

Q. And was that for the, like, for the walking paths at the site or something else?

A. RCA is for grading the property and the boulders were to make a wall.

Q. When Vic first approached you about this Yaphank property, did he mention anything about the zoning or permitting for the property?

A. No.

Q. At any time in January or February of 2023, did Vic have any discussions with you about the zoning or permitting for the property?

A. Yes.

Q. What did he tell you about that?

A. Well, we were having an issue with the Town of Brookhaven. So he explained to me that we were having an issue.

Q. How did he describe the issues with the Town of Brookhaven?

Nicholas Giordano

THE VIDEOGRAPHER: Okay, stand by. The time is 11:59 a.m. We're going off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: The time is 12:47 p.m. We're back on the record.

Q. Mr. Giordano, I want to go back and ask you a question about something we discussed before the break.

When you started working with Vic on the Yaphank property, were you planning to open a nursery with him at that property?

A. Yes.

Q. When were you planning to open that business?

A. In spring.

Q. Spring of '23?

A. Yes.

MR. CARDELLO: Is this nine?

MR. GIBBS: This is nine, I think.

(Whereupon, Exhibit 9 was

marked for identification.)

Q. There you go.

A. Thank you.

Q. I've handed you what we've marked as Giordano Exhibit 9. This is the declaration of -- I'm sorry, the affidavit of Vic Caroleo from the Town of Brookhaven's lawsuit.

If you would, just take a moment to review that and let me know once you've finished.

MR. CARDELLO: Mr. Gibbs, while we're waiting for the witness to review, could you just identify the caption, the court and the Index number so we know exactly what matter this is?

MR. GIBBS: Certainly. This is the affidavit in opposition to motion for a preliminary injunction.

The affidavit is from Victor Caroleo, the lawsuit is the Town of Brookhaven, plaintiff, versus the Garden Department Corp., Narrow Way 2

Nicholas Giordano

LLC -- excuse me, and others as the defendants. It's Index Number 2023-602154.

MR. CARDELLO: Thank you.

A. Okay, I'm ready.

Q. Have you seen this document before you sat here today, Mr. Giordano?

A. Not that I recall.

Q. Do you understand that this was a sworn testimony submitted by Vic Caroleo?

A. Yes.

Q. The -- excuse me. If you would look at Paragraph Number 2, and he says that Narrow Way 2 recently purchased the property. And it goes on later in the paragraph to say that Narrow Way 2 intends to use the property as a nursery selling flowers and other plants.

My question for you is, would a nursery selling flowers and plants, would that be competitive with SiteOne's nursery business?

MR. BIZZARO: Objection.

Q. You can answer.

Nicholas Giordano

A. Yes.

Q. The contractors that you hired to perform work at the Yaphank property, did you pay them with -- was it personal credit cards, did you have savings that you paid them with?

A. A little bit of both.

Q. I know you discussed the contractor LaMay that did the tree clearing and some of the grading work. You mentioned the fence contractor -- excuse me.

Was there an electrical contractor also that did some work out there?

A. Yes.

Q. What was the name of that contractor?

A. Bright Side Electric.

Q. Did that -- did you also hire that company to perform that work?

A. Yes.

Q. What work in particular did they do at the Yaphank property?

Nicholas Giordano

A. Yes.

Q. We'll talk about specifically in January and February of 2023. Did you have that access?

A. No.

Q. When did you no longer have access to the security footage?

A. It stopped working sometime in like November, December.

Q. Of 2022?

A. Yes.

Q. Were you able to still review historic footage on your phone after, we'll say November of 2022?

A. I don't know. I never tried.

Q. Did you ever download, save or share any footage from that app with anyone else?

A. No.

Q. Are you aware that -- well, let me ask you this first. Excuse me.

What day was your last day of employment with SiteOne?

A. February 20th, 2023.

Nicholas Giordano

Q. When did you -- let me ask you this way.

Did you have any suspicion that you were going to be fired that day?

A. No.

Q. Who was at the termination meeting?

A. Anthony Catalano, Greg Thistle, and, I think his name is Joe Ketter.

Q. How were you informed about the meeting?

A. I called the meeting about two or three weeks prior to the actual meeting. I kept getting pushed off on the actual date because I had a bunch of questions about how the company was going to run, how things were going to go, you know, they said things they weren't going to do and then they did them anyway.

So I just wanted to get a little bit of a clear understanding on what I had -- you know, what was ahead of me in this whole thing.

Q. By this point, you had decided

Nicholas Giordano

you were going to open the competing nursery with Vic, right?

MR. BIZZARO: Objection.

A. No.

Q. On January 2023, you testified that you started working with Vic to clear the property to open a nursery in the spring.

A. Exactly.

Q. So what was -- I guess I'm not a -- that seemed inconsistent to me, I guess.

A. So -- let me explain it to you. So in January 2023, I started working on a piece of property that we had intentions of opening up a nursery. We had problems with the Town of Brookhaven. Vic is an older gentleman, he didn't want to be bothered anymore.

So he said, you know, I don't know if this is going to work, as well as I agreed to it. So at that point, I just continued to do what I was doing and working for SiteOne. I had no plans on

leaving it.

Q. You called the meeting with the individuals that you just mentioned. Who specifically did you request a meeting from?

A. I only called the meting with Anthony Catalano.

Q. The meeting during which you were terminated, where did that occur?

A. The Holtsville branch.

Q. Did you, I guess, travel to the Holtsville branch, did someone ask you to meet over there?

A. Yeah. Anthony Catalano, after putting me off two or three times, eventually settled on a date of February 20th and told me to meet him at the conference room in Holtsville at whatever time it was.

Q. When you got to the meeting -- I guess, tell me how the -- how did the meeting play out? What do you recall from the meeting?

A. I got fired. That was the

whole meeting. They accused me of doing this and that. I said, absolutely not. They tried to get me to sign a non-compete again in front of me on the table. I said, I'm not doing it.

They terminated my employment. I gave them my keys and cellphone and I walked out the door.

Q. What did they accuse you of during that meeting?

A. Opening a competing nursery.

Q. Was that accurate though at the time?

A. Not technically. Was I, you know, you guys considered I was trying to open one. But did I actually open and compete with SiteOne? No. So it's not a competing nursery.

Q. You did say earlier that the Yaphank property was going to be used for a nursery?

A. Absolutely.

Q. And that the nursery would be competitive with SiteOne?

Nicholas Giordano

A. Yes.

Q. And so at the time that they sat down with you, isn't it fair to say that they were accurate that you were working to open a competing nursery?

A. No, it's not. Because I already told you, I said at the end of January when we had all the problems with the Town of Brookhaven, I decided to back away from it and continue working on my employment at SiteOne.

Q. When did you first learn about the issues with the Town of Brookhaven?

A. Sometime in January of '23.

Q. Who first told you about the issues with the Town of Brookhaven?

A. Vic did.

Q. What did he tell you?

A. I think we went over this already. He told me we were having problems with zoning or over-clearing the property.

Q. Did he -- excuse me. Did he tell you that he'd retained attorneys to

for SiteOne to give you the personal phone back?

A. No.

Q. Before -- and you said you got a new phone that same day of the termination. How did you get that new phone?

A. It got delivered to the nursery in Coram.

Q. On what day did you order that phone?

A. The Sunday prior.

Q. So the day before, you'd ordered the new phone?

A. Yes.

Q. Was it just a coincidence that you ordered that phone the day before?

A. Absolutely.

Q. What time of day was the meeting with Joe Ketter or Anthony Catalano, and Greg Thistle?

A. I want say early afternoon, I don't know the exact time.

Q. What time of day did you

receive the new phone?
A. In the morning.
Q. Was it shipped to the Coram location?
A. Yes.
Q. When you got the new phone, what information did you transfer from your old -- we'll call it your old phone to the new phone?
A. Whatever was on the phone.
Q. Did it transfer customer numbers?
A. Yes.
Q. All of your old text messages?
A. I don't know about that.
Q. Pictures?
A. Some of them.
Q. Anything else that you can recall specifically?
A. No, that's about it, really. Just contacts.
Q. Did you -- when you transferred the information from one phone to the other, did you follow any type of, you

C E R T I F I C A T E

STATE OF NEW YORK)

:ss

COUNTY OF SUFFOLK )

I, LARIN KAYWOOD, a Notary Public within and for the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such an examination is a true record of the testimony given by such a witness.

I further certify that I am not related to any of these parties to this action by blood or marriage, and that I am not in any way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of March, 2026.

LARIN KAYWOOD

_signature_